# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                        :
LEAH MCSWEENEY,                                         :
                                                        :
                              Plaintiff,                :
                                                        :
                     -v-                                :
                                                        :
ANDY COHEN, et al.,                                     :
                                                        :
                              Defendants.               :
                                                        :
------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__3/31/2025__

24-cv-01503 (LJL)

OPINION AND ORDER

**LEWIS J. LIMAN, United States District Judge:**

Defendants Andy Cohen, Lisa Shannon, John Paparazzo, Darren Ward, Warner Bros. Discovery, Inc. ("Warner"), Shed Media US Inc. ("Shed"), NBCUniversal Media, LLC ("NBC"), and Bravo Media ("Bravo," and collectively, "Defendants") move, pursuant to Federal Rule of Civil Procedure 12(b)(6), for an order dismissing Plaintiff's First Amended Complaint, Dkt. No. 54 ("FAC") for failure to state a claim for relief. Dkt. No. 57. Defendants move in the alternative and pursuant to Federal Rule of Civil Procedure 12(f) for an order striking the follow paragraphs of the FAC: 1, 69–70, 75, 82, 89, 91–92, 97–99, 107, 115, 126, 136–139, 141–142, 145, 148–153, 175, 188–192, 220, 236–239, 262, 284, 286–298, 318, 327, 341, 435, 467, 535, 601–602, 629–631, 724, 733, 746, 762, 775, 787, 795, 808, 821, 831, 844, 857, and 865. *Id.*[1]

For the following reasons, the motion to dismiss is granted in part and denied in part.

---

[1] Defendants also specifically move to dismiss Plaintiff's claims under Title VII and the ADA as to Andy Cohen, Lisa Shannon, John Paparazzo, Darren Ward (the "Individual Defendants") and Plaintiff's claims under the NYSHRL against Lisa Shannon, John Paparazzo, Darren Ward (the "Defendant Producers") for failure to state a claim under Rule 12(b)(6).

# BACKGROUND

For purposes of this motion, the Court accepts as true the well-pleaded facts of the FAC as supplemented by the documents incorporated by reference.[2]

## I. The Relevant Parties and *Real Housewives* Franchise

Plaintiff is a former participant in the reality television shows *Real Housewives of New York City* ("RHONY") and *Real Housewives Ultimate Girls Trip* ("RHUGT"). FAC ¶ 22. Shed is a media company that produces unscripted reality television shows, including some installments of the *Real Housewives* franchise. *Id.* ¶ 38. Defendants Shannon, Ward, and Paparazzo ("Defendant Producers") are employed by Shed as producers of RHONY and RHUGT. *Id.* ¶ 40. Warner is a mass media and entertainment conglomerate headquartered in New York City and owns Shed. *Id.* ¶¶ 37, 38. Bravo owns, controls, and airs the *Real Housewives* franchise. *Id.* ¶¶ 41, 49. NBC owns Bravo. *Id.* ¶ 41. Cohen is the Executive Producer of the *Real Housewives*, serves as a host for every "reunion" episode of every *Real Housewives* franchise, and hosts *Watch What Happens Live* ("WWHL"), a late-night show that often features interviews with cast members of the *Real Housewives*. *Id.* ¶ 45.

The *Real Housewives* is a reality television franchise that depicts the personal and professional lives of affluent women in various cities across the United States. *Id.* ¶ 49. Each woman who appears on a *Real Housewives* production is referred to as a "Housewife." *Id.* The show premiered in or around spring 2006. *Id.* ¶ 53. RHONY premiered in or around September 2007, as the second installment of *Real Housewives*. *Id.* ¶ 54. The *Real Housewives* franchise

---

[2] This background is not a complete summary of all of Plaintiff's allegations but just those most pertinent to Plaintiff's allegations and to the Motion to Dismiss. Plaintiff's allegations with respect to other *Real Housewives* and Bravo show cast members' mental health, substance abuse, and gender-related experiences with Defendants are not described as they are not necessary to the Court's decision.

became a cultural phenomenon due in large part to the success of RHONY.  *Id.* ¶ 55.  RHUGT premiered on the streaming service Peacock in or around November 2021.  *Id.* ¶ 56.

Most of the women in the *Real Housewives* franchise openly or privately suffer from mental illness, addiction, and personality disorders.  *Id.* ¶ 49.  During the production of *Real Housewives* shows, Bravo supplies cast members with unlimited alcohol that it pressures cast members to consume.  *Id.* ¶ 57.  Cast members are forced to film from at least 8 a.m. to 1 a.m., with little to no food or water.  *Id.*

## II.    RHONY Season 12

Plaintiff was cast in RHONY Season 12 in or around 2019, *id.* ¶ 63, and she signed a contract with Bravo on October 4, 2019, *id.* ¶ 22.  A "Talent Agreement" entered between Plaintiff and nonparty Forest Productions Inc. reflects that she was hired as a secondary participant for Season 12 of RHONY with an option by Forest Productions Inc. to engage her for additional seasons.  Dkt. No. 63.  In the Talent Agreement, Plaintiff represented that she understood that the activities "involved in or otherwise associated with the Series and Artist's Services" might include "the consumption of alcohol by Artist and others."  *Id.* § 10(d).[3] Defendants knew at the time of casting that Plaintiff suffered from alcohol use disorder.  FAC ¶ 63.  She had remained sober for approximately nine years before joining RHONY, *id.* ¶ 59, but as she disclosed in her initial casting tape for RHONY, she had lapsed in her sobriety and begun

---

[3] With the Talent Agreement, Plaintiff waived any right that she "might otherwise have to any warnings, instructions, warranties or precautionary measures" regarding activities such as the consumption of alcohol.  *Id.*  Defendants do not contend that Plaintiff has waived her rights to pursue a claim under Title VII or the ADA.  *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51 (1974) ("there can be no prospective waiver of an employee's rights under Title VII"); *Andrade v. Cultural Care, Inc.*, 706 F. Supp. 3d 348, 364 n.3 (E.D.N.Y. 2023) (same), *appeal withdrawn*, 2024 WL 1651337 (2d Cir. Mar. 18, 2024); *Wilson v. L3 Harris*, 2023 WL 7222136, at *4 (W.D.N.Y. Nov. 2, 2023) (same).  The Court has no occasion on this motion to consider whether the clause has any other relevance to Plaintiff's claims.

to consume alcohol again, *id.* ¶ 62.  Near or around the beginning of filming RHONY Season 12, she regained sobriety and expressed to Defendant Producers and various RHONY cast members her desire to remain sober while filming RHONY Season 12.  *Id.* ¶ 65.  Plaintiff told Defendant Producers that she had not consumed alcohol for thirty days prior to the date she began filming RHONY Season 12, and that she was working to maintain her sobriety.  *Id.* ¶ 76.  She also told Defendant Producers that she was intensely concerned about relapsing into alcohol use disorder on national television.  *Id.* ¶ 77.

Defendant Producers not only supplied Plaintiff with unlimited, free-of-charge alcoholic beverages throughout her employment as a cast member on RHONY Season 12, but also encouraged her and other cast members to consume those alcoholic beverages.  *Id.* ¶¶ 79–80. Around October 2019, Defendant Producers induced Plaintiff to confide in them regarding her alcohol use disorder and mental health disabilities, including sharing scenarios that might trigger her relapse into alcohol use disorder or otherwise exacerbate her mental health disabilities.  *Id.* ¶ 68.  Cohen and the Defendant Producers deliberately engineered scenarios to exacerbate Plaintiff's disabilities throughout RHONY Season 12 with the purpose of creating dramatic television.  *Id.* ¶¶ 70, 75.  As a result, Plaintiff relapsed into alcohol abuse shortly after RHONY Season 12 began filming.  *Id.* ¶ 81.

Plaintiff alleges that her relapse came to a head in an infamous cast trip which was eventually depicted in an episode of RHONY which Defendants titled "Hurricane Leah."  *Id.* ¶ 82.  While relapsing, Plaintiff grew mentally and physically ill, manifesting in extreme depressive symptoms.  *Id.* ¶ 83.  Defendant Producers were present and filming Plaintiff during her relapse.  *Id.*  After certain cast members expressed concerns regarding Plaintiff's erratic behavior, Shannon called Plaintiff and, rather than discussing any accommodations Plaintiff

4

might need, told her that despite relapsing into alcohol use disorder, she should continue consuming alcohol so long as she "remain[ed] lucid" while filming.  *Id.* ¶ 85.  After Plaintiff experienced a panic attack and requested relief from filming a scheduled scene, Shannon told Plaintiff that she would help "craft Ms. McSweeney's storyline," which Plaintiff interpreted as a veiled threat that if Plaintiff did not film the planned scene, Shannon would ensure a poor edit that would turn viewers against Plaintiff.  *Id.* ¶¶ 106–107.  Defendants did not offer any accommodations for Plaintiff's mental health symptoms and relapse or engage in any interactive process during Season 12 filming, despite Plaintiff's repeated requests for accommodation.  *Id.* ¶¶ 84–85, 106.

Defendants continued to discriminate against Plaintiff and ignore her requests for accommodation after filming for RHONY Season 12 finished.  *Id.* ¶ 88.  After Plaintiff regained her sobriety at the conclusion of filming RHONY Season 12, Defendant Producers continued to make content highlighting Plaintiff's alcohol use disorder by forcing Plaintiff to say lines such as "time for a drink" in the Confessionals segment of the show.  *Id.* ¶ 89.[4]  After she told Defendants that she intended to remain sober, Defendants created a special episode called "Leah's Best Moments" that was, in essence, a highlight reel of Plaintiff's relapse.  *Id.* ¶ 91. Defendants forced Plaintiff to narrate this special episode, requiring her to watch as she relapsed into alcohol use disorder and humiliate herself by commenting on its supposed "hilarity" rather than allow her to engage in a truthful dialogue helpful to her sobriety.  *Id.*  Plaintiff understood from cast and crew that if she did not go along with the Defendant Producers' humorous framing

---

[4] "Confessionals" on RHONY are interviews that occur after filming is complete which are later interpolated into certain scenes in a finished episode.  In these Confessionals, producers ask the Housewives to react to certain events that occurred during filming,  often prompting Housewives to say certain lines or react in a specific way to further a given narrative.  *Id.* ¶ 89 n.1.

of her relapse in post-production of Season 12, Defendant Producers would retaliate against her. *Id.* ¶ 93.  Season 12 aired on or around April 2, 2020.  *Id.* ¶ 74.  The "Hurricane Leah" episode became the highest-rated episode of RHONY Season 12.  *Id.* ¶ 86.

Defendants colluded with a non-party RHONY cast member, Ramona Singer, to expose Plaintiff's bipolar disorder diagnosis to other cast members before Plaintiff herself could do so, which Plaintiff complained at the time had exacerbated her mental illness.  *Id.* ¶¶ 100–103. Defendant Producers shamed Plaintiff for complaining about the symptoms of mental illness resulting from Singer's exposure, in an effort to convince Plaintiff that her worsened symptoms were imagined.  *Id.* ¶ 105.

In a book commissioned by Cohen, *Not All Diamonds and Rosé, id.* ¶ 97, Defendants characterized RHONY Season 12 as "defined early on by boozy chaos and thrown tiki torches, and that party lifestyle," which they noted "was especially concerning given [Plaintiff's] early admission that she had been to rehab and had been sober for years prior to filming," *id.* ¶ 94. Cohen admitted that there was "discomfort at Bravo with the amount of alcohol this season and with the lack of awareness of it on behalf of some of the women.  And that has been a recurring thing with the New York Housewives.  There's already a negative association with the New York Housewives and alcohol[.]"  *Id.* ¶ 95.  In the same book, Cohen included an interview with a former RHONY Housewife who disparaged Plaintiff and her sister for their alcohol consumption on a RHONY Season 12 cast trip.  *Id.* ¶ 97.

In the RHONY Season 12 reunion episode in fall 2020,[5] Cohen pressured cast members, including Plaintiff, to reveal whether they had had same-sex sexual contact, and then

---

[5] Defendants submit, and Plaintiff does not dispute, that this episode aired in September 2020, and was filmed prior to that.  *See* Dkt. Nos. 59-8, 59-9, 59-10.

sensationalized such experiences.  *Id.* ¶¶ 109–110.  Plaintiff alleges that even though many male

cast members have had such contact, Cohen did not pose similar probing questions to male cast

members on or off air.  *Id.* ¶ 111.  In the same reunion episode, Cohen also asked Plaintiff

inappropriate questions about a tattoo near her genital region, but did not ask similar questions to

male counterparts.  *Id.* ¶¶ 112–113.

At an unspecified point in time, Cohen commented to Plaintiff that her recent breast

augmentation made her a real "Housewife."  *Id.* ¶ 178.  Plaintiff alleges that Cohen made this

comment "repeatedly."  *Id.* ¶¶ 614, 644.

## III.   RHONY Season 13

Prior to returning to film Season 13, Plaintiff met with nonparty employees of Bravo on

or around February 4, 2020, to discuss the upcoming season.  *Id.* ¶ 122.  At that meeting,

employees questioned why Plaintiff did not consume alcohol.  *Id.* ¶ 123.  When Plaintiff revealed

her sobriety and intent to remain sober, the employees pressured her to deny having a drinking

"problem."  *Id.* ¶¶ 125–126.

In conversation with Plaintiff, Bravo employees disparaged Dorinda Medley and Sonja

Morgan, former RHONY cast members, for having alcohol use disorders.  *Id.* ¶¶ 127–130.

Shannon did so in order to convey to Plaintiff that she should be a "fun drunk" rather than a

"mean" or "pathetic" drunk.  *Id.* ¶ 131.  Shannon praised fellow cast member Luan de Lesseps

for relapsing, which Plaintiff understood to be a thinly veiled directive to prompt Plaintiff to start

drinking again.  *Id.* ¶¶ 143–144.

Once Season 13 began filming, Plaintiff repeatedly made requests for accommodations,

including requests that Defendants allow her to remain sober without interference or harassment.

*Id.* ¶¶ 132, 137.  Instead, Defendants attempted to exacerbate Plaintiff's mental illness in hopes

of causing the erratic behavior they wanted.  *Id.* ¶ 148.  Defendant Producers humiliated Plaintiff

by joking about Plaintiff's Season 12 relapse, despite her request to stop. *Id.* ¶ 136. Defendant Producers gave Plaintiff negative performance reviews to the effect that the audience would find her boring in order to cause her relapse, even though Defendant Producers knew that she was in fact a crowd favorite. *Id.* ¶¶ 139–141.

Plaintiff had repeated panic attacks during the filming of Season 13, due in part to her grandmother's impending death. *Id.* ¶¶ 149, 163. Plaintiff requested an accommodation to leave filming of a cast trip to the Hamptons in order to visit her grandmother and recover from her panic attacks. *Id.* ¶ 150. Defendant Producers made light of her panic attacks and required Plaintiff to discuss her grandmother's decline while filming, including in the midst of a panic attack. *Id.* ¶¶ 149–152. While filming, Defendants told Plaintiff she could "leave if she wanted," which Plaintiff understood to mean that she would be punished if she did so. *Id.* ¶ 153. Off-camera, Defendants told Plaintiff that if they allowed her to visit her grandmother, she would miss five episodes of filming and would not be paid for those episodes—Plaintiff understood this to be an implicit threat. *Id.* ¶¶ 154–156. Defendants continued to film Plaintiff while she prepared to attend her grandmother's funeral, despite her requests for privacy, directing her to "lighten up." *Id.* ¶¶ 162–63.

As a result of Defendants' actions, Plaintiff suffered from significant, repeated suicidal ideation. *Id.* ¶ 164. At no point before, during, or after Plaintiff's panic attacks did Defendants offer mental health support. *Id.* ¶ 165.

As Season 13 began airing, Plaintiff received threatening messages directed towards herself and her daughter. *Id.* ¶¶ 166–167. Plaintiff told Shannon and other Defendant Producers that the messages had worsened her mental illness and told Shannon about her suicidal ideation. *Id.* ¶¶ 169–170. Shannon responded that RHONY fans would like Plaintiff better if she still

consumed alcohol. *Id*. ¶ 172. Plaintiff requested as an accommodation that Defendants release her daughter from filming obligations in Season 14, which Plaintiff knew was reasonable because another cast member, Sonja Morgan, had received such an accommodation. *Id*. ¶¶ 173–174. Defendants denied the request, telling Plaintiff that Morgan was allowed the accommodation because she was willing to become inebriated on camera. *Id*. ¶ 175.

After filming Season 13, Plaintiff was admitted to a psychiatric facility due to, *inter alia*, her suicidal and self-harm ideation. *Id*. ¶ 180. Plaintiff was thereafter in outpatient therapy and at times required around-the-clock care, all of which was costly and prevented Plaintiff from being otherwise employed during that time. *Id*. ¶¶ 181–182.

Plaintiff conveyed to Cohen that she had suffered extreme mental anguish as a result of Defendants' lack of accommodations and requested that Cohen abstain from discussing her grandmother's death in the media on the grounds that it would exacerbate her mental illness. *Id*. ¶¶ 187–188. Cohen ignored her request, publicly criticizing her decision not to visit her dying grandmother on his talk show, as well as publicly mocking her sobriety on XM radio. *Id*. ¶¶ 189–193.

After the conclusion of Season 13, Shannon pressed Plaintiff to continue as a cast member even after Plaintiff requested that she not be considered for Season 14 due to Defendants' discrimination. *Id*. ¶¶ 183–185. Plaintiff alleges that Cohen and Defendant Producers continued to discuss the prospect of her appearing in Season 14 in order to discourage her from making additional complaints of discrimination. *Id*. ¶¶ 194–95. However, Defendants abruptly ceased producing RHONY with the original cast after Season 13. *Id*. ¶ 196. They continued to contact Plaintiff regarding other opportunities in the franchise. *Id*. ¶ 197.

## IV.     RHUGT

In or around 2022, Defendants approached Plaintiff about joining a *Real Housewives*

spin-off series, RHUGT, for Season 3, with the same Defendant Producers.  *Id.* ¶¶ 204–205.

After casting, Ward and Paparazzo called Plaintiff and asked her, "Are you still not drinking?"

*Id.* ¶ 207.

Out of concern for the pressure that she was already receiving from Defendants, Plaintiff

requested accommodations before filming RHUGT, specifically to be allowed to attend

Alcoholics Anonymous ("AA") meetings while filming.  *Id.* ¶¶ 209–211.  Other cast members

had previously been allowed to do so, *id.* ¶ 213, and Defendant Producers initially agreed to this

accommodation, *id.* ¶ 214.

Filming for RHUGT began on or around July 18, 2022.  *Id.* ¶ 219.  Once filming,

Defendant Producers failed to facilitate Plaintiff's participation in AA meetings.  *Id.* ¶ 230.

Specifically, in Thailand, Paparazzo told Plaintiff that Shed would not provide transportation to

AA meetings in Thailand or accommodate such attendance with the filming schedule.  *Id.*

¶¶ 231–232.  Plaintiff alleges that, especially given the advanced notice, such facilitation would

not have caused unreasonable hardship or expense, particularly compared to the cost of alcohol

and transportation the production covered for cast members to go to clubs.  *Id.* ¶¶ 233–234.

Once RHUGT began filming, Director Producers began discriminating against Plaintiff

by providing negative performance reviews based on her sobriety being "boring."  *Id.* ¶ 220.

Shannon told Plaintiff that because of her sobriety, Plaintiff was "not the Leah we know and

love."  *Id.* ¶ 221.

Plaintiff requested as an accommodation that her sobriety and substance abuse disorder

not be discussed, including sending a text to Ward complaining that the other cast members were

"trying to undermine" her sobriety, *id.* ¶ 223, to which Ward responded, "get out of your head"

and "deal with it," *id.* ¶ 224.  Approached by Plaintiff with another instance of cast member pressure to drink, Paparazzo similarly responded, "You're good."  *Id.* ¶¶ 226–227.

Plaintiff alleges that Defendant Producers directed RHUGT cast members to interrogate and taunt Plaintiff regarding her sobriety and her mental health diagnoses and pressure her into drinking, including while filming.  *Id.* ¶¶ 222, 236.  Plaintiff alleges that Director Producers directed castmate Heather Gay to confront Plaintiff during filming regarding her intent to remain sober, *id.* ¶ 237, directed a guest "fortune teller" to bring up Plaintiff's mental health and substance abuse issues, and directed or encouraged castmate Portia Williams to call Plaintiff a "drug addict," *id.* ¶¶ 238–239.  Castmate Gizelle Bryant told Plaintiff that Defendant Producers had directed cast members to discriminate against her.  *Id.* ¶ 249.

Ward and Paparazzo showed other cast members Plaintiff's private text messages in which Plaintiff complained about cast members' discussion of her sobriety.  *Id.* ¶ 251.  When Plaintiff complained about this intrusion to Shannon, Shannon cautioned Plaintiff that if she continued to complain, Plaintiff "would not like what the other women are saying about you," which Plaintiff understood to mean that Shannon would coach fellow cast members to further disparage Plaintiff.  *Id.* ¶¶ 252–253.

After Plaintiff surfaced concerns about being harassed and pressured to drink by producers and cast members, Defendants failed to investigate her complaints while RHUGT was filming.  *Id.* ¶¶ 241–242.  Shannon attempted to convince Plaintiff that Plaintiff had never requested such accommodations, telling Plaintiff that she was "mute" during the filming of RHUGT.  *Id.* ¶ 243.  When Plaintiff vocalized to fellow RHUGT cast members that she felt her working conditions were unsafe and her disabilities unaccommodated, Ward and Paparazzo relayed to Plaintiff that Shannon was "pissed," going on to threaten her continued employment

by stating "Maybe you're not made for this," "You're going to get it today," and "If you want to be on TV act like it." *Id.* ¶¶ 244–245, 247. Prior to the RHUGT finale dinner, a non-defendant producer warned Plaintiff that if she continued to complain about Defendant Producers' harassment and failure to accommodate her disabilities, Defendant Producers would ensure that Plaintiff would "never work again." *Id.* ¶ 258.

Plaintiff alleges that during the filming of RHUGT in Thailand in summer 2022, Defendants deliberately provided Plaintiff with inadequate food and water in order to trigger her mental health issues and thereby cause her to behave erratically on camera. *Id.* ¶¶ 262–263. At the same time, Defendant Producers immediately provided outside fast food upon request to other cast members like Portia Williams. *Id.* ¶ 263. The inadequate food service included one cast lunch in which dishes prepared with pork were the only food available, which Defendant Producers knew that Plaintiff could not eat due to her Jewish faith. *Id.* ¶ 264–270. As a result of inadequate food and severe emotional distress, Plaintiff lost seven pounds while filming RHUGT and was eventually hospitalized for severe dehydration and related infections while in Thailand. *Id.* ¶¶ 271–274.

