UNITED STATES DISTRICT COURT OF THE
SOUTHERN DISTRICT OF NEW YORK

X------------------------------------------------------X

LEAH MCSWEENEY,

                         Plaintiff,

                v.

ANDY COHEN, LISA SHANNON, JOHN
PAPARAZZO, DARREN WARD, WARNER
BROS. DISCOVERY, INC, SHED MEDIA US
INC., NBCUNIVERSAL MEDIA, LLC and
BRAVO MEDIA LLC,

                       Defendants.

X------------------------------------------------------X

Case No.: 1:2024-cv-01503

**SECOND AMENDED
COMPLAINT AND DEMAND
FOR JURY TRIAL**

Plaintiff, Leah McSweeney ("Ms. McSweeney"), by and through her attorneys, Adelman Matz P.C., as and for her complaint against Andy Cohen ("Cohen"), John Paparazzo ("Paparazzo"), Lisa Shannon ("Shannon"), Darren Ward ("Ward") (Paparazzo, Ward, and Shannon the "Defendant Producers"), Warner Bros. Discovery, Inc ("Warner"), Shed Media US Inc. ("Shed"), NBCUniversal Media, LLC ("NBC"), and Bravo Media, LLC ("Bravo") (the "Defendant Companies") (collectively "Defendants") alleges as follows:

## <u>NATURE OF THE CASE</u>

1.     Where there is smoke, there is fire. Defendants discriminated against, tormented, demoralized, demeaned, harassed and retaliated against Ms. McSweeney because she is a woman with disabilities, such as alcohol use disorder and various mental health disorders, all in the name of selling drama. But being in the business of reality television does not relieve Defendants of their obligation to follow employment laws that prohibit the exact type of discrimination, hostile work environment and retaliation that Defendants subjected Ms. McSweeney to. Now, Ms. McSweeney seeks justice.

2.     Defendants established a rotted workplace culture that uniquely depended on pressuring its employees to consume alcohol.  Defendants, however, abdicated the duties they owed to Ms. McSweeney, as her employer, to maintain a safe working environment and accommodate Ms. McSweeney's disabilities including alcohol use disorder and mental health disorders.

3.     Instead, Defendants with the knowledge that Ms. McSweeney struggled with alcohol use disorder, colluded with her colleagues to pressure Ms. McSweeney to drink, retaliated against her when she wanted to stay sober, and intentionally failed to provide reasonable accommodations that would aid her efforts to stay sober and able to perform.

4.      Defendants also employed psychological warfare intentionally weaponized to break Ms. McSweeney's psyche. Defendants knew Ms. McSweeney suffered from depression but intimidated and prevented her from visiting her dying grandmother by implicitly threatening to terminate her employment and cut her pay if she left the filming location. Defendants also knew of Ms. McSweeney's bipolar, depression, and anxiety disorders. Yet, rather than engaging in the interactive process to provide Ms. McSweeney with reasonable accommodations, Defendants trapped her—alone—in a foreign country and manipulated her castmates into traumatizing Ms. McSweeney.

5.     Defendants repeatedly engaged in retaliation against Ms. McSweeney, rather than accommodating her disabilities as they were legally obligated to do.

6.     Defendants created an enterprise that ventures to discriminate against and harass its employees and attempts to silence its employees by forcing them to sign overly broad, unconscionable confidentiality provisions, which Defendants admit are not enforceable, and which

Defendants admit are meant to scare participants from speaking out and making Defendants' unlawful employment practices and patterns of retaliation public.

7.     Ms. McSweeney brings this action to hold Defendants' accountable for their unlawful employment acts of disability discrimination, hostile work environment, and retaliation. Reality always reveals itself: these unconscionable practices will no longer be tolerated; the pattern of discrimination and retaliation must stop—it is time that Defendants answer.

## <u>NATURE OF THE PARTIES</u>

8.     Ms. McSweeney is a natural person currently residing in the State of New York.

9.     Upon information and belief, Cohen is a natural person currently residing in the State of New York, and at all relevant times is and was employed by one or more of the Defendants.

10.     Upon information and belief, Paparazzo is a natural person currently residing in the State of California, and at all relevant times is and was employed by one or more of the Defendants. Upon information and belief, and at all relevant times, Paparazzo's place of employment was New York, New York.

11.     Upon information and belief, Shannon is a natural person currently residing in the State of California, and at all relevant times is and was employed by one or more of the Defendants. Upon information and belief, and at all relevant times, Shannon's place of employment was New York, New York.

12.     Upon information and belief, Ward is a natural person currently residing in the State of California, and at all relevant times is and was employed by one or more of the Defendants. Upon information and belief, and at all relevant times, Ward's place of employment was New York, New York.

13.     Upon information and belief, Warner is a corporation duly formed and existing under the laws of the State of Delaware with a principal place of business located at 230 Park Ave S, New York, New York 10003.

14.     Upon information and belief, Shed is a corporation duly formed and existing under the laws of the State of Delaware with a principal place of business located at 3800 Barham Blvd., Suite 410, Los Angeles, California 90068.

15.     Upon information and belief, NBC is a corporation duly formed and existing under the laws of the State of Delaware with a principal place of business located at 100 Universal City Plaza, Universal City, California 91608.

16.     Upon information and belief, Bravo is a corporation duly formed and existing under the laws of the State of California with a principal place of business located at 100 Universal City Plaza, Universal City, California 91608.

17.     Upon information and belief, Defendants were and are the agents, employees, servants, partners, independent contractors, joint venturers, and/or participants with all other Defendants, and with each other, and in doing the things hereinafter mentioned, were agents, employees, servants, partners, and joint venturers and/or acted with the consent and permission of the co-Defendants, and each of them.

## JURISDICTION AND VENUE

18.     This Court has federal question jurisdiction over the subject matter of this action pursuant to 23 U.S.C. §§ 1331 and 1338(a) because this action alleges violations of federal statutes.

19.     This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over this action because, as stated above, this Court properly has federal question jurisdiction and because

all other claims are so related within this Court's original jurisdiction that they form part of the same case or controversy.

20.    Upon information and belief, this Court has personal jurisdiction over the Defendants pursuant to NY CPLR § 302 because Defendants have purposefully availed themselves to conduct business in New York through employing Plaintiff and establishing an employment location and principal place of business within the State of New York and, specifically, in New York, New York.

21.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(3) because the Defendants are subject to the Court's personal jurisdiction with respect to the action, as Defendants employed Plaintiff in New York, New York.

### FACTUAL ALLEGATIONS

**A. Defendants Cannot Weaponize the Arbitration Clause to Silence Ms. McSweeney's Claims of Abuse**

22.    Plaintiff and Defendant Bravo entered into a contract dated October 4th, 2019, (respectively, the "RHONY Contract" and the "RHUGT Contract", collectively the "Contracts").

23.    The Employment Contracts stipulate that either party's dispute against the other, regarding the employment contract, shall be resolved in a confidential arbitration.

24.    Ms. McSweeney's claims against Defendants, however, do not pertain to Defendants' breaches of either the RHONY Contract or the RHUGT Contract; rather, Ms. McSweeney complains that Defendants habitually engaged in unlawful employment practices in violation of their obligations under relevant Federal, State, and City employment laws as set forth herein.

25.     Also, in both the RHONY Contract and the RHUGT Contract, Ms. McSweeney is party to a confidentiality clause.  Until recently, Ms. McSweeney feared that Defendants would weaponize this confidentiality clause and silence Ms. McSweeney's claims of abuse.

26.     However, amidst mounting pressure that these clauses were being used to scare victims of unlawful employment practices from speaking out, Defendants have acknowledged that they are not enforceable to prevent such disclosures.

27.     Indeed, lawyers for Defendant Bravo confirmed that they would not enforce the confidentiality clause against any Bravo employee's claim of abuse:

> Confidentiality clauses are standard practice in reality programming to prevent disclosure of storylines prior to air. They are not intended to prevent disclosure by cast and crew of unlawful acts in the workplace, and they have not been enforced in that manner. To be clear: any current or former cast or crew is free to discuss and disclose any allegedly unlawful acts in the workplace, such as harassment or discrimination, or any other conduct they have reason to believe is inappropriate. We are also working with our third-party production companies to remind all cast and crew that they are encouraged to report any such concerns through the channels made available by the production company so concerns can be promptly addressed.

*See* Dominic Patten, *"'Vanderpump Rules' Stars & Other Reality TV Participants Can Break NDAs To Reveal 'Unlawful Acts,' Bravo Says, As Potential Lawsuits Loom"*, Deadline (Aug. 25, 2023, 4:50 PM) https://deadline.com/2023/08/vanderpump-rules-reality-tv-nda-lawsuit-bravo-1235528642/.

28.     As a matter of public policy, the Arbitration and Confidentiality Clauses are unenforceable because both would operate in tandem to ensure that Ms. McSweeney cannot disclose Defendants' abuse, even in a Court.

**B.  Ms. McSweeney Exhausted All Administrative Remedies Available to Her**

29.    On or around March 15, 2023, Ms. McSweeney dual-filed three complaints (the "Complaints") against Defendants with the New York State Human Rights Department ("NYSDHR") and the Equal Employment Opportunities Commission ("EEOC"), all of which alleged claims of disability discrimination, hostile work environment, and retaliation.

30.    On or around May 15, 2023, Defendants jointly answered the Complaints and denied all allegations asserted therein.

31.    On or around June 30, 2023, Ms. McSweeney dual-filed three First Amended Complaints (the "FACs") against Defendants with the NYSDHR and EEOC, all of which included all claims previously alleged in the Complaints and an additional claim of sexual harassment against all Defendants.

32.    Defendants answered the FACs and denied all allegations therein.

33.    On or around September 6, 2023, Ms. McSweeney formally requested that NYSDHR and EEOC administratively dismiss her claims against Defendants and that the EEOC issue her a right-to-sue letter with respect to her claims against Defendants.

34.    On or around October 6, 2023, the NYSDHR administratively dismissed the FACs filed before it.

35.    On or around January 9, 2024 and January 23, 2024, the EEOC issued Ms. McSweeney right to sue letters (the "Right to Sue Letters") that allow her to pursue her claims against the Defendants before this Court.

**C.  Introduction to the Defendants**

36.    Defendant Warner is a mass media and entertainment conglomerate headquartered in New York City.

37.    Defendant Warner is the parent company of Shed, a media company that produces various 'unscripted' reality television shows, including some installments of the *Real Housewives* franchise.

38.    Upon information and belief, Defendant Warner directs, authorizes, and exercises control over all of Defendant Shed's corporate policies, including employment policies.

39.    Upon information and belief, Defendant Shed employs the Defendant Producers as producers of, *inter alia*, RHONY and RHUGT.

40.    Upon information and belief, Defendant NBC owns the television network, Defendant Bravo, which owns, controls, and airs the television franchise "*Real Housewives*."

41.    Upon information and belief, Defendant NBC directs, authorizes, and exercises control over all of Defendant Bravo's corporate policies, including employment policies.

42.    Upon information and belief, Defendant Bravo directly reports to Defendant NBC and Defendant NBC makes all final decisions regarding Defendant Bravo's programming, including the *Real Housewives*.

43.    Upon information and belief, Defendant NBC also exercises control over Defendant Bravo's employees and makes final decisions regarding employment policies, hiring, termination, and payment of Defendant Bravo employees, including the *Real Housewives* employees and cast members.

44.    Upon information and belief, Defendant Cohen is the Executive Producer of the Real Housewives, serves as a host for each and every "reunion" episode of every *Real Housewives* franchise, and hosts *Watch What Happens Live* ("WWHL"), which is a late-night show that often features interviews with cast members of the *Real Housewives* ("Housewives").

45.    Upon information and belief, Defendant Cohen decides whether to cast each Housewife, when to terminate each Housewife, directly supervises each Housewife, and controls each and every episode and scene filmed for each and every *Real Housewives* installment.

46.    Upon information and belief, Defendant Producers also directly supervise the Housewives, control each episode and scene filmed for the *Real Housewives* installments that they work on, provide *inter alia* Defendant Cohen with daily performance reviews of each *Real Housewives* cast member at the close of each working day, and have decision making power over the terms of the Housewives' employment.

47.    Upon information and belief, each of the Defendant Producers, individually and collectively, directly participated in the discriminatory and retaliatory conduct alleged herein.

48.    Upon information and belief, each of the Defendant Producers, individually and collectively, aided, abetted, and compelled the Defendant Companies' and Defendant Cohen's discrimination and retaliation against Plaintiff alleged herein.

49.    Upon information and belief, at all times alleged herein, Plaintiff reasonably believed that the Defendant Producers had the power to terminate Plaintiff's employment because the Defendant Producers would threaten to do so.

50.    Upon information and belief, at all relevant times each of the Defendant Companies and Defendant Cohen was the joint employer of Plaintiff and was engaged with some or all of the other Defendants in a joint enterprise for profit.  Plaintiff performed services for each and every one of Defendants, and to the mutual benefit of all Defendants, and all Defendants shared control of Plaintiff as employers, either directly or indirectly, and of the manner in which Defendants' business was conducted.

**D. Introduction to the *Real Housewives* Enterprise**

51.    The *Real Housewives* is a reality television series aired on, *inter alia*, Defendant Bravo, which is a television network owned and run by NBC.  The *Real Housewives* consists of programming that dramatically exploits the personal and professional lives of affluent women in various cities across the United States, most of whom often openly or secretly suffer from mental health disabilities, personality disorders, and addiction disabilities.  Each woman who appears on a *Real Housewives* production is referred to as a "Housewife."

52.    Upon information and belief, the *Real Housewives* premiered in or around spring 2006.

53.    Upon information and belief, RHONY premiered in or around September 2007 as the second installment of *Real Housewives*.

54.    Due, in large part to RHONY, the *Real Housewives* franchise became a cultural phenomenon.

55.    Upon information and belief, in or around November 2021, RHUGT premiered on the streaming service, Peacock.

56.    RHUGT is a *Real Housewives* spin-off that brings together "Housewives" from various *Real Housewives* installments and chronicles their group vacations, which are replete with unlimited supplies of alcohol (that Defendant Bravo supplies and pressures its cast members to consume), little to no food or water, and where cast members are forced to film from at least eight in the morning to one in the morning.  Much like all other *Real Housewives* installments, these conditions are intended to induce female cast members to behave inappropriately and unsafely.

**E. RHONY Season 12: Ms. McSweeney's *Real Housewife* Debut**

57.    Prior to joining RHONY, Ms. McSweeney had maintained her sobriety for approximately nine (9) years.

58.    Five (5) months prior to joining RHONY, Ms. McSweeney relapsed into alcohol use disorder.

59.    In or around 2019, Defendants approached Ms. McSweeney with the opportunity to appear as a cast member of RHONY.

60.    In Ms. McSweeney's initial casting tape for RHONY, Ms. McSweeney disclosed that she had broken her sobriety and began to consume alcohol again.

61.    In or around 2019, Defendants created an employment relationship with Ms. McSweeney and employed Ms. McSweeney as a cast member of RHONY. Defendants knew at the time that Ms. McSweeney suffered from alcohol use disorder.

62.    Just before Ms. McSweeney began filming RHONY season 12, Defendant Producers began to use their position of power, as Ms. McSweeney's employers, to discriminate against Ms. McSweeney.

63.    Approximately one (1) month before Ms. McSweeney was scheduled to begin filming RHONY season 12, Ms. McSweeney regained sobriety.

64.    After regaining sobriety, Ms. McSweeney repeatedly and unequivocally expressed to Defendant Producers, various of the Defendant Companies' employees staffed on RHONY season 12 cast, and various RHONY cast members, that she wished to remain sober while filming RHONY season 12.  Ms. McSweeney specifically disclosed to Defendants Ward and Paparazzo that she had newly regained her sobriety and wished to remain sober while filming RHONY.

65.    In fact, just prior to beginning to film RHONY season 12, Ms. McSweeney began to cease returning Defendant Paparazzo's calls and text messages regarding filming RHONY season 12 because she felt increasingly anxious that her prospective filming obligations would

negatively impact her intent to remain sober, and more broadly, would negatively impact her alcohol use disorder.

66.     Eventually, Defendant Ward and Ms. McSweeney spoke via telephone, at which time Ms. McSweeney told Defendant Ward that she was nervous to begin filming RHONY season 12 and felt that it was not the right time for her to begin filming RHONY season 12 due to her alcohol use disorder and her need to remain sober.  During this conversation, Defendant Ward advised Ms. McSweeney to ask him or the other Defendant Producers for help if she needed anything.

67.     Ms. McSweeney confided in Defendant Ward about her alcohol use disorders and concerns regarding the impact of filming on her alcohol use disorder because the Defendant Producers controlled the day-to-day aspect of her employment.

68.     For example, the Defendant Producers told Ms. McSweeney what to wear while she was filming, where to report to film a scene, when to report to film her scenes, the length of time that Ms. McSweeney would film her scene, and who Ms. McSweeney would film her scenes with.

69.     The Defendants Producers also led Ms. McSweeney to believe that the Defendant Producers could terminate Ms. McSweeney's employment by intimating that, if Ms. McSweeney did not capitulate to their directives, Ms. McSweeney would be demoted to a less lucrative "friend of" (e.g. part time) cast position or that Ms. McSweeney's employment on RHONY would be terminated altogether.

70.     Ms. McSweeney also knew that Defendant Producers provided Defendant Cohen with daily performance reviews regarding *inter alia* her work performance while filming, and

further, Defendant Producers would provide Ms. McSweeney with performance reviews each time Ms. McSweeney concluded filming a scene.

71.    After Ms. McSweeney told her employers of her newfound sobriety, and after Ms. McSweeney had an extended conversation with Defendant Paparazzo about her alcohol use disorder and concerns that filming would negatively impact her sobriety, none of the Defendants engaged in any type of interactive process with Ms. McSweeney regarding reasonable accommodations that would help her maintain her sobriety.

72.    Instead, beginning in or around October 2019, the Defendant Producers nefariously began to extract personal, confidential information regarding Ms. McSweeney's disabilities, which they would later use against her.

73.    Upon information and belief, beginning in or around October 2019, Defendant Producers developed an artificially close relationship with Ms. McSweeney so as to manipulate Ms. McSweeney into confiding in them regarding her alcohol use disorder and mental health disabilities, and further, potential scenarios that might trigger her to relapse into alcohol use disorder or otherwise exacerbate her mental health disabilities.

74.    The result was that Defendant Producers cultivated a treasure trove of Ms. McSweeney's dark secrets with intent to place her in situations known to exacerbate her alcohol use disorder and mental health disabilities.

75.    Upon information and belief, Defendant Cohen and Defendant Producers discriminated against Ms. McSweeney's mental health and alcohol use disorders by intentionally planning scenarios intended to exacerbate Ms. McSweeney's disabilities throughout RHONY season 12.  Upon information and belief, Defendant Producers did this to drive Ms. McSweeney to the brink of insanity and force her to break her sobriety.

76.    The fact that Defendant Producers are employed to produce a reality television show, however, does not permit Defendant Producers to *carte blanche* ignore their legal obligations to engage in the interactive process, make legally required reasonable accommodations for, or to discriminate against Ms. McSweeney's mental health and addiction-related disabilities.

77.    Defendant Producers had a legal obligation to engage in an interactive process regarding how to accommodate Ms. McSweeney and to reasonably accommodate Ms. McSweeney's disabilities.

78.    Defendant Producers maliciously disregarded these obligations and chose to discriminate against Ms. McSweeney on the basis of her disability by engaging in guerilla-type psychological warfare intended to pressure Ms. McSweeney into a psychological break and cause Ms. McSweeney to relapse.

79.    Shortly thereafter in or around April 2nd, 2020, Ms. McSweeney debuted as a RHONY season 12 cast member.

80.    Unbeknownst to Ms. McSweeney, in the time between fall of 2019 and throughout RHONY season 12, Defendants intended to weaponize Ms. McSweeney's alcohol use disorder as the main storyline of RHONY season 12.

81.    Throughout filming RHONY season 12, Ms. McSweeney repeatedly advised Defendant Producers that she had not consumed alcohol for thirty (30) days prior to the date she began filming RHONY season 12 and that she was working to maintain her sobriety.

82.    Throughout filming RHONY season 12, Ms. McSweeney also repeatedly advised Defendant Producers that she was intensely concerned about relapsing into alcohol use disorder on national television.

83.    Once again, because Ms. McSweeney told Defendant Producers that she was disabled, Defendant Producers became legally obligated to provide Ms. McSweeney with reasonable accommodations, which they failed to do.

84.    Instead, Defendant Producers pressured Ms. McSweeney to drink and, upon information and belief, directed and/or encouraged other RHONY cast members to do the same.

85.    Defendant Producers not only supplied Ms. McSweeney with unlimited, free-of-charge alcoholic beverages throughout Ms. McSweeney's employment as a cast member on RHONY season 12, but also encouraged her to consume those alcoholic beverages.

86.    This environment caused Ms. McSweeney to relapse into alcohol addiction shortly after joining RHONY season 12.

87.    Ms. McSweeney's relapse came to a head in an infamous cast trip, which Defendants named "Hurricane Leah."

88.    The Hurricane Leah RHONY  trip took place in Newport, Rhode Island.  Upon Ms. McSweeney's arrival in Newport, at the temporary residence that Defendants provided Ms. McSweeney: Defendant Producers stocked Ms. McSweeney's residence with large quantities of free alcoholic beverages, notwithstanding the Defendant Producer's knowledge that Ms. McSweeney suffered from alcohol use disorder, was in the midst of relapsing into alcohol use disorder, and that Ms. McSweeny had previously requested accommodations to help her maintain, and later regain, her sobriety.

89.    At Ms. McSweeney's arrival to her temporary residence in Newport, Rhode Island, Ms. McSweeney complained to Defendants Ward and Paparazzo that she was feeling heightened symptoms of her anxiety and depression disabilities.  In response, Defendants Ward and Paparazzo directed Ms. McSweeney to consume some of the alcoholic beverages that Defendant Producers

provided her because the alcoholic beverages would make Ms. McSweeney "feel better", again, notwithstanding the fact that Defendants Ward and Paparazzo knew that Ms. McSweeney suffered from alcohol use disorder.

90.    Ms. McSweeny heeded Defendant Ward's and Paparazzo's directives and, while relapsing, continued to drink large quantities of alcohol at a cast dinner that was part of the "Hurricane Leah" cast trip.

91.    While relapsing, Ms. McSweeney grew mentally and physically ill, which manifested into extreme depressive symptoms.  All of which occurred while Defendant Producers were present and filming Ms. McSweeney.  Accordingly, they were clearly on notice of this occurrence.

92.    Defendants never offered Ms. McSweeney any accommodations for her aggravated mental health symptoms and relapse.  Defendants also never engaged in the interactive process with Ms. McSweeney to help accommodate Ms. McSweeney's mental health symptoms and relapse.  Instead, Defendants exacerbated Ms. McSweeney's disabilities by increasingly pressuring her to consume alcoholic beverages.

93.    After certain cast members expressed concerns regarding Ms. McSweeney's erratic behavior, Defendant Shannon called Ms. McSweeney and, rather than discuss any accommodations that Ms. McSweeney might need, told Ms. McSweeney that, despite relapsing into alcohol use disorder, Ms. McSweeney should continue to consume alcohol so long as she "remain[ed] lucid" while filming.

94.    The "Hurricane Leah" episode became the highest-rated episode of RHONY season 12, all due to Defendants' exacerbation of Ms. McSweeney's clear disabilities.

95.     Upon information and belief, the Defendant Producers specifically targeted and pressured Ms. McSweeney to consume alcoholic beverages, and ergo break her sobriety, because Defendant Producers knew that Ms. McSweeney suffered from alcohol use disorders and mental health disorders.

96.     Indeed, many of the current and former cast members that appear on the *Real Housewives* franchise do not suffer from alcohol use disorder, but also elect not to consume alcoholic beverages; however, upon information and belief, Defendants do not pressure these *Housewives* to consume alcoholic beverages, subject these *Housewives* to adverse employment conditions because they choose not to consume alcohol, or retaliate against these *Housewives* because they do not consume alcohol.

97.     Upon information and belief the following current and/or former *Housewives* that elect not to consume alcohol, but do not suffer from alcohol use disorder, include: Jill Zarin ("Zarin"), *Real Housewives of New York*; Gina Kirschenheiter ("Kirschenheiter"), *Real Housewives of Orange County*; Kyle Richards ("Richards"), *Real Housewives of Beverly Hills*; Kandi Burress, *Real Housewives of Atlanta*; and Margaret Josephs, *Real Housewives of New Jersey*.

98.     Upon information and belief, the Defendant Producers are employed both on RHUGT and RHONY, which featured both Zarin and Richards.

99.     Upon information and belief, however, the Defendant Producers did not pressure or request that either Zarin or Richards consume alcohol while they were filming their respective shows because, unlike Ms. McSweeney, neither Zarin nor Richards suffer from alcohol use disorder.

100.    Therefore, upon information and belief, Defendants exclusively discriminated and retaliated against Ms. McSweeney because of Ms. McSweeney's alcohol use disorder disability.

101.    Moreover, as other similarly situated employees (e.g. Housewives) elect not to consume alcoholic beverages, but do not suffer from alcohol use disorder, consumption of alcohol was not an essential function of Ms. McSweeney's employment with Defendants.

102.    Rather, Defendant Producers specifically pressured and suggested that Ms. McSweeney consume alcohol while filming because Ms. McSweeney has alcohol use disorder and because Defendant Producers knew that, if Ms. McSweeney relapsed into alcohol use disorder, her relapse would also intensify her mental health disorders.

103.    Upon information and belief, because exacerbation of Ms. McSweeney's disabilities directly caused Defendants' unprecedented success, Defendants continued to ignore their obligation to engage in the interactive process or provide reasonable accommodations throughout the pendency of Ms. McSweeney's employment, even when Ms. McSweeney asked for them.

104.    In fact, Defendants continued to discriminate against Ms. McSweeney and ignored her requests for accommodations after RHONY season 12 wrapped.

105.    After Ms. McSweeney regained her sobriety, at the conclusion of RHONY season 12, Defendant Producers forced Ms. McSweeney to partake in "Confessionals."[1]

---

[1] "Confessionals" on the *Real Housewives* franchise are interviews that occur after the Housewives complete filming and that are later interposed contemporaneously with certain scenes when an episode is complete.  In these Confessionals producers ask the Housewives to react to certain events that occur during filming.  At least on RHONY, the Defendant Producers often prompt Housewives to say certain lines or react in a specific way to continue to craft a narrative or "story line" that Defendant Producers predetermine each Housewife should have.

106.    Prior to partaking in the Confessionals, Ms. McSweeney asked Defendant Producers to accommodate her newfound sobriety by not requiring Ms. McSweeney to make light of her relapse.

107.    In fact, Ms. McSweeney, had previously expressed to the Defendant Producers that she had recently regained sobriety, after her relapse during RHONY season 12, and requested that the Defendant Producers no longer comment on Ms. McSweeney's sobriety or otherwise request that Ms. McSweeney film scenes intended to make light of her alcohol use disorder.

108.    In response, Defendant Producers brushed off Ms. McSweeney's request for an accommodation and told her to "keep it light" during her Confessionals and to deny that she suffered from alcohol use disorder.

109.    Instead of accommodating Ms. McSweeney, or engaging in the interactive process with Ms. McSweeney, during Ms. McSweeney's Confessionals: Defendant Producers directed Ms. McSweeney to make fun of her relapse by saying lines such as "time for a drink", and directed Ms. McSweeney to state that she "doesn't have a problem" with alcohol, without any care or interactive process regarding accommodating Ms. McSweeney's disability—especially in light of the fact that Ms. McSweeney had again recently become sober.

110.    Defendant Producers, therefore, required Ms. McSweeney to film these Confessionals notwithstanding their collective and individual knowledge of Ms. McSweeney's alcohol use disorder and that she was attempting to maintain her newfound sobriety.

111.    Furthermore, notwithstanding the fact that the Defendant Producers knew that Ms. McSweeney had regained her sobriety one (1) month before RHONY season 12 began filming, before Ms. McSweeney filmed her Confessionals, the Defendant Producers attempted to manipulate Ms. McSweeney into falsely stating that Ms. McSweeney had been consuming alcohol

six (6) months prior to filming RHONY season 12, notwithstanding Ms. McSweeney's reasonable accommodation request for Defendant Producers to cease talking about Ms. McSweeney's relapse and/or cease making light of Ms. McSweeney's relapse and/or alcohol use disorder.