After filming, Cohen invited Plaintiff to appear as a guest on WWHL to promote RHUGT. *Id.* ¶ 284. When Plaintiff refused, Cohen used Plaintiff's name as the prompt for a drinking game, despite knowing about Plaintiff's alcohol use disorder and the potential for her relapse. *Id.*

## V.   Termination, Retaliation, and Resulting Harm

In Fall 2022, Plaintiff submitted a formal complaint to Defendants' Human Resources regarding the discrimination and harassment she experienced while filming RHUGT. *Id.* ¶¶ 276, 285. On or around November 3, 2022, Warner purportedly initiated a formal investigation,

which took place between November and December 2022.  *Id.* ¶¶ 278–279.  Plaintiff alleges that this investigation was not conducted properly or in good faith.  *Id.* ¶ 280.

Around December 21, 2022, Silish Platon, one of the investigators, told Plaintiff that Warner's employment policies had been violated and that an employee was being disciplined for the violation.  *Id.* ¶ 281.  However, several weeks after Plaintiff requested the investigation report, Platon sent a one-paragraph "Conclusion Letter" stating that, "more likely than not, there were no specific policy violations."  *Id.* ¶ 282.

Despite repeated promises to employ Plaintiff on a new franchise spinoff, *Real Housewives of New York: Legacy* ("RHONY Legacy"), Defendants notified Plaintiff that they would not continue her employment after she made her formal complaint to Human Resources. *Id.* ¶ 285.  On or around November 10, 2022, Cohen texted Plaintiff to this effect, referencing Plaintiff's complaint of discrimination previously brought to the attention of Bravo employee Sezin Cavusoglu as part of the reason she would not be cast.  *Id.* ¶¶ 286–287.

Around this time, Cohen and Shannon both were in close contact with Plaintiff regarding casting for RHONY, strongly implying that Plaintiff would be cast for either RHONY Legacy or RHONY Season 14.  *Id.* ¶¶ 293–295.  Therefore, when Cohen informed Plaintiff that she would not be cast on RHONY Legacy, Plaintiff understood that she would instead be cast on RHONY Season 14.  *Id.* ¶ 296.  Plaintiff alleges that Defendants ultimately reneged on that promise in retaliation for her complaint.  *Id.* ¶¶ 297–298.

As a result of all of the above alleged conduct, Plaintiff continues to suffer from post-traumatic stress disorder-induced obsessive-compulsive disorder, which significantly detracts from her ability to function in day-to-day life.  *Id.* ¶ 299.

Plaintiff filed the original Complaint in this action on February 27, 2024.  *Id.* ¶ 300; Dkt. No. 1.  On or around March 6, 2024, Cohen's counsel sent Plaintiff's counsel a letter threatening legal action unless Plaintiff retracted certain allegations in her Complaint.  FAC ¶¶ 303–306.  Plaintiff alleges that the legal threats in the letter were knowingly baseless and made with the intent to scare and silence Plaintiff.  *Id.* ¶¶ 307–311.  Plaintiff alleges that Cohen published the letter to various media outlets, such as Page 6, Deadline, Variety, and the Hollywood Reporter at the same time that the letter was sent to Plaintiff's counsel, with intent to further discourage Plaintiff from her protected activity.  *Id.* ¶¶ 312–313.

## PROCEDURAL HISTORY

On March 15, 2023, Plaintiff filed charges with the New York State Division of Human Rights ("NYSDHR") and the Equal Employment Opportunity Commission ("EEOC"), complaining of disability discrimination.  *Id.* ¶ 30.  These charges included disability-related discrimination, harassment, and retaliation claims, but no sex/gender-based or religion-based claims.  Dkt. No. 59-5 (original NYSDHR charges).

Plaintiff amended her NYSDHR charges on June 30, 2023, adding claims relating to sex/gender discrimination.  Dkt. No. 59-6.  Plaintiff requested that her claim be dismissed on September 6, 2023, and the NYSDHR dismissed her claims on October 6, 2023.  FAC ¶¶ 34–35.  The EEOC issued Right to Sue letters on January 9, 2024, and January 23, 2024.  *Id.* ¶ 36.

The Initial Complaint in this action was filed on February 27, 2024.  Dkt. No. 1.

On May 22, 2024, Defendants filed a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dkt. No. 33.

On June 12, 2024, Plaintiff filed the FAC.  Dkt. No. 54.  The FAC contains thirty-three causes of action: (1) discrimination based on disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a), against Shed, Bravo, and NBC (the "Corporate

Defendants"), FAC ¶¶ 428–442; (2) discrimination based on sex/gender in violation of Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), against the Corporate Defendants,

FAC ¶¶ 443–456; (3) discrimination based on disability in violation of the New York State

Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296(1)(a), against all Defendants, FAC

¶¶ 457–479; (4) discrimination based on sex/gender in violation of the NYSHRL, N.Y. Exec.

Law § 296(1)(a), against all Defendants, *id.* ¶¶ 480–500; (5) discrimination based on religious

beliefs in violation of the NYSHRL, N.Y. Exec. Law § 296(1)(a), against all Defendants, *id.*

¶¶ 501–524; (6) discrimination based on disability in violation of the New York City Human

Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-107(1)(a), 8-502, against all Defendants,

FAC ¶¶ 525–548; (7) discrimination based on sex/gender in violation of the NYCHRL, N.Y.C.

Admin. Code §§ 8-107(1)(a), 8-502, against all Defendants, *id.* ¶¶ 549–570; (8) discrimination

based on religious beliefs in violation of the NYCHRL, N.Y.C. Admin. Code §§ 8-107(1)(a), 8-

502, against all Defendants, *id.* ¶¶ 571–594; (9) hostile work environment based on disability in

violation of the ADA, 42 U.S.C. § 12112(a), against the Corporate Defendants, *id.* ¶¶ 595–606;

(10) hostile work environment based on sex/gender in violation of Title VII, 42 U.S.C. § 2000e-

2(a)(1), *id.* ¶¶ 607–618[6]; (11) hostile work environment based on disability in violation of the

NYSHRL, N.Y. Exec. Law § 296(1)(h), against all Defendants, *id.* ¶¶ 619–633; (12) hostile

work environment based on sex/gender in violation of the NYSHRL, N.Y. Exec. Law

§ 296(1)(h), against all Defendants, *id.* ¶¶ 634–647; (13) hostile work environment based on

---

[6] Plaintiff's First Amended Complaint titles her Tenth Cause of Action "HOSTILE WORK
ENVIRONMENT HARASSMENT BASED ON SEX/GENDER pursuant to 42 U.S.C.
§ 12112(a)(2)." The code provision referenced in the heading is the ADA and not Title VII.
However, in their motion to dismiss, Defendants treat Plaintiff's claim for hostile work
environment based on gender as raised under Title VII. Accordingly, the Court treats that error
as merely typographical and assesses Plaintiff's federal gender-based hostile work environment
claim as properly raised under Title VII, 42 U.S.C. § 2000e-2(a)(1), rather than under the ADA.

religious beliefs in violation of the NYSHRL, N.Y. Exec. Law § 296(1)(h), against all

Defendants, *id.* ¶¶ 648–668; (14) hostile work environment based on disability in violation of the

NYCHRL, N.Y.C. Admin. Code §§ 8-107(1)(a), against all Defendants, *id.* ¶¶ 669–683;

(15) hostile work environment based on sex/gender in violation of the NYCHRL, N.Y.C. Admin.

Code §§ 8-107(1)(a), against all Defendants, *id.* ¶¶ 684–697; (16) hostile work environment

based on religious beliefs in violation of the NYCHRL, N.Y.C. Admin. Code §§ 8-107(1)(a),

against all Defendants, *id.* ¶¶ 698–717; (17) retaliation for opposing unlawful employment

practices in violation of Title VII, 42 U.S.C. § 2000e-3(a), against the Corporate Defendants, *id.*

¶¶ 718–726; (18) retaliation for opposing unlawful employment practices in violation of the

ADA, 42 U.S.C. § 12203(a), against the Corporate Defendants, *id.* ¶¶ 727–735; (19) retaliation

for opposing unlawful employment practices in violation of the NYSHRL, N.Y. Exec. Law §

296(7), against all Defendants, *id.* ¶¶ 736–750; (20) retaliation for opposing unlawful

employment practices in violation of the NYCHRL, N.Y.C. Admin. Code §§ 8-107(7), against

all Defendants, *id.* ¶¶ 751–765; (21) retaliation for disclosure of unsafe working conditions in

violation of New York Labor Law § 215, N.Y. Lab. Law § 215, against all Defendants, *id.* ¶¶

766–777; (22) whistleblower retaliation in violation of New York Labor Law § 740, N.Y. Lab.

Law § 740, against all Defendants, *id.* ¶¶ 778–789; (23) failure to provide reasonable

accommodations in violation of the ADA, 42 U.S.C. § 12112, against the Corporate Defendants,

*id.* ¶¶ 790–799; (24) failure to provide reasonable accommodations in violation of the NYSHRL,

N.Y. Exec. Law § 296(3), against all Defendants, *id.* ¶¶ 800–812; (25) failure to provide

reasonable accommodations in violation of NYCHRL, N.Y.C. Admin. Code §§ 8-107(28),

against all Defendants, *id.* ¶¶ 813–825; (26) failure to engage in an interactive process necessary

to provide reasonable accommodations in violation of the ADA, 42 U.S.C. § 12112, against the

Corporate Defendants, *id.* ¶¶ 826–835; (27) failure to engage in an interactive process necessary to provide reasonable accommodations in violation of the NYSHRL, N.Y. Exec. Law § 296(3), against all Defendants, *id.* ¶¶ 836–848; (28) failure to engage in an interactive process necessary to provide reasonable accommodations in violation of the NYCHRL, N.Y.C. Admin. Code §§ 8-107(28), against all Defendants, *id.* ¶¶ 849–861; (29) violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962, against all Defendants, FAC ¶¶ 862–874; (30) retaliation in violation of the NYSHRL, N.Y. Exec. Law § 296(7), against Cohen, *id.* ¶¶ 875–896; (31) retaliation in violation of the NYCHRL, N.Y.C. Admin. Code §§ 8-107(7), against Cohen, *id.* ¶¶ 897–918; (32) retaliation in violation of the New York Labor Law § 215, N.Y. Lab. Law § 215,  against Cohen, *id.* ¶¶ 919–940; (33) interference in violation of NYCHRL, N.Y.C. Admin. Code §§ 8-107(19), against Cohen, *id.* ¶¶ 941–955.

Defendants filed this motion to dismiss on July 17, 2024.  Dkt. No. 57.  Defendants also filed the declarations of Andy Cohen and Christine Lepera and a memorandum of law in support of the motion.  Dkt. Nos. 58–60.  On August 21, 2024, Plaintiff filed a memorandum of law in opposition to the motion to dismiss.  Dkt. No. 82.  Defendants filed a reply memorandum of law in further support of the motion to dismiss on September 13, 2024.  Dkt. No. 84.  The Court heard oral argument on the motion to dismiss on November 14, 2024.  Nov. 14, 2024 Minute Entry; Dkt. No. 87.[7]

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff.  *See York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir.), *cert.*

---

[7] The Court issued an order staying discovery on December 2, 2024.  Dkt. No. 92.

*denied*, 537 U.S. 1089 (2002).  This requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  A complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007).  The ultimate question is whether "[a] claim has facial plausibility [, i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556.

In determining whether a complaint states a claim for relief, the Court does not address whether each allegation in the complaint viewed independently would entitle the pleader to legal relief.  *See Albritton v. Morris*, 2016 WL 1267799, at *16 n.16 (S.D.N.Y. Mar. 30, 2016) ("Because the purpose of a Motion to Dismiss is to test the legal sufficiency of a claim, . . . rather than its necessity, the Court declines to embark upon the extracurricular caper of identifying conclusory allegations on a line-by-line basis[;] [n]or does the Court address whether certain allegations are relevant or rather are immaterial or impertinent."); *WG Woodmere LLC v. Town of Hempstead*, 2021 WL 9827555, at *19 (E.D.N.Y. Aug. 23, 2021) ("The Court need not go through each and every allegation upon which a rotational jury could rely in ultimately finding [against Defendants][;] [i]t is clear that accepting all of Plaintiffs' factual allegations as true and,

again, construing them most favorably to Plaintiffs, that Plaintiffs have adequately stated a claim."), *report and recommendation adopted in part, rejected in part on other grounds*, 2022 WL 17359339 (E.D.N.Y. Dec. 1, 2022); *Guzman v. Concavage Marine Constr. Inc.*, 176 F. Supp. 3d 330, 336 (S.D.N.Y. 2016). As discussed further below in Section VI, such arguments are better addressed through a motion to strike under Rule 12(f) or alternatively, for a protective order under Rule 26(c). It is sufficient to survive a motion to dismiss that the complaint contains sufficient fact to support the claim for relief, even if every fact does not do so. *See Tomasino v. Estee Lauder Cos.*, 2015 WL 1470177, at *6 (E.D.N.Y. Mar. 31, 2015) ("I have already concluded that the plaintiff's causes of action . . . are sufficient to survive a motion to dismiss. The complaint contains multiple allegations of fact on which the causes of action were based. Obviously, not every allegation in the complaint is essential for that purpose.").

Generally, when adjudicating a 12(b)(6) motion, a court will "not look beyond 'facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken.'" *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)); *see Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022); *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 383 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021).

Affirmative defenses "usually cannot be considered on a motion to dismiss." *Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 400 (S.D.N.Y. 2023). This rule of thumb "is not absolute," however. *Id*. at 401. Instead, "[a]n affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint." *Pani v. Empire Blue Cross Blue*

*Shield*, 152 F.3d 67, 74 (2d Cir. 1998) (affirming district court's decision that plaintiff's complaint pleaded the facts necessary to sustain defendant's official immunity affirmative defense). The Court may similarly grant a motion to dismiss based on an affirmative defense that is apparent on the face of documents incorporated by reference within the complaint or documents that are integral to the complaint. *See Teva Pharms. USA, Inc. v. Sandoz Inc.*, 2013 WL 3732867, at *3 (S.D.N.Y. July 16, 2013) (citing *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)) (documents incorporated by reference); *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 83 (S.D.N.Y. 2022) (integral documents). Thus, when an affirmative First Amendment defense is apparent on the face of the complaint, the Court may consider that defense at the pleading stage. *See Moore v. Hadestown Broadway Ltd. Liab. Co.*, 722 F. Supp. 3d 229, 258–59 (S.D.N.Y. 2024).

In addition, while "the statute of limitations is ordinarily an affirmative defense that must be raised in the answer," *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014) (citation omitted), the Second Circuit has held that "[d]ismissal under Fed. R. Civ. P. 12(b)(6) is appropriate when a defendant raises . . . [a statutory bar] as an affirmative defense and it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Staehr*, 547 F.3d at 425 (quoting *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000)). "If it appears from a complaint that claims are *prima facie* time-barred, those claims can only survive dismissal if a plaintiff 'plausibly alleges that they fall within an exception to the applicable statute of limitations.'" *Strusman v. NYU Langone Hosps.*, 2020 WL 3415111, at *3 (S.D.N.Y. June 22, 2020) (citing *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 436 (S.D.N.Y. 2014) (cleaned up) (citing cases)); *see also Clark v. Hanley*, 89 F.4th 78, 94 (2d Cir. 2023) (stating that a defendant may raise an

affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint).

## DISCUSSION

## I.  Disability-Related Claims

The entirety of Defendants' argument with respect to Plaintiff's disability-related claims (Counts One, Three, Six, Nine, Eleven, Fourteen, and Counts Seventeen through Twenty-Nine) is that they would impermissibly abridge Defendants' First Amendment rights.  Dkt. No. 58 at 8–11.  Defendants dispute no substantive elements of Plaintiff's ADA claims or their state and city analogs, challenging neither the plausibility nor the cognizability of Plaintiff's harms as a matter of antidiscrimination law.

### A.  Discrimination Claims Based on Disability

Counts One, Three, and Six allege discrimination on the basis of disability in violation of federal, state, and New York City law.[8]

Title I of the ADA provides that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  To establish a *prima facie* case for discrimination under the ADA, "a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to

---

[8] As the standards under the NYCHRL and NYSHRL for discrimination and hostile work environment are functionally identical, the Court reserves the discussion of Plaintiff's city and state discrimination claims for the following section.  *See Moore*, 722 F. Supp. 3d at 245. Section I.A. analyzes only the federal ADA discrimination claims, except to point out certain specific points of departure or overlap in the discussion of qualifying disabilities.

perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)); *Cagle v. Weill Cornell Med.*, 680 F. Supp. 3d 428, 437–38 (S.D.N.Y. 2023). "What Plaintiff must do to establish her prima facie case differs depending on the stage of the case." *Moore*, 722 F. Supp. 3d at 245 (citing *Littlejohn v. City of N.Y.*, 795 F.3d 297, 307 (2d Cir. 2015)). At this early stage of the litigation, Plaintiff's prima facie requirements are "relaxed." *Id.* Specifically, at the pleading stage, the Court does not "require a plaintiff to plead facts establishing a prima facie case." *Buon v. Spindler*, 65 F.4th 64, 79 (2d Cir. 2023) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)). Plaintiff need only offer "minimal support for the proposition that the employer was motivated by discriminatory intent." *Id.* (cleaned up).

### 1. Nature of Disability

Defendants do not dispute that Plaintiff has sufficiently alleged that she is disabled within the meaning of the ADA.

An individual has a disability under the ADA if she "has a physical or mental impairment that substantially limits one or more major life activities," has a "record of such an impairment," or is "regarded as having such an impairment." 42 U.S.C.S. § 12102(1); *see Bragdon v. Abbott*, 524 U.S. 624, 631 (1998). In 2008, Congress amended the ADA and "instructed courts that the definition of disability . . . shall be construed in favor of broad coverage of individuals, and that an impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability." *Woolf v. Strada*, 949 F.3d 89, 94 (2d Cir. 2020).

The "principal purpose" of these amendments was to "make clear that the substantial-limitation requirement in the definition of 'disability' is not an exacting one." *Id.*[9]

Alcoholism or alcohol use disorder qualifies as an "impairment" under the ADA and under the city and state analogs. *See Buckley v. Consol. Edison Co. of New York*, 127 F.3d 270, 273–74 (2d Cir. 1997); *Robertson v. Amtrak/Nat'l R.R. Passenger Corp.*, 400 F. Supp. 2d 612, 622–23 (S.D.N.Y. 2005); *Makinen v. City of New York*, 857 F.3d 491, 495 (2d Cir. 2017) ("The relevant State and federal counterparts in this case—the NYSHRL and ADA—treat alcoholism as an impairment that can form the basis of a disability discrimination suit.") (subsequent history omitted). The ADA and the NYSHRL may reach both "recovering or recovered alcoholics" and those who are untreated or in active relapse. *Makinen*, 857 F.3d at 495 (citing N.Y. Exec. Law §§ 292(21)(a), 296(1)(a); 42 U.S.C. §§ 12102, 12114).

Alcoholism "is not a disability *per se* under the ADA." *Roberts v. N.Y. State Dep't of Corr. Servs.*, 63 F. Supp. 272, 285–86 (W.D.N.Y. 1999); *see Van Ever v. N.Y. State Dep't of Corr. Servs. at Sing Sing Corr. Facility*, 2000 WL 1727713, at *3 (S.D.N.Y. Nov. 21, 2000). An "impairment" rises to the level of a disability only when it "substantially limits one or more major life activities," because "mere status as an alcoholic or substance abuser does not necessarily imply a 'limitation.'" *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 46–47 (2d Cir. 2002). Therefore, in order for a recovering or recovered alcoholic to enjoy the protection of the ADA, she must show "that this addiction substantially limited one or

---

[9] To the extent the Court cites cases interpreting the ADA's definition of qualifying disability predating 2008, it does so with the understanding that "Congress directed that courts, in assessing whether an impairment substantially limits a major life activity, 'interpret and apply' the term 'substantially limits' 'to require a degree of functional limitation that is lower than the standard . . . applied prior to the [2008 amendment].'" *Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469, 479 (5th Cir. 2023) (cleaned up).

more of h[er] major life activities." *Buckley*, 127 F.3d at 274; *see Robertson*, 400 F. Supp. 2d at

622–23. "Major life activities include 'functions such as caring for one's self, performing

manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Reg'l*

*Econ. Cmty. Action Program*, 294 F.3d at 47 (internal citations omitted). The function of caring

for oneself, "encompasses normal activities of daily living; including feeding oneself, driving,

grooming, and cleaning home." *Id*. (internal citations omitted) (quoting *Ryan v. Grae & Rybicki,*

*P.C.*, 135 F.3d 867, 871 (2d Cir. 1998)). Such a limitation is substantial when it "significantly

restricts the condition, manner or duration under which an individual can perform a particular

major life activity as compared to the condition, manner, or duration under which the average

person in the general population can perform that same major life activity." *Id*. at 48 (cleaned

up).

"Though the effects of an impairment lasting or expected to last fewer than six months

can be substantially limiting within the meaning of the ADA, the duration of an impairment is

one factor that is relevant in determining whether the impairment substantially limits a major life

activity. Impairments that last only for a short period of time are typically not covered, although

they may be covered if sufficiently severe." *Norman v. NYU Langone Health Sys.*, 492 F. Supp.

3d 154, 163 (S.D.N.Y. 2020). "[T]he [2008 amendment to the ADA] explicitly provided that 'an

impairment that is episodic or in remission is a disability if it would substantially limit a major

life activity when active.'" *Mueck*, 75 F.4th at 479 (quoting 42 U.S.C. § 12102(4)(D)).

"Consequently, courts have recognized numerous episodic conditions—including depression,

post-traumatic stress disorder, and other mental health conditions where an individual may

experience flare-ups—as disabilities." *Id.*

However, the ill-effects of an alcohol use disorder must, in order to qualify as a disability, exceed the "natural result of overindulgence, namely the temporary impairment of senses, dulled reactions, and the prospect of a restless sleep followed by an unpleasant morning." *Id.* at 481–82 (internal quotations omitted). Such effects must be "qualitatively different than those achieved by an overindulging social drinker," e.g., drinking to the point of unconsciousness or sickness, losing the ability to "think[], concentrate[], and car[e] for [onseself]" in periods of binging, failing to appear for work, etc. *Id.* at 482. For a recovering alcoholic, such a limitation may be substantial when an individual is "unable to abstain from alcohol abuse without continued care" or "absent assistance." *Id.*

Defendants do not dispute that Plaintiff has adequately alleged that she has a qualifying disability on the basis of her alcohol use disorder. Plaintiff alleges that she had historically suffered from alcohol use disorder but had remained sober for approximately nine years before joining RHONY. FAC ¶ 59. As she disclosed in her initial casting tape for RHONY, she had broken her sobriety and begun to consume alcohol again. *Id.* ¶ 62. On or around the beginning of filming of RHONY Season 12, she regained sobriety. *Id.* ¶ 65. As alleged, the severity of Plaintiff's disorder is readily discernible from the description offered of her relapse, wherein she describes herself as growing "physically and mentally ill," behaving "erratically," and "manifest[ing] into extreme depressive symptoms." *Id.* ¶¶ 82–85.