112.    As a person recovering from alcohol use disorder, one of the fundamental tenants to Ms. McSweeney's sobriety includes honesty with herself and others regarding the length of time Ms. McSweeney has remained sober and the date of her last relapse.  This is so because Ms. McSweeney, a person suffering with alcohol use disorder, would frequently conceal her relapse into alcohol use disorder in effort to *inter alia* attempt to maintain some form of control over her disorder and to avoid the shame and/or stigma that is associated with relapse.

113.    Upon information and belief, the Defendant Producers knew that Ms. McSweeney's maintained recovery from alcohol use disorder rested heavily on Ms. McSweeney's ability to be honest with herself and others about her alcohol use disorder and relapse; therefore, Defendant Producers' gaslighting attempt to force Ms. McSweeney into providing false Confessionals regarding Ms. McSweeney's alcohol consumption was intended to strip Ms. McSweeney of the control over her alcohol use disorder that she had regained through her sobriety, distort Ms. McSweeney's reality and self-perception, and cause Ms. McSweeney to relapse again prior to filming RHONY season 13.

114.    After Ms. McSweeney regained her sobriety and told Defendants that she intended to remain sober: Defendants also created a special episode called "Leah's Best Moments" that was, essentially, a highlight reel of Ms. McSweeney's relapse.  In the midst of her renewed sobriety, Defendants forced Ms. McSweeney to narrate this special episode, which required Ms. McSweeney to watch as she relapsed into alcohol use disorder and humiliate herself by

commenting on its supposed "hilarity" rather than allow Ms. McSweeney to engage in a truthful dialogue that was helpful to her sobriety.

115.    Ms. McSweeney felt extraordinarily uncomfortable and targeted throughout filming both the Confessional scenes and narrating the "Leah's Best Moments" episode, but because Defendant Producers controlled Ms. McSweeney's public image, she felt she had no choice but to comply with whatever Defendant Producers told her to say regarding her alcohol use disorder.

116.    Ms. McSweeney also understood from other cast and crew that if she did not follow the directions of Defendant Producers, they would retaliate against her.

117.    Indeed, throughout her employment with Defendants, Ms. McSweeney believed that Defendant Producers report directly to Defendant Cohen and the Defendant Companies regarding which cast members should be rehired for the next RHONY season, which cast members should be demoted on the next RHONY season, and which cast members should be terminated before the next RHONY season.

118.    Ms. McSweeney, therefore, reasonably believed that if she did not capitulate to the Defendant Producers' directives regarding "Leah's Best Moments" and the Confessionals, that the Defendant Producers would recommend termination of her employment and/or recommend demoting Ms. McSweeney to a less lucrative, part-time "Friend Of" position.

119.    Defendants retrospectively summarize RHONY season 12 as: "defined early on by *boozy chaos* and thrown tiki torches, and that party lifestyle was especially concerning given [Ms. McSweeney's] early admission that she had been to rehab and had been sober for years prior to filming." Dave Quinn, *Not All Diamonds and Rosé*, Andy Cohen Books, Henry Holt and Co., 165 (2021) (emphasis added).

120.    Defendant Cohen also admitted:

> There was a discomfort at Bravo with the amount of alcohol this season and with the lack of awareness of it on behalf of some of the women. *And that has been a recurring thing with the New York Housewives. There's already a negative association with the New York Housewives and alcohol . . .* And this season it seemed to be worse than ever.

Dave Quinn, *Not All Diamonds and Rosé*, Andy Cohen Books, Henry Holt and Co., 166 (2021) (emphasis added).

121.    Long after RHONY season 12 concluded, Defendants continued to discriminate against Ms. McSweeney's alcohol use disorder.

122.    In the book that Defendant Cohen commissioned, *Not all Diamonds and Rose*, Defendant Cohen included an interview with former RHONY Housewife, Sonja Morgan. Morgan disparaged both Ms. McSweeney and Ms. McSweeney's non-cast member sister for their alcohol consumption on a RHONY season 12 cast trip.

123.    Upon information and belief, Defendant Cohen chose to include this interview and other like interviews with intent to humiliate, degrade, and demean Ms. McSweeney on the basis of her alcohol use disorder disability.

124.    Defendants did not target their discrimination against Ms. McSweeney uniquely to her alcohol use disorder. Throughout RHONY season 12, Defendants also exploited Ms. McSweeney's mental health disabilities with intent to characterize and portray Ms. McSweeney as the deeply sexist archetypical role of an emotionally irrational, hysterical woman.

125.    Upon information and belief, Defendants colluded with fellow RHONY cast member, Ramona Singer ("Singer"), to "out" Ms. McSweeney's confidential bipolar disorder diagnosis before Ms. McSweeney disclosed it publicly.

126.    Upon information and belief, as a direct result of Defendant Producers' plan, Singer maliciously rumored to other cast members that Ms. McSweeney suffered from bipolar disorder.

127.    Singer stated that Ms. McSweeney's behavior while drinking could be attributed to Ms. McSweeney's bipolar diagnosis and falsely posited that Ms. McSweeney abused her bipolar prescription medication by combining that prescription with alcohol.

128.    Ms. McSweeney complained to Defendant Producers that Singer's 'outing' of her mental health disability caused her to suffer extreme anxiety and depression, thereby exacerbating her disclosed mental health disabilities.

129.    Defendant Producers had a duty to accommodate Ms. McSweeney or engage in an interactive process with Ms. McSweeney to develop a mutually agreed upon accommodation, but Defendant Producers again failed to do so.

130.    Instead Defendant Producers shamed Ms. McSweeney for complaining of depression and anxiety as a direct result of Singer's actions.  Defendant Producers even attempted to gaslight Ms. McSweeney into falsely believing that her worsened mental health symptoms did not exist.

131.    Furthermore, Ms. McSweeney repeatedly requested accommodations when her mental health disorders were so exacerbated.  For example, after Ms. McSweeney relapsed during the "Hurricane Leah" cast trip, Ms. McSweeney complained to Defendant Producers that she was experiencing a panic attack and requested relief from filming a scheduled scene.

132.    Rather than accommodate Ms. McSweeney or engage in an interactive process to develop an accommodation for Ms. McSweeney, Defendant Shannon told Ms. McSweeney that she would help "craft Ms. McSweeney's storyline"—the veiled threat: if Ms. McSweeney did not

film that scene, Defendant Shannon would edit Ms. McSweeney poorly to turn viewers against Ms. McSweeney, which would also likely culminate in Ms. McSweeney's termination.

133.    Public discourse regarding RHONY season 12 shows that Defendants overwhelmingly succeeded.

134.    Throughout RHONY season 12, Defendant Producers and Defendant Cohen's disparate disability discrimination against Ms. McSweeney caused Ms. McSweeney to suffer severe emotional and mental distress.

135.    Ms. McSweeney, however, felt afraid to voice her concerns more than she had for fear that she would be retaliated against with worse treatment.

136.    Ultimately, Ms. McSweeney feared speaking out publicly because she feared that Defendants would fire her and blackball her from the industry, like many before her.

**F. Ms. McSweeney Agrees to Continue Employment with Defendants and Appear on RHONY Season 13.**

137.    Tantamount to an abusive relationship, Ms. McSweeney agreed to return for RHONY season 13 because she felt she could make her experience better.

138.    There is no question that Defendants maintained acute awareness of Ms. McSweeney's disabilities, which include depression, anxiety, bipolar disorder, and addiction.

139.    In fact, prior to filming RHONY season 13, on or around February 4, 2020, Ms. McSweeney met Defendant Bravo employees at the Odeon in New York to discuss the upcoming season.

140.    At this meeting, Defendant Bravo employees, Sezin Cavusoglu and Ryann Flynn, questioned why Ms. McSweeney did not consume alcohol.

141.    Ms. McSweeney responded that she was recently sober and intended to remain sober while filming RHONY season 13.

142.    Defendant Bravo employees responded, "well you don't have a *problem* . . . do you?", notwithstanding the fact that both Cavusoglu and Flynn knew Ms. McSweeney suffered from alcoholism and had openly discussed her struggles with alcoholism on many occasions.

143.    Upon information and belief, Defendant Bravo employees asked Ms. McSweeney this question with intent to pressure her to consume alcohol on RHONY season 13 and to minimize her alcohol use disorder disability rather than accommodate it.

144.    Also, before Ms. McSweeney began filming RHONY season 13, Defendant Bravo employees told Ms. McSweeney that former castmate, Dorinda Medley, was fired from RHONY and would not appear on RHONY 13.

145.    Defendant Shannon specifically told Ms. McSweeney, and upon information and belief, also told the other cast members, that Defendants terminated Medley because Medley transformed from a "fun drunk" to a "mean drunk."

146.    In fact, Defendants' employees continued to make discriminatory comments directed towards other cast members' alcohol use disorder disabilities prior to filming RHONY season 13.

147.    Barrie Bernstein, an executive producer employed by Defendant Shed, told Ms. McSweeney that she tired of cast member Sonja Morgan's storyline, which involved excessive alcohol consumption, because it was becoming "pathetic."

148.    Upon information and belief, Defendant Shannon told this to Ms. McSweeney with the implication that Ms. McSweeney should be a 'fun drunk' and not a "mean" or "pathetic" drunk—blatantly ignoring Ms. McSweeney's requests for a reasonable accommodations request, namely, for Defendants to respect and not interfere with Ms. McSweeney's sobriety.

149.    When RHONY season 13 began filming, in spite of the discrimination she was faced and continued to face, Ms. McSweeney worked vigorously to protect her sobriety and, throughout the season, increasingly made requests for accommodations and issued complaints of discrimination.

150.    After the success of the Hurricane Leah episode, however, Defendants had no plans to help Ms. McSweeney maintain her sobriety.

151.    On one occasion, Ms. McSweeney, whom Defendants knew to be particularly sensitive to emotionally distressing situations, began to suffer a panic attack and exclaimed "I wish I still f**king drank right now"—which was particularly alarming because Ms. McSweeney had recently regained and recommitted to her sobriety.

152.    Defendant Producers directly witnessed Ms. McSweeney's panic attack, and Ms. McSweeney's statement that she wished she could consume alcohol; however, Defendant Producers never once attempted to engage in an interactive process with Ms. McSweeney to develop a mutually agreeable accommodation to both her anxiety and her alcohol use disorder.

153.    Instead, notwithstanding the Defendant Producers' knowledge that Ms. McSweeney was struggling with her alcohol use disorder, Defendant Producers directed the camera crew to continue filming Ms. McSweeney's upset, which Defendant Producers knew would serve only to heighten Ms. McSweeney's anxiety.

154.    Upon information and belief, Defendant Producers send Defendant Cohen footage from each day of RHONY that the Defendant Producers film. Defendant Cohen, therefore, viewed the footage of Ms. McSweeney suffering a panic attack and exclaiming that she wished she still consumed alcohol. Despite knowing that Ms. McSweeney was struggling to maintain her sobriety,

Defendant Cohen  failed to offer Ms. McSweeney any reasonable accommodations or engage in any interactive process to develop a mutually agreeable accommodation.

155.    Instead, Defendants saw Ms. McSweeney's struggle as an opportunity to put Ms. McSweeney in situations where she felt pressured to relapse into alcohol use disorder.

156.    Defendant Producers also humiliated Ms. McSweeney by joking about Ms. McSweeney's experience with alcohol use disorder on RHONY season 12 while filming RHONY season 13.  Though Ms. McSweeney requested Defendants accommodate her disorder by no longer joking about her relapse, Defendants ignored her request for accommodations and refused.

157.    Ms. McSweeney's request for accommodation was both simple and completely reasonable: she requested that Defendants allow her to remain sober without interference and harassment.  However, these requests fell on deaf ears.

158.    Upon information and belief, Ms. McSweeney's efforts to maintain her sobriety caused Defendants to retaliate against her for making requests for accommodations.

159.    Indeed, while Ms. McSweeney maintained her sobriety throughout of RHONY season 13, Defendant Producers and other persons employed by the Defendant Companies created a hostile and retaliatory work environment by providing Ms. McSweeney with negative performance reviews that the audience would think she was "boring."

160.    Upon information and belief, however, Defendants conducted a focus group that determined Ms. McSweeney to be the favorite RHONY cast member during season 12.

161.    Upon information and belief, Defendant Producers and other employees of Defendant Companies told Ms. McSweeney that the audience would think she was boring, when the same was not true, in hopes that Ms. McSweeney would relapse while filming season 13.

27

162.    Defendant Shannon also tried to bait Ms. McSweeney into a relapse by telling Ms. McSweeney that the audience would not like her because she was not drinking.

163.    The implication of the Defendant Producers' negative performance reviews were clear: if Ms. McSweeney did not consume alcohol, she would be perceived as "boring", and because she would be perceived as "boring", Defendants would terminate her employment.

164.    Thus, Defendant Producers attempted to give Ms. McSweeney a discriminatory ultimatum—either relapse into alcohol use disorder or lose her job.

165.    Defendant Producers also attempted to manipulate Ms. McSweeney to relapse by Defendant Shannon failing to accommodate other female cast members' disabilities, and instead glorifying and praising their relapse into alcohol use disorder.

166.    For example, Defendant Shannon and executive producer Barrie Bernstein glorified the fact that another RHONY cast member, Luann de Lesseps ("Luann" or "Ms. De Lesseps"), who had vocalized her experience with alcohol use disorder and incarceration due to alcohol use disorder on RHONY, relapsed.  After Ms. de Lesseps began drinking again, Defendant Shannon remarked to Ms. McSweeney: "I love when Luann is ON", another thinly veiled direction to Ms. McSweeney that she, too, needed to be "ON", i.e., drinking.

167.    Upon information and belief, Defendant Shannon expressed praise for Ms. De Lesseps' relapse to Ms. McSweeney in the hopes that Ms. McSweeney would, once again, relapse during filming.

168.    As a result, Ms. McSweeney feared that her sobriety would cause a trickledown effect, where if she continued not to drink during RHONY season 13, then Defendant Cohen, Defendant Producers, and the audience would think she was boring, Defendant Cohen would no

longer want her on the show, and she would lose her job and future employment opportunities with Defendant Companies.

169.    Furthermore, as Defendant Producers report directly to Defendant Cohen regarding each Housewives' "performance", Ms. McSweeney grew fearful that the Defendant Producers would continue to retaliate against Ms. McSweeney by escalating their negative reviews of Ms. McSweeney's performance to Defendant Cohen, which would cause Defendant Cohen and the Defendant Companies to terminate Ms. McSweeney's employment.

170.    Despite her fears of losing her job, Ms. McSweeney refused to drink, and as a result Defendants retaliated against her.

171.    Upon information and belief, because Ms. McSweeney refused to relapse into addiction, Defendants attempted to exacerbate Ms. McSweeney's mental health disabilities in hopes that Ms. McSweeney's worsened mental health would cause her to display the erratic behavior they wanted.

172.    For example, during a cast trip to the Hamptons (the "Hamptons Trip"), Ms. McSweeney experienced a significant decline in mental health due to the impending death of her grandmother.  Specifically, Ms. McSweeney's disability manifested itself in the form of repeated panic attacks, which Defendant Producers witnessed.

173.    Ms. McSweeney asked Defendant Producers to reasonably accommodate her disability by allowing her to leave the Hampton's Trip and temporarily cease filming RHONY. Ms. McSweeney asked for this accommodation to visit her dying grandmother and because Ms. McSweeney's panic attacks interfered with her ability to work.

174.    Instead of reasonably accommodating Ms. McSweeney and/or engaging in an interactive process with Ms. McSweeney, the Defendant Producers told Ms. McSweeney to "lighten up", "have more fun", and that her "personality is a lot different when [she was] drinking."

175.    Furthermore, in flagrant disregard of Ms. McSweeney's request to temporarily cease filming RHONY as a reasonable accommodation, Defendants only allowed Ms. McSweeney to discuss the possibility of visiting her dying grandmother while filming her.

176.    Rather, Defendants filmed Ms. McSweeney as Defendant Producers told her that she could "leave if she wanted"; however, after working for Defendants for more than two (2) years, Ms. McSweeney understood this to mean that if she left she would have to suffer severe consequences.

177.    At no point in time after Ms. McSweeney requested an accommodation for her mental health disability, i.e. to temporarily cease filming and visit her dying grandmother, did the Defendant Producers, Defendant Companies, or Defendant Cohen offer or suggest any different, potential accommodations nor did the Defendant Producers, Defendant Companies, or Defendant Cohen attempt to engage in the interactive process with Ms. McSweeney to develop a mutually agreeable accommodation.  After Defendants stopped filming Ms. McSweeney, she continued to request a reasonable accommodation to visit her dying grandmother and temporarily cease filming. Instead of reasonably accommodating Ms. McSweeney and/or engaging in an interactive process necessary to develop a mutually agreeable accommodation, Defendant Producers also threatened Ms. McSweeney's ability to earn an income.

178.    Indeed, Defendants warned Ms. McSweeney that, if they granted her accommodation (i.e. to temporarily cease filming and attend to her dying grandmother), Ms.

McSweeney would miss five (5) episodes of RHONY filming and would not be paid for those episodes.

179. Ms. McSweeney understood Defendants' threat of nonpayment to be an implicit threat intended to dissuade her from continuing to ask for a reasonable accommodation to visit her dying grandmother and temporarily cease filming.

180. Defendants knew that Ms. McSweeney was a single mother who relied on her RHONY salary to support her daughter. Upon information and belief, Defendants' threat after Ms. McSweeney requested an accommodation was intended to dissuade Ms. McSweeney from ever requesting an accommodation again.

181. Despite their legal obligation to do so, Defendant Producers entirely failed to reasonably accommodate Ms. McSweeney and/or engage in an interactive process to suggest other accommodations.

182. In fact, Defendant Producers aimed cameras at Ms. McSweeney—mid-panic attack—and caused her to feel that if she ceased filming RHONY season 13, the Defendant Producers would retaliate against her, and she would lose her job.

183. Specifically, Defendant Producers told Ms. McSweeney that she could leave the Hampton's Trip but did so passive aggressively and intimated that there would be serious consequences for Ms. McSweeney if she left.

184. Moreover, upon information and belief, Defendants continued to fail to accommodate Ms. McSweeney and even retaliated against her for requesting reasonable accommodations.

185. At no point in time, after Ms. McSweeney requested an accommodation and complained that the lack of accommodations exacerbated Ms. McSweeney's mental health

disorders, did the Defendant Producers ever attempt to engage in any remedial action to assist Ms. McSweeney in obtaining an accommodation from the Defendant Companies and/or Defendant Cohen.

186.    At no point in time, after Ms. McSweeney requested an accommodation and complained that the lack of accommodations exacerbated Ms. McSweeney's mental health disorders, did the Defendant Producers ever investigate Ms. McSweeney's complaints and/or bring Ms. McSweeney's complaints to the Defendant Companies' and/or Defendant Cohen's attention with the intent of investigating Ms. McSweeney's complaints.

187.    Furthermore, after Ms. McSweeney's grandmother died, Defendants continued to film Ms. McSweeney while Ms. McSweeney prepared to attend her grandmother's funeral, notwithstanding Ms. McSweeney's reasonable requests for privacy.

188.    Defendant Producers personally saw Ms. McSweeney suffer multiple panic attacks due to her grandmother's illness, yet, directed Ms. McSweeney "lighten up" near or around the time of Ms. McSweeney's grandmother's funeral.

189.    As a result of Defendants' failure to accommodate Ms. McSweeney or otherwise engage in an interactive process with her, Ms. McSweeney suffered significant, repeated suicidal ideations.

190.    Furthermore, at no point before, during, or after Ms. McSweeney's panic attacks did Defendants offer or otherwise attempt to supply Ms. McSweeney with mental health support or accommodate her so she could seek it.  Upon information and belief, Defendants intended to punish Ms. McSweeney in retaliation for refusing to consume alcohol and requesting accommodations for her mental health disabilities.

191.    While RHONY season 13 was airing, Ms. McSweeney also began to receive some threatening messages that saw her relapse on RHONY season 12 and her behavior on season 13.

192.    Worse, Ms. McSweeney received fan messages telling her that her daughter should commit suicide.

193.    Ms. McSweeney, who was already suffering from significant depression and anxiety related to her grandmother's death, told Defendant Shannon about the threatening fan messages.

194.    Ms. McSweeney also told Defendant Shannon and the remaining Defendant Producers that the threatening messages related to her daughter caused her depression and anxiety to worsen.

195.    In fact, Ms. McSweeney told Defendant Shannon that she was suffering from suicidal ideations.

196.    Rather than engaging in an interactive process with Ms. McSweeney to accommodate her disabilities and worsening mental health conditions, Defendant Shannon exploited Ms. McSweeney's disabilities in attempt to manipulate Ms. McSweeney to relapse into alcohol use disorder.

197.    Indeed, upon information and belief, none of the Defendant Producers ever attempted to engage in remedial efforts to assist Ms. McSweeney in obtaining accommodations for her expressed suicidal ideations.

198.    In diametric opposition to her obligations as an employer Defendant Shannon encouraged Ms. McSweeney to relapse and told her that the RHONY season 13 fans would like her more during the season if Ms. McSweeney still consumed alcohol.

199.    As a result of these messages, Ms. McSweeney also requested a future accommodation by asking Defendants to remove her daughter's filming obligations in the prospective RHONY season 14.

200.    Ms. McSweeney understood such accommodation to be reasonable because Defendants allowed RHONY Housewife, Sonja Morgan, to hide her daughter from the show.

201.    Defendants responded that they would not give Ms. McSweeney the same accommodation as they had to Morgan because Morgan, specifically, is the "golden goose" that becomes inebriated on camera, unlike Ms. McSweeney.

202.    Again, not only did Defendants fail to reasonably accommodate Ms. McSweeney's disabilities or engage in any interactive process with Ms. McSweeney: Defendants used Ms. McSweeney's worsening disability to attempt to convince her to relapse into alcohol use disorder by implying that they would help save her child if Ms. McSweeney consumed alcohol.

203.    Though Defendant Producers witnessed Ms. McSweeney suffering greatly with anxiety, depression, and maintaining her sobriety, Defendant Producers never once asked Ms. McSweeney whether she required assistance remaining sober and/or with her mental health disabilities.

204.    In fact, almost a year after the Hampton's Trip, Ms. McSweeney's mental health disorders continued to significantly decline because Defendants did not give her a reasonable accommodation to leave the Hampton's Trip or be allowed even a break to seek medical assistance.

205.    As a result, after RHONY season 13, Ms. McSweeney was institutionalized into a psychiatric care facility because she suffered from, *inter alia*, suicidal and self-harm ideations.

206.    Throughout Ms. McSweeney's experience of extreme psychological distress, hospitalization, and additional out-patient therapy, Ms. McSweeney could not work to support

herself or her daughter. In fact, Ms. McSweeney required around-the-clock care to ensure that she would stay alive and would not harm herself.

207.    As a direct result of Defendants' failure to accommodate Ms. McSweeney, the hostile work environment Defendants created, and Defendants' retaliation against Ms. McSweeney for failing to relapse into alcohol use disorder: Ms. McSweeney suffered extreme emotional distress, monetary costs associated with hospitalization and other medical costs, lost wages for the time period that her exacerbated mental health disorders prevented her from working, and her work product during RHONY season 13 was negatively affected.

208.    After RHONY season 13 concluded, Ms. McSweeney called Defendant Shannon and requested that she not be considered for RHONY season 14 due to Defendants' discrimination.

209.    Defendant Shannon remarked that if it is what's best for Ms. McSweeney's "mental health" then she would not stop her from removing herself.

210.    Defendant Shannon, however, continued to pressure Ms. McSweeney to remain a cast member in RHONY season 14.

211.    Unfortunately, Defendants discrimination against Ms. McSweeney did not cease when RHONY season 13 concluded.

212.    After RHONY season 13 concluded, Ms. McSweeney complained directly to Defendant Cohen that Defendants' lack of accommodations caused her to suffer extreme mental anguish.

213.    Upon information and belief, after Ms. McSweeney issued her complaint directly to Defendant Cohen, none of the Defendants investigated Ms. McSweeney's complaint that Defendants failed to accommodate Ms. McSweeney's disabilities.

214.    In fact, Ms. McSweeney begged Defendant Cohen not to mention her grandmother's death in the media, again requesting an accommodation, because it would exacerbate her mental health disabilities.

215.    In response, Defendant Cohen chose to dedicate a section of his talk show, WWHL, towards lambasting Ms. McSweeney's "decision" not to visit her dying grandmother, and instead, stay at the Hampton's Trip.

216.    Additionally, Defendant Cohen retaliated against Ms. McSweeney's requests for accommodations (i.e. not to pressure her to consume alcohol throughout RHONY season 13) by publicly mocking Ms. McSweeney's sobriety.

217.     Defendant Cohen, specifically, retaliated against Ms. McSweeney's complaints of discrimination and Defendant' failure to reasonably accommodate her by publicly tarnishing Ms. McSweeney's reputation which, upon information and belief, was with intent to blackball Ms. McSweeney from the entertainment industry.

218.    Defendant Cohen stated on Sirus XM's radio show that "Leah's not — somebody's not built to be a housewife", after Ms. McSweeney complained of disability discrimination on RHONY season 13, notwithstanding the fact that Ms. McSweeney was among the most popular "Housewives" cast on RHONY.

219.    Defendant Cohen's remark was clearly intended to retaliate against Ms. McSweeney's complaints because he and the Defendants later cast Ms. McSweeney on RHUGT— indicating that Defendants did believe that Ms. McSweeney was "built to be a Housewife."

220.    While Defendant Cohen publicly retaliated against Ms. McSweeney's complaints of discrimination in the media, privately however, Defendant Cohen and the Defendant Producers

continued to discuss the prospects of Ms. McSweeney's ability to rejoin the RHONY cast for season 14.

221.    Upon information and belief, Defendant Cohen and Defendant Producers did so to dissuade Ms. McSweeney from making additional complaints of discrimination by dangling the prospect of continued, lucrative employment in front of her, with the implicit condition that Ms. McSweeney keep silent and obey.

222.    Ultimately, Defendants elected to abruptly temporarily pause production of RHONY after RHONY season 13.

223.    Notwithstanding Defendants' decision to pause production of RHONY, Defendants continued to contact Ms. McSweeney regarding future employment prospects in prospective ventures such as *Real Housewives of New York: Legacy* ("RHONY Legacy"), RHUGT, and RHONY season 14.

224.    Ms. McSweeney's employment relationship with Defendants, therefore, did not end.

## G. Defendants' Discrimination Against Ms. McSweeney Peaks Throughout Her Continued Employment with Defendants on RHUGT

225.    On or around November 21, 2021, Defendants Warner, Bravo, and Cohen publicly introduced their new *Real Housewives* spin-off series, RHUGT, which would air on the streaming-service, Peacock.

226.    Also around this time, Defendants conceived of a new RHONY program—RHONY Legacy.

227.    Upon information and belief, RHONY Legacy was intended to feature star RHONY Housewives that appeared at some point throughout RHONY's thirteen season run.

228.     Similarly, although Defendants announced their intent to temporarily pause production of RHONY, Defendants purportedly changed their tune regarding Ms. McSweeney's desirability as a cast member on *Real Housewives* related productions.

229.     Upon information and belief, Defendants remained motivated by the success of RHONY season 12's "Hurricane Leah" episode and intended to weaponize Ms. McSweeney's alcohol use disorder, and hopeful relapse, to promote either or both RHONY Legacy and/or RHUGT.

230.     In or around 2022, Defendants approached Ms. McSweeney to join RHUGT's season 3 as a cast member.

231.     Notably, the Defendant Producers also signed-on to produce RHUGT; and therefore, maintained acute awareness of Ms. McSweeney's disabilities.

232.     As soon as Ms. McSweeney became a cast member on RHUGT season 3, Defendants again had a legal responsibility to reasonably accommodate or otherwise engage in an interactive process necessary to accommodate Ms. McSweeney's disabilities because they knew of Ms. McSweeney's disabilities from RHONY seasons 12 and 13.

233.     Yet immediately, Defendants Ward and Paparazzo called Ms. McSweeney and asked, "are you still not drinking?"

234.     Similarly, Housewife Marysol Patton texted Ms. McSweeney to state "I wish you were still drinking", in reference to Ms. McSweeney's alcohol use disorder and newfound sobriety.

235.     Ms. McSweeney, therefore, began to fear relapsing into alcohol use disorder before she even began filming for RHUGT, and requested reasonable accommodations that the Defendants not question her regarding her sobriety and to direct their employees to do the same.

236.    Ms. McSweeney again requested these accommodations because, after experiencing Defendants' constant interrogation regarding her sobriety on RHONY seasons 12 and 13, she feared that Defendants would continue to do so on RHUGT.