Plaintiff has also alleged a mental health disability within the meaning of the ADA and state and city analogs. The definition of physical or mental impairment under the ADA includes "[a]ny mental or psychological disorder, such as . . . emotional or mental illness." 29 C.F.R. § 1630.2(h)(2). The EEOC's regulation provides that "it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities

indicated: . . . major depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive compulsive disorder, and schizophrenia substantially limit brain function." *Id.* Plaintiff has plausibly alleged that she suffered from "bipolar, depression, and anxiety disorders," FAC ¶¶ 4, 121, "extreme anxiety and depression," *id.* ¶ 103, and "Post-Traumatic Stress Disorder induced Obsessive Compulsive Disorder," *id.* ¶ 299, though with respect to the last of these it is unclear whether Plaintiff is describing a preexisting condition or a condition caused by her traumatic experiences as a cast member of the *Housewives* franchise.

Defendants knew of these disabilities, as they initially cast Plaintiff after she disclosed in her casting tape that she had recently relapsed after nine years of sobriety, were told directly by Plaintiff that she suffered from depression, anxiety, bipolar disorder, and alcohol use disorder, observed episodes of acute mental illness in the form of panic attacks in the course of filming RHONY, and were told of Plaintiff's repeated suicidal ideations. *Id.* ¶¶ 60–63, 68, 121, 149, 163–64, 170, 392.[10]

## 2. Adverse Employment Action

Defendants also do not dispute on this motion that Plaintiff suffered an adverse employment action. For the purposes of an ADA discrimination claim, "[a] plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). "An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of

---

[10] For the purposes of this motion to dismiss, the Court does not evaluate the independent strength of Plaintiff's claims arising from her mental health disabilities as separate from her alcohol use disorder. Finding that Plaintiff has adequately pled violations of the ADA and city and state analogs on the basis of her alcohol use disorder, the Court need not at this stage determine whether she has adequately pled discrimination, hostile work environment, failure to accommodate, or retaliation, on the basis of her other mental health disorders.

job responsibilities." *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).

"Examples of materially adverse changes include termination of employment, a demotion

evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits,

significantly diminished material responsibilities, or other indices unique to a particular

situation." *Id.* (quoting *Terry*, 336 F.3d at 138). "Because the definition of an adverse

employment action under Title VII is the same as under the ADA," the Court draws on cases

from both contexts. *Richards v. Dep't of Educ. of City of N.Y.*, 2022 WL 329226, at *8

(S.D.N.Y. Feb. 2, 2022) (citing *Smith v. City of New York*, 385 F. Supp. 3d 323, 343 (S.D.N.Y.

2019); *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015); *Fox v. Costco*

*Wholesale Corp.*, 918 F.3d 65, 71–72 (2d Cir. 2019)).

"Although a reprimand can constitute an adverse employment action, 'courts in this

circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not

constitute adverse employment actions in the absence of other negative results such as a decrease

in pay or being placed on probation.'" *Davis v. Goodwill Indus. of Greater N.Y. & N.J., Inc.*,

2017 WL 1194686, at *7 (S.D.N.Y. Mar. 30, 2017) (quoting *Honey v. County of Rockland*, 200

F. Supp. 2d 311, 320 (S.D.N.Y. 2002)); *cf. Bernstein v. N.Y.C.Dep't of Educ.*, 2020 WL

6564809, at *6 (S.D.N.Y. Nov. 9, 2020) ("Whether deserved or not, however, the disciplinary

notice and disciplinary letters cannot constitute adverse employment acts on the basis of age on

their own."); *Brown v. City of New York*, 2014 WL 5394962, at *8 (S.D.N.Y. Oct. 23, 2014) ("A

negative evaluation or official reprimand may, in some circumstances, constitute adverse

employment action, but only when it triggers negative consequences to the conditions of

employment." (cleaned up)), *aff'd*, 622 F. App'x 19 (2d Cir. 2015); *Castro v. N.Y.C. Bd. of Educ.*

*Pers.*, 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) ("[A]lthough reprimands and close

monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions.").

However, as the Second Circuit made clear in *Leibowitz v. Cornell University*, the non-renewal of an employment contract, even if fully discretionary, may constitute an adverse employment action:

> It is beyond cavil that employers subject to the strictures of the [antidiscrimination laws] may not discriminate on the basis of age or gender in deciding whether or not to hire prospective employees. . . . Were we to accept defendants' argument here, we would effectively rule that current employees seeking a renewal of an employment contract are not entitled to the same statutory protections under the discrimination laws as prospective employees. In other words, under defendants' reasoning, an employee could bring a discrimination lawsuit if an employer refused to hire her based on her age and/or gender, but not if the same employer failed to renew an employment contract for the same discriminatory reasons. We decline to adopt that flawed legal analysis. . . . There is simply no reason that the discrimination laws should not apply with equal force to an employer's decision regarding a current employee who is denied a renewal of an employment contract. An employee seeking a renewal of an employment contract, just like a new applicant or a rehire after a layoff, suffers an adverse employment action when an employment opportunity is denied and is protected from discrimination in connection with such decisions under [antidiscrimination laws]. The mere fact that the employer's decision not to renew is completely discretionary does not mean that it is not an "adverse" employment decision.
>
> Accordingly, we hold that where an employee seeks renewal of an employment contract, non-renewal of an employment contract constitutes an adverse employment action for purposes of [antidiscrimination laws]. Although the parties focus on the terminology used with respect to the plaintiff, whether plaintiff was "laid off" or "terminated," or her employment was "not renewed" is not critical to the legal analysis; rather, she suffered an adverse employment action because she was denied the requested continued employment, regardless of the label.

584 F.3d 487, 500–01 (2d Cir. 2009); *Moran v. Bd. of Educ. of City of Bridgeport*, 2013 WL 1294584, at *4 (D. Conn. Mar. 28, 2013) (applying *Leibowitz* to the ADA context, finding adverse employment action even where the plaintiff did not actually apply for the contract renewal because he was told, in essence, "Don't bother applying").

Plaintiff has plausibly alleged an adverse employment action within the meaning of the ADA. After being a cast member in the Housewives franchise for three seasons (two of RHONY, one of RHUGT), Defendants chose not to recast her for either RHONY Season 14 or RHONY Legacy in fall of 2022. FAC ¶¶ 286, 296–298. Though Plaintiff characterizes this decision as a "termination," *id.* ¶¶ 724, 746, or a "discharge," *id.* ¶¶ 434, 466, 534, the decision not to recast her was, in substance, the non-renewal of an employment contract. Defendants effectively concede as much in their rebuttal to Plaintiff's claim of termination, arguing that the "allegation is illogical because she concedes she was never hired for those shows, and thus, could not have been terminated. As is reflected in her Talent Agreement, if Defendants choose not to exercise their option to reengage a cast member for a subsequent cycle, the contracts terminate by their terms." Dkt. No. 58 at 6 (citing Talent Agreement ¶ 2(a)). Plaintiff alleges that Defendants "discriminated against [her] on the basis of her disabilities," including with respect to this casting decision, which was both "due to her mental health diagnoses," *id.* ¶¶ 434, 466, 534, and was retaliatory based on her official and unofficial complaints to Defendants regarding her treatment, *id.* ¶¶ 276, 286–288, 774–775. Defendants advance no argument concerning the plausibility of Plaintiff's characterization of the decision not to recast her outside of their cursory response that "[u]nder well-settled law, even if Defendants did want to use the Housewives franchise to feature inebriated cast members (which they do not), that message—achieved through casting and directing decisions—would be protected under the First Amendment." Dkt. No. 58 at 11.

### 3. Qualifications for Role

Under the ADA, a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see also Malzberg v. New York Univ.*,

2022 WL 889240, at *9 (S.D.N.Y. Mar. 25, 2022). Defendants do not challenge that Plaintiff has sufficiently alleged that she was qualified for the role.

### 4.     First Amendment Defense of Re-Casting Decision

Defendants offer as an affirmative defense that the application of the ADA to their casting decisions would violate the First Amendment, as liability under the ADA would "impermissibly . . . abridge Defendants' First Amendment rights to tailor and adjust the messages they wish to convey in their creative works, including through cast selection." Dkt. No. 58 at 2.

The application of the First Amendment to casting decisions is relatively uncharted territory. The First Amendment contains within it a number of proscriptions against governmental conduct. It prohibits the government from "'restrict[ing] expression because of its message, its ideas, its subject matter, or its contents.'" *Reed v. Town of Gilbert, Az*, 576 U.S. 155, 163 (2015)). (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)). The Supreme Court distinguishes between two types of laws. "'Content-based laws—that that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.'" *TikTok Inc. v. Garland*, 604 U.S. __, 145 S.Ct. 57, 67 (2025) (quoting *Reed*, 576 U.S. at 163). "Content-neutral laws, in contrast, 'are subject to an intermediate level of scrutiny because in most cases, they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue.'" *Id.* (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)). There are two forms of content-based speech regulation. First, "a law is content based on its face if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *Id.* (quoting *Reed*, 576 U.S. at 163). "Second, a facially content-neutral law is nonetheless treated as a content-based regulation of speech if it 'cannot be justified

without reference to the content of the regulated speech' or was 'adopted by the government because of disagreement with the message the speech conveys.'" *Id*. (quoting *Reed*, 576 U.S. at 164).

Defendants make no convincing argument that the ADA is content-based, nor that it violates the First Amendment in that respect. The ADA is not content-based on its face. In general, the government has the power to regulate drinking and other substance use in the workplace, and could, without facially violating the First Amendment, prohibit all drinking in the workplace. Such a law could be applied, consistent with the First Amendment's proscription against viewpoint discrimination, to a company producing a television show. A show could still be produced promoting the consumption of alcohol, albeit with ersatz rather than real alcohol.[11] There is also nothing in the First Amendment that would prohibit the government from passing a law that required all businesses, including those in the media industry, to make accommodations for those with a history of alcohol addiction. Applied to television production companies, such a law on its face would not target speech or speech-laden conduct based on its communicative content or the viewpoint of the speaker.

The ADA also does not easily fall into the second category of content-based laws. The ADA was not adopted because of disagreement with any particular communicative message and does not rest for its justification on the content of regulated speech. *See N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 13 (1988) (holding that an antidiscrimination statute "does not, on its face, target speech or discriminate on the basis of its content, the focal point of its

---

[11] Thus, for example, a law prohibiting the possession of loaded handguns on set would not violate the First Amendment. Even if it could be argued that the show's message would be more forcefully conveyed with the discharge of a real firearm rather than a fake firearm, the law would not discriminate based on the viewpoint or content of the speech.

prohibition being rather on the act of discriminating against individuals in the provision of publicly available goods, privileges, and services on the proscribed grounds").  A law that requires an employer to treat persons of different races, different genders, different sexual preferences, or having different physiological characteristics even-handedly does not by its nature dictate the nature of speech content or viewpoint of the employer.

A law of general applicability does not necessarily run afoul of the First Amendment when it regulates conduct in a manner that incidentally burdens speech.  *See United States v. O'Brien*, 391 U.S. 367, 376 (1968); *cf. Reynolds v. Quiros*, 25 F.4th 72, 85 (2d Cir. 2022) (holding that "[t]he First Amendment does not confer upon an inmate the right to possess or display pictorial depictions of sexually explicit conduct, such that it creates a hostile work environment for corrections staff.").  "For example, because employment discrimination statutes primarily regulate the conduct of hiring or firing, they can 'require an employer to take down a sign reading "White Applicant Only"' without unconstitutionally abridging the employer's speech."  *Moore*, 722 F. Supp. 3d at 259 (quoting *Rumsfeld v. F. for Acad. and Inst. Rights, Inc.*, 547 U.S. 47, 62 (2006).  In such situations, the speech restriction is typically incidental to the government's regulation of an employer's practices.  *Id.*  Accordingly, the question is not whether the ADA violates the First Amendment *per se*, but whether its application in this case would violate the First Amendment.

Two First Amendment doctrines provide relevant guidance: the compelled speech doctrine and the expressive association doctrine.

First, "[t]he First Amendment protects a speaker not only from governmental punishment or regulation of speech he or she has already expressed, but from the government regulation requiring a speaker to express a message with which he or she disagrees."  *Moore*, 722 F. Supp.

3d at 260.  The First Amendment protects the right of both the individual and the corporation against being compelled to speak the government's "own preferred messages."  *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023); *id.* at 594 ("[S]peakers [do not] shed their First Amendment protections by employing the corporate form to disseminate their speech.").  "[T]he First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply 'misguided,' *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 574 (1995), and likely to cause 'anguish" or "incalculable grief,' *Snyder v. Phelps*, 562 U. S. 443, 456 (2011)."  *Id.* at 586.

"[T]he preliminary question in a case asserting unlawfully compelled speech is whether the law at issue regulates 'nonexpressive conduct' of a commercial nature—perhaps with an 'incidental burden[] on speech,'" *Emilee Carpenter, LLC v. James*, 107 F.4th 92, 103 (2d Cir. 2024) (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011)), "or whether the law as applied compels what the Court in *303 Creative* called 'pure speech' or 'expressive activity.'" *Id.* (quoting *303 Creative*, 600 U.S. at 599).  Courts then "consider whether (1) the law at issue will compel a business owner to engage in activity she would not otherwise engage in, and (2) that activity constitutes the owner's expressive activity."  *Id.* at 106.  Free speech protections are not implicated any time "'the person engaging in the conduct intends thereby to express an idea.'" *Id.* at 103 (quoting *Rumsfeld*, 547 U.S. at 65–66 ).  Rather, "courts must consider whether the good or service at issue amounts to a 'medium for the communication of ideas.'" *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) (extending First Amendment protection to films because they are a "significant medium for the communication of ideas")[12]; *see also Brown*

---

[12] *See also id.* ("It cannot be doubted that motion pictures are a significant medium for the

*v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011) (same with respect to video games).  "Thus, in *Hurley*, the Court concluded that First Amendment protection extends to parades because parades are 'mediums of expression,' and not simply 'group[s] of people . . . march[ing] from here to there.'" *Emilee Carpenter,* 107 F.4th at 103.  The *Hurley* Court noted that "we use the word 'parade' to indicate marchers who are making some sort of collective point, not just to each other but to bystanders along the way," and indeed parades "depend[ ] on watchers."  515 U. S. at 568, *compare with Rumsfeld*, 547 U.S. at 64 ("Unlike a parade organizer's choice of parade contingents, a law school's decision to allow recruiters on campus is not inherently expressive."). Moreover, "the First Amendment extends its protection to certain forms of expression even when the speaker is engaged in commerce."  *Emilee Carpenter*, 107 F.4th at 103.

Under the compelled speech doctrine, an otherwise valid, facially neutral law of general applicability may not be used to force a person to "expres[s] a story the [person] does not wish to tell," *Moore* 722 F. Supp. 3d at 261, or to forbid a person from making those decisions necessary "to tailor and adjust" the message it wishes to send, *id.*[13]  As *Hurley* instructs, that protection against compelled speech applies both to the words uttered by a single person and to the message that can be created when "individual presentations [are] perceived by spectators as part of the whole." *Hurley*, 515 U.S. at 577

---

communication of ideas. They may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression.  The importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform.").

[13] The person asserting First Amendment protection under the compelled speech doctrine must also establish that "the expressive activity is her own—that is, she created the expressive content herself or, by compiling or curating the third-party content in some forum, she is also engaged in her own expressive activity."  *Emilee Carpenter*, 107 F.4th at 104.  That element is readily established on the facts pleaded in the complaint.

However, where a law of general applicability imposes only "incidental burden[s]" on expressive activity or "regulates 'nonexpressive conduct' of a commercial nature" it may be applied without offending the First Amendment. *See 303 Creative*, 600 U.S. at 596; *Rumsfeld*, 547 U.S.at 67.

Second, the First Amendment protects the right of expressive association. Under the First Amendment, "[a]n individual's freedom to speak" also contains within it "a correlative freedom to engage in group effort toward th[at] en[d]." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). "According protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." *Id.* Moreover, freedom of expressive association "'presupposes a freedom not to associate' because '[t]here can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire.'" *Slattery v. Hochul*, 61 F.4th 278, 287–88 (2d Cir. 2023) (quoting *Jaycees,* 468 U.S. at 622–23).

The Second Circuit has adopted a three-part inquiry for evaluating expressive association claims. *Id.* at 287. It considers: (1) whether the group making the claim is engaged in expressive association; (2) whether the state action at issue significantly affects the group's ability to advocate its viewpoints; and then, (3) whether the state's interest implicated in its action justifies the burden imposed on the associational expression. *Id.* (citing *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 442 (3d Cir. 2000)). The Second Circuit has also held that the right to expressive association first recognized in *Roberts* extends beyond voluntary associations to the employer-employee relationship, though recognizing that "[i]n light of . . . significant differences between voluntary associations and employment relationships, and the long and

complex history of regulation of employment relationships, the Supreme Court's decisions regarding the freedom of expressive association enjoyed by voluntary associations do not apply neatly to employers." *CompassCare v. Hochul*, 125 F.4th 49, 60-61 (2d Cir. 2025). "[E]xpressive association rights are not unlimited; the right to expressive association does not permit an employer *generally* to discriminate in its employment practices—potentially violating the statutory or constitutional rights of employees and applicants." *Id.* at 61 (citing *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984)). There is no constitutional right "to discriminate in the selection of who may attend a private school or join a labor union." *Hishon*, 467 U.S. at 78. A commercial venture must show that it is engaged in "expressive association," and that the discrimination it exercises is intended to preserve its mission in more than "a vague and generalized sense, but in the context of a specific employment decision," which necessitates an assessment of "(1) the responsibilities of the position at issue, including whether it is client-facing and whether it involves expressly or implicitly speaking for the organization, and (2) the particular conduct or attribute of the employee that renders the employment of that person, in that position, a threat to the employer's mission." *Id.* "In short, an employer must plausibly allege that [the law's] impact on the specific employment decision 'will impede the organization's ability to engage in . . . protected activities or to disseminate its preferred views.'" *Id.* (quoting *Jaycees*, 468 U.S. at 627).

In *Slattery*, the Second Circuit held that a group doing business as a "crisis pregnancy center" had successfully stated a claim that its First Amendment right to freedom of association was violated by a state law that required it to consider for employment persons who express support for abortion access or who have engaged in extramarital sexual relations. The court rejected the argument that the burden on the plaintiff's "expressive association rights was

incidental rather than severe," reasoning that the "[t]he right to expressive association allow[ed the plaintiff] to determine that its message will be effectively conveyed only by employees who sincerely share its views." *Id.* at 288.  In *CompassCare*, likewise, the Second Circuit held that "a mission-based organization that advocates for a particular cause or set of belief, could plausibly allege that the compelled retention of a specific employee would impair its ability to express its message."  125 F.4th at 60-61.

These two doctrinal frameworks accord with the limited caselaw on the applicability of the antidiscrimination laws to casting decisions.  In *Moore v. Hadestown Broadway Limited Liability Co.*, 722 F. Supp.3d 229 (S.D.N.Y. 2024), the plaintiff, who was a Black woman, alleged that the decision of the producer of the Broadway musical Hadestown to replace her with a white actress constituted discrimination on the basis of race in violation of Title VII.  The court held that the casting decision was protected by the First Amendment.  The court drew on the compelled speech doctrine in *Hurley*, holding that "[t]he expressive nature of Defendant's work is what distinguishes this case from *Rumsfeld* and from the typical case of employment regulation."  *Id.* at 260.  "Hadestown, the employer in question, produces a Broadway musical, a medium that is inherently expressive and whose creative expression and artistic speech are protected by the First Amendment."  *Id*.  Although the court did not explicitly reference the expressive association doctrine, it posed the same questions as raised by *Slattery* and *Compasscare*.  After concluding that the musical constituted speech in an inherently expressive medium, the court concluded, in effect, that application of Title VII to the casting decision would "significantly affect" the theater ensemble's ability to express its artistic vision.  "Defendant was making its casting decisions with an eye toward how the racial composition of the Musical's cast affected the story Hadestown was telling on-stage" and the prior arrangement of actors (which

only included Black actors in the chorus) "departed both from the text of the Musical's script and from what Defendant intended to express when it staged the Musical and thereafter sought to change those casting arrangements to change the unintended expression." *Id.* at 258. Implicit in the court's decision is the conclusion that the burden on the theater troupe's protected expression outweighed the state interest implicated, because of the centrality of the casting decision to the artistic vision and message.

The compelled speech and expressive association line of cases provide helpful guidance here. From the allegations of the complaint themselves, *The Real Housewives* can be analogized to the type of group claiming a right to expressive association recognized in *Slattery,* and *CompassCare*, just as they may be understood to claim a right against compelled speech in a medium as in *Hurley*. The *Real Housewives* television show, as produced by Defendants, "constitutes expressive and artistic speech that qualifies for First Amendment protection." *Moore*, 722 F. Supp.3d at 257. Television is undoubtedly a protected "medium for the communication of ideas." *Joseph Burstyn*, 343 U.S. at 501 (finding movies to be a medium); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981) ("Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works fall within the First Amendment guarantee."). And like the parade organizer in *Hurley* and the composer to which the *Hurley* Court compared him, the director of the television show "selects the expressive units [of the show] from potential participants," and from the composition of that cast "shape[s] its expression." 515 U.S. at 574. The First Amendment value of Defendants' speech is not measured by its social utility. *See Hurley*, 515 U.S. at 569 (1995). Nor is it limited by the extent

to which the Court or a jury might consider its content distasteful.  *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992).

The allegations of the complaint also establish that the application of the ADA to the *Real Housewives* to require it to cast individuals who could not drink alcohol would impose more than an incidental burden on its freedom of speech, significantly affecting its ability to deliver its intended artistic vision.  By the terms of Plaintiff's own complaint, the *Real Housewives* is a creative work that celebrates (and Plaintiff asserts, exploits) drinking and mental health disabilities, personality disorders, and addiction disabilities, through casting and filming real-life women confronting such challenges in their real lives.  Plaintiff alleges that the "*Real Housewives* is a reality television series . . . consist[ing] of programming that dramatically exploits the personal and professional lives of affluent women in various cities across the United States, most of whom often openly or secretly suffer from mental health disabilities, personality disorders, and addiction disabilities."  FAC ¶ 49.  It is not incidental but central to the show's message that the drinking activities it portrays are authentic and genuine.  Plaintiff alleges that "RHUGT is a *Real Housewives* spin-off that brings together 'Housewives' from various *Real Housewives* installments and chronicles their group vacations, which are replete with unlimited supplies of alcohol."  *Id.* ¶ 58.  Drinking is an important part of what the series peddles, according to Plaintiff.  For example, Defendants characterized RHONY Season 12 as "defined early on by boozy chaos and thrown tiki torches, and that party lifestyle."  *Id.* ¶ 94.  According to the complaint, Defendants believed that showing women drinking to excess made good television.  Defendants "cultivated a treasure trove of [Plaintiff's] dark secrets with intent to place her in situations known to exacerbate her alcohol use disorder and mental health disabilities because they thought that intentionally making these conditions worse would create

39

good television." *Id.* ¶ 68.  In addition, "Defendants intended to weaponize [Plaintiff's] alcohol use disorder as the main storyline of RHONY season 12." *Id.* ¶ 74.