237.    Ms. McSweeney expressly requested reasonable accommodations that would allow her the ability to attend Alcoholics Anonymous meetings ("AA meetings") while filming RHUGT.

238.    As soon as Ms. McSweeney requested these accommodations Defendants had a legal responsibility to reasonably accommodate Ms. McSweeney or engage in an interactive process to find a mutually agreeable accommodation for Ms. McSweeney.

239.    Ms. McSweeney knew this accommodation to be reasonable because other RHONY cast members, both of whom appeared on RHONY seasons 12 and 13, were previously allowed to attend AA meetings while filming RHONY, and specifically, on RHONY cast trips.

240.    In fact, during the RHONY season 13 Hamptons Trip, a former RHONY cast member, who both publicly and privately denies that she suffers from alcohol use disorder, was afforded the opportunity to attend an AA meeting—an opportunity that Defendant Producers did not offer Ms. McSweeney.

241.    This RHONY cast member, however, invited Ms. McSweeney to attend the AA meeting with her; and therefore, Ms. McSweeney had personal knowledge that Defendants previously accommodated cast members' requests to attend AA meetings.

242.    Accordingly, Ms. McSweeney understood her accommodation request, i.e. to attend AA meetings during RHUGT, to be reasonable.

243.    Defendant Producers falsely told Ms. McSweeney that this request would not be a problem; however, after Ms. McSweeney flew to Thailand to film RHUGT season 3, the Defendant

Producers reneged their agreement to allow her to attend AA meetings and claimed it "did not fit" with the RHUGT filming schedule.

244.    Upon information and belief, Defendant Producers denied Ms. McSweeney the ability to attend AA meetings while filing RHUGT season 3, and declined to engage in the interactive process to develop any other mutually agreeable accommodations, because Defendant Producers were secretly hoping and planning for Ms. McSweeney to relapse into alcohol addiction through consumption of alcohol while filming RHUGT.

245.    Indeed, notwithstanding the fact that Defendant Producers initially agreed to allow Ms. McSweeney to attend AA meetings, and later reneged that accommodation, the Defendant Producers failed to engage in any interactive process with Ms. McSweeney to develop mutually agreeable accommodations.

246.    Upon information and belief, therefore, Defendant Producers willfully ignored their legal obligations to accommodate Ms. McSweeney in favor of intentionally discriminating against Ms. McSweeney to cause her to relapse into alcohol use disorder.

247.    Upon information and belief, Defendant Producers decided that they would drive Ms. McSweeney to drink or retaliate against Ms. McSweeney's refusal to drink by forcing and/or manipulating the other RHUGT cast members to turn against Ms. McSweeney.

248.    Upon information and belief, Defendant Producers' failure to provide Ms. McSweeney with reasonable accommodations and engage in the interactive process was in furtherance of their intent to treat Ms. McSweeney as a hysterical, uncontrollable, alcohol-addicted woman.

249.    On or around July 18, 2022, Defendants began production of RHUGT season 3.

250.    Defendant Producers immediately ignored Ms. McSweeney's reasonable request for accommodations and also began to discriminate against Ms. McSweeney by instantly providing Ms. McSweeney with negative performance reviews, which stated that because Ms. McSweeney did not relapse into addiction that her scenes were "boring."

251.    Specifically, Defendant Shannon directly stated to Ms. McSweeney that because Ms. McSweeney elected to film RHUGT sober, Ms. McSweeney was "not the Leah we know and love", by which Defendant Shannon meant that the Leah Defendant Producers "know and love" is the Leah that relapses into alcohol use disorder while filming.

252.    Upon information and belief, Defendant Producers also directed RHUGT cast members to interrogate Ms. McSweeney regarding her sobriety, pressure her to consume alcohol, and ostracize Ms. McSweeney if she does not.

253.    Defendant Producers succeeded.   Upon information and belief, because Ms. McSweeney would not relapse into alcohol use disorder, the Defendant Producers directed other RHUGT cast members not to interact with Ms. McSweeney.

254.    Upon information and belief, because the RHUGT cast members would not interact with Ms. McSweeney until she consumed alcohol (at Defendant Producers' behest), Defendant Shannon told Ms. McSweeney that her "value" as a Housewife would "diminish" if she failed to make connections with her cast members—all of which was at the Defendant Producers' directive.

255.    Upon information and belief, Defendant Shannon's statement that Ms. McSweeney's "value" as a Housewife would "diminish" meant that the Defendant Producers would recommend that Defendant Cohen and the Defendant Companies not hire Ms. McSweeney for any future *Housewives* installments and/or spin-offs, which essentially, was a threat to terminate Ms. McSweeney's employment if she did not consume alcohol with her cast members.

256.    Moreover, upon information and belief, Defendant Shannon's statement that Ms. McSweeney's "value" would "diminish" implied that Ms. McSweeney would be denied future employment opportunities if she did not get along with other Housewives because the Defendant Companies and Defendant Cohen like to hire, or recommend that others hire, Housewives that can work with one another.

257.    Ms. McSweeney, therefore, again reiterated her request for a reasonable accommodation to not discuss her sobriety and/or alcohol use disorder and issued a complaint regarding this discrimination by sending a text message to Defendant Ward stating that she felt very uncomfortable because the women were "trying to undermine [her sobriety]."

258.    Ms. McSweeney was also fearful that the Defendant Producers would provide negative reviews of her performance on RHUGT to Defendant Cohen and the Defendant Companies, which would cause Defendant Cohen and the Defendant Companies to terminate Ms. McSweeney's continued employment on future *Housewives* seasons and spin-offs.

259.    Instead of providing Ms. McSweeney with a reasonable accommodation such as, *inter alia*, directing employees to refrain from ostracizing Ms. McSweeney on the basis of her alcohol-related disability and/or investigating Ms. McSweeney's complaint, Defendant Ward responded: "get out of your head" and "deal with it."

260.    Upon information and belief, after Defendant Ward received Ms. McSweeney's complaint, Defendant Ward failed to undertake any investigation into whether the other RHUGT cast members were "trying to undermine" Ms. McSweeney's sobriety nor did Defendant Ward undertake any remedial efforts to remedy the conduct Ms. McSweeney complained of.

261.    Defendant Ward failed to provide Ms. McSweeney with any reasonable accommodations for her disabilities and failed to engage in the interactive process with Ms. McSweeney to discuss possible accommodations.

262.    Similarly, Ms. McSweeney reiterated her request for a reasonable accommodation and expressed discomfort to Defendant Paparazzo after Patton had told her, "I wish you were still drinking."

263.    Instead of providing Ms. McSweeney with a reasonable accommodation, Defendant Paparazzo replied: "You're good."

264.    Upon information and belief, after Defendant Paparazzo received Ms. McSweeney's complaint, Defendant Paparazzo failed to undertake any investigation into Patton's conduct and the impact thereof on Ms. McSweeney's disabilities nor did Defendant Paparazzo undertake any remedial efforts to remedy the conduct Ms. McSweeney complained of.

265.    Defendant Paparazzo failed to provide Ms. McSweeney with reasonable accommodations for her disability and failed to engage in the interactive process with Ms. McSweeney to discuss possible accommodations.

266.    In response, Ms. McSweeney urgently requested the ability to attend AA meetings.

267.    Defendant Producers, however, despite their prior promises that they would accommodate Plaintiff, failed to accommodate Ms. McSweeney's need to go to AA meetings during the filming of RHUGT or engage in any interactive process to suggest alternative reasonable accommodations.

268.    Specifically, despite the Defendant Producer's promise to provide Ms. McSweeney with this accommodation, after transporting Ms. McSweeney to Thailand to film RHUGT season 3, Defendant Paparazzo told Ms. McSweeney that Defendant Shed refused to provide

transportation to get to the AA meetings in Thailand and that there would not be time for her to attend AA meetings given the filming schedule.

269.    Defendant Producers offered no reasonable accommodation that would allow Ms. McSweeney the ability to attend AA meetings in Thailand.

270.    Upon information and belief, it would not have caused Defendant Producers unreasonable hardship or unreasonable expense to modify Ms. McSweeney's filming schedule and allow her the ability to attend AA meetings.  That is especially true as they knew of the need to provide this accommodation long prior to filming.

271.    Indeed, Defendants were more than willing to provide free alcohol to the RHUGT cast, along with transportation to nightclubs if the RHUGT cast expressed a desire to go out clubbing but refused to provide Ms. McSweeney with any reasonable accommodation to attend AA meetings.

272.    Defendant Producers also failed to engage in an interactive process with Ms. McSweeney to suggest other accommodations that might fit within her filming schedule.

273.    Again, in flagrant disregard of Ms. McSweeney's requests for accommodations: Defendant Producers specifically requested that RHUGT cast members taunt Ms. McSweeney about her sobriety and mental health diagnoses while the RHUGT cast members were filmed.

274.    Upon information and belief, Defendant Producers directed castmate Heather Gay to confront Ms. McSweeney, during a filmed scene, regarding whether Ms. McSweeney intended to remain sober while filming RHUGT.

275.    Upon information and belief, Defendant Producers also directed a guest "fortune teller" to bring up Ms. McSweeney's mental health diagnoses and addiction during filming.

276.    Upon information and belief, Defendant Producers also directed or otherwise encouraged fellow castmate, Portia Williams, to call Ms. McSweeney a "drug addict."

277.    Upon information and belief, Defendant Producers did so with express intent to discriminate against Ms. McSweeney's alcohol use disorder.

278.    Upon information and belief, the Defendant Producers told Patton, Gay, Williams, the "fortune teller", and other RHUGT cast members, to attempt to pressure Ms. McSweeney to consume alcohol, and berate her if she refused, in the hopes that such intense pressure would cause Ms. McSweeney to relapse.

279.    Upon information and belief, however, Defendant Shannon also produced RHUGT season 2, which featured Zarin.  Upon information and belief, although Zarin also does not consume alcohol, Zarin does not suffer from alcohol use disorder; and therefore, Defendant Shannon did not pressure Zarin to consume alcohol nor did Defendant Shannon ask Zarin's cast members to pressure her to consume alcohol.

280.    Defendant Producers pressured Ms. McSweeney to consume alcohol, and suggested that McSweeney's cast members do the same, only because Ms. McSweeney suffers from alcohol use disorder.

281.    Ms. McSweeney then complained of disability discrimination on the basis of her alcohol use disorder by reporting that Defendant Producers' acts of encouraging her to drink and directing other cast members to harass Ms. McSweeney based on her disabilities worsened her mental health and addiction disabilities at her place of work.

282.    Defendants failed to even investigate Ms. McSweeney's complaint while RHUGT was still filming, let alone attempt to provide Ms. McSweeney with accommodations to support her disabilities.

283.    Moreover, Defendants failed to even attempt to remediate the Defendant Producers' conduct that Ms. McSweeney complained of.

284.    In retaliation for requesting accommodations and complaining of alcohol use disorder discrimination, Defendant Shannon attempted to gaslight Ms. McSweeney into believing that she never requested accommodations by telling Ms. McSweeney that she was "mute" while filming RHUGT.

285.    Also while filming RHUGT, and in conversation with her fellow castmates, Ms. McSweeney relayed the unsafe working conditions and failure to accommodate her requests for accommodations that she experienced during the Hamptons Trip.

286.    The day after Ms. McSweeney made such disclosure to the other RHUGT cast members, Defendants Ward and Paparazzo began retaliating against Ms. McSweeney and threatened that Defendant Shannon was "pissed."

287.    At the time Defendants Ward and Paparazzo claimed that Defendant Shannon was "pissed" at Ms. McSweeney for requesting accommodations, Ms. McSweeney reasonably believed that Defendant Shannon could and would retaliate against her by providing negative reviews of Ms. McSweeney's performance to Defendant Cohen and the Defendant Companies, which would terminate Ms. McSweeney's future employment prospects with the Defendant Companies.

288.    Defendants Ward and Paparazzo also warned Ms. McSweeney that they would continue to retaliate against her by advising Ms. McSweeney that she was going to "get it."

289.    Thus, instead of investigating Ms. McSweeney's complaints of unsafe working conditions during the Hampton's Trip, or attempting to engage in remedial efforts to ensure that

Ms. McSweeney felt safe while working on RHUGT: Defendant Producers simply retaliated against Ms. McSweeney with threats and hostility.

290.    Indeed, upon information and belief, the Defendant Producers provided Defendant Cohen daily updates as to the status of RHUGT season 3; therefore, Ms. McSweeney knew that if she continued to upset the Defendant Producers by asking for accommodations for her disabilities, the Defendant Producers would negatively review Ms. McSweeney's performance to Defendant Cohen.

291.    Worse, the Defendant Producers attempted to gaslight Ms. McSweeney into believing that Ms. McSweeney was not mistreated nor discriminated against during the Hamptons Trip and called Ms. McSweeney a liar.

292.    In retaliation, Defendants Paparazzo and Ward even went on to threaten Ms. McSweeney's continued employment, both stated: "Maybe you're not made for this", "You're going to get it today", and "If you want to be on TV act like it."

293.    Upon information and belief, in further retaliation for Ms. McSweeney's disclosures—or as the Defendant Producers stated, "payback for making them look bad"—the Defendant Producers spent every day that Ms. McSweeney filmed RHUGT devising novel methods to trigger, harass, and torment Ms. McSweeney.

294.    In fact, fellow RHUGT cast member Gizelle Bryant told Ms. McSweeney that the Defendant Producers directed other cast members to discriminate against Ms. McSweeney.

295.    Upon information and belief, Defendant Producers did so with the express purpose of retaliating against Ms. McSweeney's complaints of discrimination and requests for accommodation and to cause Ms. McSweeney mental pain and suffering, and then trivialize same as nothing more than the archetypal hysteria associated with the women on the show.

296.    As just one example, Defendants Ward and Paparazzo showed Ms. McSweeney's fellow RHUGT cast members Ms. McSweeney's private text messages where she complained to Defendants Paparazzo and Ward of the cast members' routine discussion of Ms. McSweeney's sobriety.

297.    Ms. McSweeney complained of this retaliation to Defendant Shannon.    Ms. McSweeney also complained that this retaliation was exacerbating her mental health disabilities by ostracizing her from her fellow castmates.

298.    In response, Defendant Shannon warned that if Ms. McSweeney continued to complain, Ms. McSweeney "would not like what the other women are saying about you", implying both that Ms. McSweeney's coworkers did not like Ms. McSweeney because she both suffered from alcohol use disorder and requested accommodations for the same, and further, implying that Defendant Shannon would coach the women to further disparage Ms. McSweeney.

299.    In fact, Defendant Shannon's statement to Ms. McSweeney was intended to serve as a veiled threat that Ms. McSweeney's "value" as a Housewife would entirely "diminish" if Ms. McSweeney continued to complain of discriminatory and retaliatory conduct and if Ms. McSweeney continued to request accommodations for her disabilities.

300.    Defendant Shannon, again, gaslit Ms. McSweeney and attempted to convince Ms. McSweeney that her complaints were invalid, all while allowing Defendants' culture of discrimination and retaliation to continue by failing to investigate Ms. McSweeney's complaints.

301.    Defendant Shannon trivialized Ms. McSweeney's legitimate complaints by telling Ms. McSweeney that it "doesn't even matter" and she should focus on "build[ing] on the momentum of today".

302.     Upon information and belief, after Ms. McSweeney complained to Defendant Shannon directly regarding Defendants Ward's and Paparazzo's discriminatory and retaliatory conduct, Defendant Shannon failed to investigate Ms. McSweeney's complaints or otherwise attempt to remediate the conduct Ms. McSweeney complained of.

303.     Eventually, Defendants retaliation increased such that Defendants began to threaten Ms. McSweeney's continued employment.

304.     For example, prior to the RHUGT finale dinner, a non-defendant producer warned Ms. McSweeney that if she continued to complain about Defendant Producers' harassment and failure to accommodate Ms. McSweeney's disabilities, Defendant Producers would ensure that Ms. McSweeney "will never work again." That producer directed Ms. McSweeney to, instead, discuss her struggles with drinking, anxiety, and depression in attempt to save Ms. McSweeney from further provoking Defendant Producers' ire.

305.     Faced with the knowledge of this threat, and institutional knowledge that other Housewives who spoke out against Defendants were blackballed from the entertainment industry, Ms. McSweeney feared that Defendants would soon blackball her, too.

306.     In retaliation, and throughout the course of RHUGT, Defendant Producers mocked, humiliated, isolated, shamed, and gaslit Ms. McSweeney on the basis of, *inter alia*, her sobriety and her mental health diagnosis.

307.     Upon information and belief, Defendants ignored Ms. McSweeney's requests for accommodations, discriminated against Ms. McSweeney's alcohol use disorder, and retaliated against Ms. McSweeney's complaints of discrimination with intent to cause Ms. McSweeney to suffer severe emotional distress because Defendants knew Ms. McSweeney was particularly susceptible to experiencing such distress due to her known mental health disorders.

308.    Furthermore, with intent to exacerbate Ms. McSweeney's mental health disorders and cause Ms. McSweeney to behave erratically on camera, Defendants failed to provide Ms. McSweeney with adequate amounts of food and water while filming RHUGT, which took place in Thailand during the summer months.

309.    Throughout the pendency of filming RHUGT, Ms. McSweeney and other RHUGT cast members had little to no control over their meals and/or snacks.  Defendant Producers supplied the RHUGT cast members all of their meals, whether through catering services, filmed cast dinners, or an in-resident chef.  Defendant Producers also scheduled each and every time that a RHUGT cast member was allowed to eat while filming, which meant that RHUGT cast members could only consume food at a scheduled time or when they were not filming.

310.    Further, Defendant Producers also exercised complete control over the supply of food at the residence where RHUGT cast members stayed throughout filming, including through choosing what food items to stock the RHUGT cast members' residence with and whether to allow cast members to order food delivery, which RHUGT cast members were not allowed to do without Defendant Producers' permission and assistance.

311.    Prior to filming RHUGT, Ms. McSweeney had a telephone conversation wherein Ms. McSweeney advised Defendant Paparazzo that she was prescribed various medications for her mental health disabilities, and further, that she was required to consume these medications with food.   Indeed, Ms. McSweeney's physician had directed Ms. McSweeney to consume her medication contemporaneously with a meal to increase absorption of the medication and to reduce the likely onset of gastrointestinal side effects that her medication, individually and collectively, could cause.

312.     Accordingly, Ms. McSweeney requested that Defendant Paparazzo, and Defendant Producers broadly, reasonably accommodate her mental health disabilities by ensuring that the residence Ms. McSweeney stayed at while filming RHUGT was adequately stocked with food products so that Ms. McSweeney could consumer her medication, as needed, with meals.

313.     Specifically, Ms. McSweeney disclosed to Defendants that her religious dietary restrictions precluded Ms. McSweeney from consuming pork products.

314.     Thus, when Ms. McSweeney arrived in Thailand to film RHUGT, she reasonably expected that the RHUGT residence would be adequately stocked with food products based upon her request for accommodations directed to Defendant Paparazzo; and further, Defendant Producers never engaged in any interactive process with Ms. Mcsweeney regarding her request to be able to consume her medication with food to develop a mutually agreeable accommodation if this request could not be satisfied.

315.     Upon information and belief, however, Defendants intentionally deprived Ms. McSweeney of food she could eat to trigger Ms. McSweeney's mental health disabilities throughout the pendency of RHUGT.

316.     Ms. McSweeney knew that Defendants treated her disparately because she witnessed Defendant Producers providing other castmates, such as Portia Williams, with fast food immediately upon request.

317.     Additionally, though Defendant Producers asked Ms. McSweeney if she had any dietary restrictions, and therefore knew that Ms. McSweeney could not eat pork products due to her religious beliefs, Defendant Producers hosted a cast lunch where each and every product was cooked in pork substances and provided no alternatives.

318.    In fact, RHONY season 13 prominently featured Ms. McSweeney's conversion to Judaism, which occurred in or around 2022.  After Ms. McSweeney converted to Judaism, she made the Defendant Producers and Defendant Cohen aware of her religious dietary restrictions that made her unable to consume pork products.

319.    Defendant Producers, therefore, were acutely aware that Ms. McSweeney would be unable to consume any product at the cast lunch.

320.    Upon information and belief, Ms. McSweeney was the only RHUGT season 3 cast member that practiced Judaism's proscription against consumption of pork products.

321.    Upon information and belief, therefore, Ms. McSweeney was the only RHUGT cast member that could not eat the lunch provided by production, and as a result, was forced to starve.

322.    Indeed, though Ms. McSweeney requested an alternative meal, Defendant Producers failed to provide Ms. McSweeney with any alternative meals.

323.    Ms. McSweeney understood her request to consume non-pork products to be reasonable because, throughout RHUGT season 3, Defendant Producers provided Williams with fast-food of her choosing upon her demands.

324.    Upon information and belief, Defendant Producers' decision to provide a cast meal that only Ms. McSweeney could not consume, and therefore to stave Ms. McSweeney, was discriminatory on the basis of Ms. McSweeney's disabilities because Defendant Producers knew that Ms. McSweeney required food to safely consume her mental health disorder medication.

325.    Upon information and belief, Defendant Producers' act of starving Ms. McSweeney was also directly retaliatory towards Ms. McSweeney's refusal to consume alcohol and requests for accommodations for her disabilities, including her request to be provided with adequate food so that she could safely consume her mental health medication.

326.    Upon information and belief, as this cast lunch came only a few days after Ms. McSweeney whistle blew Defendants' discriminatory and retaliatory treatment of her during the Hamptons Trip to the other RHUGT cast members, Defendant Producers also intentionally deprived only Ms. McSweeney of food in direct retaliation against Ms. McSweeney's complaints.

327.    As a result of Defendants' failure to provide Ms. McSweeney with proper amounts of food, in addition to the severe emotional distress that Ms. McSweeney was experiencing, Ms. McSweeney lost seven pounds while filming RHUGT.

328.    Ms. McSweeney's health began to suffer so drastically that she became ill and needed medical treatment.

329.    Defendant Shed failed to respond to Ms. McSweeney's medical emergency and refused to provide Ms. McSweeney with medical treatment with intent to cause Ms. McSweeney to suffer extreme emotional distress and to discriminate against Ms. McSweeney's mental health disabilities.

330.    Moreover, the Defendant Producers failed to investigate the workplace environment that caused Ms. McSweeney to be hospitalized.

331.    As a result, Ms. McSweeney required emergent hospitalization while filming in Thailand.  In fact, consistent with Defendants' failure to provide Ms. McSweeney with food and water, Ms. McSweeney was diagnosed with "severe dehydration" and related infections while hospitalized.

332.    Upon information and belief, Defendant Producers exploited Ms. McSweeney's mental health diagnoses and trivialized the same, using her hospitalization and exacerbated mental health disorders for fodder.

333.    In or around late fall of 2022, Ms. McSweeney overcame her fears and submitted a formal complaint to Defendants wherein she complained of experiencing discrimination, a hostile work environment, and retaliation throughout her employment on RHUGT.

334.    Upon information and belief, the Defendant Companies knew or should have known of Ms. McSweeney's formal complaint.

335.    On or around November 3, 2022, Defendant Warner purportedly initiated a formal investigation after a conversation between its counsel, Ms. McSweeney.

336.    Upon information and belief, Defendant Warner's "investigation" into Ms. McSweeney's complaints took place in or around November and December of 2022.

337.    Upon information and belief, Defendant Warner's 'investigation' was a sham and was not conducted properly nor in good faith.

338.    On or around December 21, 2022, Ms. Silisha Platon ("Ms. Platon"), one of the investigators employed by Defendant Warner, verbally told Ms. McSweeney that employment policies were in fact violated and that Defendant Warner was disciplining an employee for the same (although Ms. Platon told Ms. McSweeney that Ms. Platon could not disclose the employee or the discipline, because Ms. McSweeney was also an employee).

339.    Subsequently, after weeks of Ms. McSweeney requesting an investigation report, Ms. Platon sent a one-paragraph "Conclusion Letter" changing her position and stating that, "more likely than not, there were no specific policy violations," and offering a time to "discuss further" if Ms. McSweeney wanted additional information about the purported investigation.

340.    After Ms. McSweeney complained about discrimination and retaliation, Defendant Bravo retaliated against Ms. McSweeney with increased vigor.

341.    For example, Defendant Cohen invited Ms. McSweeney to appear as a guest on WWHL to promote RHUGT.  Upon information and belief, WWHL is a television show that airs on Defendant Bravo's television channel.

342.    When Ms. McSweeney refused, Defendant Cohen used Ms. McSweeney's name to play a "drinking game" on WWHL, wherein every time a person mentioned Ms. McSweeney's name, Defendant Cohen directed the audience to take a sip of their alcoholic beverages.  Defendant Cohen did so even with the knowledge that Ms. McSweeney suffered from alcohol use disorder and that a "call to drink" might trigger Ms. McSweeney to relapse.

343.    Despite Defendants' repeated promise to employ Ms. McSweeney on RHONY Legacy, after issuing a formal complaint to Human Resources, Defendants notified Ms. McSweeney that they would not continue her employment.

344.    Indeed, on or around November 10th, 2022, Defendant Cohen texted Ms. McSweeney and notified her that she would no longer be considered to be a cast member on RHONY Legacy.

345.    In his message, Defendant Cohen referenced Ms. McSweeney's complaint of discrimination that she previously issued to Defendant Bravo employee Sezin Cavusoglu as part of the reason that Defendants Bravo and Cohen declined to cast Ms. McSweeney on RHONY Legacy.

346.    Defendant Cohen's message bore a clear implication that Defendants' decision to terminate Ms. McSweeney's employment relationship was direct retaliation against Ms. McSweeney's complaints of discrimination.

347.    Indeed, Defendants' retaliation against Ms. McSweeney did not end with their decision to terminate her employment.  Immediately prior to one of Ms. McSweeney's RHUGT

Confessionals, which was filmed on or around December 2022: other producers employed by the Defendant Companies and/or Defendant Cohen told Ms. McSweeney to express a desire to be cast on RHONY Legacy, notwithstanding Ms. McSweeney's knowledge that she would not be cast on RHONY Legacy.

348.    Upon information and belief, Defendants asked Ms. McSweeney to express a desire to be cast on RHONY Legacy, notwithstanding their shared knowledge that Ms. McSweeney would not be cast on the same, because Defendants wanted to rub salt in Ms. McSweeney's wound in retaliation for Ms. McSweeney's Human Resources complaint.  This directive was one of the Defendants' final power plays against Ms. McSweeney.

349.    Moreover, at the time Defendant asked Ms. McSweeney to provide the Confessional, wherein Ms. McSweeney expressed her desire to be cast on RHONY Legacy, Defendants also knew that Defendants' decision not to cast Ms. McSweeney on RHONY Legacy exacerbated Ms. McSweeney's mental health disorders.  At this time, Ms. McSweeney was a single mother and COVID significantly impacted Ms. McSweeney's business such that she was counting on the consistent income that RHONY Legacy would have provided her.

350.    Thus, upon information and belief, Defendants' directive for Ms. McSweeney to state her desire to be cast on RHONY Legacy, despite their shared knowledge that she was not cast on the same, was directly intended to needle Ms. McSweeney's already heightened anxiety and depression regarding her future income and ability to provide for her child.

351.    In further retaliation against Ms. McSweeney's complaints of discrimination, the Defendant Producers repeatedly pressured Ms. McSweeney to state—on camera—that she was thankful for everything that Defendants "gave her" while she was a part of RHONY and RHUGT. Defendant Producers did so with intent to retaliate against Ms. McSweeney by exacerbating Ms.

McSweeney's mental health disabilities and causing her to suffer anxiety and depression related to her complaints of discrimination against Defendants.

352.    Defendant Bravo knew that it promised Ms. McSweeney employment on RHONY Legacy, that it elected not to cast Ms. McSweeney on RHONY Legacy after Ms. McSweeney issued a formal complaint related to Defendants' unlawful employment practices, and that Ms. McSweeney suffered depression and anxiety related to her future employment prospects.

353.    Additionally, before and around Defendant Cohen's November 10, 2022 text message to Ms. McSweeney, Defendant Cohen told Ms. McSweeney that Defendants intended to reboot RHONY and produce RHONY season 14.

354.    Throughout this time, Defendant Shannon maintained close communication with Ms. McSweeney regarding the casting process of RHONY season 14.

355.    In fact, Defendant Cohen and Defendant Shannon asked Ms. McSweeney for cast member recommendations to support their production process for RHONY season 14.

356.    Throughout these conversations, Defendant Cohen and Shannon implied that Ms. McSweeney would either be cast on RHONY Legacy or RHONY season 14.