Producers of entertainment are, of course, not free of regulation simply by virtue of engaging in protected expression, even if the regulation will impact their means of communication.  It is unremarkable, for instance, that the government regulates the working conditions and hours that productions can require of child actors.  Such regulation can be justified on the theory that the important state interest implicated can be accommodated with only incidental effects on speech.  *See* 12 NYCRR 186.  Further, "[e]ach medium of expression," and each genre of entertainment, "may present its own problems."  *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557 (1975).  There is no single answer that would apply across all forms of entertainment and to all forms of regulation.  Application of the antidiscrimination laws to the casting decisions of an expressive production that conveys its messages through voiceovers by actors in an animated film might be permissible where application of those same laws to the same actors engaged in a live theatrical performance might not be.  *See Moore*, 722 F. Supp. 3d 229.  The antidiscrimination laws might have a different, and more incidental impact, on stories conveyed through computer-generated imagery, including images enhanced through the use of artificial intelligence, than they would have on stories told through more conventional means.

Defendants have established, from the face of the complaint, that they had a First Amendment right to choose to make a show that celebrated a party life and the drinking of alcohol and to determine that their vision could be best conveyed through reality television and not through scripted scenes.  They had a corresponding right to cast only persons who could consume large quantities of alcohol.  A rule of law that would require them to include in the cast a person who could not perform consistent with those requirements thus would directly interfere

with their First Amendment rights.  The parade organizers in *Hurley* had a right to determine that their intended message could be effectively conveyed by the participation in their expressive activity only of heterosexuals, *see* 515 U.S. at 570, and, as the Second Circuit held in *Slattery*, the crisis pregnancy center had the prerogative to determine that their message could be conveyed effectively and in a manner they intended only if transmitted by persons who had lived rather than just articulately spoken their message, *see* 61 F.4th at 288.  It stands to reason that the producers of a show that, according to the complaint, celebrates drinking, have the right to determine that their vision can be conveyed only by showing actual alcohol consumption.  Casting a person who could act out drinking but imposes limits on her actual drinking would interfere with the producers' First Amendment rights to deliver an authentic message.  To hold otherwise would be to limit the types of messages and experiences that could be authentically portrayed and would thereby threaten the "cultural diversity" that Justice Brennan in *Roberts* so rightly celebrated.  *See Jaycees*, 468 U.S. at 622.

Finally, as held in *Moore* and *Claybrooks v. Am. Broad. Co.*, 898 F. Supp. 2d 986 (M.D. Tenn. 2012), the state's interest implicated in this action does not justify the burden imposed on the First Amendment-protected expression.  Defendants had a protected right to cast in their production only individuals who could drink and to not recast individuals who could not drink.  Accordingly, Plaintiff's claims for discrimination on the basis of disability arising under the ADA are dismissed with prejudice.

**B.      Hostile Work Environment Claims Based on Disability**

Counts Nine, Eleven, and Fourteen allege hostile work environment on the basis of disability in violation of federal, state, and New York City law.  The foregoing analysis under the First Amendment informs the applicability of those claims to Defendants' conduct.

"[C]laims for hostile work environment are actionable under the ADA." *Fox*, 918 F.3d at 74 (2d Cir. 2019). "Congress borrowed [the ADA language prohibiting discrimination based on disability] from Title VII, which similarly provides that it 'shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment.'" *Lanman v. Johnson Cty.*, 393 F.3d 1151, 1155 (10th Cir. 2004) (quoting 42 U.S.C. § 2000e-2(a)(1)) (emphasis in original). "Thus, when Congress included the phrase 'terms, conditions, and privileges of employment' in the ADA, it was using a legal term of art that prohibited a broad range of employment practices, including workplace harassment." *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 720 (8th Cir. 2003).

To prevail on a hostile work environment claim under the ADA, a plaintiff must show "(1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc*., 115 F.3d 143, 149 (2d Cir. 1997)). "Although the victim must subjectively perceive the conduct as abusive, the misconduct shown also must be 'severe or pervasive enough to create an objectively hostile or abusive work environment.'" *Fox*, 918 F.3d at 74 (quoting *Alfano*, 294 F.3d at 374); *see Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21 (1993). "Even an isolated act may be so serious that it requires the conclusion that the terms and conditions of employment were altered." *Fox*, 918 F.3d at 74. A plaintiff alleging a hostile work environment claim under the ADA, therefore, "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Alfano*, 294 F.3d at 374

(internal quotation marks omitted). "Courts look to the totality of the circumstances to determine whether a plaintiff has met this burden, including proof of 'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [the plaintiff's] work performance.'" *Fox*, 918 F.3d at 74 (quoting *Harris*, 510 U.S. at 23). "[T]easing in the workplace is not uncommon, and in most instances probably not actionable." *Fox*, 918 F.3d at 76.

"Under the NYCHRL, unlike under [federal antidiscrimination law] . . . there is no distinction between a claim premised on the creation of a hostile work environment (a species of harassment claim) and one premised on unlawful discrimination: the former is subsumed into the latter, and a plaintiff need only prove that 'she has been treated less well than other employees because of a protected trait.'" *Rothbein v. City of New York*, 2019 WL 977878, at *9 (S.D.N.Y. Feb. 28, 2019) (quoting *Johnson v. Strive E. Harlem Emp't Grp.*, 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014)); *see also, e.g., Makhsudova v. City of New York*, 2022 WL 1571152, at *11 (S.D.N.Y. May 18, 2022); *Clarke v. InterContinental Hotels Grp.*, 2013 WL 2358596, at *11 (S.D.N.Y. May 30, 2013) ("Under the NYCHRL, there are not separate standards for 'discrimination' and 'harassment' claims."); *Sotomayor v. N.Y.C.*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012) ("Hostile work environment claims are analyzed under the same provision of the NYCHRL as discrimination claims." (citing *Williams v. N.Y.C.H.A*, 872 N.Y.S.2d 27, 37 (1st Dep't 2009)).

Under the NYCHRL, a "plaintiff need not establish that the conduct was severe or pervasive, only that she has been treated less well than other employees because of" a protected characteristic. *Russo v. N. Y. Presbyterian Hosp.*, 972 F.Supp.2d 429, 450 (E.D.N.Y. 2013) (quotation marks omitted). "[Q]uestions of 'severity' and 'pervasiveness' are applicable to

43

consideration of the scope of permissible damages, but not to the question of underlying liability." *Robinson v. De Niro*, 739 F. Supp. 3d 33, 118 (S.D.N.Y. 2023) (internal quotations omitted). However, "[i]t is not enough that a plaintiff has an overbearing or obnoxious boss." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013). "She must show that she has been treated less well at least in part *because of* her [protected characteristic]." *Id.* "[W]hen applying this standard, 'district courts must be mindful that the NYCHRL is not a general civility code.'" *Nofal v. IMCMV Times Square LLC*, 2024 WL 1138928, at *4 (S.D.N.Y. Mar. 15, 2024).

Under the NYSHRL, unlike the NYCHRL, the provisions relating to discrimination and hostile work environment arise under different subsections of the law. Under subsection (a), the discrimination provision, it is unlawful to "refuse to hire or employ or to bar or to discharge from employment such individual *or* to discriminate against such individual in compensation or in terms, conditions or privileges of employment" based on a protected characteristic. N.Y. Exec. Law § 296(1)(a) (emphasis added). Under subsection (h), the harassment or hostile work environment provision, it is unlawful to "subject any individual to harassment [based on a protected characteristic] regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims." N.Y. Exec. Law § 296(1)(h). Subsection (h) further explains:

> Such harassment is an unlawful discriminatory practice when it subjects an individual to *inferior terms, conditions or privileges of employment* because of the individual's membership in one or more of these protected categories. The fact that such individual did not make a complaint about the harassment to such employer, licensing agency, employment agency or labor organization shall not be determinative of whether such employer, licensing agency, employment agency or labor organization shall be liable. Nothing in this section shall imply that an employee must demonstrate the existence of an individual to whom the employee's treatment must be compared. It shall be an affirmative defense to liability under this subdivision that the harassing conduct does not rise above the level of what a

> reasonable victim of discrimination with the same protected characteristic or characteristics would consider petty slights or trivial inconveniences.

*Id.* (emphasis added). Subsection (h) was added by the New York state legislature in 2019 in the same bill which revised the construction provision of the NYSHRL to establish that its provisions should be construed liberally even if "federal civil rights law, including those laws with provisions worded comparably to the provisions of this article" have been construed narrowly. *See Deveaux v. Skechers USA, Inc.*, 2020 WL 1812741, at *3 n.3 (S.D.N.Y. Apr. 9, 2020) (quoting 2019 Sess. Law News of N.Y. Ch. 160 (A. 8421)); N.Y. Exec. Law § 300. "The effect of [that amendment] is to render the standard for claims closer to the standard under the NYCHRL." *Wellner v. Montefiore Med. Ctr.*, 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019). Prior to the effective date of October 11, 2019, allegations of a hostile work environment under the NYSHRL would generally have fallen under section 296(1)(a). *Fellah v. C.U.N.Y.*, 2022 WL 4619902, at *7 n.8 (S.D.N.Y. Sept. 30, 2022). The Court need not and does not determine that the standards for evaluating discrimination and hostile work environment claims under the NYSHRL are identical as they are under the NYCHRL, but treats them as functionally analogous for the purposes of this analysis. *See Moore*, 722 F. Supp. 3d at 253 ("[T]he Court concludes for the same reasons that Plaintiff has adequately pleaded a hostile work environment theory to support her NYCHRL and NYSHRL discrimination claims.").[14]

---

[14] Given the remedial purpose of Section 300 and the text of subsection (h), it stands to reason that although the discrimination and hostile work environment provisions of the NYSHRL are in two different subsections, the purpose of adding subsection (h) was to clarify and codify the difference between the New York state standard and the federal standard for hostile work environment claims. *See Matthew v. Tex. Comptroller of Pub. Accts.*, 2022 WL 4626511, at *10 (S.D.N.Y. Sept. 30, 2022) (describing the effect of the 2019 amendment to subsection (h) as "eliminating any requirement that harassing or discriminatory conduct be 'severe or pervasive' for it to be actionable and adopted instead a more protective standard that prohibits conduct that results in 'inferior terms, conditions or privileges of employment.'" (cleaned up)). The critical provisions of both (a) and (h) suggest that the standard for discrimination under (a) should not be construed as substantially more demanding than (h), particularly in light of the construction

Plaintiff has made out a claim for hostile work environment under both the ADA standard and the more relaxed standards of the NYCHRL and NYSHRL, based on her allegations of workplace harassment that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment on the basis of her disability. Plaintiff has therefore also made out a claim for discrimination on the basis of disability under the NYCHRL and NYSHRL.

Much of the conduct alleged by Plaintiff is protected by the First Amendment. Defendants had a right to supply cast members with unlimited alcohol free of charge and to encourage drinking while Plaintiff was filming, FAC ¶¶ 57, 79–80, to direct Plaintiff that she should continue to consume alcohol so long as she "remain[ed] lucid" while filming, *id.* ¶ 85, to direct her to say lines such as "time for a drink," *id.* ¶ 89, and to critique her sober performances as boring, *id.* ¶¶ 220–221. If Defendants have a First Amendment right to produce a reality television show based on drinking, they also have a right to direct cast members to drink while being filmed for that show.

Plaintiff's allegations, however, are not so narrowly circumscribed. She alleges additional conduct regarding the means Defendants employed to generate their message that can be regulated while imposing only an incidental burden on expressive speech. *See 303 Creative*, 600 U.S. at 596. For example, she alleges that during a meeting to discuss the upcoming Season 13, she was hectored by Defendants' employees about her drinking issues and pressured to say that she did not have a drinking problem, FAC ¶¶ 125–126. She also alleges that Defendants

---

provision in Section 300. Under subsection (a), a claim for discrimination may arise where an employer has "discriminate[d] against such individual in compensation or in terms, conditions or privileges of employment" based on a protected characteristic. Under subsection (h), a claim for a hostile work environment may arise where an employer has "subject[ed] an individual to inferior terms, conditions or privileges of employment" based on a protected characteristic.

disparaged other cast members about their drinking in conversation with Plaintiff in order to convey a hostile message, *id.* ¶¶ 127–130, joked about Plaintiff's drinking issues in her presence despite her requests that they stop, *id.* ¶ 136, taunted her about her alcohol use disorder and tried to undermine her sobriety through harassing comments, *id.* ¶¶ 222, 224, 236, directed other cast members to bring up Plaintiff's mental health and substance abuse issues and to call Plaintiff a drug addict, *Id.* ¶¶ 238–239, and coached fellow cast members to further disparage Plaintiff, *id.* ¶¶ 251–253.  Plaintiff also alleges that Defendant Producers directly coerced and harassed Plaintiff based on her disabilities, including by making light of her panic attacks and joking about her alcohol use disorder.  *Id.* ¶¶ 136, 153–159.

These allegations cannot simply be passed off as an exercise of Defendants' First Amendment right to produce a reality television show in which drinking is involved.  The right to expressive speech does not carry with it a general exemption from all laws that would govern conduct on the set.  *See CompassCare*, 125 F.4th at 60 ("In dealing with the relation of employer and employed, the Legislature has necessarily a wide field of discretion in order that there may be suitable protection of health and safety, and that peace and good order may be promoted through regulations designed to insure wholesome conditions of work and freedom from oppression." (quoting *W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 393 (1937))).  Drawing inferences in the Plaintiff's favor at this stage and recognizing that the First Amendment is an affirmative defense, the FAC adequately alleges conduct of a nonexpressive nature, only indirectly related to or in service of Defendants' expressive activity, that could be regulated while only imposing an incidental burden on speech.  Therefore, Defendants' First Amendment defense fails.[15]

---

[15] Defendants make no argument as to the substance of Plaintiff's disability-related hostile work

### C.      Failure to Accommodate, Failure of Interactive Process

Counts Twenty-Three, Twenty-Four, and Twenty-Five allege failure to reasonably accommodate Plaintiff's disability in violation of federal, state, and New York City law.  Counts Twenty-Six, Twenty-Seven, and Twenty-Eight allege failure to engage in an interactive process necessary to accommodate Plaintiff's disability in violation of federal, state, and New York City law.

The ADA requires employers to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A); *McMillan*, 711 F.3d at 125 ("An employer may also violate the ADA by failing to provide a reasonable accommodation.").  "A plaintiff states a prima facie failure to accommodate claim by demonstrating that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  *Id*. at 125–126; *see also Fox*, 918 F.3d at 73.

"A plaintiff alleging that he was denied a reasonable accommodation bears the burdens of both production and persuasion as to the existence of some accommodation that would allow him to meet the essential eligibility requirements of the service, program, or activity at issue." *Clifford v. County of Rockland*, 528 F. App'x 6, 8 (2d Cir. 2013) (quoting *McElwee v. County of Orange*, 700 F.3d 635, 642 (2d Cir. 2012).  There is authority that supports the proposition that "[r]easonable accommodation for the handicap of alcoholism requires, *inter alia,* that an employee be given time off to participate in a treatment program."  *Williams v. Widnall*, 79 F.3d

---

environment claims, disputing neither the severity nor pervasiveness of the harassing conduct. Accordingly, the Court does not address those issues.

1003, 1006 (10th Cir. 1996); *see Gibbs v. City of New York*, 87 F. Supp. 3d 482, 497 n.19

(S.D.N.Y. 2015); *Van Ever v. N.Y. State Dep't of Corr. Servs. at Sing Sing Corr. Facility*, 2000

WL 1727713, at *3 (S.D.N.Y. Nov. 21, 2000).

"The Second Circuit Court of Appeals has held that 'an employer's failure to engage in a

sufficient interactive process does not form the basis of a claim under the ADA.'" *Balchan v.*

*N.Y.C.H.A.*, 2025 WL 588021, at *9 (S.D.N.Y. Feb. 24, 2025) (quoting *McBride v. BIC*

*Consumer Prods. Mfg. Co.*, 583 F.3d 92, 101 (2d Cir. 2009)); *see also Heiden v. N.Y.C. Health*

*& Hosps. Corp.*, 2023 WL 171888, at *33 n.28 (S.D.N.Y. Jan. 11, 2023) ("[T]here is no

independent cause of action for the failure to engage in an 'interactive process' under the ADA

or NYSHRL, unlike the 'cooperative dialogue' claim under NYCHRL.").

The failure to engage in a "cooperative dialogue" under the NYCHRL is "independently

actionable as a separate claim under the NYCHRL." *Greenbaum v. N.Y.C. Transit Auth.*, 2022

WL 3347893, at *5 (2d Cir. Aug. 15, 2022).

"Cooperative dialogue" for the purposes of the NYCHRL expressly refers to:

> the process by which a covered entity and a person entitled to an accommodation,
> or who may be entitled to an accommodation under the law, engage in good faith
> in a written or oral dialogue concerning the person's accommodation needs;
> potential accommodations that may address the person's accommodation needs,
> including alternatives to a requested accommodation; and the difficulties that such
> potential accommodations may pose for the covered entity.

*Hosking v. Mem'l Sloan-Kettering Cancer Ctr.*, 126 N.Y.S.3d 98, 103 (1st Dep't 2020) (quoting

N.Y.C Admin. Code § 8-102).  However, the NYCHRL does not require an employer to "give

the employee what the employee is demanding."  *Id.* at 104; *see also Stuart v. T-Mobile USA,*

*Inc.*, 2015 WL 4760184, at *10–11 (S.D.N.Y. Aug. 12, 2015) ("[T]he NYCHRL requires only

that Defendants engage in an interactive process with the disabled individual; it does not require

that the individual be satisfied with that process or that the process result in the individual's preferred accommodation.").

Plaintiff has successfully alleged failure to provide reasonable accommodations under the ADA, NYSHRL, and NYCHRL, as well as failure to engage in an interactive process, i.e., "cooperative dialog" in violation of NYCHRL, on the grounds that Plaintiff had covered disabilities of which Defendants had notice, *see* FAC ¶¶ 60–63, 68, 121, 149, 163, 392, which Defendants refused to accommodate notwithstanding that notice. Among other allegations, Plaintiff claims that during filming of RHUGT, she requested as an accommodation to be allowed to attend AA meetings while in Thailand, which other cast members had been allowed to do. *Id.* ¶¶ 211–213. However, once filming began, Defendant Producers failed to facilitate Plaintiff's participation in AA meetings. Specifically, Paparazzo told Plaintiff that Shed would not provide transportation to AA meetings in Thailand or accommodate such attendance with the filming schedule. *Id.* ¶ 231. Plaintiff alleges that such facilitation would not have caused unreasonable hardship or expense, particularly compared to the cost of alcohol and transportation the production covered for cast members to go to clubs. *Id.* ¶¶ 233–234.

There is no First Amendment defense to Plaintiff's accommodation-related claims. A "reasonable accommodation" is by definition one that can be made without fundamentally infringing on the expressive conduct of the production. There is therefore no tension in applying the requirements of "reasonable accommodation" and "cooperative dialog" to the facts as alleged in this case. At this stage, accepting Plaintiff's pleading as true, her request to attend an AA meeting could have been accommodated without unreasonable hardship or expense. The Court therefore need not address at this stage whether any of Plaintiff's other allegations might also constitute failures to provide reasonable accommodations or engage in cooperative dialog.

### D.      Retaliation and Interference Claims

Counts Eighteen, Nineteen, and Twenty allege retaliation for opposing unlawful disability-related employment practices in violation of federal, state, and New York City law against all Defendants.  Counts Thirty, Thirty-One, and Thirty-Three allege retaliation in violation of federal, state, and city law against Defendant Cohen specifically.  Count Thirty-Three alleges interference in violation of NYCHRL against Defendant Cohen.

The ADA prohibits retaliation against an individual who "has opposed any act or practice made unlawful by this chapter."  42 U.S.C. § 12203(a).  "Like discrimination claims, retaliation claims are analyzed using the *McDonnell Douglas* burden-shifting framework."  *Frantti v. New York*, 850 F. App'x 17, 21 (2d Cir. 2021) (citing *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001)).  "To establish a prima facie case of retaliation, [a plaintiff] must show that: '(1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity.'"  *Id.* (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)).  "Once a plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate non-retaliatory reason for the challenged employment action."  *Id.*  "If the defendant meets the burden, the plaintiff must adduce evidence 'that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.'"  *Id.* (quoting *Treglia*, 313 F.3d at 721).

"[M]aking a good faith request for an accommodation is a protected activity."  *Norman*, 492 F. Supp. 3d at 166 (citing *Weixel v. Bd. of Educ. of City of N. Y.*, 287 F.3d 138, 149 (2d Cir. 2002)); *see also Rodriguez v. Atria Sr. Living Grp., Inc.*, 887 F. Supp. 2d 503, 512 (S.D.N.Y. 2012).  Complaining to a supervisor, instituting litigation, or filing a formal complaint about the

defendant's discriminatory conduct are each considered protected activities.  *See Ruiz v. City of New York*, 2015 WL 5146629, at *6 (S.D.N.Y. Sept. 2, 2015).  A complaint to a supervisor need not have had merit to make it a protected activity.  *See Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012).  Instead, an employee's complaint must only be "sufficiently pointed to be reasonably understood as a complaint [about] discrimination," *Cardwell v. Davis Polk & Wardwell LLP*, 2020 WL 6274826, at *31 (S.D.N.Y. Oct. 24, 2020) (internal quotations and citations omitted), and the employee must have a "good faith, reasonable belief that the underlying employment practice was unlawful."  *Symotyuk-Knoll v. HealthEquity, Inc.*, 2023 WL 5576405, at *5 (S.D.N.Y. Aug. 29, 2023) (cleaned up) (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)).

 "[T]he harm element of a retaliation claim is not to be analyzed in the same way as the harm from an alleged substantive act of discrimination."  *Ahmad*, 2021 WL 1225875, at *26 (quoting *Davis-Garett v. Urb. Outfitters*, Inc., 921 F.3d 30, 43–44 (2d Cir. 2019)).  In the context of a retaliation claim, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  *Vega*, 801 F.3d at 90 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).  "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination."  *Id*.

However, the plaintiff must still adequately plead a causal connection between her protected activity and the adverse employment action.  *See Fox*, 918 F.3d at 72–73 ("[The plaintiff] must show that he engaged in a protected activity, that he suffered an adverse employment action, and that a causal connection exists between that protected activity and the adverse employment action.").  For instance, "[t]here can be no inference of retaliation where the

protected activity occurred after the adverse employment action." *Richards*, 2022 WL 329226,

at *17 (quoting *Pinero v. Long Island State Veterans Home*, 375 F. Supp. 2d 162, 168 (E.D.N.Y.

2005)).  In drawing the inference of a causal relationship between the protected activity and the

adverse employment action, the time elapsed between the two matters.  *See Bamba v. U.S. Dep't

of Homeland Sec.*, 2024 WL 3924810, at *18 (S.D.N.Y. Aug. 23, 2024) ("Although generally a

gap of more than two to three months will therefore defeat an inference of causation, this is not a

bright-line rule." (citing *Massaro v. N.Y.C. Dep't of Educ.*, 2022 WL 1788203, at *2 (2d Cir.

June 2, 2022), *cert. denied*, 143 S. Ct. 372 (2022))).