357.    Ms. McSweeney, therefore, understood that Defendants would cast her on RHONY season 14 because Defendant Cohen relayed that she would not be cast on RHONY Legacy.

358.    After Ms. McSweeney formally complained of discrimination, on the basis of disability, to Human Resources; however, Defendants reneged their promise to cast Ms. McSweeney on RHONY season 14.

359.    Upon information and belief, Defendants' decision to not cast Ms. McSweeney on RHONY season 14 was direct retaliation against Ms. McSweeney's legally protected activities, which included Ms. McSweeney's formal complaint to human resources and informal complaints

to, *inter alia*, Defendant Cohen, the Defendant Producers, and other Defendant Bravo employees of *inter alia* disability discrimination, harassment on the basis of Ms. McSweeney's disabilities, requests for accommodation for Ms. McSweeney's disabilities, and retaliation against Ms. McSweeney's protected activities.

360.    As a result of Defendants discriminatory and retaliatory conduct, Ms. McSweeney was hospitalized twice for psychological disturbances and suicidal ideations.  In fact, years later, Ms. McSweeney still suffers from Post-Traumatic Stress Disorder induced Obsessive Compulsive Disorder, which significantly detracts from her ability to function in day-to-day life.

361.    On or around February 27, 2024, Ms. McSweeney filed her Complaint and alleged, *inter alia*, sex/gender discrimination, disability discrimination, religious discrimination, hostile work environment, and retaliation claims against Defendants in violation of Title VII, New York State, and New York City employment laws.

362.    Upon information and belief, Ms. McSweeney's act of filing her Complaint constitutes a protected activity.

363.    In direct response to McSweeney's filing of the Complaint in this action, Defendant Cohen further retaliated against Ms. McSweeney.

364.    Indeed, upon information and belief, Defendant Cohen either directly requested or induced current and former *Real Housewives* cast members to engage in a coordinate attack against Ms. McSweeney by weaponizing the current and former *Real Housewives* cast members to publicly assert that Ms. McSweeney's allegations in the Complaint are false, i.e. claim that Ms. McSweeney is a liar.

365.    Upon information and belief, in direct retaliation against Ms. McSweeney's protected act of filing the Complaint, Defendant Cohen induced these current and former *Real*

*Housewives* cast members to publicly disparage Ms. McSweeney's character, and propensity for truthfulness, to curry favor with Defendant Cohen in the hopes that such favor would propel their entertainment careers.

366.    Upon information and belief, the current Bravo cast members that Defendant Cohen induced to disparage Ms. McSweeney, in retaliation for Ms. McSweeney's act of filing the Complaint, hoped to remain cast members on their respective shows, and further, hoped to increase their exposure within the Defendant Companies' programs by appearing on other television shows owned by the Defendant Companies.

367.    Indeed, as Defendant Shannon warned Ms. McSweeney during RHUGT season 3, Defendant Cohen directed and/or induced current and former Defendant Bravo cast members to publicly disparage Ms. McSweeney with intent to "diminish" (or obliterate) Ms. McSweeney's value within the entertainment industry.

368.    Upon information and belief, the former Bravo cast members that Defendant Cohen induced to disparage Ms. McSweeney, in retaliation for Ms. McSweeney's act of filing the Complaint, hoped to in return be re-cast on a Bravo network television show and/or other related show owned by Defendant Companies.

369.    Some of the Bravo cast members that, upon information and belief, Defendant Cohen induced to disparage Ms. McSweeney, in retaliation for Ms. McSweeney's act of filing the Complaint, include:

        a.  Lisa Vanderpump, who is the current executive producer and cast member of Defendant Bravo's *Vanderpump Villa* television show, former *Real Housewives of Beverley Hills* cast member, and a former cast member and executive producer of Defendant Bravo's *Vanderpump Rules* television show, spoke to TMZ on or around

March 2, 2024, and appeared on *The Talk* television show in April, 2024, and publicly proclaimed "Damn right, I'm on [Defendant Cohen's] side." Upon information and belief, Lisa Vanderpump would not have made this statement but for Defendant Cohen's direction and/or inducement.

b. Kyle Richards, who is a current cast member of *Real Housewives of Beverly Hills*, spoke to TMZ on or around March 1, 2024, and upon information and belief, Kyle Richards would not have spoken to TMZ regarding Plaintiff's Complaint but for Defendant Cohen's direction and/or inducement.

c. LuAnn de Lesseps, who was a former RHONY and RHONY: Legacy cast member, and who is a current cast member on the Defendant Bravo *Bravo's Love Hotel* television show, and upon information and belief, LuAnn de Lesseps would not have spoken to TMZ regarding Plaintiff's Complaint but for Defendant Cohen's direction and/or inducement.

d. Heather Dubrow, who is a current *Real Housewives of Orange County* cast member, published an episode on her podcast, *Let's Talk with Heather Dubrow*, on or around March 21, 2024, implying that Ms. McSweeney should be "thanking" Bravo, rather than suing Bravo, because she is "making money and thriving because of this platform," and stated that she was "irritated" by Ms. McSweeney's Complaint because "no one has ever forced me to drink." Upon information and belief, however, Dubrow does not suffer from an alcohol use disorder disability; and further, Heather Dubrow would not have made this statement but for Defendant Cohen's direction and/or inducement.

e. Melissa Gorga, current *Real Housewives of New Jersey* cast member, spoke to Page 6 on or around March 1, 2024, and upon information and belief, Melissa Gorga would not have spoken to Page 6 regarding the allegations in Plaintiff's Complaint but for Defendant Cohen's direction and/or inducement.

f. Kandi Burruss, former *Real Housewives of Atlanta* and *Kandi & The Gang* cast member, spoke to Tamron Hall on or around February 29, 2024. Upon information and belief, Kandi Burruss would not have spoken to Tamron Hall regarding the allegations in Plaintiff's Complaint but for Defendant Cohen's direction and/or inducement. In fact, Ms. Burress added to her statement: "I have had, and I hope to continue to have, a good relationship with the network."

g. Dorinda Medley, a former RHONY and RHONY: Legacy cast member, told TMZ, on or around February 29, 2024, that she "feels terrible" for Defendant Cohen regarding Ms. McSweeney's allegations in the Complaint. Upon information and belief, Dorinda Medley would not have made this statement to TMZ but for Defendant Cohen's direction and/or inducement.

h. Margaret Josephs, current *Real Housewives of New Jersey* cast member, told Page 6 on or around February 29, 2024, that Ms. McSweeney's Complaint "allegations are nothing but to assassinate his character and that is disgusting." Upon information and belief, Margaret Josephs would not have made this statement to Page 6 but for Defendant Cohen's direction and/or inducement.

370. Other current and former Defendant Bravo cast members that, upon information and belief, Defendant Cohen directed and/or induced to publicly claim that Ms. McSweeney's Complaint allegations are false, in direct retaliation against Ms. McSweeney's act of filing the

Complaint include: Guerdy Abraira, *Real Housewives of Miami*; Chanel Ayan, *Real Housewives of Dubai*; Cynthia Bailey, *Real Housewives of Atlanta*; Meghan King, *Real Housewives of Orange County*; Kiki Barth, *Real Housewives of Miami*; Marysol Patton, *Real Housewives of Miami*; Vicki Gunvalson, *Real Housewives of Orange County*; Dolores Catania, *Real Housewives of New Jersey*; Crystal Kung Minkoff, *Real Housewives of Beverley Hills*; Kelly Bensimon, RHONY; Erin Lichy, RHONY; Lisa Hochstein, *Real Housewives of Miami*; Alexia Nepola, *Real Housewives of Miami*; Teddi Mellencamp, *Real Housewives of Orange County*; Julia Legimova, *Real Housewives of Miami*; Rachel Fuda, *Real Housewives of New Jersey*; Golnesa "GG" Gharachedaghi, *Shahs of Sunset* and *The Valley : Persian Style*.

371.    Upon information and belief, Defendant Cohen's act of directing and/or inducing current and former Defendant Bravo Cast members to publicly align with Defendant Cohen, and publicly tarnish and cast dispersion on Ms. McSweeney's personal and professional reputation, Defendant Cohen blacklisted Plaintiff from any future entertainment opportunities because prospective employers would not be willing to employ both Plaintiff and any of the current and former Defendant Bravo cast members that repudiated Plaintiff's Complaint for a joint, future employment opportunity.

372.    Upon information and belief, many of the current and former Defendant Bravo cast members that publicly disavowed Ms. McSweeney's propensity for truthfulness have achieved a higher level of fame and/or public goodwill than Ms. McSweeney.  Accordingly, Defendant Cohen knew that by directing and/or inducing these current and former cast members to retaliate against Ms. McSweeney, executives in the entertainment industry (who are Ms. McSweeney's prospective employers) would believe these statements over Ms. McSweeney, and therefore, not employ Ms. McSweeney.

373.    Moreover, upon information and belief, the coordinated, public, retaliatory attack that Defendant Cohen orchestrated against Ms. McSweeney was directly intended to scare other potential complainants out of publicly sharing their discriminatory experiences with Defendant Cohen.

374.    Indeed, upon viewing so many current and former Defendant Bravo cast members disparage Ms. McSweeney—and align themselves with Defendant Cohen—a reasonable employee would understand that Defendant Cohen could also orchestrate their public downfall, and therefore, expressly prevent an employee from regaining employment within the entertainment industry.

375.    Moreover, upon information and belief, similarly situated Housewives would be deterred from complaining of Defendants' unlawful activities because, like Ms. McSweeney, such Housewives know that their "value" would "diminish" if Defendant Cohen similarly engaged current and former Defendant Bravo cast members to publicly malign their reputation.

376.    Upon information and belief, Defendant Cohen made good on his promise to reward these current and former Defendant Bravo cast members for their loyalty to him and their assistance in publicly retaliating against Ms. McSweeney for filing the Complaint.

377.    Indeed, many of the former Housewives and/or Defendant Bravo cast members that assisted Defendant Cohen in retaliating against Ms. McSweeney were eventually provided new employment opportunities on various Defendant Bravo television shows.  For example, at least three (3) of the current and former Housewives that assisted Defendant Cohen in retaliating against Ms. McSweeney were cast on a Defendant NBC television show, and at least two (2) former Defendant Bravo cast members that assisted Defendant Cohen in retaliating against Ms. McSweeney received a starring role on new Defendant Bravo television shows.

378.    Upon information and belief, Defendant Cohen orchestrated this public repudiation against Ms. McSweeney to tarnish Ms. McSweeney's reputation within the entertainment industry, and public at large, by creating an apparent uniform sentiment that Ms. McSweeney is not a suitable candidate for employment and that other strong figures within the entertainment industry no longer wish to work with Ms. McSweeney.

379.    Moreover, as Defendant Shannon advised Ms. McSweeney during RHUGT season 3, Ms. McSweeney's "value" within the entertainment industry was directly diminished by the onslaught of public disparagement that Defendant Cohen caused by, upon information and belief, directing or inducing current and former Defendant Bravo employees to disparage Ms. McSweeney.

380.    Defendant Cohen's retaliation against Ms. McSweeney did not stop there.  On or around March 6, 2024, Defendant Cohen's attorney, Orin Snyder ("Snyder"), sent a letter to Ms. McSweeney's undersigned counsel and threatened legal action against Ms. McSweeney regarding Ms. McSweeney's claims against Defendant Cohen in the Complaint (the "March Letter").

381.    Upon information and belief, Defendant Cohen was aware that Ms. McSweeney filed the Complaint prior to sending the March Letter because Defendant Cohen's counsel referenced and quoted the Complaint in the March Letter.

382.    The March Letter directs Ms. McSweeney to retract her allegations in the Complaint "relating to Mr. Cohen's purported 'cocaine use'" or otherwise, Mr. Cohen will "hold [Ms. McSweeney's counsel] and [Ms. McSweeney] accountable to the fullest extent of the law."

383.    The March Letter further threatened Ms. McSweeney, in response to her act of filing her Complaint, and states: "[t]he publication of the complaint was a malicious act that [subjects] [sic] [Ms. McSweeney] to substantial compensatory and punitive damages."

384.    Upon information and belief, Defendant Cohen's plan to weaponize current and former cast members against her came to fruition in the March Letter, which also claimed "you know that no such details exist, as a slew of current and former cast members has independently confirmed (*which you well know through press reports*)." (Emphasis added).

385.    Upon information and belief, the March Letter's threats were baseless and was intended—once again—to scare Ms. McSweeney into silence.

386.    Upon information and belief, Defendant Cohen's counsel, Snyder, knew that the March Letter's threats were baseless because, on or around June 15, 2023, Mr. Snyder authored an article advising his law firm, Gibson Dunn, that allegations included in a complaint are absolutely privileged, and yet the March Letter specifically targets Ms. McSweeney's allegations in the Complaint.  *See* Orin Snyder, New York's Highest Court Addresses Recent Anti-SLAPP Amendments and Multiple Aspects of Defamation Law in Lawsuit Against Kesha, Gibson Dunn (June 15, 2023).

387.    Defendant Cohen is a public figure, and therefore, Defendant Cohen and Snyder also knew that should they follow through on their threat Defendant Cohen would be required to prove that Ms. McSweeney's allegations in the Complaint were made with actual malice to state a claim against Ms. McSweeney for defamation.

388.    Upon information and belief, however, Defendant Cohen and Snyder also knew that the allegations in the Complaint were not made with actual malice nor were the allegations in the Complaint defamatory per se; and therefore, the March Letter's threat to subject *inter alia* Ms. McSweeney to "independent and substantial legal exposure" as well as "substantial compensatory and punitive damages" were baseless.

389.    Indeed, the March Letter's threatened defamation counterclaim was baseless because Ms. McSweeney's Complaint's allegations were not knowingly false nor asserted with reckless disregard for the truth because: at least two (2) former *Real Housewives* cast members, who had very close relationships with Defendant Cohen, have privately confirmed the same to Ms. McSweeney; in or around 2020, former *Real Housewives* cast member, Linnethia Monique "Nene" Leakes ("Nene Leakes"), who also had a close personal relationship with Defendant Cohen publicly labeled Defendant Cohen as a "cocaine head"; in or around 2022, Danielle Staub, former *Real Housewives of New Jersey* cast member, also publicly confirmed Defendant Cohen's drug use; and comedian, Kathy Griffin, publicly confirmed that Defendant Cohen twice offered her cocaine prior to filming WWHL.

390.    In fact, upon information and belief, Defendant Cohen formerly employed Ms. Griffin during the time that Ms. Griffin starred on one of Defendants' television programs.

391.    Ms. McSweeney's allegations regarding Defendant Cohen's cocaine usage were also not knowingly false because a public video, which was previously circulated throughout the Internet, references Defendant Cohen's cocaine usage.  In fact, after Ms. McSweeney filed the Complaint, the video, reproductions thereof, photos, and internet articles discussing Defendant Cohen's cocaine were mysteriously removed from the Internet, upon information and belief, by Defendant Cohen.

392.    Upon information and belief, therefore, the March Letter's threatened defamation counterclaim was baseless because Ms. McSweeney's Complaint's allegations regarding Defendant Cohen's cocaine usage were not knowingly false nor asserted with reckless disregard for the truth.

393.    Defendant Cohen's act of threatening Ms. McSweeney with baseless, frivolous legal action, which Defendant Cohen and his counsel either knew or should have known to be baseless and frivolous, constitutes unlawful retaliation.

394.    Upon information and belief, therefore, the March Letter served as direct retaliation against Ms. McSweeney for engaging in protected activity, i.e. filing the Complaint.

395.    Furthermore, upon information and belief, the sole and primary purpose behind Defendant Cohen's decision to send the March Letter to Ms. McSweeney's counsel was to retaliate against Ms. McSweeney for filing the Complaint.

396.    Indeed, upon information and belief, consistent with Defendant Cohen's coordinated attack on Ms. McSweeney, and in direct retaliation against Ms. McSweeney for filing the Complaint: Defendant Cohen sent the March Letter to international news outlets contemporaneously with, or shortly after, Snyder sent the March Letter to McSweeney's counsel.

397.    Indeed, Snyder's office sent the March Letter to Ms. McSweeney's counsel on March 6, 2024 at 4:42p.m.  On March 7, 2024 at 7:18a.m.—less than twenty-four (24) hours after Snyder sent Ms. McSweeney's counsel the March Letter—TMZ reported that Cohen sent McSweeney a letter advising Ms. McSweeney to take back her allegations in the Complaint "or else", and verbatim quoted the March Letter, evidencing that TMZ obtained a copy of the March Letter.  The TMZ article also quoted a "source close to Cohen."

398.    On March 7, 2024, at 7:46a.m., the New York Post's Page 6 reported that Page 6 had "seen" the March Letter and reported on the contents of the same.

399.    On March 7, 2024 at 9:46a.m., Variety also published an article about the March Letter, which quoted the March Letter verbatim.

400.    By March 7, 2024, less than twenty-four (24) hours after Snyder transmitted the March Letter, Defendant Cohen either disseminated, or caused to be disseminated, the March Letter to a plethora of international news outlets—all of whom reported, in sum and substance, *inter alia* that Ms. McSweeney lied in the Complaint.

401.    Upon information and belief, Defendant Cohen intentionally caused the March Letter to be published with intent to discourage Ms. McSweeney from further engaging in protected activity by litigating the claims in her Complaint.

402.    Upon information and belief, Defendant Cohen's act of causing the March Letter's publication was intended to smear Ms. McSweeney in the media and was intended to dissuade Ms. McSweeney from engaging in protected activity, i.e. proceeding with her claims against Defendant Cohen.

403.    The threat of punitive action against Ms. McSweeney in the March Letter, and the publication of same to the media, was maliciously intended to intimidate Ms. McSweeney against engaging in protected activity, i.e. pursuing her claims against Defendant Cohen in this Court.

404.    Upon information and belief, after Defendant Cohen disseminated the March Letter, or caused the same to be disseminated to the media, Defendant Cohen directed or induced the same current and former Defendant Bravo cast members to publicly validate the March Letter's claims that Ms. McSweeney lied in the Complaint.

405.    Upon information and belief, Defendant Cohen directed or induced the same current and former Defendant Bravo cast members to publicly validate the March Letter's claims in direct retaliation for Ms. McSweeney's act of filing the Complaint against him.

406.    Upon information and belief, Defendant Cohen's act of directing or inducing the same current and former Defendant Bravo cast members to publicly validate the March Letter's

68

claims had the intended effect of labeling Ms. McSweeney as a liar within the entertainment industry, so as to prevent and/or hinder Ms. McSweeney from securing any future employment opportunities within the entertainment industry.

407.    Defendant Cohen's coordinated attack was no accident.    Upon information and belief, Defendant Cohen knew that Ms. McSweeney's reputation within the entertainment industry would be irreparably tarnished by: (i) directing and/or inducing at least twenty-four (24) Defendant Bravo current and former cast members to publicly allege or imply that Ms. McSweeney is a liar, through denying the truth of the allegations in her Complaint; (ii) by hiring counsel to draft and send Ms. McSweeney's counsel the March Letter, which also claimed that the allegations in the Complaint are false; (iii) systemically publicizing the March Letter in international media sources, within less than twenty-four (24) hours after Defendant Cohen transmitted the March Letter and before allowing Plaintiff the opportunity to respond to the same; and (iv) directing Defendant Bravo current and former cast members to validate the claims against Ms. McSweeney made in the March Letter (collectively the "Letter Retaliatory Acts").

408.    Upon information and belief, Defendant Cohen engaged in the Letter Retaliatory Acts to deter Ms. McSweeney from prosecuting her claims against him in this Action.

409.    Upon information and belief, Defendant Cohen engaged in the Letter Retaliatory Acts to dissuade, intimidate, and deter any other employees and/or former employees from pursuing legal claims both against Defendant Cohen and Defendants as a collective.

410.    Upon information and belief, Defendant Cohen also caused the March Letter to be published with intent to discourage other persons that Defendant Cohen supervises and employs from engaging in protected activity by complaining of Defendant Cohen's discriminatory conduct.

411.    Defendant Cohen holds immense power within the entertainment industry. Defendant Cohen is intimately connected not just to the Defendants, but to other powerful entities, networks, and public figures.

412.    Accordingly, upon information and belief, when Defendant Cohen publicly claimed Ms. McSweeney was a liar, other power players within the entertainment industry would and did elect not to work with Ms. McSweeney.

413.    Moreover, when Defendant Cohen publicly claimed Ms. McSweeney was a liar, employers within the entertainment industry that are not connected to Defendant Cohen also would and did elect not to work with Ms. McSweeney because aligning with Ms. McSweeney would foreclose the employers' ability to work with, the more powerful and lucrative, Defendant Cohen in the future.

414.    As a direct and proximate cause of Defendant Cohen's Letter Retaliatory Acts: Ms. McSweeney has been blacklisted from the entertainment industry and has lost tangible, gainful employment opportunities.

415.    Defendant Cohen's retaliation against Ms. McSweeney, by permanently and irreparably tarnishing her reputation within the entertainment industry, is par-for-the-course.  In fact, on or around September 28, 2023, Nene Leakes, former *Real Housewives of Atlanta* cast member, claimed that Defendants NBC, Bravo, and Cohen, those Defendants "blacklisted" Nene Leakes from the entertainment industry and eliminated her ability to obtain any future acting, hosting, or other television career opportunities after Nene Leakes sued *inter alia* Defendants NBC, Bravo, and Cohen in the Northern District of Atlanta in 2020 (Case No. 1:22-cv-01526). Leakes made this statement on Bethenny Frankel's *Just B* podcast.

416.    Moreover, after Kathy Griffin publicly claimed that Defendant Cohen offered her cocaine before a WWHL taping, Kathy Griffin has publicly complained that Defendant Cohen blacklisted her from the entertainment industry and prevented her from securing any future employment therein.

417.    In a YouTube video published approximately seven (7) years ago, Kathy Griffin recounts Defendant Cohen's attempt to blacklist her from the entertainment industry, in retaliation for claiming that Defendant Cohen twice offered her cocaine before filming WWHL, Kathy Griffin calls Defendant Cohen's retaliatory attack against her "coordinated" and warns: "If you guys see the Housewives coming at me, taking Andy Cohen's side, don't be too tough on them, they're just trying to keep their gigs."

418.    Indeed, like other current and former Bravo cast members, a substantial portion of Ms. McSweeney's income is derived from completing social media "brand deals", which are short-term, paid partnerships between Ms. McSweeney and various brands, wherein brands will pay Ms. McSweeney to promote their goods and services on her social media platforms ("Brand Deals").

419.    Brand Deals are profitable for the brand because the Brand can platform its products through Ms. McSweeney's large social media following, and critically, the brand can gain customers who trust Ms. McSweeney's recommendation of a good or service.  It is critical, therefore, that the Brand Deal's intended audience is capable of trusting Ms. McSweeney's representations about the good or service she contracted to promote.

420.    Generally, Ms. McSweeney does not initiate Brand Deals; rather, brands will contact Ms. McSweeney to ascertain whether Ms. McSweeney would be interested in platforming their goods or services in exchange for monetary compensation due to Ms. McSweeney's social media following and reputation.

421.    Prior to Defendant Cohen's Letter Retaliatory Acts, Ms. McSweeney garnered significant attention from brands looking to enter into a Brand Deal with Ms. McSweeney; however, after the Letter Retaliatory Acts, Ms. McSweeney's ability to secure Brand Deals diminished by more than fifty-percent (50%).

422.    Indeed, upon information and belief, as a direct and proximate cause of the Retaliatory Acts, brands will not enter into Brand Deals with Ms. McSweeney because Defendant Cohen caused her to be publicly labeled as a liar, which makes Ms. McSweeney an undesirable brand representative as the consuming public will not trust her endorsement of goods and services that she would otherwise be able to promote.

423.    For example, in early March, 2025—before Defendant Cohen publicized the March Letter—a marketing agency contacted Ms. McSweeney to engage in a Brand Deal with Patti Stanger to promote Ms. Stanger's upcoming project.

424.    Defendant Bravo previously employed Patti Stanger.  In fact, Patti Stanger was the star of Defendant Bravo's television series, *Millionaire Matchmaker*, from on or around January, 2008 through December, 2013.    Furthermore, Defendant Cohen hosted the *Millionaire Matchmaker* reunion episodes throughout the pendency of the series.

425.    In or around the first week of March, 2024, after the marketing agency contacted Ms. McSweeney regarding the prospective Brand Deal with Stanger, Ms. McSweeney and the marketing agency engaged in negotiations to finalize the terms of the Brand Deal.

426.    On March 7, 2024, after Defendant Cohen, upon information and belief, caused the March Letter to be published, however, the marketing agency elected not to move forward with the Brand Deal between Ms. McSweeney and Stanger.

427.    Upon information and belief, Defendant Cohen's act of publishing the March Letter directly and proximately caused the Brand Deal between Ms. McSweeney and Stanger to fail because, after the press reported that Defendant Cohen threatened to pursue defamation counterclaims against Ms. McSweeney in the March Letter, Stanger no longer wished to align herself or her brand with Ms. McSweeney.

428.    Upon information and belief, Defendant Cohen's Letter Retaliatory Act, directly and proximately damaged Ms. McSweeney's employment opportunities by depriving her of the exposure and monetary compensation that she could have earned through the Brand Deal with Patti Stanger.

429.    As a direct and proximate cause of Defendant Cohen's Letter Retaliatory Acts, Ms. McSweeney's employment opportunities have been damaged because she is unable to find entities within the entertainment industry and/or brands that are willing to align themselves with Ms. McSweeney over Defendant Cohen.

## H. Defendants Established a Willful Practice of Discriminating and Retaliating Against their Employees on the Basis of Protected Traits[2]

430.    As one former Housewife stated: "Filming is addictive. It's an adrenaline rush." Dave Quinn, *Not All Diamonds and Rosé*, Andy Cohen Books, Henry Holt and Co., 92 (2021).

431.    Though Ms. McSweeney is the sole plaintiff in this action, she is just one of Defendants' many victims. Like many others, Ms. McSweeney had no idea that agreeing to

---

[2] This Court's Order, dated March 31, 2025 (Dkt. No. 93) (the "Order") dismissed, with prejudice, the Complaint's (Dkt. No. 1) and First Amended Complaint's (Dkt. No. 54) claims of discrimination, hostile work environment, and retaliation on the basis of sex and gender and religion. In accordance with this Court's Order, Plaintiff does not replead the claims dismissed with prejudice herein; however, nothing herein shall be construed as a waiver of Plaintiff's right to appeal the Order, all such rights are expressly reserved to Plaintiff.

employment with Defendants would result in subjugation by unlawful working environments and those that foster them, with impunity.

432.    Defendants know that their employment practices are discriminatory and illegal; however, they choose to perpetuate these unlawful practices for the sake of profitable, salacious reality television.

433.    Defendants' individual and collective acts of discrimination against employees who are members of a protective class, other than Ms. McSweeney, may evidence Defendants' individual and collective discriminatory motives.

434.    Defendants' individual and collective acts of discrimination against employees who are members of a protective class, other than Ms. McSweeney, may evidence that Defendants created a hostile workplace environment.

### a. Defendants Intentionally Discriminate Against Cast Members' Disabilities.

435.    Defendants glorified Housewives' addiction since Defendants conceived the *Real Housewives*.

436.    Cast members such as Kim Richards, Sonja Morgan, Luann de Lesseps, Karen Huger, and James Kennedy have openly exhibited alcohol and drug addiction while employed by Defendants.  *See* Tom Syverson, *From Vanderpump Rules to the Real Housewives, Bravo's Sobering Portrait of Addiction and Recovery*, Paste (April 4, 2017, 3:00PM), https://www.pastemagazine.com/tv/the-real-housewives-of-beverly-hills/from-vanderpump-rules-to-the-real-housewives-of-be.

437.    Additionally, in response to accusations that Defendant Cohen engages in discriminatory workplace behavior, he is quoted as saying: "It's a complicated relationship … I'm a boss, I'm a friend … I'm an adversary, I'm a button pusher.  I've become legitimately friends with

many of them.  I care about them.  So it's nuanced.  And sometimes it's great and sometimes it's not great.  It's an emotional relationship." *See Andy Cohen's Friendships With Former Housewives: Who is He Still on Good Terms With*, Us Weekly (Aug. 22, 2023), https://www.yahoo.com/entertainment/andy-cohen-friendships-former-housewives-152715336.html.

438.    What Defendant Cohen conveniently omits, however, is that as the Housewives' employer, he is legally obligated to ensure safe, fair, nondiscriminatory places of employment.