### 1.    Retaliation Through Re-Casting Decision

Defendants do not dispute that Plaintiff's claim of retaliation based on the decision not to

recast her on RHONY satisfies the ADA as well as state and city law, raising only a First

Amendment defense.

Plaintiff has adequately alleged that she engaged in an activity protected by the ADA and

city and state analogs, and that Defendants were aware of this activity.[16]  As described in more

detail above, Plaintiff requested various accommodations for her disabilities.  FAC ¶¶ 106, 132,

137, 153–159, 173–176, 210–213, 223–224, 229–235.  She raised her concerns to her employers

directly.  *Id.* ¶¶ 223–224, 241–242, 244–248, 251–253.[17]  She eventually made a formal

---

[16] Because the standards for a retaliation claim under the NYCHRL and NYSHRL are more
forgiving than under the ADA, the conclusion that the Plaintiff has sufficiently alleged retaliation
under the ADA supports the result that Plaintiff has alleged retaliation under the city and state
standards.  *See Moore*, 722 F. Supp. at 247 (holding that an adverse employment action is not a
required element under NYSHRL and NYCHRL, such that "a plaintiff can survive a motion to
dismiss if she shows that something happened that was reasonably likely to deter a person from
engaging in protected activity," but that otherwise, the burden on the other three prongs of a
prima facie retaliation claim under the federal antidiscrimination law is identical to the
NYCHRL and NYSHRL standards) (cleaned up)).

[17] "Pleading 'general corporate knowledge' of a protected activity suffices to satisfy the
knowledge prong of a retaliation claim."  *Moore*, 722 F.Supp.3d at 256 (citing *Patane v. Clark*,
508 F.3d 106, 115 (2d Cir. 2007)).  Such general corporate knowledge "arise[s] when a

complaint to Defendants' HR regarding her disability-related claims in late fall 2022, which was resolved without action in late December 2022.  *Id.* ¶¶ 276–282.  She then filed complaints against Defendants with the NY State Human Rights Department and the EEOC on March 15, 2023.  *Id.* ¶ 30.

Plaintiff has also plausibly alleged that Defendants took adverse employment actions within the meaning of ADA retaliation, and its city and state analogs.  For example, despite repeated promises to employ Plaintiff on RHONY Legacy, after Plaintiff issued a formal complaint to Defendants' HR, Defendants notified Plaintiff that they would not continue her employment as a RHONY Legacy cast member.  *Id.* ¶ 285.  Cohen texted Plaintiff to that effect on November 10, 2022, referencing Plaintiff's complaint of discrimination previously brought to the attention of Bravo employee Sezin Cavusoglu as part of the reason she would not be cast.  *Id.* ¶¶ 286–288.  Around this time, Cohen and Shannon were in close contact with Plaintiff regarding casting for RHONY, strongly implying that Plaintiff would be cast for either RHONY Legacy or RHONY Season 14.  Even after Cohen informed Plaintiff that she would not be cast on RHONY Legacy, Plaintiff understood that she would instead be cast on RHONY Season 14, but Defendants ultimately declined to cast her for Season 14.  *Id.* ¶¶ 292–297.  The expressly negative responses of Defendants to Plaintiff's protected activity, the fact that Plaintiff had been told that she would likely be cast on at least one of the two shows, and the close temporal nexus between that protected activity of filing a report with Defendant HR and the decision not to recast Plaintiff, within a range of one or two months, adequately suggest at this stage an

---

supervisor, corporate officer, or employee whose job it is to investigate and resolve discrimination complaints becomes aware of the protected activity."  *Armstrong v. Metro. Transp. Auth.*, 2014 WL 4276336, at *20 (S.D.N.Y. Aug. 28, 2014) (emphasis added) (citing *Patane*, 508 F.3d at 115).

inference of retaliatory intent.  *See Vega*, 801 F.3d at 90–92 (an allegation that two months had passed before an adverse employment action sufficed to create an indirect inference of causation).

There is no First Amendment right to retaliate against an employee for protected activity, as retaliation is not "inherently expressive."  *Moore*, 722 F. Supp. 3d at 263.  "Such an alleged retaliatory firing is in no way related to the artistic storytelling that confers certain First Amendment protections upon Defendant."  *Id. (citing Rowell v. Sony Pictures Television, Inc.*, 2016 WL 10644537, at \*10 (C.D. Cal. June 24, 2016) (rejecting defendant television producers' First Amendment defense to retaliation claims where the complaint lacked any allegation "that the decision not to hire [the plaintiff] was related to Defendants' creative vision")).

### 2.    Retaliation Through March Letter

Defendants' more substantial challenge is to the allegation that Cohen retaliated against Plaintiff in connection with a letter that Cohen's lawyers sent to Plaintiff's lawyer on March 6, 2024, after she filed her initial complaint in this matter on February 27, 2024.  FAC ¶¶ 303–315. In the March Letter, Cohen's counsel demanded that Plaintiff retract and withdraw the allegations in her complaint that Cohen had used cocaine with Bravo cast members.  Dkt. No. 59-12.  Defendants argue that Plaintiff's retaliation claims as to Defendant Cohen based on the March Letter should be dismissed because (1) the March Letter was not an "adverse action"; and (2) there is no causal connection between the letter and any protected activity.  Dkt. No. 58 at 26–29.

Plaintiff has adequately alleged that she engaged in activity protected by the ADA and city and state analogs, and that Defendants were aware of this activity.  For Plaintiff's complaint to be protected, she need not have adequately stated claims for disability-related or gender discrimination or hostile work environment.  Nor need the Court address whether the allegation

of cocaine use to which the March Letter is addressed is material and pertinent to those claims. Plaintiff alleges that the cocaine usage is part and parcel of a hostile work environment to those with substance abuse disorders. *See* FAC ¶ 337 ("Defendant Cohen intentionally uses cocaine with his employees to further promote a workplace culture that thrives off drug and alcohol abuse, which leads to a failure to accommodate employees who are disabled and attempting to remain substance free"). For the purposes of establishing that Plaintiff's activity was protected, she need only have had a "good faith, reasonable belief that the underlying employment practice was unlawful." *Symotyuk-Knoll*, 2023 WL 5576405, at *5 (cleaned up) (quoting *A.W. Lawrence*, 95 F.3d at 1178)). She has adequately alleged that the filing of the complaint, with the cocaine allegation, was protected activity.

The transmission of the March Letter to Plaintiff via her attorney, however, is not an adverse action within the meaning of the ADA or its state and city counterparts. Courts have held that an employer who is facing a lawsuit filed by its employee charging discrimination can file a counterclaim without committing an adverse action within the meaning of the antidiscrimination statutes so long as the counterclaim is filed without a retaliatory motive and with a reasonable basis in fact or law. *See Kim v. Lee*, 576 F. Supp. 3d 14, 31 (S.D.N.Y. 2021), *aff'd*, 2023 WL 2317248 (2d Cir. Mar. 2, 2023) (citing cases); *Klein v. Town & Country Fine Jewelry Grp., Inc.*, 725 N.Y.S.2d 42, 42 (2001) (noting that it is "rare . . . that the filing of a counterclaim can serve as the basis for a retaliation claim."); *Torres v. Gristede's Operating Corp.*, 628 F.Supp.2d 447, 472–73 (S.D.N.Y. 2008) (allowing retaliation counterclaims to proceed in an FLSA action where the court found the counterclaims to be "completely baseless" and made in bad faith); *Arevalo v. Burg*, 10 N.Y.S.3d 231, 231 (1st Dep't 2015). While litigation may negatively impact a worker's reputation and dissuade a reasonable worker from

making a charge of discrimination, it also enjoys constitutional protection.  The Supreme Court has recognized that "[t]he right of access to the courts is . . . one aspect of the right to petition" the government for a redress of grievances secured by the First Amendment to the Constitution.  *Cal.Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).  "[T]he First Amendment affords the employer, as well as an employee, [the right] to petition the Government for redress of grievances and, in particular, to have access to the courts for the redress of those grievances."  *Robinson*, 739 F. Supp. 3d at 89–90 (citing *Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 741 (1983)).  "The underlying principle is that the employer should not be required to forfeit a potentially meritorious claim against its employee simply because the employee has brought a claim against the employer."  *Sherman v. Fivesky*, 2020 WL 5105164, at *6 (S.D.N.Y. Aug. 31, 2020) (citing *Grauer v. UBS Finan. Servs., Inc.*, 2008 WL 11398936, at *8 (S.D.N.Y. Dec. 17, 2008)); *see also Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 342 (S.D.N.Y. 2009) ("[N]othing in Title VII or any other anti-discrimination statute . . . should prevent an employer from bringing a legitimate claim against a current or former employee simply because that employee has complained about what the employee believes to be discriminatory behavior.").  Indeed, "the ability to lawfully prosecute even unsuccessful suits adds legitimacy to the court system as a designated alternative to force."  *Sherman*, 2020 WL 5105164, at *5(quoting *BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 532 (2002)).  "Due process requires that there be an opportunity to present every available defense."  *Lindsey v. Normet*, 405 U.S. 56, 66 (1972) (quoting *Am. Surety Co. v. Baldwin*, 287 U.S. 156, 168 (1932)).  Further, "[e]mployers should . . . not be discouraged from expressing their own potential claims, at least where, as here, such claims are addressed to the employee's attorney."  *Klein v. Town & Country Fine Jewelry Grp.*, 725 N.Y.S.2d 42, 42 (1st Dep't 2001).

The conclusion that a counterclaim that is not objectively baseless is not retaliatory fits squarely within the doctrine regarding an adverse action under the statutes prohibiting retaliation. "[N]o reasonable employee should expect that the employer-defendant would simply surrender in the face of litigation.  Although the threat of a vigorous defense . . . might well cause an employee to think carefully about whether to start litigation at all, that threat is not the 'retaliation' that Congress had in mind in crafting the retaliation provisions of [federal antidiscrimination law]."  *Sherman*, 2020 WL 5105164, at *6; *see also Robinson*, 739 F. Supp. 3d at 90 (the risk that an employer when sued by an employee will countersue is one that 'all employees experience'") (quoting *Burlington N.*, 548 U.S. at 68)).

If an employer can file a counterclaim without running afoul of the retaliation provisions of the antidiscrimination laws, it follows *a fortiori* that the employer can send a letter that does not actually initiate litigation but simply raises the specter of it.  The March Letter here did not itself subject Plaintiff to any risk of liability.  Cohen's lawyer simply asked that Plaintiff retract and withdraw her allegations that Cohen had used cocaine and reserved his rights to hold Plaintiff's counsel and Plaintiff herself "accountable to the fullest extent of the law," if they did not do so.  Dkt. No. 59-12 at 2.[18]  It also demanded a public retraction and apology.  *Id.* at 3. The letter did not state that Cohen would actually file any lawsuit against Plaintiff.  Moreover, it was sent not by Cohen himself or directly to Plaintiff but by Cohen's lawyer privately to

---

[18] The Court may consider the March Letter because "the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint."  *In re Turquoise Hill Res. Ltd.*, 2024 WL 4711185, at *8 (S.D.N.Y. Nov. 7, 2024) (quoting *Searle v. Red Creek Cent. Sch. Dist.*, 2023 WL 3398137, at *2 (2d Cir. May 12, 2023)).  Plaintiff's reliance on the March Letter is "more than a mention or even limited quotations."  *Id.*  Rather, the document is "necessary to the 'short and plain statement of the claim showing that [a plaintiff is] entitled to relief.'"  *Id.* (quoting *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 68 (2d Cir. 2008) (quoting Fed. R. Civ. P. 8(a)(2))).

Plaintiff's lawyer. "Context matters" in assessing the meaning and effect of allegedly adverse actions. *Burlington N.*, 548 U.S. at 69. Lawyers frequently send letters to their litigation counterparts demanding action and threatening litigation consequences. To the extent that the threats were empty ones, as Plaintiff now contends, *see* Dkt. No. 82 at 27–28, Plaintiff would have been fully able to understand that through her own counsel.

Moreover, although the March Letter was strongly worded, it was not objectively baseless. The March Letter stated that "[a]n allegation of drug use in the workplace is a serious charge" and that where "such allegations are false, they are defamatory per se." Dkt. No. 59-12 at 2. The proposition is an unexceptional, and accurate, statement of law. *See, e.g.*, *Paul v. Davis*, 424 U.S. 693, 697 (1976) ("Imputing criminal behavior to an individual is generally considered defamatory per se."); *Sang Lan v. Time Warner, Inc.*, 2014 WL 764250, at *9 (S.D.N.Y. Feb. 25, 2014) (listing "charging plaintiff with a serious crime" as one of four categories of statements that are per se defamatory under New York law (citing *Epifani v. Johnson*, 882 N.Y.S.2d 234, 234 (2nd Dep't 2009))). The letter goes on to state that "[t]he allegations lost any arguable legal immunity given that they were asserted maliciously and sent to the media and other third parties, with the goal of generating widespread media coverage painting Mr. Cohen in a false and negative light." Dkt. No. 59-12 at 2. The proposition again is unexceptional. The immunity with which a judicial filing is cloaked against a defamation lawsuit can be lost when a suit is "maliciously institute[d] . . .alleging false and defamatory charges," and plaintiffs then circulate press releases, copies, or other statements relating to that suit to the media. *Sheindlin v. Brady*, 597 F. Supp. 3d 607, 630-31 (S.D.N.Y. 2022); *Gottwald v. Sebert*, 40 N.Y.3d 240, 255 (N.Y. 2023) (quoting *Williams v. Williams*, 246 N.E.2d 333, 333 (N.Y. 1969)). Finally, the letter stated that the allegations about cocaine use subjected Plaintiff's

counsel and Plaintiff "to independent and substantial legal exposure." Dkt. No. 59-12 at 2. That

claim, based on the premise stated within the letter itself, also was not objectively baseless. If, as

Cohen's lawyer claimed, the allegation was made knowing it was false and with an improper

purpose, there is an argument (as Cohen's counsel stated) that the pleading could subject both

Plaintiff and her lawyer to Rule 11 sanctions, including monetary sanctions. *See Williamson v.*

*Recovery Ltd. P'ship*, 542 F.3d 43, 51 (2d Cir. 2008) ("Rule 11(c) of the Federal Rules of Civil

Procedures allows the court to sanction a party, if the court determines that the party has violated

Rule 11(b) by making false, misleading, improper, or frivolous representations to the court."

(citing Fed. R. Civ. P. 11)). If, as the March Letter also suggested, the cocaine allegation was

not "material and pertinent to the questions involved," then Plaintiff and her lawyer also faced

the risk of a defamation lawsuit. *See Gottwald*, 40 N.Y.3d at 253 ("This Court has long held that

'absolute immunity from liability for defamation exists for oral or written statements made by

attorneys in connection with a proceeding before a court "when such words and writings are

material and pertinent to the questions involved."'" (quoting *Front, Inc. v Khalil*, 24 NY3d 713,

718 (2015) (quoting in turn *Youmans v Smith*, 153 NY 214, 219 (1897)))). "Defendants are

entitled to probe those issues as part of their defense." *Sherman*, 2020 WL 5105164, at *5.[19]

---

[19] Plaintiff alleges that the March Letter was baseless, and knowingly so, because Cohen's
attorney "authored an article advising his law firm, Gibson Dunn, that allegations included in a
complaint are absolutely privileged" against defamation suits under New York law. FAC ¶ 308.
The allegation is misleadingly incomplete. The Gibson Dunn article to which the complaint
hyperlinks is in fact an exposition of the New York Court of Appeals' 2023 *Gottwald* decision.
The article itself points out the limitations of the absolute litigation privilege as to both
"pertinence" and the narrow exception to the Section 74 "fair report" privilege recognized in
*Williams*, 246 N.E.2d at 333, which the *Gottwald* court reiterated. Thus, the claim is undermined
by the very document to which it cites. Moreover, even if there were statements in the article
inconsistent with the assertions in the March Letter, that would not support a claim of retaliation.
Plaintiff's allegation asks the wrong question. The question is not counsel's subjective belief
regarding the scope of protection accorded by New York law to statements made in lawsuits. A
retaliation claim does not give the aggrieved employee the excuse to probe into attorney-client

Plaintiff does not rest her claim solely on the sending of the March Letter to her counsel. She alleges that Cohen simultaneously published the letter to various media outlets, such as Page 6, Deadline, Variety, and the Hollywood Reporter.  FAC ¶ 312.  She also asserts that the decision to publish the letter to the media was made "with the malicious intent of harming Plaintiff's reputation in the entertainment industry, thereby negatively affecting Plaintiff's prospective employment or business opportunities."  *Id.* ¶ 894.  Whether Plaintiff has alleged sufficient facts to make it plausible that the sending of the March Letter to the media constitutes an adverse action raises a distinct legal question, different from the question whether the sending of the letter to counsel constitutes an adverse action.

The courts have held that an action by an employer that sullies a plaintiff's reputation, thereby affecting "tangible *future* employment objectives," can be retaliatory.  *Wannamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) (stating that a retaliation claim could be maintained where a former employer "blacklists" a former employee, "wrongfully" refuses to write a letter of recommendation, or sullies a plaintiff's reputation, but not where employers has placed only "a minor, ministerial stumbling block towards securing future employment" such as "barring a terminated employee from using an office and phone to conduct a job hunt").  Thus, for example, the transmission of a negative reference or even in some cases, the refusal to provide a letter of reference, can be retaliatory within the meaning of the antidiscrimination statutes.  *See Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 391–92 (S.D.N.Y. 2019) (collecting cases); *Silver v. Mohasco Corp.*, 602 F.2d 1083, 1086, 1090 (2d Cir.

---

communications to determine what was said about the law and the risks that the employer might face of an adverse decision.  The question is instead whether the claim is "objectively baseless."  *See Cal. Motor* , 404 U.S. at 510; *Bill Johnson's Restaurants*, 461 U.S. at 741.  That question may be addressed on the law without any need or basis to inquire into otherwise privileged communications.

1979) (finding that post-employment "blacklisting," i.e., "supplying unfavorable references to prospective employers," falls within the scope of retaliatory provisions of Title VII);  *Costantin v. N.Y.C. Fire Dep't*, 2009 WL 3053851, at *14 (S.D.N.Y. Sept. 22, 2009) (finding that denial of recommendation letter sufficed for adverse employment action even where plaintiff could have asked a different supervisor and where letter would only have made her eligible for, not guaranteed, her access to an internal loan program which would have defrayed the cost of retraining for a higher-paying role); *Patchenko v. C.B. Dolge Co., Inc.*, 581 F.2d 1052, 1054–55 (2d Cir.1978) (finding that a refusal to provide a letter of recommendation and making "disparaging and untrue statements about her to her prospective employers" constituted adverse employment action); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 178–79 (2d Cir. 2005) (holding that a retaliation claim based on a negative job reference claim was actionable where former supervisor made a false statement to an inquiring prospective employer that he could not discuss her qualifications because she "had a lawsuit pending" against employer where no such suit was yet pending).  Where future employment requires "a wholesome reputation," a letter that "besmirch[es]" the employee's reputation may constitute an adverse action. *Wanamaker*, 108 F.3d at 466.  The principle extends even to a letter that impairs the employee's future educational prospects.  *See Robinson*, 739 F. Supp. 3d at 113 (holding that refusing to provide a letter of reference may be adverse employment action even if it is for professional school rather than a future job, but finding on the facts that defendant had offered a non-pretextual, non-retaliatory motive for the refusal).

Plaintiff's claim sounds in these cases.  She essentially asserts that, regardless whether the March Letter had legal merit based on its factual assumptions, the transmission of the March Letter to the media was not protected by the First Amendment right of access and, if it was not

protected by the First Amendment, that it should be considered adverse.  Her claim would have

the Court find that the March Letter was sent to the press not to defend Cohen's reputation but to

deter her and others from making claims of discrimination against Cohen.  But Plaintiff has not

alleged facts in her complaint sufficient to make that claim plausible.

The cases holding that post-employment conduct is adverse involve communications

made to or withheld from prospective employers, *see e.g.*, *Schaper*, 408 F. Supp. 3d at 391–92;

*Silver*, 602 F.2d at 1086; *Patchenko*, 581 F.2d at 1054–55; *Jute*, 420 F.3d at 178–79, or

gatekeepers to prospective employment, *see e.g., Robinson*, 739 F. Supp. 3d at 113

(recommendation for professional school); *Costantin*, 2009 WL 3053851, at *14

(recommendation for internal loan program which would have defrayed the cost of retraining for

a higher-paying role).  They also turn on the fact that the letters (or failure to send a letter)

convey something negative about the employee's job performance or professional reputation or

that could bear on the future employer's potential hiring decision .  *See, e.g., Corbett v.

Napolitano*, 897 F. Supp. 2d 96, 113 (E.D.N.Y. 2012) (finding adverse employment action where

former supervisors told a background investigator that he "would not recommend [plaintiff] for a

position of trust with the federal government," and that plaintiff "was repeatedly late for work"

and "was involved in a security violation").  When the action "presents only a minor, ministerial

stumbling block toward securing future employment" or when the allegations are "conclusory"

and "unsupported," the courts have found that the plaintiff has not stated a claim.  *See

Wanamaker*, 108 F.3d at 466; *Blutreich v. N. Shore-Long Island Jewish Health Sys., Inc.*, 844 F.

App'x 417, 419 (2d Cir. 2021) (finding no adverse employment action on summary judgment

where, contrary to plaintiff's allegations, no evidence showed that prospective employers

communicated or sought a reference from the sources of the purportedly negative references, the

description of plaintiff's role in the employment verification report was accurate, and the former employer had taken a reasonable amount of time to process requests for employment verification); *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999) (no evidence that statements of former employer caused or contributed to the rejection by the prospective employer).

The March Letter on its face is not analogous to the negative references or refusals to provide letters of recommendation that the courts have found to be actionable. Plaintiff's allegation also is conclusory and unsupported. The letter casts doubt on Plaintiff's allegations and not on Plaintiff's performance as an actor or reputation as an employee in the entertainment industry. The letter states that her "allegations are missing every detail, including the who, where, and when." Dkt. No. 59-12 at 2. It further accuses her lawyer, as well as Plaintiff herself, of litigation misconduct, claiming that the allegations in the complaint were made with the improper purposes of using them "to force an unjustified settlement." *Id.* at 2. The language is the same as the Court would expect to see in a court filing accusing counsel of a Rule 11 violation. And, while it might have cast Plaintiff as "a vexatiously litigious liar," as Plaintiff argues, Dkt. No. 82 at 30, it is indiscriminate. It casts the same aspersions on Plaintiff's counsel, suggesting that the decision is as much that of the lawyer as of the client. Tellingly, there is no well-pleaded allegation that the sending of the March Letter to the media "caused Plaintiff any incremental harm or injury," beyond what she would have already caused to herself by the filing of the lawsuit and the allegations contained within it. *Robinson*, 739 F. Supp. 3d at 96. Plaintiff showed herself to be litigious by filing a lawsuit which she would have known, from its targets, would receive public attention, and she could reasonably expect that the Defendant would deny the allegation. She was not entitled to assume to the contrary. "The anti-retaliation provision

protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N.*, 548 U.S. at 67; *see also Reichman v. City of N. Y.*, 117 N.Y.S.3d 280, 280 (1st Dep't 2020) (quoting *Burlington N.* in the context of the NYSHRL).