439.    Specifically, as Ms. McSweeney's employer, Defendant Cohen knew of Ms. McSweeney's disabilities but willfully shirked his legal obligation to reasonably accommodate Ms. McSweeney's disabilities, and instead, actively discriminated and retaliated against Ms. McSweeney on the basis of her disabilities.

440.    Defendant Cohen also received many of Ms. McSweeney's complaints of employment discrimination and failed to investigate or otherwise address Ms. McSweeney's complaints; worse, he himself actively discriminated against her and intentionally exacerbated Ms. McSweeney's mental disability so as to cause her to suffer extreme emotional distress.

441.    In fact, the *Real Housewives* producers hope that the Housewives engage in dangerous behaviors with alcohol.  Non-defendant producer, Alex Baskin, is quoted stating: "Vicki [Gunvalson] is great in group scenes, particularly on trips . . . you know sh*t's going to go down and she's probably going to end up in an ambulance." Dave Quinn, *Not All Diamonds and Rosé*, Andy Cohen Books, Henry Holt and Co., 87 (2021).

442.    Upon information and belief, Defendant Producers shared this hope because Defendant Producers produced *Real Housewives of Orange County* when Gunvalson was a cast member thereon.

75

443.    Similarly, Defendant Producers knew that Ms. de Lesseps' suffered from alcohol use disorder through filming Ms. de Lesseps' alcohol related arrest, criminal prosecution, parole, and experience in a rehabilitation center.    Notwithstanding this knowledge, the Defendant Producers joked to Ms. McSweeney about watching as de Lesseps drunkenly entered into a vehicle with two men that she did not know in effort to obtain illicit substances.

444.    Another former Housewife, Brauwyn Windham-Burke also requested that the Defendant Producers not speak about her sobriety on camera, and Defendants also ignored her reasonable requests for accommodations.  Dave Quinn, *Not All Diamonds and Rosé*, Andy Cohen Books, Henry Holt and Co., 97 (2021).

445.    Additionally, former Housewives including Bethenny Frankel, Aviva Drescher, and Stephanie Hollman have also complained that Defendants withhold food while forcing Housewives to consume alcohol.  *See* Olivia Davis, *'Real Housewives of Dallas' Alum Claims Production 'Over-Served' and 'Starved' Cast Following Bethenny Frankel's Lawsuit Against Bravo*, All About the Tea (Aug. 29, 2023), https://allaboutthetea.com/2023/08/29/real-housewives-of-dallas-alum-claims-production-over-served-and-starved-cast-following-bethenny-frankels-lawsuit-against-bravo/; Dana Schuster, *'Housewives' say Bravo Keeps the Booze Flowing*, Page 6 (June 16, 2018, 3:29 PM),  https://pagesix.com/2018/06/16/housewives-say-bravo-keeps-the-booze-flowing/.

446.    Another Defendant Bravo cast member is quoted as stating: "[the producers are] like, 'Oh, you know, go out, have dinner, have a good time.' You're like, 'I'd rather just get some sleep' and they're like, 'No, you're gonna drink. You're gonna drink and you're gonna stay up until four in the morning, and you're going to like it!'" *See* Linda Holmes, *'Below Deck,' reality*

*producers stepped in to stop a drunken assault — this time*, NPR (Aug. 12, 2023), https://www.npr.org/2023/08/12/1193446744/below-deck-down-under-sexual-assault.

447.    These accounts demonstrate that Defendants' pattern of disability discrimination and failure to accommodate is willful.

448.    Furthermore, Defendant Cohen favors Housewives that 'play ball' with his proclivity for substance abuse and discriminates against the sober Housewives that, because of their substance use disorders, cannot.

449.    Upon information and belief, Defendant Cohen also engages in cocaine use with Housewives and other "Bravolebrities" that he employs.

450.    One long-standing, former *Real Housewives* cast member confirmed to Ms. McSweeney that Defendant Cohen engaged in drug use with a cast member of a Defendant Bravo series at Bravocon, which is an event hosted by the Defendant Companies to promote the Defendant Bravo television shows.

451.    Another long-standing former *Real Housewives* member expressed to Ms. McSweeney her belief that Defendant Cohen favors the employees who he can use cocaine with.

452.    Upon information and belief, Defendant Cohen's proclivity for cocaine usage with his employees is well-known throughout the *Real Housewives* franchise.

453.    Indeed, in 2017, Kathy Griffin publicly claimed that Defendant Cohen twice offered her cocaine before the pair were scheduled to appear on WWHL.  Griffin also alleged that Defendant Cohen was her direct supervisor, who controlled whether she remained employed with Defendant Bravo, from approximately 2004 through 2013.

454.    In 2022, Nene Leakes publicly tweeted about Defendant Cohen's cocaine use and called Defendant Cohen a "cocaine head."

455.    In fact, upon information and belief, Defendant Cohen tends to provide the Housewives with whom he uses cocaine with more favorable treatment and edits.

456.    Upon information and belief, Defendant Cohen intentionally uses cocaine with his employees to further promote a workplace culture that thrives off drug and alcohol abuse, which leads to a failure to accommodate employees who are disabled and attempting to remain substance free.

457.    Defendant Cohen's preferred workplace environment, which is fueled with substances and illicit behavior, permeates every aspect of Defendant Bravo productions.

458.    Indeed, in Defendant Cohen's directly states his preference for illicit substances in his autobiography entitled *The Andy Cohen Diaries: a Deep Look Into a Shallow Year*.

459.    Recently, Defendant Bravo recently, sickeningly aired an episode of its series *Below Deck*, which portrayed a female cast member's sexual assault by a male cast member. *See* Linday Lowe, *Inside the 'Below Deck: Down Under' Consent Incidents that Led to 2 Firings and an Outpouring of Praise*, Today (Aug. 9, 2023, 2:15 PM), https://www.today.com/popculture/tv/below-deck-down-under-consent-controversy-recap-luke-jones-rcna99047.

460.    Upon information and belief, in productions such as RHONY, RHUGT, and *Below Deck*, Defendants provide employees with unlimited, free alcohol and fail to provide any security to keep cast members safe after consuming copious amounts of alcohol.

461.    To the contrary Bravo's entire *modus operandi* is to induce employees to enter into dangerous situations that prey upon their weaknesses, light the proverbial match, and then –Watch What Happens Live.

462.    As one Below Deck cast member stated:

> [W]atching the producers swoop in here *only reminds you how often they do not swoop in*. They watch people get in fights, punch things, scream at each other, drink until they're sick, drink until they have to be carried home, drink until they have no idea what they're doing — in a way, seeing producers become visible in one instance makes them hover like ghosts at the edges in all the past situations they've allowed to unfold (encouraged to unfold?) without any obvious intervention. . . . *I can't remember ever hearing a producer say, "You've had enough, stop drinking, go to bed."*

*See* Linda Holmes, *'Below Deck,' reality producers stepped in to stop a drunken assault — this time*, NPR (Aug. 12, 2023), https://www.npr.org/2023/08/12/1193446744/below-deck-down-under-sexual-assault (emphasis added).

**b. Defendants Routinely Retaliate Against Housewives that Request Accommodations for their Disabilities.**

463.    Defendants will go to all lengths to ensure that their cast members remain under their control.  When Bravo cast members refuse to 'play ball' with Defendants, Defendants retaliate by tarnishing the cast member's reputation and public image.

464.    Like Ms. McSweeney, former RHONY Housewife, Kelly Killoren Bensimon recounted how the Defendant Producers threatened her continued career after Killoren Bensimon requested an accommodation to leave a cast trip due to her mental health disabilities. When Killoren Bensimon ultimately left that cast trip, after Defendant Producers told her that she could not, she recounts:

> I was filming six days a week, from the very beginning to the very end.  I filmed all the time, and I thought I was doing great.  It was one of my best years.  But my agent was like "[Defendant Producers and Defendant Bravo] are really mad at you and they don't know whether they're going to bring you back." I don't know why all this pressure was on me, but there was a lot of animosity and they told me that they were going to cancel if I didn't go on the trip.  That's why I said at the reunion that I was forced.

Dave Quinn, *Not All Diamonds and Rosé*, Andy Cohen Books, Henry Holt and Co., 115 (2021).

465.    Also like Ms. McSweeney, former "bravoleberity", Raquel Leviss, also complained that Defendants punished her by originally promising her that she would receive on-set mental health counseling and later reneging that support after Leviss engaged in unauthorized media interviews. *See* Samantha Nungesser, *Rachel Leviss Blasts Andy Cohen For "Damaging" Accusation That She Was "Medicated" During the 'Vanderpump Rules' Reunion: "I Feel Like That Violates Some Sort of HIPAA Law"*, The Decider (Aug. 18, 2023), https://decider.com/2023/08/18/rachel-leviss-blasts-andy-cohen-damaging-accusation-medicated-vanderpump-rules-reunion/.

466.    Leakes has also complained that Defendants blacklisted her from the entertainment industry after Leakes filed a lawsuit against *inter alia* Defendants Warner, NBC, Bravo, and Cohen. Specially, Leakes stated that after she began to publicly complain of racial discrimination while working for Defendants Warner, NBC, and Cohen, she was suddenly deprived of any and all employment opportunities in the entertainment industry.

467.    After Ms. Leakes claimed that Defendant Cohen was a "cocaine head", and filed a lawsuit against *inter alia* Defendant Cohen alleging various claims of employment discrimination against *inter alia* Defendant Cohen, Ms. Leakes released a statement complaining of Defendant Cohen's retaliation providing: "Yes, I've been blacklisted - when you haven't worked in three years when all of a sudden you're working and sought after, and suddenly you're not working, it's being blacklisted."

468.    After Griffin publicized that Defendant Cohen twice offered her cocaine before taping WWHL, Griffin publicly stated that Defendant Cohen blacklisted her from the entertainment industry and has worked to prevent her from securing additional employment opportunities alongside a powerful cohort of entertainment executives.

469.    Upon information and belief, Monique Samuels, a former *Real Housewives of Potomac* cast member, publicly confirmed Leakes' allegations of retaliatory blacklisting.

470.    Defendants' pattern and practice of retaliation proves that Defendants willfully retaliate against any employee that speaks out against discrimination.

### c. Defendants Habitually Fail to Investigate Formal Claims of Discrimination.

471.    Like the 'investigation' that Defendants undertook after Ms. McSweeney formally complained of discrimination on RHUGT, other Defendants habitually ignore other Housewives' claims of discrimination, hostile work environment and retaliation with intent to perpetuate an unlawful, discriminatory and retaliatory work culture.

472.    Following Defendant Cohen's lead, other Defendants, specifically the Defendant Producers, acquiesce to unlawful employment behaviors that create a workplace culture where male producers like Defendant Paparazzo and Defendant Ward have no reason to follow employment law, as Defendants know that they could act however they wished with impunity.

473.    Defendants' failure to take appropriate remedial actions—and active acceptance of unlawful employment practices—creates an environment where perpetrators are never held accountable for wrongdoing.

474.    Moreover, Defendants' systematic silencing of complainants operates only to embolden staff to perpetuate despicable, unlawful practices.

475.    As a result, Defendants created a culture where female employees know all too well that Defendants' Human Resources department refuses to address discriminatory conduct. Female employees, therefore, understand that if they complain to human resources, they will be ostracized and retaliated against. That is exactly what happened to Ms. McSweeney.

476.    Defendants created a culture where women, like Ms. McSweeney, who make any effort to complain or speak out against unlawful employment practices are retaliated against.

Indeed, these women are degraded and treated with open hostility, and any complaints of such treatment are met with the Housewives being labeled as a problem, 'not made for [TV]', 'argumentative', and otherwise given negative reputations on- and off-air.

477.    Defendants' routine failure to investigate or otherwise lawfully address instances of discrimination has the intended effect of silencing employees that might wish to speak out against discrimination.

478.    Thus, until recently, Ms. McSweeney and other Housewives were forced to suffer in silence.

479.    Now, Ms. McSweeney intends to hold her abusive employers to account and obtain justice.

480.    Defendants will no longer survive on her silence.

## FIRST CAUSE OF ACTION
### (DISCRIMINATION BASED ON DISABILITY, pursuant to N.Y. Exec. Law § 296(1)(a) – AGAINST DEFENDANT COMPANIES AND DEFENDANT COHEN)

481.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

482.    Plaintiff was an employee of the Defendant Companies and Defendant Cohen under New York State law.

483.    The Defendant Companies are "employer(s)" and "covered entit(ies)" under New York State law.

484.    Defendant Cohen is an "employer" under New York State law.

485.    Defendant Cohen was Plaintiff's supervisor and employer for the entirety of the time period that Plaintiff was employed as a cast member on RHONY seasons 12 and 13 and RHUGT season 3.

486.    Upon information and belief, at all relevant times herein, Defendant Cohen had both the ability and authority to decide whether to hire and fire Plaintiff, as well as all other cast members on *inter alia* the *Real Housewives* franchise.

487.    At all relevant times, Plaintiff resided in New York State, Plaintiff was employed in New York State, and Plaintiff's principal place of work was New York State.

488.    At all relevant times, Plaintiff was a member of a protected class as a person with disabilities under New York State law.

489.    At all relevant times, Plaintiff was qualified and capable of performing all essential job duties with and/or without reasonable accommodations.

490.    Plaintiff was employed by the Defendant Companies and Defendant Cohen.  The Producer Defendants each supervised Ms. McSweeney's employment.  Each of the Defendants are causally linked through their own actions, conduct, and/or inactions or failures to act, and each of the Defendant Companies and Defendant Cohen created and/or maintained the discriminatory conduct alleged herein.

491.    At all relevant times, Plaintiff was disabled, had record of, and was regarded as having the following impairments: anxiety, depression, bipolar disorder, and alcohol use disorder.

492.    The Defendant Companies and Defendant Cohen discriminated against Plaintiff on the basis of her disabilities by failing to engage in the interactive process, failing to provide Plaintiff reasonable accommodations, such as allowing Plaintiff to attend AA meetings; tormenting Plaintiff on the basis of her disabilities, such as colluding with other cast members to taunt Plaintiff regarding her sobriety; failing to advance Plaintiff due to her mental health diagnoses and alcohol use disorder, and ultimately discharging Plaintiff due to her mental health diagnoses and alcohol use disorder.

493.    Upon information and belief, the Defendant Companies and Defendant Cohen did not cast Plaintiff on RHONY Season 14 and/or RHONY Legacy due to Plaintiff's disabilities, and specifically, Plaintiff's failure to relapse into her alcohol use disorder.

494.    Upon information and belief, the Defendant Companies and Defendant Cohen each, respectively, supported, encouraged, condoned, and approved the other Defendants' individual and collective acts of discriminatory conduct against Plaintiff on the basis of her disabilities.

495.    Upon information and belief, the Defendant Companies and Defendant Cohen each, respectively, knew of the other Defendants' discrimination against Plaintiff on the basis of her disabilities and failed to take action against the other Defendants' discrimination against Plaintiff on the basis of her disabilities.

496.    Upon information and belief, the Defendant Companies and Defendant Cohen each, respectively, knew of Plaintiff's complaints of discrimination on the basis of her disabilities but failed to investigate any of Plaintiff's complaints of discrimination on the basis of her disabilities.

497.    Upon information and belief, as Plaintiff's employers, the Defendant Companies and Defendant Cohen failed to take adequate remedial measures in response to Plaintiff's complaints of disability discrimination.

498.    Upon information and belief, the Defendant Companies' and Defendant Cohen's discrimination against Plaintiff on the basis of Plaintiff's disabilities was willful.

499.    Upon information and belief, the willful nature of the Defendant Companies' and Defendant Cohen's discrimination against Plaintiff, on the basis of Plaintiff's disabilities, is further evidenced by the similar treatment of other disabled persons that the Defendant Companies and Defendant Cohen employe(d).

500.    Upon information and belief, the above conduct created a hostile work environment for Plaintiff, significantly altered the terms and conditions of her employment, caused Plaintiff to suffer suicidal ideations, caused Plaintiff to become institutionalized in a psychiatric facility and has continued to cause ongoing mental pain and suffering.

501.    Upon information and belief, Defendant Companies and Defendant Cohen condoned and/or perpetuated the Defendant Producers discriminatory behavior.

502.    Upon information and belief, the above conduct created a hostile work environment for Plaintiff and significantly altered the terms and conditions of her employment.

503.    Upon information and belief, in addition, Plaintiff was humiliated and disturbed by Defendants' discriminatory acts, which were committed with reckless indifference.

504.    Upon information and belief, the Defendant Companies' and Defendant Cohen's unlawful discrimination against Plaintiff on the basis of Plaintiff's disability violates N.Y. Exec. Law § 296(1)(a).

505.    Upon information and belief, as a direct and proximate result of the above, Plaintiff has suffered damages, and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation pursuant to N.Y. Exec. Law § 296(1)(a).

## SECOND CAUSE OF ACTION
## (AIDING AND ABETTING DISCRIMINATION BASED ON DISABILITY, pursuant to N.Y. Exec. Law § 296(6) – AGAINST DEFENDANT PRODUCERS)

506.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

507.    At all relevant times, Plaintiff resided in New York State, Plaintiff was employed in New York State, and Plaintiff's principal place of work was New York State.

508.     Plaintiff was an employee of the Defendant Companies and Defendant Cohen under New York State law.

509.     The Defendant Companies are "employer(s)" and "covered entit(ies)" under New York State law.

510.     Upon information and belief, at all relevant times, the Defendant Producers were employed by one or more of the Defendant Companies.

511.     Upon information and belief, the Defendant Producers supervised and worked with Plaintiff for the entirety of the time period that Plaintiff was employed as a cast member on RHONY seasons 12 and 13 and RHUGT season 3.

512.     At all relevant times, Plaintiff was a member of a protected class as a person with disabilities under New York State law.

513.     At all relevant times, Plaintiff was disabled, had record of, and was regarded as having the following impairments: anxiety, depression, bipolar disorder, and alcohol use disorder.

514.     At all relevant times, Plaintiff was qualified and capable of performing all essential job duties with and/or without reasonable accommodations.

515.     Plaintiff was employed by the Defendant Companies and Defendant Cohen.  The Producer Defendants each supervised Ms. McSweeney's employment.  Each of the Defendants are causally linked through their own actions, conduct, and/or inactions or failures to act.

516.     Upon information and belief, the Defendant Producers are liable to Plaintiff for aiding and abetting the Defendant Companies' and Defendant Cohen's discrimination against Plaintiff on the basis of Plaintiff's disabilities because the Defendant Producers aided, abetted, incited, and compelled the Defendant Companies and Defendant Cohen's discrimination against Plaintiff on the basis of Plaintiff's disabilities.

517.    The Defendant Producers, as the employees of the Defendant Companies and as Ms. McSweeney's supervisors and/or coworkers, each participated in creating and/or maintaining the discriminatory conduct alleged herein.

518.    Upon information and belief, the Defendant Producers each supported, encouraged, condoned, and approved the other Defendants' individual and collective acts of discriminatory conduct against Plaintiff on the basis of her disabilities.

519.    The Defendant Producers, both individually and collectively, participated in the conduct giving rise to Plaintiff's claims of discrimination on the basis of Plaintiff's disabilities alleged herein by: failing to engage in the interactive process, failing to provide Plaintiff reasonable accommodations, such as allowing Plaintiff to attend AA meetings; tormenting Plaintiff on the basis of her disabilities, such as colluding with other cast members to taunt Plaintiff regarding her sobriety; failing to advance Plaintiff due to her mental health diagnoses and alcohol use disorder, and ultimately recommended that Defendant Cohen and the Defendant Companies discharge Plaintiff due to her mental health diagnoses and alcohol use disorder.

520.    Upon information and belief, the Defendant Producers' discrimination against Plaintiff on the basis of Plaintiff's disabilities caused or contributed to the Defendant Companies' and Defendant Cohen's decision not cast Plaintiff on RHONY Season 14 and/or RHONY Legacy.

521.    Upon information and belief, each of the Defendant Producers knew of the other Defendants' discrimination against Plaintiff on the basis of her disabilities and failed to take action against the other Defendants' discrimination against Plaintiff on the basis of her disabilities.

522.    Upon information and belief, Plaintiff directly complained to each of the Defendant Producers of the discrimination on the basis of Plaintiff's disabilities that Plaintiff faced, but Defendant Producers failed to investigate any of Plaintiff's complaints.

523.    Upon information and belief, Plaintiff directly complained to each of the Defendant Producers of the discrimination on the basis of Plaintiff's disabilities that Plaintiff faced, but Defendant Producers failed to take adequate remedial measures in response to Plaintiff's complaints of disability discrimination.

524.    Upon information and belief, the Defendant Producers directly participated in conduct that created a hostile work environment for Plaintiff, significantly altered the terms and conditions of her employment, caused Plaintiff to suffer suicidal ideations, caused Plaintiff to become institutionalized in a psychiatric facility and has continued to cause ongoing mental pain and suffering.

525.    Upon information and belief, in addition, Plaintiff was humiliated and disturbed by the Defendant Producers' discriminatory acts, which were committed with reckless indifference.

526.    Upon information and belief, the Defendant Producers are liable to Plaintiff for aiding and abetting the Defendant Companies and Defendant Cohen's unlawful discrimination against Plaintiff on the basis of Plaintiff's disabilities is in violation of N.Y. Exec. Law § 296(6).

527.    Upon information and belief, as a direct and proximate result of the above, Plaintiff has suffered damages, and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation pursuant to N.Y. Exec. Law § 296(6).

## **THIRD CAUSE OF ACTION**
### **(DISCRIMINATION BASED ON DISABILITY pursuant to N.Y.C. Admin. Code §§ 8-107(1)(a), 8-502 – AGAINST DEFENDANT COMPANIES AND DEFENDANT COHEN)**

528.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

529.    Plaintiff was an employee of Defendants under New York City law.

530.    The Defendant Companies are "employer(s)" and "covered entit(ies)" under New York City law.

531.    Defendant Cohen was Plaintiff's supervisor and employer for the entirety of the time period that Plaintiff was employed as a cast member on RHONY seasons 12 and 13 and RHUGT season 3.

532.    Upon information and belief, at all relevant times herein, Defendant Cohen had both the ability and authority to decide whether to hire and fire Plaintiff, as well as all other cast members on *inter alia* the *Real Housewives* franchise.

533.    At all relevant times, Plaintiff resided in New York City, Plaintiff was employed in New York City, and Plaintiff's principal place of work was New York City.

534.    At all relevant times, Plaintiff was a member of a protected class as a person with disabilities under New York City law.

535.    At all relevant times, Plaintiff was disabled, had record of, and was regarded as having the following impairments: anxiety, depression, bipolar disorder, and alcohol use disorder.

536.    At all relevant times, Plaintiff was qualified and capable of performing all essential job duties with and/or without reasonable accommodations.

537.    Plaintiff was employed by the Defendant Companies and Defendant Cohen.  The Producer Defendants each supervised Ms. McSweeney's employment.  Each of the Defendants are causally linked through their own actions, conduct, and/or inactions or failures to act, and each of the Defendant Companies and Defendant Cohen created and/or maintained the discriminatory conduct alleged herein.

538.    The Defendant Companies and Defendant Cohen discriminated against Plaintiff on the basis of her disabilities by failing to engage in the interactive process, failing to provide

Plaintiff reasonable accommodations, such as allowing Plaintiff to attend AA meetings; tormenting Plaintiff on the basis of her disabilities, such as colluding with other cast members to taunt Plaintiff regarding her sobriety; failing to advance Plaintiff due to her mental health diagnoses and alcohol use disorder, and ultimately discharging Plaintiff due to her mental health diagnoses and alcohol use disorder.

539. Upon information and belief, the Defendant Companies and Defendant Cohen did not cast Plaintiff on RHONY Season 14 and/or RHONY Legacy due to Plaintiff's disabilities, and specifically, Plaintiff's failure to relapse into her alcohol use disorder.

540. Upon information and belief, the Defendant Companies and Defendant Cohen each, respectively, supported, encouraged, condoned, and approved the other Defendants' individual and collective acts of discriminatory conduct against Plaintiff on the basis of her disabilities.

541. Upon information and belief, the Defendant Companies and Defendant Cohen each, respectively, knew of the other Defendants' discrimination against Plaintiff on the basis of her disabilities and failed to take action against the other Defendants' discrimination against Plaintiff on the basis of her disabilities.

542. Upon information and belief, the Defendant Companies and Defendant Cohen each, respectively, knew of Plaintiff's complaints of discrimination on the basis of her disabilities but failed to investigate any of Plaintiff's complaints of discrimination on the basis of her disabilities.

543. Upon information and belief, as Plaintiff's employers, the Defendant Companies and Defendant Cohen failed to take adequate remedial measures in response to Plaintiff's complaints of disability discrimination.

544. Upon information and belief, the Defendant Companies' and Defendant Cohen's discrimination against Plaintiff on the basis of Plaintiff's disabilities was willful.

545. Upon information and belief, the willful nature of the Defendant Companies' and Defendant Cohen's discrimination against Plaintiff, on the basis of Plaintiff's disabilities, is further evidenced by the similar treatment of other disabled persons that the Defendant Companies and Defendant Cohen employ(ed).

546. Upon information and belief, the above conduct created a hostile work environment for Plaintiff, significantly altered the terms and conditions of her employment, caused Plaintiff to suffer suicidal ideations, caused Plaintiff to become institutionalized in a psychiatric facility and has continued to cause ongoing mental pain and suffering.

547. Upon information and belief, Defendant Companies and Defendant Cohen condoned and/or perpetuated the Defendant Producers discriminatory behavior.

548. Upon information and belief, the above conduct created a hostile work environment for Plaintiff and significantly altered the terms and conditions of her employment.

549. Upon information and belief, in addition, Plaintiff was humiliated and disturbed by Defendants' discriminatory acts, which were committed with reckless indifference.

550. Upon information and belief, the Defendant Companies and Defendant Cohen unlawfully discriminated against Plaintiff on the basis of Plaintiff's disabilities in violation of N.Y.C. Admin. Code § 8-107(1)(a).

551. Upon information and belief, as a direct and proximate result of the above, Plaintiff has suffered damages, and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation pursuant to N.Y.C. Admin. Code § 8-107(1)(a).

## FOURTH CAUSE OF ACTION
### (AIDING AND ABETTING DISCRIMINATION BASED ON DISABILITY pursuant to N.Y.C. Admin. Code §§ 8-107(6), 8-502 – AGAINST DEFENDANT PRODUCERS)

552.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

553.    At all relevant times, Plaintiff resided in New York City, Plaintiff was employed in New York City, and Plaintiff's principal place of work was New York City.

554.    Plaintiff was an employee of the Defendant Companies and Defendant Cohen under New York City law.

555.    The Defendant Companies are "employer(s)" and "covered entit(ies)" under New York City law.

556.    Upon information and belief, at all relevant times, the Defendant Producers were employed by one or more of the Defendant Companies.

557.    Upon information and belief, the Defendant Producers supervised and worked with Plaintiff for the entirety of the time period that Plaintiff was employed as a cast member on RHONY seasons 12 and 13 and RHUGT season 3.

558.    At all relevant times, Plaintiff was a member of a protected class as a person with disabilities under New York City law.

559.    At all relevant times, Plaintiff was disabled, had record of, and was regarded as having the following impairments: anxiety, depression, bipolar disorder, and alcohol use disorder.

560.    At all relevant times, Plaintiff was qualified and capable of performing all essential job duties with and/or without reasonable accommodations.

561.    Plaintiff was employed by the Defendant Companies and Defendant Cohen.  The Producer Defendants each supervised Ms. McSweeney's employment.  Each of the Defendants are causally linked through their own actions, conduct, and/or inactions or failures to act.

562.     Upon information and belief, the Defendant Producers are liable to Plaintiff for aiding and abetting the Defendant Companies' and Defendant Cohen's discrimination against Plaintiff on the basis of Plaintiff's disabilities because the Defendant Producers aided, abetted, incited, and compelled the Defendant Companies and Defendant Cohen's discrimination against Plaintiff on the basis of Plaintiff's disabilities.

563.     The Defendant Producers, as the employees of the Defendant Companies and as Ms. McSweeney's supervisors and/or coworkers, each participated in creating and/or maintaining the discriminatory conduct alleged herein.

564.     Upon information and belief, the Defendant Producers each supported, encouraged, condoned, and approved the other Defendants' individual and collective acts of discriminatory conduct against Plaintiff on the basis of her disabilities.