The only allegation that Plaintiff makes regarding the harm or injury resulting from sending the letter to the media are the bare statements that Cohen's act of causing the March Letter's publication was "intended to smear [Plaintiff] in the media," FAC ¶¶ 315, "with the malicious intent of harming Plaintiff's reputation in the entertainment industry, thereby negatively affecting Plaintiff's prospective employment or business opportunities," *id.* ¶ 894. But that claim is purely conclusory. Plaintiff does not describe how the March Letter, which does not discuss her professional performance as a RHONY cast member at all, might nonetheless impact her prospective employment or business opportunities. *See Yankelevitz v. Cornell Univ.*, 1996 WL 447749, at *5 (S.D.N.Y. Aug.7, 1996) (finding that counterclaim at issue was actionable because it "shed a negative light on plaintiff's professionalism and ethics . . . [and] mar[red] plaintiff's professional reputation"). Plaintiff's allegation as to the March Letter is framed in terms of intent, not effect. Indeed, the complaint does not allege facts suggesting that the March Letter itself had any impact on Plaintiff's career in the industry or that it had any prospect of doing so. [20] Absent more than a "[t]hreadbare" recitation of the elements, *Iqbal*, 556 U.S. at 678, this Court cannot find that the publication of the March Letter constituted an adverse employment action. *See Cooper v. N.Y. State Dep't of Labor*, 819 F.3d 678, 680 (2d

---

[20] As set out in Section I.D.1., the NYSHRL and NYCHRL do not require an "adverse employment action" in order to state a claim for retaliation, *see Moore*, 722 F. Supp. at 247, but only that "something happened that was reasonably likely to deter a person from engaging in protected activity." *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 67 (S.D.N.Y. 2020). Plaintiff's threadbare allegations do not support a reasonable likelihood of deterrence under the NYSHRL and NYCHRL, and those claims are likewise dismissed without prejudice.

Cir. 2016) (applying federal pleading standards to retaliation claims under the NYSHRL).

Plaintiff's claim of retaliation based on the March Letter is accordingly dismissed without

prejudice.

The Court need not reach the merits of Plaintiff's interference claim. Because Plaintiff

does not address this claim in her briefing, the Court will consider it waived. *See First Cap.*

*Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369 (S.D.N.Y. July 29, 2002) (waiving

plaintiff's argument when plaintiff failed to address the argument in their memorandum of law).

### E. Disability-Related Claims as to Defendant Producers

Defendants argue that the above disability-related claims may not be maintained against

the Defendant Producers because individual defendants can only be liable as "employers" under

the NYCHRL and NYSHRL, and Defendant Producers are not Plaintiff's employers. Dkt. No.

58 at 26.

Individual liability exists under NYCHRL and NYSHRL "if either (1) the individual

defendant is an 'employer,' . . . or (2) the defendant aided and abetted the unlawful

discriminatory acts." *Stanley v. Mount Sinai Health Sys., Inc.*, 2023 WL 8355393, at *13

(S.D.N.Y. Dec. 1, 2023). "An individual defendant is liable as an 'employer' . . . 'when that

individual has an ownership interest in the relevant organization or the power to do more than

carry out personnel decisions made by others,' i.e., the power to hire or fire." *Xiang v. Eagle*

*Enters., LLC*, 2020 WL 248941, at *5 (S.D.N.Y. Jan. 16, 2020) (quoting *Townsend v. Benjamin*

*Enters., Inc.*, 679 F.3d 41, 57 (2d Cir. 2012)).

To state a claim for aiding and abetting unlawful retaliation under both the NYCHRL and

NYSHRL laws, a plaintiff must plead both that the "defendant actually participate[d] in the

conduct giving rise to the retaliation claim," *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp.

3d 309, 337 (S.D.N.Y. 2020) (internal quotation marks omitted); *see also Lewis v. Turning Point*

*Brooklyn, Inc.*, 2019 WL 1433068, at *6 (E.D.N.Y. Mar. 29, 2019), and that the defendant

"share[d] the intent or purpose of the principal actor," *Fried v. LVI Servs., Inc.*, 2011 WL

2119748, at *7 (S.D.N.Y. May 23, 2011) (internal quotation marks omitted); *see, e.g.*, *Feingold*

*v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) (noting that the same standard governs aiding-

and-abetting claims under the NYSHRL and the NYCHRL "because the language of the two

laws is virtually identical" (internal quotation marks omitted)). The aider and abettor need not

have had an employer-employee or supervisory relationship with the plaintiff.  *See Emanuel v.*

*City of New York*, 2024 WL 3638328, at *7 (S.D.N.Y. Aug. 2, 2024) (citing N.Y. Exec. Law

§ 296(6); N.Y.C Admin. Code § 8-107(6)); *Feingold*, 366 F.3d at 158 ("[A] co-worker who

actually participates in the conduct giving rise to a discrimination claim [can] be held liable

under the NYSHRL [or NYCHRL] even though that co-worker lacked the authority to either hire

or fire the plaintiff.").  "Significantly, however, 'an individual cannot aid and abet his or her own

violation' of the statute." *Emanuel*, 2024 WL 3638328, at *7 (quoting *Baptiste v. C.U.N.Y.*, 680

F. Supp. 3d 415, 27 (S.D.N.Y. 2023)); *see also Singhal v. Doughnut Plant, Inc.*, 2022 WL

976885, at *5 (S.D.N.Y. Mar. 31, 2022) ("Under the NYSHRL and NYCHRL, [an] individual[ ]

may not be held liable merely for aiding and abetting his own discriminatory conduct but only

for assisting another party in violating that law." (cleaned up)).

　　　Plaintiff offers conclusory allegations that Defendant Producers "have decision making

power over the terms of the Housewives' employment," FAC ¶ 47, but does not allege that any

of the Defendant Producers had hiring or firing power, or an ownership interest in RHONY.

Defendant Producers may not therefore be held liable as Plaintiff's employers under NYCHRL

or NYSHRL.  Plaintiff argues that her claims against the Defendant Producers should survive as

claims that they "aided and abetted" Plaintiff's employers' discriminatory acts.  Dkt. No. 82 at

22. However, Plaintiff has not plead aiding and abetting as to the Defendant Producers. Plaintiff's disability-related claims as to Defendant Producers are therefore dismissed without prejudice.

## II. Gender-Based Claims

### A. Discrimination and Hostile Work Environment Claims Based on Sex/Gender

Counts Two, Four, Seven, Ten, Twelve, and Fifteen allege discrimination and hostile work environment on the basis of sex or gender in violation of federal, state, and New York City law based on several communications between Plaintiff and Defendant Cohen in 2020. Defendants argue that the claims should all be dismissed because (1) all but one of the communications is time-barred; and (2) the remaining communication does not support a viable claim. Dkt. No. 58 at 12–17. Defendants also argue that two of the allegedly untimely gender-based factual allegations are barred by the First Amendment and are too trivial to support a claim. *Id.* at 18. Plaintiff in turn argues that her gender-related allegations cannot be reduced to the three specified incidents relating to the Plaintiff directly but should also take into account the "mosaic" of allegations in her complaint relating to gender. Dkt. No. 82 at 12. With respect to the three specific incidents, she argues that two are not untimely as they form part of a "continuing violation," *id.* at 17–18, and that all three in context are non-trivial, *id.* at 10–11.

### 1. Legal Standards

When only indirect evidence of intent to discriminate is available, discrimination claims under Title VII are subject to the three-step burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See Bart v. Golub Corp.*, 96 F.4th 566, 569 (2d Cir. 2024) ("To succeed on a Title VII disparate treatment claim, a plaintiff must prove discrimination either by direct evidence of intent to discriminate or, more commonly, by indirectly showing circumstances giving rise to an inference of discrimination." (internal

quotations omitted)), *cert. denied sub nom. The Golub Corp. v. Elaine Bart*, 145 S. Ct. 173

(2024); *DeMuth v. U.S. Small Bus. Admin.*, 819 F. App'x 23, 25 (2d Cir. 2020) (summary order);

*Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015).  Under that framework, a plaintiff must first

establish "a *prima facie* case of discrimination."  *DeMuth*, 819 F. App'x at 25.  To do so, she

must show that "(1) she belonged to a protected class; (2) she was qualified for the position she

held; (3) she suffered an adverse employment action; and (4) the adverse employment action

occurred under circumstances giving rise to an inference of discriminatory intent."  *Fischman v.

Mitsubishi Chem. Holdings Am., Inc.*, 2023 WL 4763257, at *5 (S.D.N.Y. July 26, 2023) (citing

*Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *Terry*, 336 F.3d at 138).  An

"adverse employment action" under the Title VII discrimination standard must be "more

disruptive than a mere inconvenience or an alteration of job responsibilities."  *Vega*, 801 F.3d at

85.  "Examples of materially adverse changes include termination of employment, a demotion

evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits,

significantly diminished material responsibilities, or other indices unique to a particular

situation."  *Id.* (internal quotations omitted).

     Hostile work environment claims under Title VII arise when "the workplace is permeated

with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the

conditions of the victim's employment."  *Kassner*, 496 F.3d at 240 (quoting *Brennan v. Metro.

Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999)) (internal quotations omitted); *see Cruz v. Coach

Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000).  A plaintiff must allege that the conduct "(1) was

objectively severe or pervasive in that it created an environment that a reasonable person would

find hostile or abusive; (2) created an environment that the plaintiff subjectively perceived as

hostile or abusive; and (3) occurred because of the plaintiff's protected characteristic."  *Sherman*,

2020 WL 2136227, at *5.  "[A] plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) (citation and quotation marks omitted). Objective severity "can be determined only by looking at all of the circumstances [including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.  The Second Circuit has "cautioned against setting the bar too high" in the context of a motion to dismiss a claim of hostile workplace, and a plaintiff is therefore not required to recount an exhaustive list of specific acts that contributed to a hostile workplace. *Patane*, 508 F.3d at 113 (quoting *Terry*, 336 F.3d at 148).

At the same time, however, the Supreme Court has cautioned that Title VII does not enact "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).  "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at '*discriminat[ion]* . . . because of . . . sex.'" *Id.*.  "A hostile work environment is 'not one that is bad for all living things in a manner that happens to involve [characteristics of the protected class]; rather it is one that is *discriminatorily* hostile to an employee based on *his or her* [membership in the protected class].'" *Bernstein v. N.Y.C. Dep't of Educ.*, 2020 WL 6564809, at *7 (S.D.N.Y. Nov. 9, 2020) (quoting *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 514 (S.D.N.Y. 2010) (Lynch, J., sitting by designation)).

Moreover, "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully

captured by a simple recitation of the words used or the physical acts performed." *Oncale*, 523 U.S. at 81–82 (noting that "[a] professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office"); *see also Johnstone v. Vill. of Monticello*, 691 F. App'x 657, 658 (2d Cir. 2017) ("Jenkins's alleged comments were severe, but they were not made in the context of an employer addressing an employee in the workplace; they were made by an apparently intoxicated citizen who was belligerent because he was being taken into custody and processed for violating the law.  Being subjected to an intoxicated and verbally abusive perpetrator does not alter the conditions of a police officer's employment or create an actionably hostile work environment, even if the person arrested happens to be the mayor.").

"Under the NYCHRL, unlike under Title VII . . . there is no distinction between a claim premised on the creation of a hostile work environment (a species of harassment claim) and one premised on unlawful discrimination." *Rothbein*, 2019 WL 977878, at *9.  Under NYCHRL and NYSHRL, a "plaintiff need not establish that the conduct was severe or pervasive, only that she has been treated less well than other employees because of" a protected characteristic. *Russo*, 972 F.Supp.2d at 450 (quotation marks omitted).  "[Q]uestions of 'severity' and 'pervasiveness' are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability." *Robinson*, 739 F. Supp. 3d at 118 (internal quotations omitted).  However, "[i]t is not enough that a plaintiff has an overbearing or obnoxious boss." *Mihalik*, 715 F.3d at 110.  "She must show that she has been treated less well at least in part *because of* her [protected characteristic]." *Id*.  "Under the forgiving standard of the NYCHRL . . . 'even a single comment may be actionable,'" though judgment in the defendant's favor "may be appropriate where 'a

reasonable jury could conclude only that the conduct amounted to no more than a petty slight,' based on the totality of the circumstances."  *Nofal*, 2024 WL 1138928, at *4 (quoting *Mihalik*, 715 F.3d at 111).  A "single comment" may still be actionable if "made in circumstances where that comment would, for example, signal views about the role of [the protected class] in the workplace," *Mihalik*, 715 F.3d at 111 (quoting *Williams v. N.Y.C.H.A.*, 872 N.Y.S.2d at 41 n.30). However, "when applying this standard, 'district courts must be mindful that the NYCHRL is not a general civility code.'" *Nofal*, 2024 WL 1138928, at *4.  "[T]he overall context in which [the challenged conduct occurs] cannot be ignored." *Hernandez v. Kaisman*, 957 N.Y.S.2d 53, 59 (1st Dep't 2012).

For hostile work environment claims arising under Title VII and under the city and state human rights laws, the Court must assess Cohen's comments and the allegedly hostile environment of RHONY as a production "from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances including the social context in which particular behavior occurs and is experienced by its target." *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004) (quoting *Oncale*, 523 U.S. at 81); *Hernandez*, 957 N.Y.S.2d at 57 (quoting *Petrosino*, 385 F.3d. at 221).

### 2.  Timeliness

The claims arising under Title VII, NYSHRL, and NYCHRL are subject to different statutes of limitations.  Under Title VII, a plaintiff must "file a complaint with the Equal Employment Opportunity Commission [] or an equivalent state agency within 300 days of the allegedly discriminatory action." *Richards*, 2022 WL 329226, at *6.  "[O]nly incidents that took place within the timely filing period are actionable." *Id*.  The 300-day look-back period is triggered by the filing of an administrative complaint addressing the specific type of discrimination at issue. *See, e.g., Bowen v. MTA N.Y.C. Transit Auth.*, 2011 WL 7940367, at *7

(E.D.N.Y. Dec. 29, 2011); *Bailey v. Colgate-Palmolive Co.*, 2003 WL 21108325, at *11–14

(S.D.N.Y. May 14, 2003), *aff'd*, 93 F. App'x 321 (2d Cir. 2004). With respect to Plaintiff's

sex/gender-based claims, therefore, the relevant date is June 30, 2023, when Plaintiff amended

her NYSDHR charge to add claims of sexual harassment/discrimination, see FAC ¶ 32; Dkt. No.

59-6, not the March 15, 2023 date of her original charge, which alleged only disability

discrimination, *see* FAC ¶ 30; Dkt. No. 59-5. Accordingly, only incidents that took place on or

after September 3, 2022 (300 days before June 30, 2023) are actionable.

      Under NYSHRL and NYCHRL, the statute of limitations is three years. *See* N.Y. Exec.

Law § 297(5); N.Y.C. Admin. Code § 8-502(d). Both statutes ordinarily toll the limitations

period during the pendency of an administrative complaint. *See* N.Y.C. Admin. Code § 8-502(d)

("Upon the filing of a complaint with . . . the state division of human rights and during the

pendency of such complaint and any court proceeding for review of the dismissal of such

complaint, such three-year limitations period shall be tolled."); *Schwartz v. Middletown City Sch.

Dist.*, 2024 WL 1257095, at *9 (S.D.N.Y. Mar. 25, 2024) ("[T]he statute of limitations is tolled

during the pendency of a complaint with [NYSDHR] pursuant to CPLR 204(a)." (citing *Penman

v. Pan Am. World Airways, Inc.*, 510 N.E.2d 803, 803 (N.Y. 1987)).

      Tolling under the NYCHRL is not impacted by the claimant's request for dismissal of the

administrative charge. *See Strusman v. NYU Langone Hosps.*, 2020 WL 3415111, *6–7

(S.D.N.Y. June 22, 2020); *Williams v. Russo's Payroll Grp., Inc.*, 2023 WL 3042236, at *4–5

(E.D.N.Y. Apr. 21, 2023). However, under the NYSHRL, if the claimant requests that the

complaint be dismissed, she loses the benefit of that tolling. *Id.* (citing NYSHRL § 297(9) ("[I]f

a complaint is so annulled by the division, upon the request of the party bringing such complaint

before the division, such party's rights to bring such cause of action before a court of appropriate

jurisdiction shall be limited by the statute of limitations in effect in such court at the time the complaint was initially filed with the division."). Here, because Plaintiff requested that her administrative complaint be dismissed on September 6, 2023 and NYSDHR dismissed her claims on October 6, 2023, FAC ¶¶ 34–35, the NYSHRL and NYCHRL limitations periods differ. Under the NYSHRL, claims are untimely if they accrued before February 27, 2021 (three years before Plaintiff's original Complaint filed on February 27, 2024, *see* Dkt. No. 1). Under NYCHRL, however, the ninety-eight days between the June 30, 2023 amended charge, Dkt. No. 59-6, and the October 6, 2023 NYSDHR dismissal, FAC ¶¶ 34–35, is disregarded. Accordingly, claims accruing before November 21, 2020 are untimely under the NYCHRL.

In the RHONY Season 12 reunion episode, Cohen pressured cast members, including Plaintiff, to reveal whether they had had same-sex sexual contact, and then sensationalized such experiences. *Id.* ¶¶ 109–110. Plaintiff alleges that even though many male cast members have had such contact, Cohen did not pose similar probing questions to male cast members on or off air. *Id.* ¶ 111. In the same reunion episode, Cohen also asked Plaintiff inappropriate questions about a tattoo near her genital region, and did not ask similar questions to male counterparts. *Id.* ¶ 112. The Court takes judicial notice of the fact that the reunion episode aired in September 2020, and must therefore have been filmed prior to September 2020. *See* Dkt. No. 59-8, 59-9, 59-10; *Howard v. Carter*, 615 F. Supp. 3d 190, 194 (W.D.N.Y. 2022) (taking judicial notice of the date of release of an album); *Rapaport v. Barstool Sports, Inc.*, 2021 WL 1178240, at *22 n.22 (S.D.N.Y. Mar. 29, 2021), *aff'd*, 2024 WL 88636 (2d Cir. Jan. 9, 2024) (taking judicial notice of the fact of a radio broadcast). Accordingly, Plaintiff's allegations relating to Cohen's comments on the Season 12 reunion episode are time-barred under Title VII, NYSHRL, and NYCHRL, and may only be considered to the extent to which they evidence a "continuing

violation" for the purposes of her hostile work environment claims.  *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115–122 (2002)*; Olivieri v. Stifel, Nicolaus & Co., Inc.*, 112 F.4th 74, 88 (2d Cir. 2024).  For the reasons elaborated below, the Court finds that even if the claims relating to the reunion episode were timely, they do not suffice to make out a claim for a hostile work environment.

Cohen is also alleged to have posed many intrusive questions and comments to other female cast members about their plastic surgery, sex lives, weight gain and loss, and marriages, FAC ¶¶ 349–350, 353–354, which he did not make to husbands of Housewives or male producers, *id.* ¶¶ 347, 355.  Plaintiff does not allege that any of these comments were made to her or in her presence or even that she was aware of the comments before her contract was not renewed.  They thus cannot stand alone as the basis for Plaintiff's claims.  *See Eldars v. State University of N.Y. at Albany*, 2021 WL 4699221, at *3 (2d Cir. Oct. 8, 2021) (rejecting "conclusory, vague, or general allegations" for failure to state a claim).

### 3.    Whether the timely claims state a claim for relief

Plaintiff alleges generally that the *Real Housewives* franchise, even with its naming, "forces its [female] subjects into the proverbial 'kitchen' by demeaning and diminishing its subjects' individual careers, success, and livelihoods, and encouraging the women on the show to engage in what they view is female drama i.e. bickering and infighting amongst the female cast members."  Dkt. No. 1 ¶ 50.  The complaint further alleges that male talent on the show, by contrast, "are treated with deference, their careers are highlighted and exulted, and they are not nearly as often featured as engaging in drama with other cast members."  *Id.* ¶ 51.  Plaintiff alleges that "[e]ach woman who appears on a *Real Housewives* production is referred to as a 'Housewife.'"  *Id.* ¶ 48.  She claims "Defendants' antiquated view of what a woman should be

and how they should be treated . . . is markedly different than the men on the show" and "infects

every aspect of the *Real Housewives* production." *Id.* ¶ 49.[21]

There is little question that such conduct, if it occurred on the factory floor or in the

executive suite, would support a claim for hostile work environment based on gender.  Neither

Title VII nor society tolerate calling all women (or all men) "housewives" or treating members

of one gender differently than another solely because of hostility to that gender.  *See Pucino v.*

*Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117–18 (2d Cir. 2010) (a hostile work

environment "may be proven by harassment in such sex-specific and derogatory terms as to

make it clear that the harasser is motivated by general hostility to the presence of women in the

workplace." (internal quotations omitted));  *Marshall v. Kingsborough Cmty. Coll. of Cuny*, 2015

WL 5773748, at *11 (E.D.N.Y. July 27, 2015) (where defendant referred to plaintiff and other

female employees as "cunts" and "bitches" and stated that "women don't belong in the work

place," there was sufficient evidence for a reasonable jury to conclude defendant had created a

hostile work environment), *report and recommendation adopted sub nom. Marshall v.*

---

[21] Plaintiff offers as evidence of the pervasiveness of sexist comments and attitudes at RHONY various statements from Defendant Cohen in written publications.  For example, in *Not All Diamonds and Rosé*, Cohen is quoted as saying, "I was kind of a nice Jewish boy, talking to women about boob sizes and plastic surgery and their love lives.  These were topics I probably couldn't get away talking about if I were straight, by the way.  Certainly not in the same way," *id.* ¶ 349, and "This is very un-PC to say but I also couldn't get over how big [Lauri Peterson's] boobs were.  I just couldn't imagine [Lauri] and Vicki [Gunvalson] selling insurance with those big boobs—I'd never considered that this could be a thing!" *id.* ¶ 353.  In an interview with The Washington Post, Cohen is quoted as saying, "I've asked too many inappropriate questions.  I've asked women questions about their vaginas, their sex lives, their marriages, their famil[ies]. There is no stone I've left unturned." *Id.* ¶ 350.  These comments cannot give rise to a hostile work environment claim.  Leaving aside that Plaintiff does not allege she was aware of them at any relevant time, it is plain from the complaint that the comments were not made by Cohen in his capacity as employer towards his employees.  They thus did not alter the terms and conditions of Plaintiff's employment.  *See Johnstone*, 691 F. App'x at 658 (comments by mayor towards police officer could not give rise to hostile work environment claim because made in his capacity as "an apparently intoxicated citizen").