565.     The Defendant Producers, both individually and collectively, participated in the conduct giving rise to Plaintiff's claims of discrimination on the basis of Plaintiff's disabilities alleged herein by: failing to engage in the interactive process, failing to provide Plaintiff reasonable accommodations, such as allowing Plaintiff to attend AA meetings; tormenting Plaintiff on the basis of her disabilities, such as colluding with other cast members to taunt Plaintiff regarding her sobriety; failing to advance Plaintiff due to her mental health diagnoses and alcohol use disorder, and ultimately recommended that Defendant Cohen and the Defendant Companies discharge Plaintiff due to her mental health diagnoses and alcohol use disorder.

566.     Upon information and belief, the Defendant Producers' discrimination against Plaintiff on the basis of Plaintiff's disabilities caused or contributed to the Defendant Companies' and Defendant Cohen's decision not cast Plaintiff on RHONY Season 14 and/or RHONY Legacy.

567.    Upon information and belief, each of the Defendant Producers knew of the other Defendants' discrimination against Plaintiff on the basis of her disabilities and failed to take action against the other Defendants' discrimination against Plaintiff on the basis of her disabilities.

568.    Upon information and belief, Plaintiff directly complained to each of the Defendant Producers of the discrimination on the basis of Plaintiff's disabilities that Plaintiff faced, but Defendant Producers failed to investigate any of Plaintiff's complaints.

569.    Upon information and belief, Plaintiff directly complained to each of the Defendant Producers of the discrimination on the basis of Plaintiff's disabilities that Plaintiff faced, but Defendant Producers failed to take adequate remedial measures in response to Plaintiff's complaints of disability discrimination.

570.    Upon information and belief, the Defendant Producers directly participated in conduct that created a hostile work environment for Plaintiff, significantly altered the terms and conditions of her employment, caused Plaintiff to suffer suicidal ideations, caused Plaintiff to become institutionalized in a psychiatric facility and has continued to cause ongoing mental pain and suffering.

571.    Upon information and belief, in addition, Plaintiff was humiliated and disturbed by the Defendant Producers' discriminatory acts, which were committed with reckless indifference.

572.    Upon information and belief, the Defendant Producers are liable to Plaintiff for aiding and abetting the Defendant Companies and Defendant Cohen's unlawful discrimination against Plaintiff on the basis of Plaintiff's disabilities is in violation of N.Y.C. Admin. Code §§ 8-107(6).

573.    Upon information and belief, as a direct and proximate result of the above, Plaintiff has suffered damages, and is entitled to the recovery of damages, including punitive damages, as

well as reasonable attorneys' fees, costs, and other compensation pursuant to N.Y.C. Admin. Code §§ 8-107(6), 8-502.

## FIFTH CAUSE OF ACTION
### (HOSTILE WORK ENVIRONMENT HARASSMENT BASED ON DISABILITY, pursuant to 42 U.S.C. § 12112(a) – AGAINST THE DEFENDANT COMPANIES)

574.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

575.    Plaintiff exhausted all administrative remedies available to her and the EEOC issued Right to Sue letters, which allow her to pursue her claims against the Defendant Companies before this Court.

576.    The Defendant Companies are "employer(s)" and "covered entit(ies)" under federal and New York State law.

577.    Plaintiff was an employee of the Defendant Companies under federal law.

578.    At all relevant times, Plaintiff was disabled, had record of, and was regarded as having the following impairments: anxiety, depression, bipolar disorder, and alcohol use disorder.

579.    Throughout Plaintiff's employment on RHONY season 12, RHONY season 13, and RHUGT: Plaintiff was forced to work in a work environment wherein the Defendant Companies directed abuse against Plaintiff's mental health and addiction disabilities.

580.    The Defendant Companies intentionally exacerbated Plaintiff's mental health diagnoses by taunting Plaintiff, isolating Plaintiff, colluding with Plaintiff's cast members to humiliate Plaintiff regarding her mental health diagnoses, and providing Plaintiff with negative performance reviews on the basis of her alcohol use disorder and mental health disabilities.

581.    Defendant Producers and Defendant Cohen also created a hostile work environment on the basis of Plaintiff's addiction disability by forcing Plaintiff to work in environments where

all other cast members consumed alcohol, colluding with cast members to isolate Plaintiff due to Plaintiff's failure to consume alcohol, taunting Plaintiff into believing that all other cast members disliked Plaintiff because she refused to consume alcohol, and failing to reasonably accommodate Plaintiff.

582.    The Defendant Companies knew or should have known about the hostile work environment but failed to take any actions designed to stop it.

583.    Plaintiff was employed by the entity the Defendant Companies. The Defendant Companies, Defendant Producers, and Defendant Cohen are causally linked through their own actions, conduct, and/or inactions or failures to act, created and/or maintained the discriminatory conduct alleged herein.

584.    As a direct and proximate consequence of the Defendant Companies' unlawful and discriminatory employment policies and practices, Plaintiff has suffered loss of income, including but not limited to loss of past and future wages and health benefits, has incurred the costs of bringing this action, and has undergone severe emotional distress, mental anxiety, loss of enjoyment of life, loss of reputation and humiliation. Plaintiff will continue to suffer these irreparable injuries and monetary damages as a result of defendant's discriminatory practices unless and until this Court grants relief.

585.    Upon information and belief, as a direct and proximate result of the above, Plaintiff has suffered damages, and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation.

**SIXTH CAUSE OF ACTION**
**(HOSTILE WORK ENVIRONMENT HARASSMENT BASED ON DISABILITY,**
**pursuant to N.Y. Exec. Law § 296(1)(h) – AGAINST THE DEFENDANT COMPANIES**
**AND DEFENDANT COHEN)**

586.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

587.    Plaintiff was an employee of the Defendant Companies and Defendant Cohen under New York State law.

588.    The Defendant Companies are "employer(s)" and "covered entit(ies)" under New York State law.

589.    Defendant Cohen is an "employer" under New York State law.

590.    Defendant Cohen was Plaintiff's supervisor and employer for the entirety of the time period that Plaintiff was employed as a cast member on RHONY seasons 12 and 13 and RHUGT season 3.

591.    Upon information and belief, at all relevant times herein, Defendant Cohen had both the ability and authority to decide whether to hire and fire Plaintiff, as well as all other cast members on *inter alia* the *Real Housewives* franchise.

592.    At all relevant times, Plaintiff resided in New York State, Plaintiff was employed in New York State, and Plaintiff's principal place of work was New York State.

593.    At all relevant times, Plaintiff was a member of a protected class as a person with disabilities under New York State law.

594.    Plaintiff was employed by the Defendant Companies and Defendant Cohen.  The Producer Defendants each supervised Ms. McSweeney's employment.  Each of the Defendants are causally linked through their own actions, conduct, and/or inactions or failures to act, and each of

the Defendant Companies and Defendant Cohen created and/or maintained the discriminatory conduct alleged herein.

595.    Throughout Plaintiff's employment on RHONY season 12, RHONY season 13, and RHUGT: the Defendant Companies and Defendant Cohen forced Plaintiff to work in an environment wherein Defendants directed abuse against Plaintiff's mental health and alcohol use disorder disabilities.

596.    The Defendant Companies and Defendant Cohen intentionally exacerbated Plaintiff's mental health diagnoses by providing Plaintiff with negative performance reviews on the basis of her alcohol use disorder and mental health disabilities and by allowing their employees to taunt Plaintiff, isolate Plaintiff, collude with Plaintiff's cast members to humiliate Plaintiff regarding her mental health diagnoses and alcohol use disorder.

597.    Defendant Cohen intentionally exacerbated Plaintiff's mental health diagnoses by taunting Plaintiff, isolating Plaintiff, colluding with Plaintiff's cast members to humiliate Plaintiff regarding her mental health diagnoses, and providing Plaintiff with negative performance reviews on the basis of her alcohol use disorder and mental health disabilities.

598.    The Defendant Companies and Defendant Cohen also created a hostile work environment on the basis of Plaintiff's addiction disability by forcing Plaintiff to work in environments where all other cast members consumed alcohol and failing to reasonably accommodate Plaintiff, and by allowing their employees to collude with cast members to isolate Plaintiff due to Plaintiff's failure to consume alcohol, taunt Plaintiff into believing that all other cast members disliked Plaintiff because she refused to consume alcohol, and intentionally fail to reasonably accommodate Plaintiff.

599. Defendant Cohen also created a hostile work environment on the basis of Plaintiff's addiction disability by forcing Plaintiff to work in environments where all other cast members consumed alcohol, colluding with cast members to isolate Plaintiff due to Plaintiff's failure to consume alcohol, taunting Plaintiff into believing that all other cast members disliked Plaintiff because she refused to consume alcohol, and failing to reasonably accommodate Plaintiff.

600. Defendant Companies and Defendant Cohen knew or should have known about the hostile work environment, which their employees created on the basis of Plaintiff's disabilities, but failed to take any actions designed to stop it.

601. As a direct and proximate consequence of the Defendant Companies' and Defendant Cohen's unlawful and discriminatory employment policies and practices, Plaintiff has suffered loss of income, including but not limited to loss of past and future wages and health benefits, has incurred the costs of bringing this action, and has undergone severe emotional distress, mental anxiety, loss of enjoyment of life, loss of reputation and humiliation. Plaintiff will continue to suffer these irreparable injuries and monetary damages as a result of defendant's discriminatory practices unless and until this Court grants relief.

602. Upon information and belief, as a direct and proximate result of the above, Plaintiff has suffered damages, and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation pursuant to N.Y. Exec. Law § 296(1)(h).

**SEVENTH CAUSE OF ACTION**
**(AIDING AND ABETTING HOSTILE WORK ENVIRONMENT HARASSMENT BASED ON DISABILITY, pursuant to N.Y. Exec. Law § 296(6) – AGAINST DEFENDANT PRODUCERS)**

603. Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

604.    At all relevant times, Plaintiff resided in New York State, Plaintiff was employed in New York State, and Plaintiff's principal place of work was New York State.

605.    Plaintiff was an employee of the Defendant Companies and Defendant Cohen under New York State law.

606.    The Defendant Companies are "employer(s)" and "covered entit(ies)" under New York State law.

607.    Upon information and belief, at all relevant times, the Defendant Producers were employed by one or more of the Defendant Companies.

608.    Upon information and belief, the Defendant Producers supervised and worked with Plaintiff for the entirety of the time period that Plaintiff was employed as a cast member on RHONY seasons 12 and 13 and RHUGT season 3.

609.    At all relevant times, Plaintiff was a member of a protected class as a person with disabilities under New York State law.

610.    At all relevant times, Plaintiff was disabled, had record of, and was regarded as having the following impairments: anxiety, depression, bipolar disorder, and alcohol use disorder.

611.    Plaintiff was employed by the Defendant Companies and Defendant Cohen.  The Producer Defendants each supervised Ms. McSweeney's employment.  Each of the Defendants are causally linked through their own actions, conduct, and/or inactions or failures to act.

612.    Upon information and belief, the Defendant Producers are liable to Plaintiff for aiding and abetting the Defendant Companies' and Defendant Cohen's creation of a hostile work environment, against Plaintiff, on the basis of Plaintiff's disabilities, because the Defendant Producers aided, abetted, incited, and compelled the Defendant Companies and Defendant Cohen's discrimination against Plaintiff on the basis of Plaintiff's disabilities.

613.    Throughout Plaintiff's employment on RHONY season 12, RHONY season 13, and RHUGT: the Defendant Producers actively participated in the creation of a hostile work environment, against Plaintiff, on the basis of Plaintiff's disabilities, by causing Plaintiff to work in an environment wherein the Defendant Producers directed abuse against Plaintiff's mental health and alcohol use disorder disabilities.

614.    The Defendant Producers intentionally exacerbated Plaintiff's mental health diagnoses by providing Plaintiff with negative performance reviews on the basis of her alcohol use disorder and mental health disabilities, taunting Plaintiff, isolating Plaintiff, and colluding with Plaintiff's cast members to humiliate Plaintiff regarding her mental health diagnoses and alcohol use disorder.

615.    The Defendant Producers also created a hostile work environment on the basis of Plaintiff's alcohol use  disability by forcing Plaintiff to work in environments where all other cast members consumed alcohol, pressuring Plaintiff to consume alcohol, failing to reasonably accommodate Plaintiff, colluding with cast members to isolate Plaintiff due to Plaintiff's failure to consume alcohol, manipulating Plaintiff into believing that all other cast members disliked Plaintiff because she refused to consume alcohol, and intentionally depriving Plaintiff of adequate food and water.

616.    Plaintiff directly complained about the hostile work environment on the basis of her disabilities to each of the Defendant Producers, however, the Defendant Producers failed to take any actions designed to stop it.

617.    As a direct and proximate consequence of the Defendant Producers' participation in creating a hostile work environment on the basis of Plaintiff's disabilities, Plaintiff has suffered loss of income, including but not limited to loss of past and future wages and health benefits, has

incurred the costs of bringing this action, and has undergone severe emotional distress, mental anxiety, loss of enjoyment of life, loss of reputation and humiliation. Plaintiff will continue to suffer these irreparable injuries and monetary damages as a result of defendant's discriminatory practices unless and until this Court grants relief.

618.    Upon information and belief, as a direct and proximate result of the conduct alleged herein, the Defendant Producers are liable to Plaintiff for aiding and abetting a hostile work environment on the basis of Plaintiff's disabilities, in violation of N.Y. Exec. Law § 296(6).

619.    Upon information and belief, as a direct and proximate result of the above, Plaintiff has suffered damages, and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation pursuant to N.Y. Exec. Law § 296(1)(h).

## EIGHTH CAUSE OF ACTION
### (HOSTILE WORK ENVIRONMENT HARASSMENT BASED ON DISABILITY, pursuant to N.Y.C. Admin. Code § 8-107(1)(a) – AGAINST THE DEFENDANT COMPANIES AND DEFENDANT COHEN)

620.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

621.    Plaintiff was an employee of the Defendant Companies and Defendant Cohen under New York City law.

622.    The Defendant Companies are "employer(s)" and "covered entit(ies)" under New York City law.

623.    Defendant Cohen is an "employer" under New York City law.

624.    Defendant Cohen was Plaintiff's supervisor and employer for the entirety of the time period that Plaintiff was employed as a cast member on RHONY seasons 12 and 13 and RHUGT season 3.

625.     Upon information and belief, at all relevant times herein, Defendant Cohen had both the ability and authority to decide whether to hire and fire Plaintiff, as well as all other cast members on *inter alia* the *Real Housewives* franchise.

626.     At all relevant times, Plaintiff resided in New York City, Plaintiff was employed in New York City, and Plaintiff's principal place of work was New York City.

627.     At all relevant times, Plaintiff was a member of a protected class as a person with disabilities under New York City law.

628.     Plaintiff was employed by the Defendant Companies and Defendant Cohen. The Producer Defendants each supervised Ms. McSweeney's employment. Each of the Defendants are causally linked through their own actions, conduct, and/or inactions or failures to act, and each of the Defendant Companies and Defendant Cohen created and/or maintained the discriminatory conduct alleged herein.

629.     Throughout Plaintiff's employment on RHONY season 12, RHONY season 13, and RHUGT: the Defendant Companies and Defendant Cohen forced Plaintiff to work in an environment wherein Defendants directed abuse against Plaintiff's mental health and alcohol use disorder disabilities.

630.     The Defendant Companies and Defendant Cohen intentionally exacerbated Plaintiff's mental health diagnoses by providing Plaintiff with negative performance reviews on the basis of her alcohol use disorder and mental health disabilities and by allowing their employees to taunt Plaintiff, isolate Plaintiff, collude with Plaintiff's cast members to humiliate Plaintiff regarding her mental health diagnoses and alcohol use disorder.

631.     Defendant Cohen intentionally exacerbated Plaintiff's mental health diagnoses by taunting Plaintiff, isolating Plaintiff, colluding with Plaintiff's cast members to humiliate Plaintiff

regarding her mental health diagnoses, and providing Plaintiff with negative performance reviews on the basis of her alcohol use disorder and mental health disabilities.

632.    The Defendant Companies and Defendant Cohen also created a hostile work environment on the basis of Plaintiff's addiction disability by forcing Plaintiff to work in environments where all other cast members consumed alcohol and failing to reasonably accommodate Plaintiff, and by allowing their employees to collude with cast members to isolate Plaintiff due to Plaintiff's failure to consume alcohol, taunt Plaintiff into believing that all other cast members disliked Plaintiff because she refused to consume alcohol, and intentionally fail to reasonably accommodate Plaintiff.

633.    Defendant Cohen also created a hostile work environment on the basis of Plaintiff's addiction disability by forcing Plaintiff to work in environments where all other cast members consumed alcohol, colluding with cast members to isolate Plaintiff due to Plaintiff's failure to consume alcohol, taunting Plaintiff into believing that all other cast members disliked Plaintiff because she refused to consume alcohol, and failing to reasonably accommodate Plaintiff.

634.    Defendant Companies and Defendant Cohen knew or should have known about the hostile work environment, which their employees created on the basis of Plaintiff's disabilities, but failed to take any actions designed to stop it.

635.    As a direct and proximate consequence of the Defendant Companies' and Defendant Cohen's unlawful and discriminatory employment policies and practices, Plaintiff has suffered loss of income, including but not limited to loss of past and future wages and health benefits, has incurred the costs of bringing this action, and has undergone severe emotional distress, mental anxiety, loss of enjoyment of life, loss of reputation and humiliation. Plaintiff will

continue to suffer these irreparable injuries and monetary damages as a result of defendant's discriminatory practices unless and until this Court grants relief.

636.    Upon information and belief, as a direct and proximate result of the above, Plaintiff has suffered damages, and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation pursuant to N.Y.C. Admin. Code § 8-107(1)(a).

**<u>NINTH CAUSE OF ACTION</u>**
**(AIDING AND ABETTING HOSTILE WORK ENVIRONMENT HARASSMENT BASED ON DISABILITY, pursuant to N.Y.C. Admin. Code §§ 8-107(6), 8-502 – AGAINST DEFENDANT PRODUCERS)**

637.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

638.    At all relevant times, Plaintiff resided in New York City, Plaintiff was employed in New York City, and Plaintiff's principal place of work was New York City.

639.    Plaintiff was an employee of the Defendant Companies and Defendant Cohen under New York City law.

640.    The Defendant Companies are "employer(s)" and "covered entit(ies)" under New York City law.

641.    Upon information and belief, at all relevant times, the Defendant Producers were employed by one or more of the Defendant Companies.

642.    Upon information and belief, the Defendant Producers supervised and worked with Plaintiff for the entirety of the time period that Plaintiff was employed as a cast member on RHONY seasons 12 and 13 and RHUGT season 3.

643.    At all relevant times, Plaintiff was a member of a protected class as a person with disabilities under New York State law.

644.    At all relevant times, Plaintiff was disabled, had record of, and was regarded as having the following impairments: anxiety, depression, bipolar disorder, and alcohol use disorder.

645.    Plaintiff was employed by the Defendant Companies and Defendant Cohen.  The Producer Defendants each supervised Ms. McSweeney's employment.  Each of the Defendants are causally linked through their own actions, conduct, and/or inactions or failures to act.

646.    Upon information and belief, the Defendant Producers are liable to Plaintiff for aiding and abetting the Defendant Companies' and Defendant Cohen's creation of a hostile work environment, against Plaintiff, on the basis of Plaintiff's disabilities, because the Defendant Producers aided, abetted, incited, and compelled the Defendant Companies and Defendant Cohen's discrimination against Plaintiff on the basis of Plaintiff's disabilities.

647.    Throughout Plaintiff's employment on RHONY season 12, RHONY season 13, and RHUGT: the Defendant Producers actively participated in the creation of a hostile work environment, against Plaintiff, on the basis of Plaintiff's disabilities, by causing Plaintiff to work in an environment wherein the Defendant Producers directed abuse against Plaintiff's mental health and alcohol use disorder disabilities.

648.    The Defendant Producers intentionally exacerbated Plaintiff's mental health diagnoses by providing Plaintiff with negative performance reviews on the basis of her alcohol use disorder and mental health disabilities, taunting Plaintiff, isolating Plaintiff, and colluding with Plaintiff's cast members to humiliate Plaintiff regarding her mental health diagnoses and alcohol use disorder.

649.    The Defendant Producers also created a hostile work environment on the basis of Plaintiff's alcohol use  disability by forcing Plaintiff to work in environments where all other cast members consumed alcohol, pressuring Plaintiff to consume alcohol, failing to reasonably

accommodate Plaintiff, colluding with cast members to isolate Plaintiff due to Plaintiff's failure to consume alcohol, manipulating Plaintiff into believing that all other cast members disliked Plaintiff because she refused to consume alcohol, and intentionally depriving Plaintiff of adequate food and water.

650.    Plaintiff directly complained about the hostile work environment on the basis of her disabilities to each of the Defendant Producers, however, the Defendant Producers failed to take any actions designed to stop it.

651.    As a direct and proximate consequence of the Defendant Producers' participation in creating a hostile work environment on the basis of Plaintiff's disabilities, Plaintiff has suffered loss of income, including but not limited to loss of past and future wages and health benefits, has incurred the costs of bringing this action, and has undergone severe emotional distress, mental anxiety, loss of enjoyment of life, loss of reputation and humiliation.  Plaintiff will continue to suffer these irreparable injuries and monetary damages as a result of defendant's discriminatory practices unless and until this Court grants relief.

652.    Upon information and belief, as a direct and proximate result of the conduct alleged herein, the Defendant Producers are liable to Plaintiff for aiding and abetting a hostile work environment on the basis of Plaintiff's disabilities, in violation of N.Y.C. Admin. Code §§ 8-107(6), 8-502.

653.    Upon information and belief, as a direct and proximate result of the above, Plaintiff has suffered damages, and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation pursuant to N.Y.C. Admin. Code § 8-107(1)(a).

**TENTH CAUSE OF ACTION**
**(RETALIATION FOR OPPOSING UNLAWFUL EMPLOYMENT PRACTICES,**
**pursuant to 42 U.S.C. § 12203(a) – AGAINST THE DEFENDANT COMPANIES)**

654.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

655.    Plaintiff exhausted all administrative remedies available to her and the EEOC issued Right to Sue letters, which allow her to pursue her claims against the Defendant Companies before this Court.

656.    At all relevant times, Plaintiff was a member of a protected class on the basis of a person with a disability under federal law.

657.    The Defendant Companies are "employer(s)" and "covered entit(ies)" under federal law.

658.    Plaintiff was an employee of the Defendant Companies under federal law.

659.    Plaintiff complained to human resources, senior employees at the Defendant Companies, to Defendant Cohen, and to Defendant Producers regarding, *inter alia*, Defendants' discrimination against Plaintiff on the basis of Plaintiff's disabilities and Defendants' creation of a hostile work environment on the basis of Plaintiff's disabilities.

660.    In response, Defendants threatened Ms. McSweeney's continued employment, threatened Plaintiff that her complaints would result in termination, conspired with Plaintiff's RHONY and RHUGT cast members to torment Plaintiff regarding her disabilities, and eventually terminated Plaintiff's employment and denied Plaintiff future employment on RHONY Legacy and/or RHONY season 14.

661.    All the various actions taken by Defendants against Plaintiff subsequent to her complaints of discrimination constitute unlawful retaliation.

662.    As a direct and proximate consequence of the Defendant Companies' unlawful and discriminatory employment policies and practices, Plaintiff has suffered loss of income, including but not limited to loss of past and future wages and health benefits, has incurred the costs of bringing this action, and has undergone severe emotional distress, mental anxiety, loss of enjoyment of life, loss of reputation and humiliation. Plaintiff will continue to suffer these irreparable injuries and monetary damages as a result of defendant's discriminatory practices unless and until this Court grants relief.

### ELEVENTH CAUSE OF ACTION
### (RETALIATION FOR OPPOSING UNLAWFUL EMPLOYMENT PRACTICES, pursuant to N.Y. Exec. Law § 296(7) – AGAINST DEFENDANT COMPANIES AND DEFENDANT COHEN)

663.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

664.    Plaintiff was an employee of the Defendant Companies and Defendant Cohen under New York State law.

665.    The Defendant Companies are "employer(s)" and "covered entit(ies)" under New York State law.

666.    Defendant Cohen is an "employer" under New York State law.

667.    Defendant Cohen was Plaintiff's supervisor and employer for the entirety of the time period that Plaintiff was employed as a cast member on RHONY seasons 12 and 13 and RHUGT season 3.

668.    Upon information and belief, at all relevant times herein, Defendant Cohen had both the ability and authority to decide whether to hire and fire Plaintiff, as well as all other cast members on *inter alia* the *Real Housewives* franchise.

669. At all relevant times, Plaintiff resided in New York State, Plaintiff was employed in New York State, and Plaintiff's principal place of work was New York State.

670. At all relevant times, Plaintiff was a member of a protected class as a person with disabilities under New York State law.

671. Plaintiff was employed by the Defendant Companies and Defendant Cohen. The Producer Defendants each supervised Ms. McSweeney's employment. Each of the Defendants are causally linked through their own actions, conduct, and/or inactions or failures to act, and each of the Defendant Companies and Defendant Cohen created and/or maintained the retaliatory conduct alleged herein.

672. Upon information and belief, after Plaintiff complained about discrimination on numerous occasions, the Defendant Companies and Defendant Cohen subjected Plaintiff to unfair and unwarranted treatment.

673. Upon information and belief, the unfair and unwanted treatment was in retaliation for Plaintiff's complaint.

674. Upon information and belief, after Plaintiff complained about discrimination, Plaintiff was terminated and not cast on RHONY Season 14 and/or RHONY Legacy.

675. Upon information and belief, the Defendant Companies' and Defendant Cohen's choice to terminate Plaintiff, specifically the Defendant Companies' and Defendant Cohen's choice not to cast Plaintiff on RHONY Season 14 and/or RHONY Legacy, was in retaliation for her complaints concerning her treatment.

676. Upon information and belief, Plaintiff's complaints are protected activities under New York State Human Rights Law.

677.    Upon information and belief, the retaliatory conduct and termination of Plaintiff by Defendants as a result of Plaintiff's engagement in protected activities is in violation of N.Y. Exec. Law §§ 296(7).

678.    Upon information and belief, as a direct and proximate result of the above, Plaintiff has suffered damages, and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation pursuant N.Y. Exec. Law §§ 296(7).

### TWELFTH CAUSE OF ACTION
**(AIDING AND ABETTING RETALIATION FOR OPPOSING UNLAWFUL EMPLOYMENT PRACTICES, pursuant to N.Y. Exec. Law § 296(6) – AGAINST DEFENDANT PRODUCERS)**

679.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

680.    At all relevant times, Plaintiff resided in New York State, Plaintiff was employed in New York State, and Plaintiff's principal place of work was New York State.

681.    Plaintiff was an employee of the Defendant Companies and Defendant Cohen under New York State law.

682.    The Defendant Companies are "employer(s)" and "covered entit(ies)" under New York State law.

683.    Upon information and belief, at all relevant times, the Defendant Producers were employed by one or more of the Defendant Companies.

684.    Upon information and belief, the Defendant Producers supervised and worked with Plaintiff for the entirety of the time period that Plaintiff was employed as a cast member on RHONY seasons 12 and 13 and RHUGT season 3.

685.    At all relevant times, Plaintiff was a member of a protected class as a person with disabilities under New York State law.

686.    At all relevant times, Plaintiff was disabled, had record of, and was regarded as having the following impairments: anxiety, depression, bipolar disorder, and alcohol use disorder.

687.    Upon information and belief, the Defendant Producers are liable to Plaintiff for aiding and abetting the Defendant Companies' and Defendant Cohen's retaliation against Plaintiff's engagement in protected activities the Defendant Producers aided, abetted, incited, and compelled the Defendant Companies and Defendant Cohen's retaliation against Plaintiff's engagement in protected activities.

688.    Plaintiff was employed by the Defendant Companies and Defendant Cohen.  The Producer Defendants each supervised Ms. McSweeney's employment.  Each of the Defendants are causally linked through their own actions, conduct, and/or inactions or failures to act, and each of the Defendant Companies and Defendant Cohen created and/or maintained the retaliatory conduct alleged herein.

689.    Upon information and belief, after Plaintiff complained about discrimination and requested accommodations for Plaintiff's disabilities on numerous occasions, the Defendant Producers subjected Plaintiff to unfair and unwarranted treatment.

690.    Upon information and belief, the unfair and unwanted treatment was in retaliation for Plaintiff's complaints and/or requests for accommodations.

691.    Upon information and belief, after Plaintiff complained about discrimination, Defendant Producers retaliated against Plaintiff by denying her requests for accommodations without engagement in the interactive process, colluded with cast members to taunt and/or mock Plaintiff's disabilities, deprived Plaintiff of adequate food and water, intentionally exacerbated

Plaintiff's mental health disorders, provided Plaintiff negative performance reviews, and recommended that the Defendant Companies and Defendant Cohen terminate Plaintiff and not recast on RHONY Season 14 and/or RHONY Legacy.