*Kingsborough Cmty. Coll. of C.U.N.Y.*, 2015 WL 5774269 (E.D.N.Y. Sept. 30, 2015); *Patane*, 508 F.3d at 114 ("[S]exually charged conduct in the workplace may create a hostile environment for women notwithstanding the fact that it is also experienced by men."); *Petrosino*, 385 F.3d at 222 (finding a hostile work environment where "the depiction of women in the offensive jokes and graphics was uniformly sexually demeaning and communicated the message that women as a group were available for sexual exploitation by men.");  *Anderson v. Reno*, 190 F.3d 930 (9th Cir. 1999) (finding a hostile work environment where a supervisor repeatedly referred to the employee as "office sex goddess," "sexy," and "the good little girl"); *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 694 (7th Cir. 2001) (finding that a reasonable fact finder could find that plaintiff was treated differently than her male colleagues because of her sex where "harassment was not of a sexual nature but rather it was directed at the terms and conditions of her employment: questioning her abilities and the ability of women to do her job in general, plotting to give her job to a male custodian"); *Aponte-Rivera v. DHL Solutions, (USA) Inc.*, 650 F.3d 803, 809 (1st Cir.2011) (upholding jury verdict in favor of plaintiff on hostile work environment claim based on evidence that supervisors generally referred to women as "dumbies" and made several gender-based comments to plaintiff, including that women were supposed to do household chores, that the person running the company had to "have balls," and that the company had to be run by a man).

However, the claim that Defendants treat women differently in their roles on the show than they treat men does not make out a claim that Defendants maintain a workplace that is hostile to women because they are women.  As the Supreme Court has noted, harassment under Title VII must be assessed against "the social context in which particular behavior occurs and is experienced by its target." *Oncale.*, 523 U.S. at 81.  The fact that the portrayal of women on the

show might be considered misogynist or sexist does not mean that, in the production of the show, Defendants have created a hostile work environment or a workplace "motivated by general hostility to the presence of women in the workplace." *Id.* at 80. One can produce a show that contains a message that might be considered to be hostile to a particular protected class without actually being hostile or abusive to the members of that class in such a way that "unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. In context, actors in a play containing sexist dialog would reasonably understand that dialog to be part of a performance, i.e., part of the "constellation of surrounding circumstances, expectations, and relationships" surrounding the play, *Oncale*, 523 U.S. at 82, rather than an expression of hostility or animus towards their gender. An individual actor in that play might find the experience of performance subjectively painful, but without more, she would not have a claim for a hostile work environment because even if the use of sexist dialog "happens to involve sex," it is not "discriminatorily hostile to an employee based on his or her sex." *Krasner*, 680 F. Supp. 2d at 514.

On the facts of this case as alleged in the Complaint, Plaintiff and the other cast female cast members were fully aware of the premise of the show, the nature of Cohen's on-screen persona, and the types of potentially provocative or abrasive comments that Cohen typically made in those circumstances. Plaintiff alleges that "since its inception, the *Real Housewives* franchise thrives off the most incendiary portrayals of female cast members." FAC ¶ 351. In that social context, a reasonable person in Plaintiff's shoes would have understood that Cohen was playing a role, the same role that he had played continuously for the prior twelve seasons of RHONY as on-screen agitator, agonist, and group therapist to the *Housewives* cast. A reasonable cast member also would understand that when Plaintiff and the other women were

called "Housewives," it was not a comment about them as human beings or a comment about women generally, but about the employees in the role they were asked to play on the show. Accordingly, Plaintiff's claims for a hostile work environment based on Cohen's on-screen behavior and the allegedly sexist premises of the show fail under Title VII as well as NYSHRL and NYCHRL. *See Hernandez*, 957 N.Y.S.2d at 57 (finding with respect to the NYCHRL "[T]he overall context in which [the challenged conduct occurs] cannot be ignored" (citing *Petrosino*, 385 F.3d. at 221 (in turn quoting *Oncale*, 523 U.S. at 81))).

The question remains whether comments made to Plaintiff off-screen could support Plaintiff's claims of a hostile work environment. At some unspecified point in time, Cohen commented to Plaintiff "that a recent breast augmentation made her a real 'Housewife.'" FAC ¶ 178. At another point in the complaint, Plaintiff states that Cohen "*repeatedly* commented on Plaintiff's breast augmentation surgery and implied that Plaintiff's surgery allowed her to properly fit the role of 'housewife.'" FAC ¶ 614 (emphasis added). Plaintiff does not provide a date or dates on which this communication with Cohen occurred, nor any additional context around the comment. She does not specify whether the comment was made on-screen or off-screen. Defendants suggest that the statement was made no earlier than December 2020 based on a People magazine article reporting on Plaintiff's Instagram post announcing a breast augmentation, dated December 28, 2020. Dkt. No. 59-11, and on a text exchange dated December 28, 2020, attached as an exhibit to Defendant Cohen's declaration, *see* Dkt. No. 60-1, which Defendants suggest is the source of the comment relating to the breast augmentation. The Court may not take judicial notice of either document for the purposes for which they are offered, namely for the propositions that Plaintiff had received a breast augmentation or the date of the augmentation, much less Plaintiff's state of mind as it related to the augmentation, or the

date on which Defendant Cohen would have come to know of the augmentation.  *See Staehr*, 547 F.3d 406, 424 (2d Cir. 2008) (the Court may take judicial notice of media coverage "to establish that the matters had been publicly asserted," not "for the truth of the matters asserted in them."); *Lee v. Springer Nature Am., Inc.*, 2025 WL 692152, at *4 (S.D.N.Y. Mar. 4, 2025).  The purported text exchange also is not incorporated into the complaint by reference or integral to the complaint.[22]

Accordingly, the Court does not consider the attached text exchange, nor evaluate that exchange for the purposes of assessing the context of the allegedly discriminatory remark.  Because the statute of limitations defense as it relates to this comment is not obvious on the face of the complaint, Plaintiff's claims arising from this comment are not barred as a matter of law.  *See Staehr*, 547 F.3d at 425.[23]  Regardless, as presented in Plaintiff's First Amended Complaint,

---

[22] For a document to be incorporated by reference, "the complaint must make a clear, definite and substantial reference to the document."  *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 436 (S.D.N.Y. 2022) (quoting *McKeefry v. Town of Bedford*, 2019 WL 6498312, at *3 (S.D.N.Y. Dec. 2, 2019)). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint."  *Guzman v. Bldg. Serv. 32BJ Pension Fund*, 2023 WL 2526093, at *6 (S.D.N.Y. Mar. 15, 2023) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)) (internal quotation marks omitted). "Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering 'limited quotation[s]' from the document is not enough."  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006)).  Furthermore, as noted, Plaintiff's complaint implies that Cohen made this comment more than once—Defendants ask the Court to infer that the text exchange attached as an exhibit is the entirety of the communication at issue, which the Court may not do at this stage.  *See Turquoise Hill*, 2024 WL 4711185, at *9  ("[T]he [complaint] does not clearly and definitely reference the exhibits provided . . . The quotations are contained in the documents, but so is a variety of other information. It requires inference to assume that the exhibits are the documents referenced in the [complaint].").

[23] If the Court were to consider the text exchange as incorporated by reference, the Court would find in the alternative that the Plaintiff's claims based on this single comment are timely under the NYCHRL, but not under Title VII or NYSHRL.  Only incidents that took place on or after September 3, 2022 for Title VII, February 27, 2021 for NYSHRL, and November 21, 2020 for NYCHRL are actionable.  Since the given text exchange occurred in December 2020, the Title

Plaintiff's claim for gender-based discrimination and hostile work environment cannot survive based on this single comment relating to breast augmentation.

Even without considering the text exchange offered by Defendants, in the context of Defendant Cohen's role and relationship to the cast members of the *Housewives* franchise, his comment to Plaintiff about her recent breast augmentation making her a real "Housewife," is, at worst, a petty slight.  Context matters: if a supervisor in a normal office environment told an employee that a breast augmentation made her "properly fit the role of 'housewife,'" *id.* ¶ 614, such a comment might be actionable under the NYCHRL as "signal[ing] views about the role of women in the workplace," *Williams v. N.Y.C.H.A.*, 872 N.Y.S.2d at 41 n.30.  In the professional environment in which Cohen and Plaintiff communicated, "Housewife" means something very different from "housewife."  The term is not devoid of gendered meaning, but it refers not to an archetypical female homemaker but rather to a cast member in an extremely popular television franchise in which plastic surgery was both prevalent and openly discussed.  FAC ¶ 349.  The Court credits, as it must, that Plaintiff experienced the comment as degrading and hypersexualizing, *id.* ¶ 643, but even if Cohen's comment may have been obnoxious and insensitive, as an objective matter it did not rise above the level of a "petty slight."  *See Sosa v. Loc. Staff, LLC*, 618 F. App'x 19, 19–20 (2d Cir. 2015) (finding supervisor's single comment, "You're so street" to be "nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences" under NYCHRL); *Goodwine v. City of New York*, 2016 WL 3017398, at *8–9 (S.D.N.Y. May 23, 2016) (finding no NYCHRL gender-related claim based on supervisors referring to plaintiff as a "cunt" and "bitch" where no allegation that "stray remarks using nominally gendered or racial language had a discriminatory motive."); *cf.*

---

VII and NYSHRL claims are time-barred.

*Marshall v. Kingsborough Cmty. Coll. of CUNY*, 2015 WL 5773748, at *12 (E.D.N.Y. July 27, 2015) (finding NYCHRL standard met when the plaintiff's boss "referred to her and other female employees by such gendered slurs as 'cunt' and 'bitch' on a regular basis and said that 'women don't belong in the workplace'"), *report and recommendation adopted by* 2015 WL 5774269 (E.D.N.Y. Sept. 30, 2015).[24]

Because the Court finds that the comment about the Plaintiff's breast augmentation is trivial under "the forgiving standard of the NYCHRL," Plaintiff's claims for gender-related discrimination and hostile work environment under NYSHRL and Title VII also fail. *Nofal*, 2024 WL 1138928, at *4 ("Because Plaintiff's NYSHRL claims accrued after the most recent amendments, they 'rise and fall with [her] NYCHRL claims.'" (citing *Syeed v. Bloomberg L.P.*, 568 F. Supp. 3d 314, 345 (S.D.N.Y. 2021)); *id.* ("[NYCHRL and NYSHRL] are less demanding of plaintiffs than Title VII on discrimination claims."). Plaintiff's claims for Title VII discrimination fail because she alleges nothing that would constitute an "adverse employment action" based on her gender. *Vega*, 801 F.3d at 85.

### B.   Retaliation Claims Based on Sex/Gender

Plaintiff also claims retaliation on the basis of her gender-related protected activity, *see* Count Seventeen.[25] Defendants argue that Plaintiff's claims for retaliation based on sex and

---

[24] The Court rejects Defendant's suggestion that a single incident gives rise to a claim under the NYCHRL only when it is "extraordinarily severe." *See* Dkt. No. 58 at 16, 21 (citing *Sosa v. Loc. Staff, LLC*, 618 F. App'x 19, 20 (2d Cir. 2015), *San Juan v. Leach*, 717 N.Y.S.2d 334, 336 (2nd Dep't 2000)). The cases cited by Defendant either do not apply that standard to NYCHRL, *see Sosa*, 618 F. App'x at 20 (describing the requirement as "extremely serious" under Title VII, but affirming dismissal of NYCHRL claim on grounds that single incident was merely a "petty slight[]" or "trivial inconvenience[]" under *Williams v. N.Y.C.H.A.*, 872 N.Y.S.2d at 41, or, like *San Juan*, predate the amendment to the NYCHRL which expressly rejected the construction of NYCHRL as aligning with Title VII, *see generally Williams v. N.Y.C.H.A.*, 872 N.Y.S.2d at 36–40 (discussing the impact of the revisions to the NYCHRL of the Local Civil Rights Restoration Act of 2005).

[25] Plaintiff does not specifically allege that her NYCHRL and NYSHRL retaliation claims are

gender should be dismissed because Plaintiff makes only conclusory allegations of protected activity. Dkt. No. 58 at 19–20. Plaintiff argues in turn that she was not required to "use unspecified 'magic words' when reporting Defendants' discrimination." Dkt. No. 82 at 19.

To prevail on her claims for sex/gender-based retaliation under Title VII, Plaintiff must show "1) that [she] engaged in a protected activity; 2) that [Defendants] had knowledge of the protected activity; 3) an adverse employment action; and 4) a causal connection between the protected activity and the adverse employment action." *Brantman v. Fortistar Cap., Inc.*, 2017 WL 3172864, at *4 (S.D.N.Y. July 22, 2017). Plaintiff alleges that her "protected activity" was that she "complained to human resources, senior employees at Defendant Company, to Defendant Cohen, and to Defendant Producers regarding, inter alia, Defendants' discrimination on the basis of sex and gender and Defendants' creation of a hostile work environment on the basis of Plaintiff's sex and gender." FAC ¶ 729.

Defendants are correct that Plaintiff's bald allegation, asserted only in the recital of claim, is precisely the kind of "threadbare recital[] of the elements of a cause of action, supported by mere conclusory statements" that "do[es] not suffice" under Rule 12(b)(6). *Lateral Recovery*, 632 F. Supp. 3d at 435. It is not supported by any information regarding when she made the complaint and what she stated. A pleading that offers only "labels and conclusions" or "a formulaic recitation of a cause of action's elements will not do." *Gilani v. Deloitte LLP*, 2024 WL 4042256, at *3 (S.D.N.Y. Sept. 4, 2024) (quoting *Twombly*, 550 U.S. at 545). If Plaintiff has not alleged facts sufficient to "nudge[] [her] claim[] across the line from conceivable to plausible," the claim must be dismissed. *Id.* (quoting *Twombly*, 550 U.S. at 570).

---

based on sex/gender. *See* FAC ¶¶ 736-765 (Counts Nineteen and Twenty). To the extent she now argues that they are, the claims would be dismissed for the same reason as the Title VII retaliation claim.

Based on Plaintiff's First Amended Complaint, her protected activity related only to her disability discrimination claims. Plaintiff alleges that she "formally complained of discrimination on the basis of disability to human resources" and the decision not to cast Plaintiff on subsequent shows "was direct retaliation" against her "formal complaint to human resources and informal complaints to, inter alia, Defendant Cohen and other Defendant Bravo employees of disability discrimination and harassment." FAC ¶¶ 297–298. She does not allege facts to support the inference that she formally complained of sex/gender-based discrimination to Defendants or that she otherwise put Defendants on notice of such discrimination at any point prior to the casting decisions which she identifies as "adverse employment actions" under Title VII. Nor does Plaintiff allege that the casting decisions for RHONY Season 14 or RHONY Legacy were based on her complaints of sex/gender discrimination. In her original NYSDHR complaint, filed on March 15, 2023, Plaintiff complained only about alleged disability discrimination, and not sex/gender discrimination. FAC ¶ 30. She added gender-related claims when she amended her NYSDHR complaint on June 30, 2023. *Id.* ¶ 32. The casting decisions for RHONY Legacy were, according to Plaintiff, made in November 2022. *Id.* ¶ 286. The casting decisions for RHONY Season 14 were made around the same time. *Id.* ¶¶ 296–98.[26]

Plaintiff's conclusory allegation that she engaged in protected activity is insufficient because the factual allegations of the FAC establish that she made no complaint of sex-based misconduct before the alleged adverse employment actions.[27]

---

[26] For the same reasons stated above, the Court does not consider the casting announcement attached to the declaration of Christine Lepera at Dkt. No. 59-4 (announcing the cast of RHONY Season 14 in October 2022). However, the Court takes judicial notice of the fact that RHONY Season 14 first aired in July 2023, and must therefore have been cast and filmed well before Plaintiff amended her NYSDHR complaint.

[27] Plaintiff also alleges gender-based claims for retaliation as to Defendant Cohen on the basis of the March Letter. The reasoning that supports the dismissal of those claims with respect to

## III. Religion-Based Claims

In Counts Five, Eight, Thirteen, and Sixteen, Plaintiff claims religious discrimination and hostile work environment under the NYSHRL and NYCHRL, based on a single lunch in which she was served a meal of exclusively pork products. Plaintiff argues that the single incident was non-trivial, and that Plaintiff was treated less well "because of" her religion. Dkt. No. 82 at 19–22. Defendants argue that the single incident offered by Plaintiff as evidence of religious discrimination is too trivial to support a claim. Dkt. No. 58 at 21.

A NYCHRL discrimination or hostile work environment claim should be dismissed "if the plaintiff does not allege behavior by the defendant that cannot be said to fall within the broad range of conduct that falls between severe and pervasive on the one hand and a petty slight or trivial inconvenience on the other," *Springs v. City of New York*, 2020 WL 3488893, at *7 (S.D.N.Y. June 26, 2020) (quotation marks omitted), or if the plaintiff fails to meet her "burden of showing that the conduct is caused by a discriminatory motive," *Isbell v. City of New York*, 316 F.Supp.3d 571, 593 (S.D.N.Y. 2018); *accord Dillon v. Ned Mgmt., Inc.*, 85 F.Supp.3d 639, 657 (E.D.N.Y. 2015) ("Plaintiff nonetheless has the burden of showing that the . . . conduct complained of was caused by a discriminatory motive."); *Bilitch v. N.Y.C. Health & Hosp. Corp.*, 148 N.Y.S. 3d 238, 244 (2nd Dep't 2021) ("In order to prevail on a claim of discrimination under the NYCHRL, a plaintiff must prove that unlawful discrimination was one of the motivating factors of the complained-of conduct."); *Harris v. NYU Langone Med. Ctr.*, 2013 WL 3487032, at *27 (S. D.N.Y. July 9, 2013) (noting that even under the NYCHRL, a plaintiff must "plead facts tending to show that actions that created the hostile work environment were taken against him because of a prohibited factor" and that "the broader remediation

---

disability-based retaliation requires dismissal of those claims when framed as gender-based retaliation.

available under the City law does not allow the Plaintiff to dispense with linking his claim of hostility to some attitude that the law forbids" (internal quotation marks omitted))

A "single comment" may still be actionable if "made in circumstances where that comment would, for example, signal views about the role of [the protected class] in the workplace," *id.* at 13, and "the overall context in which [the challenged conduct occurs] cannot be ignored." *Hernandez*, 957 N.Y.S.2d at 59. However, "when applying this standard, 'district courts must be mindful that the NYCHRL is not a general civility code.'" *Nofal*, 2024 WL 1138928, at *4 . For the same reasons elaborated above, Plaintiff's NYSHRL claims "rise and fall with her NYCHRL claims." *Syeed*, 568 F. Supp. 3d at 345.

Plaintiff alleges that, while filming RHUGT in Thailand, Defendant Producers hosted a cast lunch at which every product was cooked in pork substances and provided no alternatives. FAC ¶ 264. Defendant Producers had previously asked Plaintiff if she had any dietary restrictions, and therefore knew that she could not eat pork products due to her religious beliefs. *Id*. Defendants were also aware of Plaintiff's recent conversion to Judaism and corresponding religious dietary restrictions. *Id.* ¶¶ 265–266. Defendants could reasonably have accommodated Plaintiff's dietary restrictions by providing her with non-pork products to consume. *Id.* ¶ 268. Plaintiff alleges that Defendants intentionally declined to provide her with non-pork alternatives. *Id.* ¶ 269.

Even read in the light most favorable to Plaintiff, the one incident which Plaintiff describes is a "classic example[] of petty slight[] or trivial inconvenience[]" under the NYCHRL. *Springs*, 2020 WL 3488893, at *8. The *Springs* case is squarely on point. In *Springs*, the plaintiff claimed that his colleagues prepared a meal using a pan that had been used to cook pork, despite knowing that he could not eat or cook with pork due to religious dietary restrictions. *Id.*

at *2.  The court dismissed plaintiff's claim on the grounds that while it "may have been insensitive," the incident "did not impose anything more than a petty slight or inconvenience." *Id.* at *8.  "Even stretching to its limit the duty to read the FAC in the light that is most favorable to [plaintiff], it seems that at worst he would have been required to clean this pan in order to cook in it himself, or perhaps would have been required to notify a superior . . . that, in the future, his meals would need to be prepared separately."  *Id.*  There is no allegation here that Defendants knew in advance that the products offered at the cast lunch were cooked in pork substances.  Nor does Plaintiff allege that the event was repeated after Defendants would have been made aware.  Like the *Springs* plaintiff, Plaintiff could have provisioned herself in advance with kosher food, or simply reminded Defendants to prepare food that was not cooked in pork substances in the future.

Plaintiff here attempts to distinguish *Springs* on the basis that it involves conduct of colleagues rather than supervisors, but that distinction does not bear the weight Plaintiff puts on it.  Though in general, insensitive or discriminatory conduct from a supervisor may be inherently more serious than identical conduct from a colleague, a supervisor's conduct may still be trivial. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998) (A "supervisor's power and authority invests his or her harassing conduct with a particular threatening character").  In *Nofal v. IMCMV Times Square LLC*, a plaintiff sous chef was told by his supervisor, the executive chef, to try certain pork food products because "when someone cooks something in a restaurant, they should try it."  2024 WL 1138928, at *4.  After plaintiff explained his dietary restrictions based on his Muslim faith and asked why the chef made such comments, the chef responded that "if plaintiff did not like it, he should go home."  *Id.*  The chef's statement was the only negative comment related to plaintiff's religion made during his employment, and the court found that

though the chef's alleged comment was "insensitive and offensive," it was "no more than a petty slight for purposes of the NYCHRL, and thus, not actionable." *Id.*; *see also Livingston v. City of New York*, 563 F. Supp. 3d 201, 223, 233–35, 255 (S.D.N.Y. 2021) (finding repeated comments from supervisors that an employee's observing of the Sabbath was "unacceptable" and that he "can't be missing Saturdays" "amounts at most to petty slights" under the NYCHRL).

Plaintiff's claim also fails because she does not sufficiently allege facts suggesting that the incident in Thailand was "caused by a discriminatory motive," i.e., "at least in part because of" her religion. *Mihalik*, 715 F.3d at 110. Plaintiff plausibly alleges that Defendants knew of her recent conversion to Judaism. FAC ¶ 265. But as to a discriminatory motive, Plaintiff complains that "[u]pon information and belief, Defendants intentionally failed to provide Ms. McSweeney with products to consume in lieu of pork products, notwithstanding Ms. McSweeney's protestations that her religion precluded her from eating pork products and requests for non-pork products." *Id.* ¶ 269. Facially, Plaintiff states her belief that the Defendants intentionally "failed" to serve her products that were not cooked in pork—but she does not actually state that Defendants chose to serve pork products or that they did so with a discriminatory motive against Plaintiff as a Jewish person, i.e., "at least in part because of" her Jewish identity. Plaintiff offers no other context or background which would suggest that the Defendants were motivated by antisemitism when they served her pork at a single lunch in Thailand, a country whose cuisine is widely known for featuring pork and shellfish.

The cases relied on by Plaintiff all involve much more serious and persistent conduct than what is alleged here, and none undermine the conclusions above. *See Faison v. Leonard St., LLC*, 2009 WL 636724, at *6 (S.D.N.Y. Mar. 9, 2009) (employer refused to grant permission to attend religious event and gave a direct ultimatum: "make a choice between work and your

religion") (Title VII case); *Muhammad v. N.Y.C. Transit Auth.*, 52 F. Supp. 3d 468, 479–80
(E.D.N.Y. 2014) (bus driver was told multiple times to remove her head scarf, and when she
refused, was assigned janitorial work and no longer permitted to interact with passengers) (Title
VII case); *Makhsudova*, 2022 WL 1571152, at *11 (supervisor would, *inter alia*, "tell Plaintiff
that 'her people' lived in mountains and ate horse meat; [and] 'neigh' like a horse in Plaintiff's
direction"); *EEOC v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 389 (E.D.N.Y.
2016) (plaintiffs subjected to mandatory prayer in workplace) (Title VII case).