692.    Upon information and belief, Defendant Producers engaged in the retaliatory conduct alleged herein in direct retaliation for Plaintiff's complaints of disability discrimination and requests for accommodations.

693.    Upon information and belief, based upon the aforementioned conduct, Defendant Producers actively participated in retaliating against Plaintiff because Plaintiff engaged in protected activities, i.e. complaining of disability discrimination and requesting accommodations for her disabilities.

694.    Upon information and belief, Plaintiff's complaints and requests for accommodations are protected activities under New York State Human Rights Law.

695.    Upon information and belief, the Defendant Producers are liable to Plaintiff for aiding and abetting the Defendant Companies' and Defendant Cohen's unlawful retaliation against Plaintiff's engagement in protected activities in violation of N.Y. Exec. Law § 296(6).

696.    Upon information and belief, as a direct and proximate result of the above, Plaintiff has suffered damages, and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation pursuant N.Y. Exec. Law §§ 296(6)-(7).

## THIRTEENTH CAUSE OF ACTION
### (RETALIATION FOR OPPOSING UNLAWFUL EMPLOYMENT PRACTICES, pursuant to N.Y. Admin. Code §§ 8–107(7) – AGAINST THE DEFENDANT COMPANIES AND DEFENDANT COHEN)

697.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

698.    Plaintiff was an employee of the Defendant Companies and Defendant Cohen under New York City law.

699.    The Defendant Companies are "employer(s)" and "covered entit(ies)" under New York City law.

700.    Defendant Cohen is an "employer" under New York City law.

701.    Defendant Cohen was Plaintiff's supervisor and employer for the entirety of the time period that Plaintiff was employed as a cast member on RHONY seasons 12 and 13 and RHUGT season 3.

702.    Upon information and belief, at all relevant times herein, Defendant Cohen had both the ability and authority to decide whether to hire and fire Plaintiff, as well as all other cast members on *inter alia* the *Real Housewives* franchise.

703.    At all relevant times, Plaintiff resided in New York State, Plaintiff was employed in New York State, and Plaintiff's principal place of work was New York City.

704.    At all relevant times, Plaintiff was a member of a protected class as a person with disabilities under New York City law.

705.    Plaintiff was employed by the Defendant Companies and Defendant Cohen.  The Producer Defendants each supervised Ms. McSweeney's employment.  Each of the Defendants are causally linked through their own actions, conduct, and/or inactions or failures to act, and each of the Defendant Companies and Defendant Cohen created and/or maintained the retaliatory conduct alleged herein.

706.    Upon information and belief, after Plaintiff complained about discrimination on numerous occasions, the Defendant Companies and Defendant Cohen subjected Plaintiff to unfair and unwarranted treatment.

707.    Upon information and belief, the unfair and unwanted treatment was in retaliation for Plaintiff's complaint.

708.    Upon information and belief, after Plaintiff complained about discrimination, Plaintiff was terminated and not cast on RHONY Season 14 and/or RHONY Legacy.

709.    Upon information and belief, the Defendant Companies' and Defendant Cohen's choice to terminate Plaintiff, specifically the Defendant Companies' and Defendant Cohen's choice not to cast Plaintiff on RHONY Season 14 and/or RHONY Legacy, was in retaliation for her complaints concerning her treatment.

710.    Upon information and belief, Plaintiff's complaints are protected activities under New York City Human Rights Law.

711.    Upon information and belief, the retaliatory conduct and termination of Plaintiff by Defendants as a result of Plaintiff's engagement in protected activities is in violation of New York City Human Rights Law§ 8-107(7).

712.    Upon information and belief, as a direct and proximate result of the above, Plaintiff has suffered damages, and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation pursuant to New York City Human Rights Law § 8-502.

## FOURTEENTH CAUSE OF ACTION
### (AIDING AND ABETTING RETALIATION FOR OPPOSING UNLAWFUL EMPLOYMENT PRACTICES, pursuant to §§ 8-107(6), 8-502 – AGAINST DEFENDANT PRODUCERS)

713.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

714.    At all relevant times, Plaintiff resided in New York City, Plaintiff was employed in New York City, and Plaintiff's principal place of work was New York City.

715.    Plaintiff was an employee of the Defendant Companies and Defendant Cohen under New City State law.

716.    The Defendant Companies are "employer(s)" and "covered entit(ies)" under New York City law.

717.    Upon information and belief, at all relevant times, the Defendant Producers were employed by one or more of the Defendant Companies.

718.    Upon information and belief, the Defendant Producers supervised and worked with Plaintiff for the entirety of the time period that Plaintiff was employed as a cast member on RHONY seasons 12 and 13 and RHUGT season 3.

719.    At all relevant times, Plaintiff was a member of a protected class as a person with disabilities under New York City law.

720.    At all relevant times, Plaintiff was disabled, had record of, and was regarded as having the following impairments: anxiety, depression, bipolar disorder, and alcohol use disorder.

721.    Upon information and belief, the Defendant Producers are liable to Plaintiff for aiding and abetting the Defendant Companies' and Defendant Cohen's retaliation against Plaintiff's engagement in protected activities the Defendant Producers aided, abetted, incited, and compelled the Defendant Companies and Defendant Cohen's retaliation against Plaintiff's engagement in protected activities.

722.    Plaintiff was employed by the Defendant Companies and Defendant Cohen.  The Producer Defendants each supervised Ms. McSweeney's employment.  Each of the Defendants are causally linked through their own actions, conduct, and/or inactions or failures to act, and each of the Defendant Companies and Defendant Cohen created and/or maintained the retaliatory conduct alleged herein.

723.    Upon information and belief, after Plaintiff complained about discrimination and requested accommodations for Plaintiff's disabilities on numerous occasions, the Defendant Producers subjected Plaintiff to unfair and unwarranted treatment.

724.    Upon information and belief, the unfair and unwanted treatment was in retaliation for Plaintiff's complaints and/or requests for accommodations.

725.    Upon information and belief, after Plaintiff complained about discrimination, Defendant Producers retaliated against Plaintiff by denying her requests for accommodations without engagement in the interactive process, colluded with cast members to taunt and/or mock Plaintiff's disabilities, deprived Plaintiff of adequate food and water, intentionally exacerbated Plaintiff's mental health disorders, provided Plaintiff negative performance reviews, and recommended that the Defendant Companies and Defendant Cohen terminate Plaintiff and not recast on RHONY Season 14 and/or RHONY Legacy.

726.    Upon information and belief, Defendant Producers engaged in the retaliatory conduct alleged herein in direct retaliation for Plaintiff's complaints of disability discrimination and requests for accommodations.

727.    Upon information and belief, based upon the aforementioned conduct, Defendant Producers actively participated in retaliating against Plaintiff because Plaintiff engaged in protected activities, i.e. complaining of disability discrimination and requesting accommodations for her disabilities.

728.    Upon information and belief, Plaintiff's complaints and requests for accommodations are protected activities under New York State Human Rights Law.

729.    Upon information and belief, the Defendant Producers are liable to Plaintiff for aiding and abetting the Defendant Companies' and Defendant Cohen's unlawful retaliation against

Plaintiff's engagement in protected activities in violation of N.Y.C. Admin Code § 8-107(6), 8-502.

730.    Upon information and belief, as a direct and proximate result of the above, Plaintiff has suffered damages, and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation pursuant N.Y.C. Admin Code § 8-502.

## FIFTEENTH  CAUSE OF ACTION
### (WHISTLEBLOWER RETALIATION, pursuant to Labor Law §740 - AGAINST THE DEFENDANT COMPANIES AND DEFENDANT COHEN)

731.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

732.    At all relevant times, Plaintiff was a member of a protected class on the basis of religious belief, sex and gender, and a person with  disabilities under New York State law.

733.    Defendant Companies are "employer(s)" and "covered entit(ies)" under New York State law.

734.    Defendant Cohen is an "employer" under New York State law.

735.    Defendant Cohen was Plaintiff's supervisor and employer for the entirety of the time period that Plaintiff was employed as a cast member on RHONY seasons 12 and 13 and RHUGT season 3.

736.    Upon information and belief, at all relevant times herein, Defendant Cohen had both the ability and authority to decide whether to hire and fire Plaintiff, as well as all other cast members on *inter alia* the *Real Housewives* franchise.

737.    Plaintiff was an employee of the Defendant Companies and Defendant Cohen under New York State law.

738.    At all relevant times, Plaintiff resided in New York State, Plaintiff was employed in New York State, and Plaintiff's principal place of work was New York State.

739.    Plaintiff was employed by the Defendant Companies and Defendant Cohen.  The Producer Defendants each supervised Ms. McSweeney's employment.  Each of the Defendants are causally linked through their own actions, conduct, and/or inactions or failures to act, and each of the Defendant Companies and Defendant Cohen created and/or maintained the retaliatory conduct alleged herein.

740.    Plaintiff complained to human resources, senior employees at the Defendant Companies, Defendant Producers, and Defendant Cohen regarding, *inter alia*, Defendants' creation of unsafe working conditions by exacerbating Plaintiff's mental illnesses and addiction, which resulted in Plaintiff's hospitalization.

741.    In response, the Defendant Companies and Defendant Cohen took retaliatory personnel action against Plaintiff by threatening Plaintiff's continued employment, threatening Plaintiff that her complaints would result in termination, conspiring with Plaintiff's RHONY and RHUGT cast members to torment Plaintiff regarding her disabilities, and eventually terminating Plaintiff's employment.

742.    All the various actions taken by the Defendant Companies and Defendant Cohen against Plaintiff were subsequent to her complaints of discrimination constitute unlawful retaliation.

743.    As a direct and proximate consequence of the Defendant Companies' and Defendant Cohen's unlawful and discriminatory employment policies and practices, Plaintiff has suffered loss of income, including but not limited to loss of past and future wages and health benefits, has incurred the costs of bringing this action, and has undergone severe emotional

distress, mental anxiety, loss of enjoyment of life, loss of reputation and humiliation. Plaintiff will continue to suffer these irreparable injuries and monetary damages as a result of defendant's discriminatory practices unless and until this Court grants relief.

## SIXTEENTH CAUSE OF ACTION
### (FAILURE TO PROVIDE REASONABLE ACCOMMODATIONS, pursuant to 42 U.S.C. § 12112- AGAINST THE DEFENDANT COMPANIES)

744.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

745.    Plaintiff exhausted all administrative remedies available to her and the EEOC issued Right to Sue letters, which allow her to pursue her claims against Defendants before this Court.

746.    The Defendant Companies are "employer(s)" and "covered entit(ies)" under federal law.

747.    Plaintiff was an employee of the Defendant Companies under federal law.

748.    At all relevant times, Plaintiff was a member of a protected class as a person with disabilities under federal law.

749.    At all relevant times, Plaintiff was qualified and capable of performing all essential job duties with and/or without reasonable accommodations.

750.    The Defendant Companies failed to reasonably accommodate Plaintiff's disabilities by, *inter alia*, allowing accommodations for Plaintiff and other cast members to participate in cast events without alcohol consumption, disallowing Plaintiff from attending AA meetings, and failing to reprimand and/or otherwise stop the Defendant Companies' employees from demeaning, taunting, and exacerbating Plaintiff's disabilities.

751.    To the contrary of their obligations, the Defendant Companies intentionally exacerbated Plaintiff's disabilities.

752.    All above accommodations would have been reasonable and would not have caused Defendants to suffer undue hardship.

753.    The Defendant Companies, by their actions, willfully, intentionally, and with reckless indifference, discriminated against Plaintiff in violation of federal law by refusing to provide reasonable accommodations.

754.    As a direct and proximate consequence of the Defendant Companies' unlawful and discriminatory employment policies and practices, Plaintiff has suffered loss of income, including but not limited to loss of past and future wages and health benefits, has incurred the costs of bringing this action, and has undergone severe emotional distress, mental anxiety, loss of enjoyment of life, loss of reputation and humiliation. Plaintiff will continue to suffer these irreparable injuries and monetary damages as a result of defendant's discriminatory practices unless and until this Court grants relief.

## SEVENTEENTH CAUSE OF ACTION
**(FAILURE TO PROVIDE REASONABLE ACCOMMODATIONS, pursuant to N.Y. Exec. Law § 296(3) – AGAINST THE DEFENDANT COMPANIES AND DEFENDANT COHEN)**

755.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

756.    Plaintiff was an employee of the Defendant Companies and Defendant Cohen under New York State law.

757.    The Defendant Companies are "employer(s)" and "covered entit(ies)" under New York State law.

758.    Defendant Cohen is an "employer" under New York State law.

121

759.    Defendant Cohen was Plaintiff's supervisor and employer for the entirety of the time period that Plaintiff was employed as a cast member on RHONY seasons 12 and 13 and RHUGT season 3.

760.    Upon information and belief, at all relevant times herein, Defendant Cohen had both the ability and authority to decide whether to hire and fire Plaintiff, as well as all other cast members on *inter alia* the *Real Housewives* franchise.

761.    At all relevant times, Plaintiff resided in New York State, Plaintiff was employed in New York State, and Plaintiff's principal place of work was New York State.

762.    At all relevant times, Plaintiff was a member of a protected class as a person with disabilities under New York State law.

763.    Plaintiff was employed by the Defendant Companies and Defendant Cohen.  The Producer Defendants each supervised Ms. McSweeney's employment.  Each of the Defendants are causally linked through their own actions, conduct, and/or inactions or failures to act, and each of the Defendant Companies and Defendant Cohen created and/or maintained the discriminatory conduct alleged herein.

764.    At all relevant times, Plaintiff was qualified and capable of performing all essential job duties with and/or without reasonable accommodations.

765.    Upon information and belief, as Plaintiff's employers, and because the Defendant Companies and Defendant Cohen knew of Plaintiff's disabilities and regarded Plaintiff as having disabilities, the Defendant Companies and Defendant Cohen had an obligation to provide reasonable accommodations to Plaintiff that would not cause the Defendant Companies and/or Defendant Cohen undue hardship.

766.    The Defendant Companies and Defendant Cohen failed to reasonably accommodate Plaintiff's disabilities by, *inter alia*, disallowing Plaintiff and other cast members to participate in cast events without alcohol consumption, disallowing Plaintiff from attending AA meetings, and failing to reprimand and/or otherwise stop the Defendant Companies' and Defendant Cohen's employees from demeaning, taunting, and exacerbating Plaintiff's disabilities.

767.    To the contrary of their obligations, the Defendant Companies and Defendant Cohen intentionally exacerbated Plaintiff's disabilities.

768.    All above accommodations would have been reasonable and would not have caused the Defendant Companies or Defendant Cohen to suffer undue hardship.

769.    The Defendant Companies and Defendant Cohen, by their actions, willfully, intentionally, and with reckless indifference, discriminated against Plaintiff in violation of New York State law by refusing to provide reasonable accommodations.

770.    As a direct and proximate consequence of the Defendant Companies' and Defendant Cohen's unlawful and discriminatory employment policies and practices, Plaintiff has suffered loss of income, including but not limited to loss of past and future wages and health benefits, has incurred the costs of bringing this action, and has undergone severe emotional distress, mental anxiety, loss of enjoyment of life, loss of reputation and humiliation. Plaintiff will continue to suffer these irreparable injuries and monetary damages as a result of defendant's discriminatory practices unless and until this Court grants relief.

### EIGHTEENTH CAUSE OF ACTION
### (AIDING AND ABETTING FAILURE TO PROVIDE REASONABLE ACCOMMODATIONS, pursuant to N.Y. Exec. Law § 296(6) – AGAINST THE DEFENDANT PRODUCERS)

771.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

772. At all relevant times, Plaintiff resided in New York State, Plaintiff was employed in New York State, and Plaintiff's principal place of work was New York State.

773. Plaintiff was an employee of the Defendant Companies and Defendant Cohen under New York State law.

774. The Defendant Companies are "employer(s)" and "covered entit(ies)" under New York State law.

775. Upon information and belief, at all relevant times, the Defendant Producers were employed by one or more of the Defendant Companies.

776. Upon information and belief, the Defendant Producers supervised and worked with Plaintiff for the entirety of the time period that Plaintiff was employed as a cast member on RHONY seasons 12 and 13 and RHUGT season 3.

777. At all relevant times, Plaintiff was a member of a protected class as a person with disabilities under New York State law.

778. At all relevant times, Plaintiff was disabled, had record of, and was regarded as having the following impairments: anxiety, depression, bipolar disorder, and alcohol use disorder.

779. Plaintiff was employed by the Defendant Companies and Defendant Cohen. The Producer Defendants each supervised Ms. McSweeney's employment. Each of the Defendants are causally linked through their own actions, conduct, and/or inactions or failures to act.

780. Upon information and belief, the Defendant Producers are liable to Plaintiff for aiding and abetting the Defendant Companies' and Defendant Cohen's failure to provide reasonable accommodations to Plaintiff for Plaintiff's disabilities because the Defendant Producers aided, abetted, incited, and compelled the Defendant Companies and Defendant Cohen's failure to provide reasonable accommodations to Plaintiff for Plaintiff's disabilities.

781.    At all relevant times, Plaintiff was qualified and capable of performing all essential job duties with and/or without reasonable accommodations.

782.    Defendant Producers knew of Plaintiff's disabilities and regarded Plaintiff of having disabilities.

783.    Defendant Producers actively participated in failing to provide Plaintiff with accommodations because each time Plaintiff requested a reasonable accommodation for her disabilities, Defendant Producers ignored Plaintiff's requests, denied Plaintiff's requests without engagement in the interactive process, and/or retaliated against Plaintiff for requesting reasonable accommodations for her disabilities.

784.    The Defendant Producers actively participated in the Defendant Companies' and Defendant Cohen's failure to reasonably accommodate Plaintiff's disabilities by, *inter alia*, disallowing Plaintiff and other cast members to participate in cast events without alcohol consumption, disallowing Plaintiff from attending AA meetings, and failing to reprimand and/or otherwise stop the Defendant Companies' and Defendant Cohen's employees from demeaning, taunting, and exacerbating Plaintiff's disabilities.

785.    To the contrary of their obligations, the Defendant Producers intentionally exacerbated Plaintiff's disabilities and retaliated against Plaintiff for requesting accommodations.

786.    All above accommodations would have been reasonable and would not have caused any Defendant to suffer undue hardship.

787.    Upon information and belief, the Defendant Producers are liable to Plaintiff for aiding and abetting the Defendant Companies' and Defendant Cohen's failure to accommodate Plaintiff's disabilities in violation of N.Y. Exec. Law § 296(6).

788.    As a direct and proximate consequence of the Defendant Companies' and Defendant Cohen's unlawful and discriminatory employment policies and practices, Plaintiff has suffered loss of income, including but not limited to loss of past and future wages and health benefits, has incurred the costs of bringing this action, and has undergone severe emotional distress, mental anxiety, loss of enjoyment of life, loss of reputation and humiliation. Plaintiff will continue to suffer these irreparable injuries and monetary damages as a result of defendant's discriminatory practices unless and until this Court grants relief.

### NINETEENTH CAUSE OF ACTION
### (FAILURE TO PROVIDE REASONABLE ACCOMMODATIONS, pursuant to N.Y. Admin. Code §§ 8–107(28) – AGAINST THE DEFENDANT COMPANIES AND DEFENDANT COHEN)

789.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

790.    Plaintiff was an employee of the Defendant Companies and Defendant Cohen under New York City law.

791.    The Defendant Companies are "employer(s)" and "covered entit(ies)" under New York City law.

792.    Defendant Cohen is an "employer" under New York City law.

793.    Defendant Cohen was Plaintiff's supervisor and employer for the entirety of the time period that Plaintiff was employed as a cast member on RHONY seasons 12 and 13 and RHUGT season 3.

794.    Upon information and belief, at all relevant times herein, Defendant Cohen had both the ability and authority to decide whether to hire and fire Plaintiff, as well as all other cast members on *inter alia* the *Real Housewives* franchise.

795.    At all relevant times, Plaintiff resided in New York City, Plaintiff was employed in New York City, and Plaintiff's principal place of work was New York City.

796.    At all relevant times, Plaintiff was a member of a protected class as a person with disabilities under New York City law.

797.    Plaintiff was employed by the Defendant Companies and Defendant Cohen.  The Producer Defendants each supervised Ms. McSweeney's employment.  Each of the Defendants are causally linked through their own actions, conduct, and/or inactions or failures to act, and each of the Defendant Companies and Defendant Cohen created and/or maintained the discriminatory conduct alleged herein.

798.    At all relevant times, Plaintiff was qualified and capable of performing all essential job duties with and/or without reasonable accommodations.

799.    Upon information and belief, as Plaintiff's employers, and because the Defendant Companies and Defendant Cohen knew of Plaintiff's disabilities and regarded Plaintiff as having disabilities, the Defendant Companies and Defendant Cohen had an obligation to provide reasonable accommodations to Plaintiff that would not cause the Defendant Companies and/or Defendant Cohen undue hardship.

800.    The Defendant Companies and Defendant Cohen failed to reasonably accommodate Plaintiff's disabilities by, *inter alia*, disallowing Plaintiff and other cast members to participate in cast events without alcohol consumption, disallowing Plaintiff from attending AA meetings, and failing to reprimand and/or otherwise stop the Defendant Companies' and Defendant Cohen's employees from demeaning, taunting, and exacerbating Plaintiff's disabilities.

801.    To the contrary of their obligations, the Defendant Companies and Defendant Cohen intentionally exacerbated Plaintiff's disabilities.

127

802.     All above accommodations would have been reasonable and would not have caused the Defendant Companies or Defendant Cohen to suffer undue hardship.

803.     The Defendant Companies and Defendant Cohen, by their actions, willfully, intentionally, and with reckless indifference, discriminated against Plaintiff in violation of New York City law by refusing to provide reasonable accommodations.

804.     As a direct and proximate consequence of the Defendant Companies' and Defendant Cohen's unlawful and discriminatory employment policies and practices, Plaintiff has suffered loss of income, including but not limited to loss of past and future wages and health benefits, has incurred the costs of bringing this action, and has undergone severe emotional distress, mental anxiety, loss of enjoyment of life, loss of reputation and humiliation. Plaintiff will continue to suffer these irreparable injuries and monetary damages as a result of defendant's discriminatory practices unless and until this Court grants relief.

**TWENTIETH CAUSE OF ACTION**
**(AIDING AND ABETTING FAILURE TO PROVIDE REASONABLE**
**ACCOMMODATIONS, pursuant to N.Y. Admin. Code §§ 8–107(6) – AGAINST**
**DEFENDANT PRODUCERS)**

805.     Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

806.     At all relevant times, Plaintiff resided in New York City, Plaintiff was employed in New York City, and Plaintiff's principal place of work was New York City.

807.     Plaintiff was an employee of the Defendant Companies and Defendant Cohen under New York City law.

808.     The Defendant Companies are "employer(s)" and "covered entit(ies)" under New York State law.

809.    Upon information and belief, at all relevant times, the Defendant Producers were employed by one or more of the Defendant Companies.

810.    Upon information and belief, the Defendant Producers supervised and worked with Plaintiff for the entirety of the time period that Plaintiff was employed as a cast member on RHONY seasons 12 and 13 and RHUGT season 3.

811.    At all relevant times, Plaintiff was a member of a protected class as a person with disabilities under New York City law.

812.    At all relevant times, Plaintiff was disabled, had record of, and was regarded as having the following impairments: anxiety, depression, bipolar disorder, and alcohol use disorder.

813.    Plaintiff was employed by the Defendant Companies and Defendant Cohen.  The Producer Defendants each supervised Ms. McSweeney's employment.  Each of the Defendants are causally linked through their own actions, conduct, and/or inactions or failures to act.

814.    Upon information and belief, the Defendant Producers are liable to Plaintiff for aiding and abetting the Defendant Companies' and Defendant Cohen's failure to provide reasonable accommodations to Plaintiff for Plaintiff's disabilities because the Defendant Producers aided, abetted, incited, and compelled the Defendant Companies and Defendant Cohen's failure to provide reasonable accommodations to Plaintiff for Plaintiff's disabilities.

815.    At all relevant times, Plaintiff was qualified and capable of performing all essential job duties with and/or without reasonable accommodations.

816.    Defendant Producers knew of Plaintiff's disabilities and regarded Plaintiff of having disabilities.

817.    Defendant Producers actively participated in failing to provide Plaintiff with accommodations because each time Plaintiff requested a reasonable accommodation for her

disabilities, Defendant Producers ignored Plaintiff's requests, denied Plaintiff's requests without engagement in the interactive process, and/or retaliated against Plaintiff for requesting reasonable accommodations for her disabilities.

818.    The Defendant Producers actively participated in the Defendant Companies' and Defendant Cohen's failure to reasonably accommodate Plaintiff's disabilities by, *inter alia*, disallowing Plaintiff and other cast members to participate in cast events without alcohol consumption, disallowing Plaintiff from attending AA meetings, and failing to reprimand and/or otherwise stop the Defendant Companies' and Defendant Cohen's employees from demeaning, taunting, and exacerbating Plaintiff's disabilities.

819.    To the contrary of their obligations, the Defendant Producers intentionally exacerbated Plaintiff's disabilities and retaliated against Plaintiff for requesting accommodations.

820.    All above accommodations would have been reasonable and would not have caused any Defendant to suffer undue hardship.

821.    Upon information and belief, the Defendant Producers are liable to Plaintiff for aiding and abetting the Defendant Companies' and Defendant Cohen's failure to accommodate Plaintiff's disabilities in violation of New York City Human Rights laws.

822.    As a direct and proximate consequence of the Defendant Companies' and Defendant Cohen's unlawful and discriminatory employment policies and practices, Plaintiff has suffered loss of income, including but not limited to loss of past and future wages and health benefits, has incurred the costs of bringing this action, and has undergone severe emotional distress, mental anxiety, loss of enjoyment of life, loss of reputation and humiliation. Plaintiff will continue to suffer these irreparable injuries and monetary damages as a result of defendant's discriminatory practices unless and until this Court grants relief.

<u>TWENTY-FIRST CAUSE OF ACTION</u>
**(FAILURE TO ENGAGE IN AN INTERACTIVE PROCESS NECESSARY TO PROVIDE REASONABLE ACCOMMODATIONS, pursuant to N.Y. Admin. Code §§ 8–107(28) – AGAINST THE DEFENDANT COMPANIES AND DEFENDANT COHEN)**

823.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

824.    Plaintiff was an employee of the Defendant Companies and Defendant Cohen under New York City law.

825.    The Defendant Companies are "employer(s)" and "covered entit(ies)" under New York City law.

826.    Defendant Cohen is an "employer" under New York City law.

827.    Defendant Cohen was Plaintiff's supervisor and employer for the entirety of the time period that Plaintiff was employed as a cast member on RHONY seasons 12 and 13 and RHUGT season 3.

828.    Upon information and belief, at all relevant times herein, Defendant Cohen had both the ability and authority to decide whether to hire and fire Plaintiff, as well as all other cast members on *inter alia* the *Real Housewives* franchise.

829.    At all relevant times, Plaintiff resided in New York City, Plaintiff was employed in New York City, and Plaintiff's principal place of work was New York City.

830.    At all relevant times, Plaintiff was a member of a protected class as a person with disabilities under New York City law.

831.    Plaintiff was employed by the Defendant Companies and Defendant Cohen.  The Producer Defendants each supervised Ms. McSweeney's employment.  Each of the Defendants are causally linked through their own actions, conduct, and/or inactions or failures to act, and each of

the Defendant Companies and Defendant Cohen created and/or maintained the discriminatory conduct alleged herein.

832.    At all relevant times, Plaintiff was qualified and capable of performing all essential job duties with and/or without reasonable accommodations.

833.    Upon information and belief, as Plaintiff's employers, and because the Defendant Companies and Defendant Cohen knew of Plaintiff's disabilities and regarded Plaintiff as having disabilities, the Defendant Companies and Defendant Cohen had an obligation to engage in an interactive process with Plaintiff to develop mutually agreeable reasonable accommodations for Plaintiff's disabilities, which would not cause the Defendant Companies and/or Defendant Cohen undue hardship.

834.    The Defendant Companies and Defendant Cohen failed to engage in any interactive process necessary to reasonably accommodate Plaintiff's disabilities by, *inter alia*, disallowing Plaintiff to participate in cast events without alcohol consumption, disallowing Plaintiff from attending AA meetings, and causing, failing to reprimand, and/or otherwise stop the Defendant Companies' and Defendant Cohen's employees from demeaning, taunting, and exacerbating Plaintiff's disabilities.