Plaintiff's claims of discrimination and hostile work environment on the basis of her
religion are dismissed under both the NYCHRL and the NYSHRL.

## IV.    RICO Claim

In Count Twenty-Nine, Plaintiff alleges that the Defendants created a RICO enterprise in
the form of the *Real Housewives* franchise, separate and apart from its illegal activities, FAC
¶¶ 376, 400, and that they participated in the affairs of that enterprise through a pattern of
employment law violations that they either actively perpetuated or knew of, condoned, and
encouraged, *id.* ¶¶ 409–426, 865–873. Plaintiff alleges that she suffered a significant injury to
her business and property, including medical expenses related to her hospitalizations. *Id.* ¶ 874.
Defendants argue that the claim should be dismissed because allegations of the violation of
employment laws do not constitute predicate acts under RICO. Dkt. No. 58 at 22–23.

Section 1962(c) of Title 18 makes it "unlawful for any person employed by or associated
with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce,
to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through
a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To
establish a claim for a civil violation of 18 U.S.C. § 1962(c) through a pattern of racketeering
activity, "a plaintiff must show that he was injured by defendants' (1) conduct (2) of an

enterprise; (3) through a pattern (4) of racketeering activity." *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir. 1994) (internal quotation marks omitted).

Plaintiff fails to allege that Defendants engaged in a pattern of racketeering activity. A "pattern of racketeering activity" requires at least two acts of racketeering activity. 18 U.S.C. § 1961(5). "Racketeering activity" is a term of art under RICO, defined at 18 U.S.C. § 1961(1). It refers to "any act or threat involving murder, kidnapping, gambling, arson, robbery bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or illicit chemical" or "any act which is indicatable" under a large number of federal statutes. *Id.* Civil rights and employment law violations are not included within the statutory definition of "racketeering activity." *See Plemmons v. Penn. Mfrs. Ass'n Ins. Co.*, 1991 WL 61128, at *2 (E.D. Pa. Apr. 13, 1991).

Plaintiff responds that RICO can be used to remedy civilly unlawful employment enterprise or against entities that commit "civil rights violations or otherwise impugn a plaintiff's civil rights." Dkt. No. 82 at 23–24 & 23 n.33. It is true that RICO defendants can included entities that are alleged to have committed civil rights violations. *See Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 253 (1994) (lawsuit against alleged members of nationwide conspiracy to shut down abortion clinics). However, in each of the cases cited by Plaintiff, the defendant was alleged to have committed one of the RICO predicate acts listed in Section 1961(1). *See Scheidler*, 510 U.S. at 253 (defendants alleged to have engaged in extortion in violation of the Hobbs Act); *Lewis v. Danos*, 83 F.4th 948, 957 (5th Cir. 2023) (RICO predicate acts of obstructing official proceedings, retaliation against a witness in an official proceeding, mail fraud and wire fraud, and bribery); *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 606 (6th Cir. 2004) (RICO action against company that had been indicted for causing the use of illegal

documents and causing the possession of fraudulent documents by undocumented immigrants in violation of 18 U.S.C. § 1546, which is defined as racketeering activity); *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1167 n.2 (9th Cir. 2002) (complaint alleged a mail fraud RICO predicate); *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 328–29 (E.D.N.Y. 2012) (witness tampering and mail fraud); *Trib. Co. v. Purcigliotti*, 869 F. Supp. 1076, 1088 (S.D.N.Y. 1994), *aff'd sub nom. Trib. Co. v. Abiola*, 66 F.3d 12 (2d Cir. 1995) (plaintiffs alleged that the defendants committed acts of mail fraud, constituting the predicate acts for the RICO claim). Plaintiff does not allege that Defendants committed an act that falls within the definition of Section 1961(1) and does not cite a single case where a RICO claim has been sustained based on violations of the ADA and Title VII. The RICO claim therefore must be dismissed.

## V. New York Labor Law Claims

Plaintiff's Counts Twenty-One and Twenty-Two allege violations of the New York Labor Law. In Count Twenty-One, Plaintiff alleges that Defendants' conduct violated New York Labor Law § 215. In Count Twenty-One, she alleges that Defendants' conduct violated New York Labor Law § 740. Both causes of action rely on the identical allegations that she complained to human resources, senior employees at Corporate Defendants, Defendant Producers, and Defendant Cohen regarding Defendants' creation of unsafe working conditions, which had the effect of exacerbating her mental illnesses and addiction and that, in response, Defendants threatened her continued employment, threatened that her complaints would result in termination, conspired with cast members to torment Plaintiff regarding her disabilities, and eventually terminated her employment. FAC ¶¶ 766–777.

Defendants argue that neither cause of action states a claim for relief. Dkt. No. 58 at 24–25. Defendants argue that claims for discrimination and retaliation for complaints of

discrimination are not covered by Labor Law Section 215 and that claims under Labor Law Section 740 require allegations of a substantial and specific danger to public health or safety. *Id.*

### A. New York Labor Law § 215

New York Labor Law Section 215 prohibits an employer from "discharg[ing], threatening, penalizing, or in any other manner discriminat[ing] or retaliat[ing] against any employee (i) because such employee has made a complaint to his or her employer . . . that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of [the NYLL] or any order issued by [the Commissioner of Labor]." N.Y. Lab L. § 215(1).

"To establish a claim of retaliation under Section 215, the plaintiff must allege '(1) participation in protected activity known to the defendant . . . ; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.'" *Zhang v. Centene Mgmt. Co., LLC*, 2023 WL 2969309, at *11 (E.D.N.Y. Feb. 2, 2023) (quoting *Thompson v. Jennings & Hartwell Fuel Oil Corp.*, 2015 WL 5437492, at *4 (E.D.N.Y. Aug. 27, 2015)). Plaintiff must "plead that while employed by the defendant, she made a complaint about the employer's violation of the law and, as a result, was terminated or otherwise penalized, discriminated against, or subjected to an adverse employment action." *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 302 (S.D.N.Y. 2011) (quoting *Higueros v. N.Y. State Catholic Health Plan, Inc.*, 630 F.Supp.2d 265, 269 (E.D.N.Y. 2009)). "Additionally, under Section 215, courts have required the employee to complain about conduct that is a violation of the Labor Law in order to pursue a claim of retaliation." *Zhang v*, 2023 WL 2969309, at *11.

Plaintiff's Section 215 claim fails because she does not allege that she complained about conduct that constitutes an independent violation of the New York Labor Laws. She alleges that

she complained that Defendants discriminated against her and failed to make an accommodation for her mental illnesses and addiction. But "a request for accommodation owing to disability is not an employment action protected by the New York Labor Law." *Quartararo v. J. Kings Food Serv. Pros., Inc.*, 2021 WL 1209716, at \*15 (E.D.N.Y. Mar. 31, 2021). "Disability discrimination and retaliation for complaints of discrimination are instead covered by the New York State Human Rights Law, § 296(1)(a)." *Id.*

### B.     New York Labor Law § 740

Section 740, as amended October 28, 2021, with an effective date of January 26, 2022, states:

> An employer shall not take any retaliatory action against an employee, whether or not within the scope of the employee's job duties, because such employee . . . discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee <u>reasonably believes</u> is in violation of law, rule or regulation <u>or</u> that the employee <u>reasonably believes</u> poses a substantial and specific danger to the public health or safety.

N.Y. Lab. Law § 740(2)(a) (emphasis added); 2021 Sess. Law News of N.Y. Ch. 522 (S. 4394-A). The pre-amendment version of the law stated:

> An employer shall not take any retaliatory personnel action against an employee because such employee . . . discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates <u>and</u> presents a substantial and specific danger to the public health or safety, or which constitutes health care fraud.

2019 Sess. Law News of N.Y. Ch. 684 (A. 375) (emphasis added). The prior version of the law thus required that any employee seeking Section 740's protection disclose or threaten to disclose actions by the employer that both (1) actually violated a law, rule, or regulation, and (2) posed a substantial and specific danger to public health or safety. *See Rinaldi v. Mills*, 2022 WL 17480081, at \*2 (2d Cir. Dec. 7, 2022); *Coyle v. Coll. of Westchester, Inc.*, 87 N.Y.S.3d 242, 244 (2d Dep't 2018). Case law concerning the pre-amendment version of that statute uniformly required that the

Plaintiff establish that the violation was "of the kind that 'creates a substantial and specific danger to the public health or safety." *Webb-Weber v. Cmty. Action for Human Servs., Inc.*, 15 N.E.3d 1172, 1172 (N.Y. 2014).

Defendants argue that courts considering the amended version continue to require pleadings and evidence that the violation of law created "a substantial and specific danger to public health or safety." *See* Dkt. No. 58 at 25. The Court disagrees with that reading of the law. Under the new iteration of the whistleblower law, the provisions of Section 740 are disjunctive: "a plaintiff need only prove either (1) that they reasonably believed the defendant's conduct to violate a law, rule or regulation *or* (2) that they reasonably believed the defendant's conduct posed a substantial and specific danger to the public health or safety." *Accettola v. He*, 2025 WL 843412, at *7 (S.D.N.Y. Mar. 18, 2025).

Defendants are correct that Plaintiff fails to allege any substantial and specific danger to public health or safety, *see* FAC ¶¶ 778–789, but Plaintiff's complaint does sufficiently allege that in fall of 2022, well after the effective date of January 26, 2022, she began making formal complaints to Bravo HR, *see id.* ¶ 276, regarding "an activity, policy or practice of the employer that is in violation of law, rule or regulation," i.e., the purported violations of the ADA, Title VII, NYSHRL, and NYCHRL, among others.

An earlier version of Section 740 included a waiver provision which provided that "the institution of an action in accordance with this section shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, law, rule or regulation under the common law." L.2006, c. 442, §§ 12, 13, eff. Nov. 1, 2006. Under that version of the law, a plaintiff could not bring retaliation claims under NYSHRL and NYCHRL if the claims were "based on identical facts." *Kugel v. Queens Nassau Nursing Home Inc.*, 568 F.

Supp. 3d 253, 269 (E.D.N.Y. 2021) (citing *Feinman v. Morgan Stanley Dean Witter*, 752

N.Y.S.2d 229, 231 (N.Y. Sup. Ct. 2002)); *Cabrera v. Fresh Direct, LLC*, 2013 WL 4525659, at

*3 (E.D.N.Y. Aug. 27, 2013). The "entire point of" the former waiver provision was to "prevent

duplicative recovery." *Reddington v. Staten Is. Univ. Hosp.*, 893 N.E.2d 120, 125 (N.Y. 2008).

However, that waiver provision was repealed in 2019. *See* L.2019, c. 684, § 1, eff. Dec. 20,

2019; *Mills v. Steuben Foods, Inc.*, 2021 WL 4060421, at *14 (W.D.N.Y. Sept. 7, 2021) (noting

that the state legislature sought to eliminate "a self-contradictory provision . . . which purports

not to diminish the rights of a whistleblowers but then days [*sic*] that they cannot assert any other

claims if they bring a whistleblower claim, thus diminishing the rights of whistleblowers in

comparison to the other citizens" (quoting New York State Assembly, Memorandum in Support

of A375)). There is therefore no bar to Plaintiff claiming a violation of Section 740 based on

facts which are identical to those underlying her NYSHRL and NYCHRL retaliation claims, as

she does now.

"To state a claim under § 740, a plaintiff must plausibly allege: '(1) [an] activity

protected by the statute; (2) [a] retaliatory action; and (3) some causal connection between the

protected activity and the adverse action.'" *Callahan v. HSBC Sec. (USA) Inc.*, 2024 WL

1157075, at *6 (S.D.N.Y. Mar. 18, 2024) (quoting *Samuels v. Urb. Assembly Charter Sch. for

Computer Sci.*, 2024 WL 4008165, at *12 (S.D.N.Y. Aug. 30, 2024)).

The statute of limitations for actions brought under Section 740 for retaliation is two

years. N.Y. Lab. Law § 740(4)(a) ("An employee who has been the subject of a retaliatory

action in violation of this section may institute a civil action in a court of competent jurisdiction

for relief as set forth in subdivision five of this section within two years after the alleged

retaliatory action was taken."). The allegedly retaliatory conduct occurred in October–

November 2022 (the casting decisions) and March 2024 (the Cohen letters).  Plaintiff's claim

under Section 740 is accordingly timely, as her charges were filed with the NYSDHR and EEOC

in March 2023, FAC ¶ 30, and her original complaint was filed in this action in February 2024.

Dkt. No. 1.[28]

Because identical claims may be brought under Section 740 and NYSHRL and

NYCHRL, Plaintiff has plausibly alleged whistleblower retaliation under Section 740 as to the

November 2022 casting decisions, for the same reasons elaborated in Section I.D.1.  The claim is

however dismissed as to the Defendant Producers, as they are not "employers" under Section

740.  *See Geldzahler v. N.Y. Med. Coll.*, 746 F. Supp. 2d 618, 632 (S.D.N.Y. 2010); N.Y. Lab.

Law § 740(1)(a),(b), (f).  Plaintiff's claim for whistleblower retaliation against Cohen based on

the March Letter is dismissed for the same reasons elaborated in Section I.D.2.

## VI.    Striking in the Alternative

Defendants move, in the alternative and pursuant to Federal Rule of Civil Procedure

12(f), for an order striking the paragraphs of the FAC which they characterize as "allegations that

Defendants discriminated and retaliated against her in service of the alleged message of the

show" and thereby "concern First Amendment protected activity": 1, 69–70, 75, 82, 89, 91–92,

97–99, 107, 115, 126, 136–139, 141–142, 145, 148–153, 175, 188–192, 220, 236–239, 262, 284,

286–298, 318, 327, 341, 435, 467, 535, 601–602, 629—631, 724, 733, 746, 762, 775, 787, 795,

808, 821, 831, 844, 857, and 865.  Dkt. No. 57.

---

[28] The Court notes that in any event, the limitations period was tolled during the period in which
her administrative actions were pending before the NYSDHR and EEOC.  *Cf. Gray v. Shearson
Lehman Bros.*, 947 F. Supp. 132, 137 (S.D.N.Y. 1996) (rejecting plaintiff's argument that "the
limitations period under [Section 740] should be tolled while his administrative action . . . was
pending" because his "claim under the whistleblower statute is based upon a different theory and
different facts from his discrimination claims."); *Hall v. USAir, Inc.*, 1996 WL 228458, at *3
(E.D.N.Y. Apr. 29, 1996) (Weinstein, J.).

"Federal Rule of Civil Procedure 12(f) provides that a court 'may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.'" *New York v. Egon Zehnder Int'l, Inc.*, 2022 WL 4072853, at *1 (S.D.N.Y. Sept. 2, 2022) (quoting Fed. R. Civ. P. 12(f)). "Federal courts have discretion in deciding whether to grant motions to strike." *Capri Sun GmbH v. Am. Beverage Corp.*, 414 F. Supp. 3d 414, 423 (S.D.N.Y. Oct. 29, 2019) (quoting *Orientview Techs. LLC v. Seven For All Mankind, LLC*, 2013 WL 4016302, at *3 (S.D.N.Y. Aug. 7, 2013)). "However, motions to strike under Rule 12(f) are generally 'disfavored and granted only if there is strong reason to do so.'" *Sweigert v. Goodman*, 2021 WL 603069, at *1 (S.D.N.Y. Feb. 16, 2021) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 2013 WL 1746062, at *3 (S.D.N.Y. Apr. 23, 2013)).

"The Second Circuit has instructed that 'ordinarily' a district court should not 'decide to strike a portion of the complaint on the grounds that the material could not possibly be relevant on the sterile field of the pleadings alone.'" *Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC*, 680 F. Supp. 3d 322, 352–53 (S.D.N.Y. 2023) (quoting *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976)). "Usually the questions of relevancy and admissibility in general require the context of an ongoing and unfolding trial in which to be properly decided." *Id.*; *Beatie & Osborn LLP v. Patriot Sci. Corp.*, 431 F. Supp. 2d 367, 398 (S.D.N.Y. 2006) ("The Second Circuit has made clear that district courts should be wary when deciding whether to grant a Rule 12(f) motion on the ground that the matter is impertinent and immaterial."). "To prevail on a [Rule 12(f)] motion to strike, a party must demonstrate that (1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." *Kraiem v. JonesTrading Int'l Ltd.*, 2022 WL 204354, at *1 (S.D.N.Y. Jan. 24, 2022) (quoting

*Acco, Ltd. v. Rich Kids Jean Corp.*, 2016 WL 3144053, at *1 (S.D.N.Y. Apr. 11, 2016)); *see also Porsch v. LLR, Inc.*, 380 F. Supp. 3d 418, 429 (S.D.N.Y. 2019) ("Motions to strike under Rule 12(f) 'should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action.'" (quoting *VNB Realty, Inc. v. Bank of Am. Corp.*, 2013 WL 5179197, at *3 (S.D.N.Y. Sept. 16, 2013))).

As previously noted, Plaintiff's complaint is replete with allegations. Some support her claims while others do not. At this point, Defendants have offered no "strong reason" for the Court to line edit the complaint and determine which allegations are immaterial or impertinent and which are not. Having determined that some of Plaintiff's disability-related claims survive Defendants' motion to dismiss, the Court will not now prejudge the materiality or relevance of those paragraphs to Plaintiff's surviving claims "on the sterile field of the pleadings alone." *Lipsky*, 551 F.2d at 893. Defendants may renew the motion at summary judgment or pretrial and may argue, in connection with discovery motions, that certain allegations are immaterial.

## CONCLUSION

The motion to dismiss is GRANTED IN PART and DENIED IN PART. A summary table reflecting the outcome of Defendants' motion is included below at Appendix I. Any motion to file an amended pleading must be filed within two weeks of the date of this Opinion and Order and must be consistent with this Opinion and Order. The motion to dismiss the Complaint at Dkt. No. 33 is dismissed as moot in light of the filing of the First Amended Complaint. The Clerk of Court is respectfully directed to close Dkt. Nos. 33 and 57.

SO ORDERED.

Dated: March 31, 2025
   New York, New York

                                    LEWIS J. LIMAN
                                    United States District Judge

## Appendix I: Summary Table

The following terms are defined as: Hostile Work Environment ("HWE"); Prejudice ("P"); All Defendants ("AD"); Corporate Defendant ("CD"); Defendant Producers ("DP").  Unless otherwise noted, dismissals are with prejudice.

| No. | COA | Statute | Against… | FAC ¶ | Outcome |
|---|---|---|---|---|---|
| 1 | Disability Discrimination | 42 U.S.C. § 12112(a) | CD | 428–442 | Dismissed |
| 2 | Sex/Gender Discrimination | 42 U.S.C. § 2000e-2(a)(1) | CD | 443–456 | Dismissed |
| 3 | Disability Discrimination | N.Y. Exec. Law § 296(1)(a) | AD | 457–479 | Dismissed w/o P only against DP |
| 4 | Sex/Gender Discrimination | N.Y. Exec. Law § 296(1)(a) | AD | 480–500 | Dismissed |
| 5 | Religious Discrimination | N.Y. Exec. Law § 296(1)(a) | AD | 501–524 | Dismissed |
| 6 | Disability Discrimination | N.Y.C. Admin. Code §§ 8-107(1)(a) | AD | 525–548 | Dismissed w/o P only against DP |
| 7 | Sex/Gender Discrimination | N.Y.C. Admin. Code §§ 8-107(1)(a) | AD | 549–570 | Dismissed |
| 8 | Religious Discrimination | N.Y.C. Admin. Code §§ 8-107(1)(a) | AD | 571–594 | Dismissed |
| 9 | HWE Disability | 42 U.S.C. § 12112(a) | CD | 595–606 | Not dismissed |
| 10 | HWE Sex/Gender | 42 U.S.C. § 2000e-2(a)(1) | CD | 607–618 | Dismissed |
| 11 | HWE Disability | N.Y. Exec. Law § 296(1)(h) | AD | 619–633 | Dismissed w/o P only against DP |
| 12 | HWE Sex/Gender | N.Y. Exec. Law § 296(1)(h) | AD | 634–647 | Dismissed |
| 13 | HWE Religion | N.Y. Exec. Law § 296(1)(h) | AD | 648–668 | Dismissed |
| 14 | HWE Disability | N.Y.C. Admin. Code § 8-107(1)(a) | AD | 669–683 | Dismissed w/o P only against DP |
| 15 | HWE Sex/Gender | N.Y.C. Admin. Code § 8-107(1)(a) | AD | 684–697 | Dismissed |
| 16 | HWE Religion | N.Y.C. Admin. Code § 8-107(1)(a) | AD | 698–717 | Dismissed |
| 17 | Retaliation (Title VII) | 42 U.S.C. § 2000e-3(a) | CD | 718–726 | Dismissed |
| 18 | Retaliation (ADA) | 42 U.S.C. § 12203(a) | CD | 727–735 | Not Dismissed |
| 19 | Retaliation | N.Y. Exec. Law § 296(7) | AD | 736–750 | Dismissed w/o P only against DP |
| 20 | Retaliation | N.Y. Admin. Code § 8-107(7) | AD | 751–765 | Dismissed w/o P only against DP |
| 21 | Labor Law Retaliation | NY Labor Law § 215 | AD | 766–777 | Dismissed |
| 22 | Whistleblower Retaliation | Labor Law § 740 | AD | 778–789 | Dismissed only against DP |
| 23 | Reasonable Accommodation | 42 U.S.C. § 12112 | CD | 790–799 | Not dismissed |
| 24 | Reasonable Accommodation | N.Y. Exec. Law § 296(3) | AD | 800–812 | Dismissed w/o P only against DP |
| 25 | Reasonable Accommodation | N.Y. Admin. Code § 8-107(28) | AD | 813–825 | Dismissed w/o P only against DP |
| 26 | Interactive Process | 42 U.S.C. § 12112 | CD | 826–835 | Dismissed |
| 27 | Interactive Process | N.Y. Exec. Law § 296(3) | AD | 836–-848 | Dismissed |

| 28 | Interactive Process | N.Y.C. Admin. Code § 8–107(28) | AD | 849–861 | Dismissed w/o P only against DP |
| 29 | RICO | 18 U.S.C. § 1962 | AD | 862–874 | Dismissed |
| 30 | Retaliation | N.Y. Exec. Law § 296(7) | Cohen | 875–896 | Dismissed w/o P |
| 31 | Retaliation | N.Y. Admin. Code § 8–107(7) | Cohen | 897–918 | Dismissed w/o P |
| 32 | Retaliation | N.Y. Labor Law § 215 | Cohen | 919–940 | Dismissed w/o P |
| 33 | Interference | N.Y. Admin. Code § 8–107(19) | Cohen | 941–955 | Dismissed |