835.    The Defendant Companies and Defendant Cohen entirely failed to discuss any possible accommodation with Plaintiff that would reasonably accommodate Plaintiff's disabilities and not cause the Defendant Companies and Defendant Cohen to suffer undue hardship.

836.    The Defendant Companies and Defendant Cohen, by their actions, willfully, intentionally, and with reckless indifference, discriminated against Plaintiff in violation of New York City Human Rights laws by refusing to engage in an interactive process necessary to reasonably accommodate Plaintiff's disabilities.

837.    To the contrary, the Defendant Companies and Defendant Cohen intentionally exacerbated Plaintiff's disabilities.

838.    As a direct and proximate consequence of the Defendant Companies' and Defendant Cohen's unlawful and discriminatory employment policies and practices, Plaintiff has suffered loss of income, including but not limited to loss of past and future wages and health benefits, has incurred the costs of bringing this action, and has undergone severe emotional distress, mental anxiety, loss of enjoyment of life, loss of reputation and humiliation.  Plaintiff will continue to suffer these irreparable injuries and monetary damages as a result of defendant's discriminatory practices unless and until this Court grants relief.

### TWENTY-SECOND CAUSE OF ACTION
### (AIDING AND ABETTING FAILURE TO ENGAGE IN AN INTERACTIVE PROCESS NECESSARY TO PROVIDE REASONABLE ACCOMMODATIONS, pursuant to N.Y. Admin. Code §§ 8–107(28) – AGAINST THE DEFENDANT PRODUCERS)

839.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

840.    At all relevant times, Plaintiff resided in New York City, Plaintiff was employed in New York City, and Plaintiff's principal place of work was New York City.

841.    Plaintiff was an employee of the Defendant Companies and Defendant Cohen under New York City law.

842.    The Defendant Companies are "employer(s)" and "covered entit(ies)" under New York City law.

843.    Upon information and belief, at all relevant times, the Defendant Producers were employed by one or more of the Defendant Companies.

844.    Upon information and belief, the Defendant Producers supervised and worked with Plaintiff for the entirety of the time period that Plaintiff was employed as a cast member on RHONY seasons 12 and 13 and RHUGT season 3.

845.    At all relevant times, Plaintiff was a member of a protected class as a person with disabilities under New York City law.

846.    At all relevant times, Plaintiff was disabled, had record of, and was regarded as having the following impairments: anxiety, depression, bipolar disorder, and alcohol use disorder.

847.    Plaintiff was employed by the Defendant Companies and Defendant Cohen.  The Producer Defendants each supervised Ms. McSweeney's employment.  Each of the Defendants are causally linked through their own actions, conduct, and/or inactions or failures to act.

848.    Upon information and belief, the Defendant Producers are liable to Plaintiff for aiding and abetting the Defendant Companies' and Defendant Cohen's failure to engage in the interactive process with Plaintiff to reasonably accommodate Plaintiff's disabilities because the Defendant Producers aided, abetted, incited, and compelled the Defendant Companies and Defendant Cohen's failure to engage in the interactive process with Plaintiff to reasonably accommodate Plaintiff's disabilities.

849.    The Defendant Producers, as the employees of the Defendant Companies and as Ms. McSweeney's supervisors and/or coworkers, each participated in failing to engage in the interactive process with Plaintiff to reasonably accommodate Plaintiff's disabilities.

850.    At all relevant times, Plaintiff was qualified and capable of performing all essential job duties with and/or without reasonable accommodations.

851.    At all relevant times, Defendant Producers knew of Plaintiff's disabilities and regarded Plaintiff as having disabilities.

852.    Defendant Producers actively participated in the Defendant Companies' and Defendant Cohen's failure to engage in the interactive process with Plaintiff because Defendant Producers never engaged in any interactive process with Plaintiff to reasonably accommodate Plaintiff's disabilities, notwithstanding Plaintiff's repeated requests for reasonable accommodations, and instead ignored Plaintiff's requests to reasonably accommodate her disabilities and/or retaliated against Plaintiff for the same.

853.    The Defendant Producers actively prevented, hindered, and/or obstructed the Defendant Companies and Defendant Cohen from engaging in any interactive process with Plaintiff to reasonably accommodate Plaintiff's disabilities by, instead, threatening Plaintiff with adverse employment actions if Plaintiff engaged in any interactive process with the Defendant Companies and/or Defendant Cohen.

854.    The Defendant Producers entirely failed to discuss any possible accommodation with Plaintiff that would reasonably accommodate Plaintiff's disabilities and not cause undue hardship.

855.    The Defendant Producers, by their actions, willfully, intentionally, and with reckless indifference, aided and abetted the Defendant Companies' and Defendant Cohen's discrimination against Plaintiff in violation of New York City Human Rights laws by refusing to engage in an interactive process necessary to reasonably accommodate Plaintiff's disabilities.

856.    To the contrary, the Defendant Producers intentionally exacerbated Plaintiff's disabilities.

857.    As a direct and proximate consequence of the Defendant Producers' aiding and abetting of the Defendant Companies' and Defendant Cohen's unlawful and discriminatory employment policies and practices, Plaintiff has suffered loss of income, including but not limited

to loss of past and future wages and health benefits, has incurred the costs of bringing this action, and has undergone severe emotional distress, mental anxiety, loss of enjoyment of life, loss of reputation and humiliation. Plaintiff will continue to suffer these irreparable injuries and monetary damages as a result of defendant's discriminatory practices unless and until this Court grants relief.

## TWENTY-THIRD CAUSE OF ACTION
### (RETALIATION, pursuant to N.Y. Exec. Law §§ 296(7) – AGAINST DEFENDANT COHEN)

858.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

859.    At all relevant times, Defendant Cohen is or was Plaintiff's "employer" under New York State law.

860.    At all relevant times, Plaintiff is or was Defendant Cohen's employee under New York State law.

861.    At all relevant times, Plaintiff resided in New York State, Plaintiff was employed in New York State, and Plaintiff's principal place of work was New York State.

862.    At all relevant times, Plaintiff was a member of at least one protected class under New York State law.

863.    On or around February 27, 2024, Ms. McSweeney filed her Complaint, against, *inter alia*, Defendant Cohen, and alleged, *inter alia*, sex/gender discrimination, disability discrimination, religious discrimination, hostile work environment, and retaliation claims in violation of Title VII, New York State, and New York City laws.

864.    Upon information and belief, Plaintiff's act of filing the Complaint in this action is protected activity under the New York State Human Rights Law, as it contains specific facts

regarding Defendants' violations of New York employment laws and the adverse employment actions that she suffered as a result.

865.    Defendant Cohen was aware that Plaintiff filed the Complaint against *inter alia* Defendant Cohen because Defendant Cohen referenced and cited the Complaint in the March Letter.

866.    Upon information and belief, after Plaintiff filed the Complaint, Defendant Cohen subjected Plaintiff to unfair and unwarranted treatment.

867.    Upon information and belief, in direct retaliation against Plaintiff's act of filing the Complaint, Defendant Cohen directed or induced current and former Bravo cast members to publicly support Cohen, and publicly claim that the allegations in the Complaint are not true, with the intent to tarnish Plaintiff's public and professional reputation by falsely creating the impression that Plaintiff is a liar.

868.    Moreover, upon information and belief, Defendant Cohen's coordinated, retaliatory, public attack on Plaintiff's propensity for truthfulness was intended to blacklist Plaintiff from any employment opportunity within the entertainment industry.

869.    As a direct result of Defendant Cohen's coordinated, retaliatory, public attack on Plaintiff's propensity for truthfulness, Plaintiff reasonably feared that pursuing her causes of action against *inter alia* Defendant Cohen would irreparably harm her ability to ever again gain employment in the entertainment industry, and further, Plaintiff reasonably feared that Defendant Cohen had blacklisted her from employment in the entertainment industry.

870.    Upon information and belief, after witnessing Defendant Cohen mobilize his immense power within the entertainment industry to systemically destroy Plaintiff's personal and professional reputation, and to blacklist Plaintiff from obtaining future employment within the

entertainment industry, a reasonable employee would be dissuaded from speaking out against Defendants' unlawful employment practices.

871.    Upon information and belief, as direct retaliation against Plaintiff's act of filing the Complaint, Defendant Cohen also engaged in unwarranted and unfair conduct against Plaintiff by causing Snyder to transmit the March Letter to Plaintiff through her counsel.

872.    In the March Letter, Defendant Cohen, *inter alia*, threatens to sue Ms. McSweeney for defamation, hold Plaintiff "accountable to the fullest extent of the law", and threatened to seek "substantial" compensatory and punitive damages if Ms. McSweeney does not retract the allegations of discrimination against Defendant Cohen alleged in her Complaint.

873.    The March Letter also referenced the coordinated public attack on Plaintiff, which upon information and belief Defendant Cohen orchestrated, which further demonstrates that Defendant Cohen intended to retaliate against Plaintiff by causing his current and former employees—all of whom are public-facing members of the entertainment industry—to paint Plaintiff as a liar to other industry professionals, and potential employers, and which also served as a veiled threat that Defendant Cohen would further retaliate against Plaintiff by using his immense power within the entertainment industry if Plaintiff did not withdraw her Complaint.

874.    Upon information and belief, the March Letter's threat to pursue defamation claim(s) against Plaintiff was baseless because Defendant Cohen and his counsel knew that Plaintiff neither published knowingly false allegations in the Complaint nor did she publish false allegations in the Complaint with reckless indifference to the truth.  Furthermore, upon information and belief, Defendant Cohen knew that the Complaint's allegations are protected by the New York State litigation privilege.

875.    Upon information and belief, the sole purpose of transmitting the March Letter to Plaintiff was to retaliate against Plaintiff for filing the Complaint.

876.    Upon information and belief, given Defendant Cohen's wealth and power, the March Letter would dissuade a reasonable employee from speaking out against Defendants' unlawful employment practices for fear that Defendant Cohen would engage in expensive, lengthy, meritless, frivolous, and retaliatory litigation against the employee.

877.    Upon information and belief, in direct retaliation for Plaintiff's act of filing the Complaint, Defendant Cohen also engaged in unfair and unwarranted conduct by transmitting the March Letter to international media outlets within less than twenty-four (24) hours of sending Plaintiff the same and by directing and/or inducing current and former Defendant Bravo cast members to publicly verify the March Letter's allegation that Plaintiff's Complaint was untrue.

878.    Upon information and belief, Defendant Cohen's act of transmitting the March Letter to international media, and directing and/or inducing Defendant Bravo current and former cast members to verify the purported truth of the March Letter, had the intended effects of further tarnishing Plaintiff's public and professional reputation by branding Plaintiff a liar.

879.    Upon information and belief, Defendant Cohen also caused the March Letter to be published with malicious intent to discourage other persons that Defendant Cohen supervises from engaging in protected activity by complaining of Defendant Cohen's discriminatory conduct.

880.    Upon information and belief, Defendant Cohen's act of weaponizing the March Letter against Plaintiff, further irreparably damaging Plaintiff's personal and professional reputation, and blacklisting Plaintiff from future opportunities in the entertainment industry, would dissuade a reasonable employee from speaking out about Defendants' unlawful employment practices.

881.    Upon information and belief, as a direct and proximate cause of the Letter Retaliatory Acts alleged herein, Plaintiff has been blacklisted from ever again working in the entertainment industry.  Indeed, since Defendant Cohen engaged in the Letter Retaliatory Acts, Plaintiff has been unable to secure any employment within the entertainment industry.

882.    Upon information and belief, as a direct and proximate cause of the Letter Retaliatory Acts alleged herein, Plaintiff's ability to obtain employment through Brand Deals has substantial decreased because, given Defendant Cohen's immense power within the entertainment industry—and pop culture more broadly—brands.

883.    Upon information and belief, as a direct and proximate cause of the Letter Retaliatory Acts alleged herein, Plaintiff's ability to obtain employment through Brand Deals has substantially decreased because the Letter Retaliatory Acts have incorrectly caused Plaintiff to be perceived as a liar, and therefore, the public would not trust Plaintiff's endorsement of the goods and services that she would be obligated to platform through Brand Deals.

884.    Upon information and belief, as a direct and proximate cause of the Letter Retaliatory Acts alleged herein, Plaintiff lost the ability to earn income through a prospective Brand Deal with Stanger.

885.    Upon information and belief, Defendant Cohen's retaliatory conduct, as a result of Plaintiff's engagement in protected activities, is in violation of N.Y. Exec. Law §§ 296(7).

886.    Upon information and belief, as a direct and proximate result of the above, Plaintiff has suffered damages, and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation pursuant N.Y. Exec. Law §§296(7).

**TWENTY-FOURTH CAUSE OF ACTION**
**(RETALIATION, pursuant to N.Y. Admin. Code §§ 8–107(7) – AGAINST DEFENDANT COHEN)**

887.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph.

888.    At all relevant times, Defendant Cohen is or was Plaintiff's "employer" under New York City law.

889.    At all relevant times, Plaintiff is or was Defendant Cohen's employee under New York City law.

890.    At all relevant times, Plaintiff resided in New York City, Plaintiff was employed in New York City, and Plaintiff's principal place of work was New York City.

891.    At all relevant times, Plaintiff was a member of at least one protected class under New York City law.

892.    On or around February 27, 2024, Ms. McSweeney filed her Complaint, against, *inter alia*, Defendant Cohen, and alleged, *inter alia*, sex/gender discrimination, disability discrimination, religious discrimination, hostile work environment, and retaliation claims in violation of Title VII, New York State, and New York City laws.

893.    Upon information and belief, Plaintiff's act of filing the Complaint in this action is protected activity under the New York State Human Rights Law, as it contains specific facts regarding Defendants' violations of New York employment laws and the adverse employment actions that she suffered as a result.

894.    Defendant Cohen was aware that Plaintiff filed the Complaint against *inter alia* Defendant Cohen because Defendant Cohen was served with the Complaint and Defendant Cohen referenced and cited the Complaint in the March Letter.

895.    Upon information and belief, after Plaintiff filed the Complaint, Defendant Cohen subjected Plaintiff to unfair and unwarranted treatment.

896.    Upon information and belief, in direct retaliation against Plaintiff's act of filing the Complaint, Defendant Cohen directed or induced current and former Bravo cast members to publicly support Cohen, and publicly claim that the allegations in the Complaint are not true, with the intent to tarnish Plaintiff's public and professional reputation by falsely creating the impression that Plaintiff is a liar.

897.    Moreover, upon information and belief, Defendant Cohen's coordinated, retaliatory, public attack on Plaintiff's propensity for truthfulness was intended to blacklist Plaintiff from any employment opportunity within the entertainment industry.

898.    As a direct result of Defendant Cohen's coordinated, retaliatory, public attack on Plaintiff's propensity for truthfulness, Plaintiff reasonably feared that pursuing her causes of action against *inter alia* Defendant Cohen would irreparably harm her ability to ever again gain employment in the entertainment industry, and further, Plaintiff reasonably feared that Defendant Cohen had blacklisted her from employment in the entertainment industry.

899.    Upon information and belief, after witnessing Defendant Cohen mobilize his immense power within the entertainment industry to systemically destroy Plaintiff's personal and professional reputation, and to blacklist Plaintiff from obtaining future employment within the entertainment industry, a reasonable employee would be dissuaded from speaking out against Defendants' unlawful employment practices.

900.    Upon information and belief, as direct retaliation against Plaintiff's act of filing the Complaint, Defendant Cohen also engaged in unwarranted and unfair conduct against Plaintiff by causing Snyder to transmit the March Letter to Plaintiff through her counsel.

901.    In the March Letter, Defendant Cohen, *inter alia*, threatens to sue Ms. McSweeney for defamation, hold Plaintiff "accountable to the fullest extent of the law", and threatened to seek "substantial" compensatory and punitive damages if Ms. McSweeney does not retract the allegations of discrimination against Defendant Cohen alleged in her Complaint.

902.    The March Letter also referenced the coordinated public attack on Plaintiff, which upon information and belief Defendant Cohen orchestrated, which further demonstrates that Defendant Cohen intended to retaliate against Plaintiff by causing his current and former employees—all of whom are public-facing members of the entertainment industry—to paint Plaintiff as a liar to other industry professionals, and potential employers, and which also served as a veiled threat that Defendant Cohen would further retaliate against Plaintiff by using his immense power within the entertainment industry if Plaintiff did not withdraw her Complaint.

903.    Upon information and belief, the March Letter's threat to pursue defamation claim(s) against Plaintiff was baseless because Defendant Cohen and his counsel knew that Plaintiff neither published knowingly false allegations in the Complaint nor did she published false allegations in the Complaint with reckless indifference to the truth.  Furthermore, upon information and belief, Defendant Cohen knew that the Complaint's allegations are protected by the New York State litigation privilege.

904.    Upon information and belief, the sole purpose of transmitting the March Letter to Plaintiff was to retaliate against Plaintiff for filing the Complaint.

905.    Upon information and belief, given Defendant Cohen's wealth and power, the March Letter would dissuade a reasonable employee from speaking out against Defendants' unlawful employment practices for fear that Defendant Cohen would engage in expensive, lengthy, meritless, frivolous, and retaliatory litigation against the employee.

906.    Upon information and belief, in direct retaliation for Plaintiff's act of filing the Complaint, Defendant Cohen also engaged in unfair and unwarranted conduct by transmitting the March Letter to international media outlets within less than twenty-four (24) hours of sending Plaintiff the same and by directing and/or inducing current and former Defendant Bravo cast members to publicly verify the March Letter's allegation that Plaintiff's Complaint was untrue.

907.    Upon information and belief, Defendant Cohen's act of transmitting the March Letter to international media, and directing and/or inducing Defendant Bravo current and former cast members to verify the purported truth of the March Letter, had the intended effects of further tarnishing Plaintiff's public and professional reputation by branding Plaintiff a liar.

908.    Upon information and belief, Defendant Cohen also caused the March Letter to be published with malicious intent to discourage other persons that Defendant Cohen supervises from engaging in protected activity by complaining of Defendant Cohen's discriminatory conduct.

909.    Upon information and belief, Defendant Cohen's act of weaponizing the March Letter against Plaintiff, further irreparably damaging Plaintiff's personal and professional reputation, and blacklisting Plaintiff from future opportunities in the entertainment industry, would dissuade a reasonable employee from speaking out about Defendants' unlawful employment practices.

910.    Upon information and belief, as a direct and proximate cause of the Letter Retaliatory Acts alleged herein, Plaintiff has been blacklisted from ever again working in the entertainment industry.  Indeed, since Defendant Cohen engaged in the Letter Retaliatory Acts, Plaintiff has been unable to secure any employment within the entertainment industry.

911.    Upon information and belief, as a direct and proximate cause of the Letter Retaliatory Acts alleged herein, Plaintiff's ability to obtain employment through Brand Deals has

substantial decreased because, given Defendant Cohen's immense power within the entertainment industry—and pop culture more broadly—brands.

912.    Upon information and belief, as a direct and proximate cause of the Letter Retaliatory Acts alleged herein, Plaintiff's ability to obtain employment through Brand Deals has substantially decreased because the Letter Retaliatory Acts have incorrectly caused Plaintiff to be perceived as a liar, and therefore, the public would not trust Plaintiff's endorsement of the goods and services that she would be obligated to platform through Brand Deals.

913.    Upon information and belief, as a direct and proximate cause of the Letter Retaliatory Acts alleged herein, Plaintiff lost the ability to earn income through a prospective Brand Deal with Stanger.

914.    Upon information and belief, Defendant Cohen's retaliatory conduct, as a result of Plaintiff's engagement in protected activities, is in violation of N.Y. Admin. Code §§ 8–107(7).

915.    Upon information and belief, as a direct and proximate result of the above, Plaintiff has suffered damages, and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation pursuant N.Y. Admin. Code §§ 8–107(7).

**TWENTY-FIFTH CAUSE OF ACTION**
**(RETALIATION, pursuant to N.Y. Labor Law § 215 – AGAINST DEFENDANT COHEN)**

916.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph.

917.    At all relevant times, Defendant Cohen is or was Plaintiff's "employer" under New York City law.

918.    At all relevant times, Plaintiff is or was Defendant Cohen's employee under New York City law.

145

919.    At all relevant times, Plaintiff resided in New York City, Plaintiff was employed in New York City, and Plaintiff's principal place of work was New York City.

920.    At all relevant times, Plaintiff was a member of at least one protected class under New York City law.

921.    On or around February 27, 2024, Ms. McSweeney filed her Complaint, against, *inter alia*, Defendant Cohen, and alleged, *inter alia*, sex/gender discrimination, disability discrimination, religious discrimination, hostile work environment, and retaliation claims in violation of Title VII, New York State, and New York City laws.

922.    Upon information and belief, Plaintiff's act of filing the Complaint in this action is protected activity under the New York State Human Rights Law, as it contains specific facts regarding Defendants' violations of New York employment laws and the adverse employment actions that she suffered as a result.

923.    Defendant Cohen was aware that Plaintiff filed the Complaint against *inter alia* Defendant Cohen because Defendant Cohen was served with the Complaint and Defendant Cohen referenced and cited the Complaint in the March Letter.

924.    Upon information and belief, after Plaintiff filed the Complaint, Defendant Cohen subjected Plaintiff to unfair and unwarranted treatment.

925.    Upon information and belief, in direct retaliation against Plaintiff's act of filing the Complaint, Defendant Cohen directed or induced current and former Bravo cast members to publicly support Cohen, and publicly claim that the allegations in the Complaint are not true, with the intent to tarnish Plaintiff's public and professional reputation by falsely creating the impression that Plaintiff is a liar.

926. Moreover, upon information and belief, Defendant Cohen's coordinated, retaliatory, public attack on Plaintiff's propensity for truthfulness was intended to blacklist Plaintiff from any employment opportunity within the entertainment industry.

927. As a direct result of Defendant Cohen's coordinated, retaliatory, public attack on Plaintiff's propensity for truthfulness, Plaintiff reasonably feared that pursuing her causes of action against *inter alia* Defendant Cohen would irreparably harm her ability to ever again gain employment in the entertainment industry, and further, Plaintiff reasonably feared that Defendant Cohen had blacklisted her from employment in the entertainment industry.

928. Upon information and belief, after witnessing Defendant Cohen mobilize his immense power within the entertainment industry to systemically destroy Plaintiff's personal and professional reputation, and to blacklist Plaintiff from obtaining future employment within the entertainment industry, a reasonable employee would be dissuaded from speaking out against Defendants' unlawful employment practices.

929. Upon information and belief, as direct retaliation against Plaintiff's act of filing the Complaint, Defendant Cohen also engaged in unwarranted and unfair conduct against Plaintiff by causing Snyder to transmit the March Letter to Plaintiff through her counsel.

930. In the March Letter, Defendant Cohen, *inter alia*, threatens to sue Ms. McSweeney for defamation, hold Plaintiff "accountable to the fullest extent of the law", and threatened to seek "substantial" compensatory and punitive damages if Ms. McSweeney does not retract the allegations of discrimination against Defendant Cohen alleged in her Complaint.

931. The March Letter also referenced the coordinated public attack on Plaintiff, which upon information and belief Defendant Cohen orchestrated, which further demonstrates that Defendant Cohen intended to retaliate against Plaintiff by causing his current and former

employees—all of whom are public-facing members of the entertainment industry—to paint Plaintiff as a liar to other industry professionals, and potential employers, and which also served as a veiled threat that Defendant Cohen would further retaliate against Plaintiff by using his immense power within the entertainment industry if Plaintiff did not withdraw her Complaint.

932.    Upon information and belief, the March Letter's threat to pursue defamation claim(s) against Plaintiff was baseless because Defendant Cohen and his counsel knew that Plaintiff neither published knowingly false allegations in the Complaint nor did she published false allegations in the Complaint with reckless indifference to the truth.  Furthermore, upon information and belief, Defendant Cohen knew that the Complaint's allegations are protected by the New York State litigation privilege.

933.    Upon information and belief, the sole purpose of transmitting the March Letter to Plaintiff was to retaliate against Plaintiff for filing the Complaint.

934.    Upon information and belief, given Defendant Cohen's wealth and power, the March Letter would dissuade a reasonable employee from speaking out against Defendants' unlawful employment practices for fear that Defendant Cohen would engage in expensive, lengthy, meritless, frivolous, and retaliatory litigation against the employee.

935.    Upon information and belief, in direct retaliation for Plaintiff's act of filing the Complaint, Defendant Cohen also engaged in unfair and unwarranted conduct by transmitting the March Letter to international media outlets within less than twenty-four (24) hours of sending Plaintiff the same and by directing and/or inducing current and former Defendant Bravo cast members to publicly verify the March Letter's allegation that Plaintiff's Complaint was untrue.

936.    Upon information and belief, Defendant Cohen's act of transmitting the March Letter to international media, and directing and/or inducing Defendant Bravo current and former

cast members to verify the purported truth of the March Letter, had the intended effects of further tarnishing Plaintiff's public and professional reputation by branding Plaintiff a liar.

937.    Upon information and belief, Defendant Cohen also caused the March Letter to be published with malicious intent to discourage other persons that Defendant Cohen supervises from engaging in protected activity by complaining of Defendant Cohen's discriminatory conduct.

938.    Upon information and belief, Defendant Cohen's act of weaponizing the March Letter against Plaintiff, further irreparably damaging Plaintiff's personal and professional reputation, and blacklisting Plaintiff from future opportunities in the entertainment industry, would dissuade a reasonable employee from speaking out about Defendants' unlawful employment practices.

939.    Upon information and belief, as a direct and proximate cause of the Letter Retaliatory Acts alleged herein, Plaintiff has been blacklisted from ever again working in the entertainment industry.  Indeed, since Defendant Cohen engaged in the Letter Retaliatory Acts, Plaintiff has been unable to secure any employment within the entertainment industry.

940.    Upon information and belief, as a direct and proximate cause of the Letter Retaliatory Acts alleged herein, Plaintiff's ability to obtain employment through Brand Deals has substantial decreased because, given Defendant Cohen's immense power within the entertainment industry—and pop culture more broadly—brands.

941.    Upon information and belief, as a direct and proximate cause of the Letter Retaliatory Acts alleged herein, Plaintiff's ability to obtain employment through Brand Deals has substantially decreased because the Letter Retaliatory Acts have incorrectly caused Plaintiff to be perceived as a liar, and therefore, the public would not trust Plaintiff's endorsement of the goods and services that she would be obligated to platform through Brand Deals.

942.    Upon information and belief, as a direct and proximate cause of the Letter Retaliatory Acts alleged herein, Plaintiff lost the ability to earn income through a prospective Brand Deal with Stanger.

943.    Upon information and belief, Defendant Cohen's retaliatory conduct, as a result of Plaintiff's engagement in protected activities, is in violation of N.Y. Labor Law § 215.

944.    Upon information and belief, as a direct and proximate result of the above, Plaintiff has suffered damages, and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation pursuant N.Y. Labor Law § 215.

## JURY TRIAL DEMANDED

Plaintiff hereby requests a trial by jury on all causes of action alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that the Court enter judgement in her favor and against Defendants, containing the following relief:

i.    For general and special damages, according to proof;

ii.    For punitive and/or exemplary damages in an amount to punish Defendants to the extent allowed by law;

iii.    For attorneys' fees in prosecuting this action to the extent allowed by law;

iv.    For damages, including compensatory damages, relating to lost wages and lost future earnings for the time that Ms. McSweeney was mentally impaired and unable to work;

v.    For damages, including compensatory damages, relating to mental, emotional, and physical pain and suffering, emotional trauma and distress, impairment of relationships, impairment of life, impairment of mental abilities, lack of enjoyment

of life, lost future earnings, and other damages that this Court deems just and proper;

vi. For pre-judgment interest to the extent allowed by law;

vii. For post-judgment interest to the extent allowed by law;

viii. For costs of suit incurred herein;

ix. For any other damages allowed by statute and/or law;

x. Any other and further relief as the Court deems necessary and proper.

Dated: July 10, 2025
New York, New York

Respectfully submitted,
**ADELMAN MATZ P.C.**

By:_____

*Attorneys for Plaintiff*
Sarah M. Matz, Esq.
Gary Adelman, Esq.
Celena E. Stoia, Esq.
Madyson R. Nucci, Esq.
1159 Second Ave, Suite 153
New York, New York 10065
Telephone: (646) 650-2207
sarah@adelmanmatz.com
g@adelmanmatz.com
cstoia@adelmanmatz.com
mnucci@adelmanmatz.com