# Exhibit 1

"THE REAL HOUSEWIVES OF NEW YORK CITY" / LEAH MCSWEENEY / TALENT AGREEMENT

| Effective Date: | September 26, 2019 ("Effective Date") | |
|---|---|---|
| Project: | "The Real Housewives of New York City" (working title) and all material produced in connection therewith, including, without limitation, all series episodes ("Episodes") and any enhanced, promotional, development and other material shall collectively be referred to as, the "Series." | |
| Studio: | Forest Productions Inc. ("Studio")<br>3800 Barham Blvd., Suite 410<br>Los Angeles, CA 90068<br>Attention: Business Affairs | |
| Artist: | Name: LEAH MCSWEENEY ("Artist") | |
| | Contact Details:<br><br>Adelman Matz, PC<br>1173A Second Avenue #153<br>New York, NY 10065<br>Attention: Gary Adelman | Loan-out Company (if applicable):<br><br>Kier, LLC |

Capitalized terms not defined in this portion of the Agreement shall have the meanings given in Appendix 1 ("**Standard Terms**"), which is incorporated herein. For good and valuable consideration, the sufficiency of which is hereby acknowledged (including, without limitation, the potential to appear in the Series), Studio and Artist hereby agree as follows:

1. **CONTINGENCIES:** Studio's obligations are contingent on (a) Artist's execution of this Agreement, including, Studio's Standard Terms, on terms and conditions acceptable to Studio, and (b) Studio's and Network's review and acceptance of the results of Network's customary background check with respect to Artist.

2. **SERIES:**

   a. **Options / Cycles:** Studio engages Artist ("pay or play") in connection with Artist's minimum guarantee set forth below to render Services in connection with the twelfth cycle of Episodes of the Series (the "**Twelfth Cycle**") as a secondary participant ("**Secondary Participant**"). Studio shall have ▬ additional exclusive, irrevocable, successive, dependent options to engage Artist to render Services, either as a Secondary Participant or a main participant ("**Main Participant**") (including the right to elevate Artist's role at any time during the Twelfth Cycle from Secondary Participant to Main Participant), all in Studio's sole discretion as provided herein, in connection with additional cycles of Episodes (each, an "**Additional Cycle**," and together with the Twelfth Cycle, each a "**Cycle**"), to the maximum extent permitted by law. Each option is exercisable by written notice to Artist on or before the date that is the earlier of (a) 6 months after the initial exhibition of the final Episode of the immediately preceding Cycle, or (b) 9 months after Network's final acceptance of delivery of all Episodes of the immediately preceding Cycle (including all related deliverables). Studio may order additional Episodes beyond its initial or any subsequent order in any Cycle.

   b. **Fees:**

      i. **Secondary Participant Fees:** Subject to the remainder of this subparagraph (b), Artist shall receive ▬ for each original Episode (including special Episodes, *e.g.*, reunion Episodes) (each, an "**Original Episode**") for the Twelfth Cycle in which Artist appears as a Secondary Participant (if any). Thereafter, for each Additional Cycle in which Artist is engaged by Studio to participate as a Secondary Participant, Artist's applicable Original Episode shall increase ▬ on a cumulative cyclical basis. Artist's applicable Original Episode fee shall remain the same for up to ▬ minutes of either, over-run time (i.e., "super-sizing") per Episode, after which the applicable Original Episode fee will be subject to increase on a pro-rata basis, or under-run time (i.e., a shortened Episode) per Episode, after which the applicable Original Episode fee will be subject to good faith negotiation between the parties.

      ii. **Main Participant Fees:** Subject to the remainder of this subparagraph (b), Artist shall receive ▬ for each Original Episode for the Twelfth Cycle in which Artist appears as a Main Participant (if any). Thereafter, for each Additional Cycle in which Artist is engaged by Studio to participate as a Main Participant, Artist's applicable Original Episode fee shall increase ▬ on a cumulative cyclical basis. In the event that Studio elects, in its sole discretion, to elevate Artist to a Main Participant in the Twelfth Cycle at any time, Artist shall receive an additional ▬ for

NBCUniversal:4954461v1                                    1

each Original Episode for the Twelfth Cycle (i.e., Artist shall receive ▊ for each Original Episode for the Twelfth Cycle in such instance). If Studio elects to engage Artist as a Main Participant, Artist's applicable Original Episode fee shall remain the same for up to ▊ minutes of either, over-run time (i.e., "super-sizing") per Episode, after which the applicable Original Episode fee will be subject to increase on a pro-rata basis, or under-run time (i.e., a shortened Episode) per Episode, after which the applicable Original Episode fee will be subject to good faith negotiation between the parties.

    iii. **Minimum Guarantee:** Subject to Studio's suspension and termination rights, Artist shall receive episodic compensation hereunder in connection with a minimum of ▊ Episodes for each Cycle of the Series produced for which Studio exercises its option to engage Artist.

    iv. **Payment Schedule:** The compensation due to Artist for the Twelfth Cycle set forth in above, as applicable, shall be payable in the following manner: (i) 25% upon Artist's execution of this Agreement; (ii) 30% upon the date that is 8 weeks after commencement of principal photography; (iii) 30% upon the completion of principal photography; and (iv) 15% upon the completion of services for the Twelfth Cycle (including taping of the reunion, if any).

c. **Bonus:** During the Exclusivity Period (as defined below) Artist shall comply with Bravo Talent Guidelines attached hereto as Appendix 2 (the "**Bravo Talent Guidelines**"). Artist shall be eligible to receive a bonus at the end of each Cycle in the amount of ▊ for each Original Episode in which Artist appears ("**Episodic Bonus**"). No Episodic Bonus is guaranteed and receipt of any Episodic Bonus is contingent upon Artist's full compliance within the Bravo Talent Guidelines and is awarded, if at all, in Network's sole discretion. Episodic Bonuses, to the extent payable, shall be payable no later than two (2) months following the initial exhibition of the last Episode of the then-current Cycle.

d. **Repackaged Episodes:** Notwithstanding anything contained herein: if Artist is engaged to render new Services (e.g., voiceover, wraps) in connection with production of newly-created (as opposed to "re-branded" Episodes – e.g., a "social edition") clip, compilation, "making of," casting, "best of," "countdown," and/or similar types of Episodes that are substantially comprised of either footage that has already been exhibited and/or footage from Cycles other than the then-current Cycle (collectively, "**Repackaged Episodes**"), then in lieu of any other fees that Artist would otherwise be entitled to hereunder, Artist shall receive a fee of ▊ of Artist's applicable then-current Original Episode fee.

e. Artist shall not receive any fee if no new Services are required of Artist in connection with any Episode (including any Original Episode, Repackaged Episode or any other non-original Episode such as a repeat or "re-branded" Episode).

3. **EXCLUSIVITY:** From the Effective Date and for as long as Studio has the option to engage Artist hereunder, and if Studio has exercised its last Additional Cycle option hereunder, until the date that is the earlier of 3 months after Network's initial exhibition of the last Episode of the then-current Cycle or 6 months after the date of Network's final acceptance of delivery of all Episodes of such Cycle (collectively, the "**Exclusivity Period**"), the following shall apply:

(a) **Secondary Participant Exclusivity:** If Studio has not exercised a Main Participant Option, Artist shall be exclusive in all forms of unscripted, "docu-series" programming and content (whether such programming or content is still or moving, audio and/or visual) in all forms of television, digital and new media, whether now known or hereafter devised. Notwithstanding the foregoing, during the Exclusivity Period, Artist shall not appear in any form of unscripted programming on the following programming services or any digital platform branded with the branding of any such programming service without Network's advance written consent: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▊ (as each may be renamed from time to time.

(b) **Main Participant Exclusivity:** If Studio has exercised a Main Participant Option, Artist shall be exclusive to Network in all forms of unscripted programming and content (i.e., other than programming or content that is entirely scripted with character(s) and plot ["**Scripted Programming**"]) (whether such programming or content is audio and/or visual), in all forms of media, whether now known or hereafter devised. Any activities that Artist is not prohibited from participating in or which are otherwise authorized by Network (including, without limitation, appearances and services for third parties) shall be referred to collectively as, "**Permitted Activities**." Notwithstanding the foregoing, subject to the remainder of this paragraph, Artist shall be permitted to render services for the podcast owned by Artist and Laura Carranza in connection with the podcast currently entitled 'Improper Etiquette' (such podcast, the "**Podcast**," and such services, "**Podcast Services**"); however, Artist's

rendition of such Podcast Services and ability to render the foregoing shall be contingent on and subject to the following: (i) Artist's compliance with Artist's obligations under this Agreement (including the Publicity and Confidentiality provisions of the Standard Terms and the conditions on Permitted Activities [as defined below] set forth in this paragraph below); (ii) Artist's obligations to Studio remaining in first priority at all times during the Exclusivity Period, and Artist's Podcast Services not interfering therewith; and (iii) the Podcast not (A) containing any docu-follow or reality formatted elements, (B) involving any other current or past Network talent as a contributor, (C) mentioning the Series or Network, (D) referencing what has occurred or will occur on any Network series Artist has appeared in or is scheduled to appear in, (E) being exhibited or exploited on any form of television platform or network ("**Television Platform**"), (F) being exploited on any vertically integrated website of any Television Platform, (G) being sponsored by a competitor of a sponsor(s) that is(are) integrated into the Series or major sponsor(s) of the Series or Network (e.g., the Series is "presented by" the sponsor or a sponsor that is purchasing a significant amount of advertising time in the Series or on the Network); it being understood that advertisement adjacency and/or pre-roll, mid-roll, and post-roll advertising shall not be deemed a sponsorship for the purposes of this subsection G. Notwithstanding anything contained herein, Artist's participation in Permitted Activities shall be, contingent on satisfaction of, and subject to, the following conditions: (i) Artist must be and remain in compliance with Artist's obligations under this Agreement (including, without limitation, the Publicity and Confidentiality provisions of the Standard Terms); (ii) Artist's obligations to Studio shall remain in first priority at all times during the production period and related publicity/promotional periods of each Cycle in the Exclusivity Period, and Artist's Permitted Activities shall not interfere therewith; (iii) Artist shall not appear as Artist's self in scripted programming (i.e., playing the role of Artist), without Network's prior written approval in each instance; (iv) such Permitted Activities shall not be in connection with programming or content scheduled for exhibition in a time period in which an Episode is being premiered or during the four (4) weeks preceding or the two (2) weeks following the initial exhibition of the initial Episode or the finale Episode of any Cycle, without Network's advanced written consent, provided that if the scheduled exhibition of any such appearance changes without Artist's knowledge to a time period that conflicts with the requirements of this subparagraph, then such rescheduling shall not be deemed a breach of this Agreement by Artist if (A) Artist has made appropriate inquiries as to the scheduled exhibition time of the appearance and has not been informed of such time, (B) Artist otherwise had no reason to know the applicable appearance would be scheduled during a period prohibited hereunder (e.g., the program in which Artist is appearing is regularly scheduled for exhibition in a time period prohibited hereunder), and (C) Artist has complied with subparagraph (v) below; (v) Artist shall put any third party engaging Artist's services on notice of Artist's obligations pursuant to subparagraph (iv);. (vi) Artist shall not render services in connection with any programming or content with a substantially similar format or other material elements to that/those of the Series; (vii) Artist shall provide Network's publicity department with reasonable advance notice of any Permitted Activities that Artist intends to participate in; (viii) Artist shall, in accordance with the terms of this Agreement and the instructions of Network's publicity department, use Artist's good faith efforts to identify Artist's self as Network talent during all Permitted Activities; and (ix) such Permitted Activities shall not be in connection with programming services currently known as: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (including, without limitation, any sub- or affiliated programming services connected to the foregoing [e.g., ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ]) as the foregoing may be re-branded) or ▮▮▮▮.

(c) Without limiting Network's exclusivity rights pursuant to subparagraphs (a) and (b) above, Artist's obligations hereunder shall take first priority over Artist's other obligations and Permitted Activities, which shall not interfere with Artist's obligations hereunder. Subject to the foregoing and the terms and conditions of this Agreement, throughout the production of the Series, Artist may continue to render Artist's normal and customary off-camera services for Artist's designer brand Kier, LLC ("**Kier**"), Kier's subsidiaries "Married To The Mob" and "LOL CARTEL", their affiliates, licensees, successors and assigns, the products and services provided by Kier ("**Kier Products and Services**"), and collaborations Kier may do with other companies, brands, celebrities and third parties ("**Kier Collaborations**"). Kier, Keir Products and Services and Kier Collaborations and the Improper Etiquette podcast featuring Artist on Apple Podcasts are collectively referred to as "**Existing Artist Businesses**".

(d) Without limiting Network's exclusivity rights pursuant to subparagraphs (a) and (b) above, Artist shall not directly or indirectly (e.g., through Artist's businesses) endorse, or render services in connection with any endorsement for, any product, service or brand, without Network's prior written approval, other than Existing Artist Businesses.

(e) Without limiting Network's exclusivity rights pursuant to subparagraph (a) above, Artist shall submit exclusively to Network on a "first look" basis all concepts for projects of any kind based on Artist's life story to the extent that Artist owns and/or controls and desires to develop and/or produce such projects (each, an "**Artist Controlled Project**") and Artist shall notify Network's business affairs department in writing of each such submission ("**Submission Notice**").

(f) Without limiting Artist's rights pursuant to this subparagraph (e), solely as a courtesy to Studio, Artist shall notify Studio of each brand an Existing Artist Business is involved with during the Series provided that no use of the Series or Network names or logos is permitted in connection therewith.

(g) Notwithstanding anything set forth above, Artist may continue to own and operate any and all of Artist's individual social media platforms using Artist's name, image and likeness as well as any and all social media platforms used in connection with Existing Artist Businesses, including, but not limited to, Instagram, Facebook, Twitter, Snapchat, Youtube, and/or any other social media site created by Artist during the aforementioned term and for the aforementioned purposes, provided Artist shall not identify herself as Network talent while conducting her individual and/or Kier related business and shall not use the name, brand or logo of the Series or Network in connection therewith without the prior written approval of Network in each instance..

4. **CREDIT:** All credits (if any) shall be at the sole discretion of Network.

5. **TRAVEL:** If Artist is required by Studio or Network to travel in connection with any Services to a location ("**Required Location**") that is outside the metropolitan area (a) in which Artist resides ("**Artist's Residence**"), in connection with publicity and promotion Services, or (b) in which the Series is regularly produced ("**Primary Production Location**"), in connection with all other Services, Artist shall receive the following, subject to availability and Studio's Standard Terms: (i) ground transportation to and from Artist's home, accommodation, airports (if applicable), and the Required Location(s); (ii) a per diem for each day of Services rendered at the Required Location in accordance with Studio or Network policy (as applicable); (iii) if air travel is appropriate and required, ███████████████████████████████████████████████████████████████; and (iv) if overnight stays at the Required Location are required, lodging accommodations (room and room tax only).

6. **ROYALTIES TO NETWORK:**

   (a) Initial Threshold / Network Participation: **If (i) Artist is engaged to render Services in connection with Episodes of the Series, and (ii) the Total Business Revenue (as defined below) attributable to New Artist Businesses (as defined below, but excluding all revenue and proceeds received by Artist from Existing Artist Businesses after the initial broadcast date of the Current Cycle collectively exceeds ███ ("Initial Threshold"), Artist shall pay Network ███ of Artist's share of the Total Business Revenue (in excess of the Initial Threshold amount) attributable to each Featured Artist Business during its Revenue Period (as defined below).**

   (b) Definitions:
   
   (i) Applicable Businesses:
   
   (A) "**New Artist Business**" means any venture or business (including, without limitation, the provision of personal services) in which Artist, directly or indirectly, is involved or has an ownership interest, or from which Artist gains or has the potential to gain financially other than the Existing Artist Businesses, that is Featured (as defined below) in the Series.
   
   (B) "**Featured**" means verbally mentioned or visually depicted in at least 5 Episodes or 10 scenes of the Series.
   
   (ii) Applicable Revenue:
   
   (A) "**Total Business Revenue**" means the sum of the (aa) Net Revenue (as defined below) attributable to all New Artist Businesses during such businesses' respective Revenue Periods (as defined below),
   
   (B) The "**Net Revenue**" of a New Artist Business means all non-refundable guaranteed monies actually received thereby or credited, including, without limitation: commissions; profit shares; K-1 distributions; license fees; dividends; revenue from any source (including, without limitation, from all locations of a New Artist Business and the use of New Artist Business' names, brands, trademarks, trade names, service marks, symbols and logos [collectively, "**Names**; personal services, endorsements, personal appearances, and writings, each as relating to a New Artist Business LESS all operating costs and expenses incurred in the operation of the New Artist Business \The "**Revenue Period**" for each New Artist Business means the period commencing with the initial verbal mention or visual depiction of such New Artist Business in the Series and concluding on the date that is six (6) months after the initial exhibition of the final Episode of the last Cycle of the Series in which Artist appears and the New Artist Business is verbally mentioned or visually depicted ("**End Date**").

7. **NON-UNION:** Artist's Services shall not be subject to any union, guild or collective bargaining agreement.

ACCEPTED AND AGREED BY STUDIO:

_____
(Signature)

PAMELA HEALEY
(Print Name)

AUTHORIZED SIGNATORY
(Title)

Date: 10/7/19

ACCEPTED AND AGREED BY ARTIST:

_____
(Signature)

Leah McSweeney
(Print Name)

Date: 10/4/2019

Date of Birth (MM/DD/YY):* ▮▮▮▮▮

\* For verification purposes only pursuant to 18 U.S.C. §§ 2256 et seq.

### APPENDIX 1
### STANDARD TERMS AND CONDITIONS, AND ARBITRATION PROVISIONS

Capitalized terms not defined in these Standard Terms have the meanings given in the agreement to which these Standard Terms are attached ("Main Agreement"). Unless otherwise provided herein, paragraph references used in these Standard Terms refer to paragraphs of these Standard Terms. As used in this Agreement (as defined in the Entire Agreement paragraph below), "Network" shall mean one or more of the television networks or platforms of NBCUniversal Media, LLC.

1. ENTIRE AGREEMENT. This agreement is comprised of, and as used herein the term "Agreement" shall collectively refer to, the Main Agreement, these Standard Terms, and any other appendices attached hereto (if any) which are incorporated herein. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes any and all prior and contemporaneous agreements, drafts, negotiations, undertakings, arrangements and communications of any nature with respect thereto. Artist has not executed this Agreement in reliance on any promise, representation, or warranty not expressly contained herein. This Agreement cannot be amended except by a written agreement signed by both parties. Unless otherwise expressly set forth in this Agreement, in the event of a conflict between the terms and conditions of the Main Agreement, on the one hand, and the terms and conditions of the Standard Terms or any other Appendix hereto, on the other hand, the terms and conditions of the Main Agreement shall govern. The provisions in these Standard Terms that add to but do not expressly conflict with the provisions in the Main Agreement shall be deemed to supplement the Main Agreement, and are not superseded thereby.

2. SERVICES AND COMPENSATION. As used in this Agreement, "Services" shall mean all services referred to in subparagraphs (b) and (c) below, and any other services provided by Artist or otherwise required under this Agreement.

(a) Standard of Services. Artist shall render all Services: (i) to the highest standards of professionalism; (ii) at such times and places, and in the manner, required by Studio; and (iii) in accordance with Studio's decisions, reasonable and lawful instructions, and requirements (including regarding matters of personal taste and judgment), all of which shall be final and controlling. Artist's employment hereunder shall be subject to Studio's and Network's other applicable policies and procedures as notified to Artist from time to time in writing. All Services rendered hereunder, including pursuant to paragraphs 2(b) and 2(c) below, shall be rendered as reasonably required by Studio, when and where consistent with this Agreement, and in the manner reasonably specified and required by Studio and/or Network; however, Artist may not refuse to render Services on the grounds that Artist believes such Services to be unreasonable from a creative standpoint.

(b) Series Requirements. Artist shall render all on-camera and off-camera services required by Studio in connection with the Series during the term of Artist's employment hereunder. Such services may include, without limitation, on-camera appearances as Artist's self in the Series, off-camera preparation (including discussions with Studio and Series personnel), "voiceovers," "opens," "closes," "pickups," re-shoots and any other pre-production, production and post-production services required by Studio. Artist shall also render any on-camera and off-camera services required by Studio in connection with new, promotional and enhanced material (collectively, "Enhanced Material") related to the Series, and intended for initial exhibition in short segments via any media (whether now known or hereafter devised).

(c) Advertising and Promotion Requirements. Artist shall render all services required by Network in connection with advertising, publicity, promotion and other activities in connection with the Series, Network, Network's related and affiliated entities, programming services, platforms and sponsors, and the exercise of all rights granted hereunder. Such services may include, without limitation, participation in: (i) publicity and promotional appearances, including in public, in other programs (e.g., promotional appearances on talk shows), and at events (e.g., TCA, NATPE, Network's "upfront" and sponsored events); (ii) photo shoots, on-air promotions, promotional films and spots, electronic press kits, sweepstakes and other promotional materials; (iii) the creation of written, audio and/or visual materials (e.g., blogs and vlogs); (iv) online, new and social media promotional activities, including interactive viewer activities and sharing Series and Network related content and links on Artist's personal and professional websites, new and social media platforms in accordance with Network's instructions; and (v) advertising sales and sponsorship activities and materials including (A) sales tapes and materials for distribution in non-paid media, and (B) trade-outs, product and service integrations, commercial tie-ins, custom content and sponsored promotions. Artist may be required to use, consume, touch, or comment upon products or services in and in connection with the Series and any marketing, promotion, and publicity activities in connection with the Series. Artist hereby consents to any product placement (whether active or passive) in or in connection with the Series.

(d) Access Requirements. Artist shall grant Studio and its representatives access to a sufficient number of days of Artist's personal and/or professional activities as required by Studio, to permit Studio to obtain a sufficient quality and quantity of material for production of the Series, as determined by Studio. Subject to the Assumption of Risks and Waivers (Recordings) paragraph below, in connection with Artist's Services, Artist irrevocably grants Studio and its representatives access to (including, without limitation, permission to film and otherwise make recordings in and of) all premises, vehicles, events and activities for which Artist owns and/or controls all such access rights. If requested by Studio, Artist shall execute a location contract substantially in the form set forth in Appendix 3 ("Location Contract") of this Agreement. To the extent that Artist does not own or control the right to grant the access set forth above with respect to any vehicles and premises that Artist may enter or appear in (e.g., the homes of Artist's family and friends, or Artist's employer's premises) or any events or activities that Artist may attend or participate in, upon Studio's request, Artist shall use Artist's reasonable and good faith efforts to assist Studio and its representatives to: (i) obtain such access; and (ii) obtain agreement from any and all relevant parties to a Location Contract in connection with the foregoing. As required by Studio, Artist shall use Artist's reasonable and good faith efforts to assist Studio in obtaining appearance releases from Artist's family, friends, employees and any other individuals in Artist's life, in connection with the Series; however, any failure by Studio to secure any such appearance release after the exercise of such efforts, shall not be deemed a breach of this Agreement by Artist.. In the event that Studio is unable to secure the appropriate permissions and releases referenced in this paragraph, Studio shall have the right to terminate Artist's Services under this Agreement with no further obligation to Artist.

(e) Work and Production Time. To the maximum extent permitted by law, Studio shall be entitled to as much work and production time as Studio requires for the satisfactory completion of Artist's Services.

(f) Compensation. The fees set forth in the Main Agreement include payment for all rights granted by Artist and all Services and materials provided by Artist hereunder. The following shall not constitute an appearance in an Episode for the purposes of calculating Artist's fees or determining whether credit is due to Artist: (i) incidental appearances (e.g., appearing solely in still photos, phone calls or other audio and/or visual calls [e.g., FaceTime or Skype calls]) or inclusion of audio-only recordings of Artist; or (ii) appearances in Series "show opens," "clips," "main titles," "end credits," "cold opens," "super-teases," "flashbacks," "next-ons," "previously-ons," "this season ons," or "last season ons" of an Episode or other production. To the maximum extent permitted by law, all payments (if any) and other benefits due to Artist (including, without limitation, any travel, credit or other benefits specified in this Agreement) shall be subject to (A) all applicable federal, state, and local laws relating to withholding of taxes and otherwise, (B) Studio's rights of suspension, extension and termination as set forth herein, (C) Artist's completion and delivery to Studio of all taxation, immigration, payroll, diligence and other paperwork and supporting documentation required by Studio and/or Studio's payroll company (collectively, "Start Paperwork"), and (D) Artist's complete and satisfactory performance of Artist's obligations under this Agreement. All fees payable to Artist hereunder shall be payable in accordance with Studio's then-current payment policies for the Series. With the exception of withholdings made by Studio as required by law, Artist shall be responsible for any taxes and other obligations that are or may become payable by Artist.

(g) Travel. Notwithstanding anything contained herein, Artist may be required to travel from one Required Location to another, without returning to Artist's Residence or the Primary Production Location. In no event shall Studio or Network be required to provide any of the travel or expense requirements in this Agreement in connection with travel to a location where Artist already is travelling, appearing or residing for a reason or purpose unrelated to Artist's Services. Artist shall not be entitled to the value of, or replacements or substitutions for, any of the travel or expense requirements of this Agreement if such travel or expenses are not used, available or required. All travel arrangements will be made by, and shall be subject to the guidelines and policies of, Studio and/or Network (as applicable).

(h) Credit. Except as expressly provided in the Main Agreement, all aspects of any credits due to Artist shall be determined by Network in its sole discretion. All credits shall be subject to Network's then-current policies and timing requirements. In the event that individual Episodes are scheduled for consecutive exhibition with (i) other Episodes (e.g., as a so called "double pump" or "marathon"), or (ii) the premiere of any cycle or special episode of any other

program, any Artist on-screen credits may be accorded once in connection with such consecutive exhibition (rather than in connection with each individual episode therein), with the placement of such credit therein being determined by Studio and/or Network. No casual or inadvertent failure by Studio and no failure by any third party to comply with the credit provisions of this Agreement shall be deemed a breach of this Agreement.

3. RESULTS AND PROCEEDS; STUDIO'S RIGHTS.

(a) Except as otherwise expressly set forth herein, the results and proceeds of Artist's Services, including, without limitation, Artist's appearance, actions, poses, statements, characters, and vocal, instrumental or musical sounds and compositions, of any kind, and any other materials of any kind created or contributed by Artist during Artist's employment hereunder (collectively, "Results and Proceeds"), shall constitute a "work made for hire" under the U.S. Copyright Act, as amended, (or a "commissioned work" or other designated type of work under the applicable laws of any other jurisdiction providing that all rights in material are owned by the party that commissions or otherwise directs another party to create such material [collectively, a "Commissioned Work"]) prepared within the scope of Artist's employment hereunder and specially ordered or commissioned by Studio for use as part of a motion picture or other audiovisual work, with Studio being deemed the author for copyright purposes and the owner of the copyright (including, without limitation, all renewals, extensions and revivals) and all other rights, titles and interests therein, in any and all media (whether now known or hereafter devised), throughout the universe, in perpetuity. Except as expressly set forth herein, if any portion of such Results and Proceeds is determined not to be "work(s) made for hire" or a Commissioned Work as set forth above (including because such portion is a pre-existing element), or such designation is not sufficient under any applicable law to place authorship and ownership of all rights, titles and interests in such Results and Proceeds in Studio as set forth above, or Artist holds or obtains any rights in the Results and Proceeds for any reason, Artist hereby irrevocably assigns, transfers and exclusively conveys to Studio, all rights, titles and interests in such Results and Proceeds, in any media (whether now known or hereafter devised), throughout the universe, in perpetuity. As used in this Agreement, the "Work" shall collectively refer to all Results and Proceeds, Artist Licensed Material and Artist Music. Studio, Network and the licensees, successors and assigns of the foregoing (as applicable) shall have the unrestricted right to exploit the Work, including, without limitation, the right to use, broadcast, exhibit, distribute, advertise, publicize and promote the Work, by any means and for any purposes (including, without limitation, merchandising and commercial publishing) in any and all media (whether now known or hereafter devised), throughout the universe, in perpetuity, at any time and with any frequency, whether as part of the Series or otherwise, as Studio determines, except as expressly limited in subparagraphs (b), (c) and (d) below. Studio, Network and the licensees, successors and assigns of the foregoing (as applicable) may edit, cut, rearrange, adapt, dub, revise, modify, fictionalize, add to, take from, translate or otherwise alter the Work for any purposes, and to the maximum extent permitted by law: (i) Artist hereby waives the exercise of any rights of Artist known as "moral rights," "droit moral" and any other analogous rights however denominated in any jurisdiction throughout the universe (collectively, "Moral Rights"), and (ii) to the extent such Moral Rights cannot be waived under the applicable laws of any jurisdiction but Artist may consent to the doing of all acts and omissions that, in the absence of such consent, would infringe Artist's Moral Rights, Artist grants such consent; and (iii) Artist agrees that neither Artist nor any other person shall institute, support, maintain or permit any action or lawsuit on the ground that the Series constitutes an infringement of Artist's Moral Rights. Artist hereby irrevocably and exclusively assigns, licenses and grants to Studio, throughout the universe, in perpetuity, any rights conferred upon Artist under applicable laws, regulations or directives including (if any) to authorize, prohibit and/or control the renting, lending, fixation, reproduction and/or other exploitation of any audio-visual work produced hereunder (and any rights therein) in any and all manners and media (whether now known or hereafter devised), including, without limitation, any so-called "Rental And Lending Rights" pursuant to any European Union ("EU") directives and/or enabling or implementing legislation, laws or regulations enacted by member nations of the EU. Artist hereby acknowledges that the compensation payable hereunder constitutes a complete buy-out of all such Rental And Lending rights from Artist and constitutes adequate and equitable remuneration therefor.

(b) As between Studio and Artist, Artist is the sole owner of all intellectual property rights in and to the Artist Licensed Material (as defined below); however such ownership shall not detract from Studio's ownership of all rights, titles and interests in the Series and all other elements thereof (e.g., if Series advertising material includes an Artist licensed photo, Studio shall own all rights in such advertising material). Without limiting subparagraph (a) above, Artist hereby irrevocably grants (or if Artist does not own and/or control all rights, title, and interest in the Artist Licensed Material, Artist shall cause to be irrevocably granted) to Studio and Network a non-exclusive License (as defined below) to the Artist Licensed Material; however, such License shall only be exclusive to Studio and Network in all forms of television, digital and new media, whether now known or hereafter devised. As used in this Agreement, the "Artist Licensed Material" shall refer collectively to: (i) material of any kind contributed by Artist pursuant hereto that was created prior to Artist's engagement hereunder (e.g., family photos and videos); (ii) material of any kind contributed by Artist that was created during the period of Artist's employment hereunder other than within the scope of Artist's Services and employment hereunder (e.g., text or picture messages sent during Artist's personal life); (iii) Artist Marks; and (iv) any photos and/or videos for which Artist is the copyright owner that Artist posts to Artist's public social media accounts (e.g., Instagram, Snapchat, Facebook). Without limiting subparagraph (a) above, as used in this Agreement, a "License" shall refer to transferable, perpetual, royalty-free license throughout the universe (including the right to sub-license), to use any material in and in connection with the production, distribution, exhibition, advertising, marketing, publicity, promotion, merchandising and other exploitation of the Series (including, without limitation, as or as part of the Series title, as applicable) in any manner, in all media (whether now known or hereafter devised) on a gratis basis (including, without limitation, for no additional clearance fees, residuals, royalties or any other compensation). All rights in and to Artist Licensed Material not expressly granted to Studio or Network herein are reserved by Artist.

(c) As between Studio and Artist, Artist is the sole owner of all intellectual property rights in and to the Artist Marks (as defined below); however such ownership shall not detract from Studio's ownership of all rights, titles and interests in the Series and all other elements thereof (e.g., if the title of the Series includes any Artist Mark, Studio shall own all rights in such title). Without limiting subparagraph (a) above, Artist hereby irrevocably grants (or if Artist does not own and/or control all rights, title, and interest in the Artist Marks, Artist shall cause to be irrevocably granted) to Studio and Network a non-exclusive License to the Artist Marks; however, such License shall only be exclusive to Studio and Network in all forms of television, digital and new media, whether now known or hereafter devised. As used in this Agreement, the "Artist Marks" shall mean Artist's name and any names, brands, trademarks, trade names, service marks, domain names, and all related terms, images, logos and symbols, and any other marks that may be used by or registered in connection with Artist or Artist's business(es), if any, with the exception of any of the foregoing which are created within the scope of Artist's Services hereunder, which shall form part of the Results and Proceeds.

(d) As between Studio and Artist, copyright in all Artist Music (as defined below), shall be owned by Artist; however such ownership shall not detract from Studio's ownership of all rights, titles and interests in the Series and all other elements thereof, which shall include any recordings made by Studio of Artist performing Artist Music pursuant hereto. Notwithstanding the foregoing, (i) Artist hereby grants to Studio and Network non-exclusive synchronization and master use (if applicable) Licenses to the portion of the Artist Music that is owned and/or controlled by Artist, (ii) Artist will use reasonable, good faith efforts to assist Studio and Network in obtaining non-exclusive synchronization and master use (if applicable) Licenses to any portion of the Artist Music that is not owned and/or controlled by Artist, as well as a waiver of exclusivity from Artist's record label and/or publisher (if applicable). Nothing contained herein shall be deemed to affect Artist's right, or the right of any applicable third party, to collect public performance royalties from any applicable performing rights society(ies), nor shall the foregoing be deemed to grant to Studio the right to use the Artist Music on an audio-only basis in a "stand alone" manner (e.g., for release as a phonorecord, "mobiletone" or audio-only download), unless separately agreed to by Artist. As used in this Agreement, "Artist Music" shall refer collectively to all musical compositions and sound recordings created and/or performed by Artist: (A) in or in connection with Artist's Services, other than at the specific request of Studio as part of Artist's Services (e.g., if Studio requests Artist to participate in the recording of a theme song for the Series); and (B) during the course of Artist's life independent of Artist's Services, whether prior to or during Artist's engagement hereunder.

(e) Artist irrevocably grants to Studio and Network the perpetual, transferable right throughout the universe to use Artist's name, sobriquet, voice, actual and simulated likeness, biographical data, and any other form of personal identification (collectively, Artist's "Likeness") in any media (whether now known or hereafter devised), in and in connection with the following: (i) the development, production, exhibition, advertising, publicity, promotion,

merchandising, and other exploitation of the Work, whether as part of the Series or otherwise (including, without limitation, in the Series title); (ii) in connection with the exploitation of any subsidiary, allied and ancillary rights in the Series or the Work; and (iii) the business activities of Studio, Network and Studio's and Network's respective licensees, assigns and sponsors.

(f) As between Studio and Artist, Studio shall own all rights, titles and interests in the Series and nothing in this Agreement shall (i) limit Studio's ability to exploit the Series or the Work in any location, media or manner, or (ii) be deemed to convey to or vest in Artist any right, title or interest in or to the Series or any elements thereof. Unless expressly set forth herein, nothing in this Agreement shall limit Studio's right to use the Artist Licensed Material, Artist Music or Artist's Likeness in any manner (including, in any unrelated entertainment property) as otherwise permitted by law (i.e., nothing in this Agreement shall put Studio in a worse position than members of the general public).

4. NO OBLIGATION; "PAY-OR-PLAY." Neither Studio nor Network shall have any obligation to: (a) use Artist's Services or include Artist in the Series in any manner or at all; or (b) produce, complete, release, distribute, advertise or otherwise exploit the Series, the Work or any other material in any manner or at all. To the maximum extent permitted by law, the Released Parties (as defined in the Release and Agreement Not to Sue paragraph below) shall not be liable for, and Artist shall not make any Claims (as defined in the Release and Agreement Not to Sue paragraph below) or institute any proceedings against the Released Parties or anyone else, relating to any loss or damage Artist may suffer by reason of any election by Studio or Network not to do, or to cease doing, any of the foregoing. If Studio or Network elects not to use or to cease using Artist's Services pursuant to this paragraph, to the maximum extent permitted by law: (i) Studio shall have fully discharged its obligations to Artist by paying Artist all fixed and accrued monetary compensation payable to Artist hereunder at the time of such election (if any); and (ii) any such election by Studio shall not affect the exclusivity rights granted to Studio hereunder which shall remain in full force and effect during the Exclusivity Period, unless Studio expressly waives such rights in writing. Such waiver by Studio, if granted, shall be conditioned upon Artist promptly reporting to Studio the amount of all compensation earned by Artist in the entertainment industry for services rendered that would otherwise have been exclusive to Studio in the absence of such waiver during the Exclusivity Period, and to the maximum extent permitted by law, all such compensation shall be credited against the compensation due to Artist (if any) upon Studio's election not to use, or to cease using Artist's Services pursuant to this paragraph.

5. FIRST LOOK. Network shall have the option to develop, produce and otherwise exploit each Artist Controlled Project ("Development Option"). Each such option shall be exercisable by written notice to Artist within 15 business days following the later of (a) Network's business affairs department's receipt of a Submission Notice from Artist in connection with the applicable Artist Controlled Project, or (b) the date on which the applicable Artist Controlled Project was actually pitched to Network (such 15 business day period, the "First Look Period"). If Network exercises its Development Option in connection with an Artist Controlled Project during the First Look Period (such project, an "Accepted Project"), Network and Artist shall exclusively negotiate the terms of an agreement in connection with such Accepted Project ("Accepted Project Terms"), for a period of 30 business days ("Exclusive Negotiating Period"). Network and Artist shall negotiate such Accepted Project Terms in good faith within Network's customary parameters for projects of the applicable type and artists of Artist's stature in the entertainment industry. Artist acknowledges and agrees that such Accepted Project Terms shall include, without limitation, that as between Artist and Network, Network shall own all right, title and interest to the applicable Accepted Project, in all media (whether now known or hereafter devised), throughout the universe, in perpetuity. Prior to and during the Exclusive Negotiating Period for an Accepted Project, Artist shall not (i) develop, produce or otherwise exploit such Accepted Project nor grant any third party the right to do any of the foregoing, or (ii) negotiate with any third party regarding the right to develop, produce or otherwise exploit such Accepted Project.

6. ROYALTIES TO NETWORK. All transactions relating to or involving any Featured Artist Business shall be made in good faith, on an arms-length basis and shall not seek to frustrate the intent of the Royalties to Network provision of the Main Agreement (i.e., transactions shall be conducted in a manner so as to ensure that Network recognizes any royalties due to Network pursuant to this Agreement, whether earned by Artist directly or indirectly, through a "loan-out" company that provides the services of Artist or otherwise and regardless of the form and timing of any purchase or sale consideration). "Threshold Date" means the date on which the Initial Threshold is exceeded. "Reporting Date" means each twelve (12) month anniversary of the Threshold Date; however, the final Reporting Date shall be the End Date. "Reporting Period" means the twelve (12) month period immediately preceding each Reporting Date, or such shorter period in the case of the final Reporting Date. Within thirty (30) days after each Reporting Date, Artist shall transmit an accurate, complete, and itemized certified statement of all Gross Revenue of all Featured Artist Businesses during the applicable Reporting Period, setting forth applicable information and data (e.g., sales, production reports) in sufficient detail to enable Network to readily verify whether royalty payments are due, and if so, the basis upon which any royalty payments have been determined and are payable (each, a "Statement"). In addition, at any time following the Effective Date and prior to the Threshold Date, at Studio's request, Artist shall transmit to Studio one (1) or more Statements to verify the Gross Revenue of Featured Artist Businesses to verify whether the Initial Threshold has been achieved. Applicable payments shall accompany all Statements. At Network's request at any time, Artist's Statements shall be made in such format and provided in such delivery media as Network may require. Artist shall keep complete and accurate records and accounts in accordance with established accounting practices in relation to all matters in any way relating to the subject matter of the Royalties to Network provision of the Main Agreement in sufficient detail to permit Network to readily determine whether royalty payments are due hereunder and the amount and calculation thereof ("Records"). From the Effective Date until the date that is three (3) years after the End Date, all such Records shall be open to inspection, audit, and copying by Network's auditors. Such auditors shall be permitted access to all Records for reasonable time periods during normal business hours. Without limiting Network's other rights hereunder (including, without limitation, the right to conduct on-site audits), Network may furnish to Artist an audit questionnaire, and Artist shall return such questionnaire to Network within thirty (30) days of Artist's receipt thereof. If an audit of any Records reveals that there is a shortfall in the royalties reported for any Reporting Period, Artist shall pay such shortfall to Network with interest (calculated at the rate of one hundred and twenty five percent [125%] of the prime interest rate per annum quoted by the JP Morgan Chase Bank N.A. at the respective times at which such interest is computed, but not in excess of the maximum rate permitted by applicable law) and, if the shortfall is equal to or in excess of five percent (5%) of the applicable royalty actually due to Network for the applicable Reporting Period, Artist shall also reimburse Network for Network's full audit costs and expenses. Studio shall have no obligation to include any Featured Artist Business or any product, service, brand or entity endorsed by Artist in the Series.

7. WARRANTIES. Artist represents and warrants that:
(a) Artist has the sole right and authority to enter into, fully perform obligations, and grant all rights, in this Agreement, and Artist shall remain free to do each of the foregoing in future;
(b) the Work is and shall be Artist's sole creation and Artist owns and/or fully controls all rights, titles and interests therein, however Artist does not make the foregoing warranty (i) with respect to material in the public domain, or (ii) to the extent Artist does not own certain rights in Artist Licensed Material or Artist Music (provided that Artist has notified Studio in writing of the limited extent of Artist's rights in such material prior to the earlier of Artist's contribution or Studio's use of such material);
(c) neither Artist, Artist's Services, nor Artist's Work, will infringe or violate the rights of any third party or any applicable municipal, local, city, state and federal laws, including, without limitation, any laws pertaining to licensure, if Artist's Services or participation in connection with the Series involve any activities subject to licensing;
(d) to the best of Artist's knowledge (including, without limitation, that which Artist should have known following exercise of reasonable diligence), there are no adverse Claims, pending or threats of litigation involving the Work, or any rights granted or Artist's engagement hereunder;
(e) Artist is not currently, nor does Artist currently intend to be, a candidate for public office, and Artist agrees that if there is any change in this representation prior to the initial exhibition of the final Episode in which Artist appears, Artist will immediately notify Network at ReportingCandidacy@nbcuni.com. Becoming a candidate before or around the time of the initial exhibition of the final Episode in which Artist appears may under certain circumstances have legal implications on the exhibitor's ability to exhibit the Series; and
(f) prior to commencing any Services hereunder, and for the duration of Artist's employment hereunder, Artist shall be authorized to work in the United States in compliance with the Immigration Reform Act of 1986, however, if Artist is required to render Services outside of the United States, then in connection

with such Services, Artist must qualify for all required work permits, visas and other required employment approvals (and Artist shall provide Studio with all documentation necessary to obtain such approvals), and if Artist does not so qualify, then upon such failure Studio shall have the right to terminate Artist's employment under this Agreement.

8. "PAYOLA" AND "PLUGOLA." Artist warrants that Artist has not, and shall not in the future: (a) accept or agree to accept, or pay or agree to pay, any money, service or other valuable consideration for the inclusion of, or otherwise include without Studio's prior written approval, any plug, reference, product or service identification, or any other matter as a part of the Series; or (b) pay or give, or agree to pay or give, any money, service or other valuable consideration to any member of the production staff or anyone else in order to arrange Artist's appearance in the Series. Artist acknowledges that the foregoing conduct is prohibited by Studio and may be a criminal offense.

9. PUBLICITY AND CONFIDENTIALITY.
(a) Except as expressly set forth in this Agreement, Artist shall not, and shall not authorize or cause others to, directly or indirectly, in any way (including via new or social media) without Network's advance written approval:

(i) engage in any promotion or publicity in connection with this Agreement, the Series, or Artist's Services (including participating in any new or social media depicting or relating in any way to the foregoing, e.g., any video on a video hosting website or social media post), except for incidental, non-derogatory mention of the Series in Artist's personal publicity (i.e., "I was on [name of Series]" or "[Artist's name] from/of [name of Series]"), subject to this subparagraph and subparagraph (b) below, however, no such mention shall imply any endorsement on behalf of Studio, Network or the Series and Artist shall not disclose publicly that (A) Artist is participating in the Series or any Cycle, or (B) Artist is no longer participating in the Series or any Cycle, until after Network has announced, or exhibited Artist's appearance in, the foregoing;

(ii) use or render services in connection with any material that uses, for any purpose or in any manner, the names, logos, trade names, trademarks or other intellectual property of the Released Parties;

(iii) make public comment, create or disseminate (or render services in connection with) any content or material that (A) makes negative, derogatory or otherwise unfavorable statements about or otherwise denigrates or disparages any of the Released Parties, the Series or Artist's participation therein, (B) parodies, replicates or otherwise trades off of the Series or Artist's participation therein, or (C) otherwise tarnishes Artist's image as an on-air personality for the Series;

(iv) receive or generate any monetary advantage in connection with Artist's participation in the Series or Artist's Services (including by reason of publishing of any written, audio and/or visual work [e.g., a book, blog, column or film]); or

(v) make appearances to promote the Series not arranged by Network.

(b) Except as expressly set forth herein or as pre-approved by Network in writing, Artist shall not, and shall not authorize or cause others to, directly or indirectly, use or disclose to any third party at any time any of the following which is the exclusive property of Studio and Network: (i) anything that occurs during Artist's employment hereunder relating to the Series or Artist's Services hereunder, or any information that Artist may read, hear, or otherwise acquire or learn as a result of the foregoing (including, without limitation, the Company Property [as defined in the Suspension and Termination – Effect of Suspension and Termination paragraph below], storylines and concepts, and any other information relating to the business of the Released Parties); (ii) the terms of this Agreement or any other agreement between Artist and Studio or Network; and (iii) any information arising from or in connection with any Dispute (as defined in the Mandatory Mediation and Arbitration; Governing Law and Form; Remedies paragraph below) or any proceeding with respect thereto (including, without limitation, the existence of such proceedings or Dispute to the extent such existence is not publicly recorded) (all of the foregoing collectively, "Confidential Information").

(c) Artist may disclose Confidential Information: (i) to the extent it is in the public domain as a result of being directly and specifically disclosed by Studio or Network; (ii) under compulsion of legal process, provided in each instance such disclosure is to the minimum extent required by such legal process and Artist provides Studio with a reasonable opportunity to seek, and uses Artist's best efforts to assist Studio to obtain, protective legal treatment for such Confidential Information in advance of such disclosure; and (iii) to Artist's attorneys, agents, and accountants on a "need to know basis" to the limited extent necessary to allow such personal representatives to advise Artist, and provided that such individuals agree not to disclose such Confidential Information to any third party.

(d) During the Exclusivity Period, Artist shall provide Network with reasonable advance written notice if at any time Artist intends to exploit, seek offers to exploit, or grant any third party the right to exploit one (1) or more of the following (each a "Publicity Opportunity"): (i) any photograph, video footage, or image containing Artist's Likeness; or (ii) any type of interview regarding a newsworthy event occurring in Artist's personal life. Network shall have a first right of negotiation with respect to each Publicity Opportunity ("First Negotiation Right"), which may be exercisable by giving notice to Artist within ten (10) business days of Network's receipt of written notice from Artist of the applicable opportunity. In the event Network exercises a First Negotiation Right in connection with a Publicity Opportunity, the parties shall negotiate exclusively with each other in good faith for up to fifteen (15) business days following Artist's receipt of notice from Network of its exercise of such right. Artist shall not negotiate or otherwise discuss any applicable Publicity Opportunity with any third party prior to the commencement of or during such exclusive negotiating period. If the parties are unable to reach an agreement in principle during such exclusive negotiating period with respect to the applicable Publicity Opportunity, or Network elects not to exercise its First Negotiation Right with respect thereto, Artist shall be free to negotiate with third parties with respect to the applicable Publicity Opportunity; however Artist shall give Network written notice of any offers from third parties with respect to such Publicity Opportunity (including the third party(ies) involved, the proposed terms and all modifications thereto). In each instance, Network shall then have three (3) business days in which to elect to exploit the applicable Publicity Opportunity on the financial terms contained in the written notice provided by Artist ("Matching Right"). If Network declines to meet such financial terms or fails to notify Artist of its intent to exercise its Matching Right within such three (3) business day period, Artist may accept the applicable third party offer with respect to the applicable Publicity Opportunity. If Artist does not accept such third party offer, then the Matching Right shall apply to any other third party offer (or an offer with the same third party on less favorable terms than the first one) that Artist receives with respect to the applicable Publicity Opportunity.

10. ASSUMPTION OF RISKS AND WAIVERS.
(a) Misrepresentations. Artist understands and agrees that the nature of the Series and Services is such that, for dramatic effect or other creative purposes, other than with respect to Studio's obligations in this Agreement, Studio and Network may make certain misrepresentations to Artist and others prior to and during the course of Artist's employment hereunder (including prior to Artist signing this Agreement), which misrepresentations may relate to any and all topics of every kind and nature whatsoever; however, Studio has not made any affirmative misrepresentations to Artist in this Agreement. The parties acknowledge and agree that changes to the title of the Series shall not be deemed to be a misrepresentation in breach of the foregoing. Artist consents and agrees to, and assumes all risks of, the foregoing acts and omissions regardless of whether they may infringe Artist's rights or give rise to any Claim in the absence of Artist's express consent and agreement.

(b) Recordings. ARTIST UNDERSTANDS AND AGREES THAT DURING ARTIST'S EMPLOYMENT HEREUNDER: (i) STUDIO AND NETWORK MAY MAKE AUDIO, VISUAL, AUDIO-VISUAL AND OTHER RECORDINGS OF ARTIST AND OTHER PARTICIPANTS (AS DEFINED IN SUBPARAGRAPH (d) BELOW) (INCLUDING ARTIST'S AND OTHER PARTICIPANTS' ACTIONS, SOUNDS, STATEMENTS, ACTIVITIES AND LIFE INCIDENTS) BY ANY MEANS, INCLUDING, WITHOUT LIMITATION, USING CONCEALED OR HIDDEN CAMERAS, MICROPHONES, AND OTHER DEVICES, THE PRESENCE AND USE OF WHICH ARTIST AND SUCH PARTICIPANTS MAY NOT BE AWARE (COLLECTIVELY, "RECORDINGS"); (ii) STUDIO AND NETWORK MAY MAKE SUCH RECORDINGS AT TIMES AND IN LOCATIONS AS DETERMINED BY STUDIO, INCLUDING, WITHOUT LIMITATION, AT TIMES, IN LOCATIONS (AS DEFINED IN SUBPARAGRAPH (d) BELOW) AND IN CIRCUMSTANCES WHERE ARTIST AND SUCH OTHER PARTICIPANTS MIGHT OTHERWISE HAVE A REASONABLE EXPECTATION OF PRIVACY; AND (iii) NEITHER ARTIST NOR ANYONE ELSE NEED BE GIVEN ANY FURTHER NOTICE THAT SUCH RECORDINGS ARE TAKING PLACE. ALL OF ARTIST'S CONTRIBUTIONS TO SUCH RECORDINGS FORM PART OF THE WORK, AND THE RECORDINGS MAY BE USED AND EXPLOITED AS SET FORTH HEREIN. NOTWITHSTANDING THE FOREGOING, NEITHER STUDIO NOR NETWORK SHALL MAKE AUDIO AND/OR VISUAL RECORDINGS OF ARTIST (INCLUDING USING CONCEALED OR HIDDEN RECORDING DEVICES) IN BATHROOMS, LOCKER-ROOMS OR ANY ROOMS DESIGNATED BY STUDIO FOR CHANGING CLOTHES, WITHOUT ARTIST'S CONSENT; HOWEVER, TO THE MAXIMUM EXTENT PERMITTED BY LAW, ARTIST SHALL BE DEEMED TO HAVE CONSENTED TO THE MAKING OF RECORDINGS IN ANY SUCH LOCATION IF ARTIST ALLOWS FILMING OR OTHER RECORDING OF ARTIST IN SUCH LOCATION, OR ARTIST WEARS OR

OTHERWISE CARRIES A RECORDING DEVICE WHILE ARTIST IS PRESENT IN SUCH LOCATION. Artist consents and agrees to, and assumes all risks of, the Recordings and the conduct described in this paragraph regardless of whether it may infringe Artist's rights or give rise to any Claim in the absence of Artist's express consent and agreement.

(c) <u>Waiver of Privacy and Other Claims.</u> Artist understands and agrees that, at any time, in connection with Artist's Services or otherwise: (i) the appearance, actions, sounds and statements of Artist and others, and the information related or revealed thereby, may be of a personal, private, surprising, defamatory, disparaging, embarrassing, offensive or an otherwise unfavorable or injurious nature, and may be factual or fictional; (ii) the depiction and portrayal of each of the foregoing in connection with the Series or otherwise, as edited or otherwise, by Studio, Network or the licensees, successors or assigns of either of the foregoing (as applicable) may be invasive of Artist's privacy, surprising, defamatory, disparaging, embarrassing, offensive or otherwise unfavorable or injurious, may expose Artist to public ridicule, humiliation or condemnation, and may portray Artist in a false light; and (iii) each of the foregoing and all information obtained about Artist shall be deemed part of the Work, which may be used and otherwise exploited as set forth herein and disclosed to third parties, to the maximum extent permitted by law. **NOTWITHSTANDING ANYTHING CONTAINED IN THIS PARAGRAPH, STUDIO SHALL NOT DISCLOSE OR INCORPORATE IN THE SERIES ANY MEDICAL INFORMATION OBTAINED ABOUT ARTIST, EXCEPT (A) WHERE SUCH INFORMATION IS DISCLOSED OR INCLUDED IN THE SERIES BY ARTIST OR ANY OTHER ON-CAMERA PARTICIPANT IN THE SERIES, (B) PURSUANT TO THE EMERGENCY CARE PARAGRAPH BELOW, (C) WHERE SUCH INFORMATION IS PUBLICLY AVAILABLE, OR (D) WITH ARTIST'S CONSENT OR AS OTHERWISE PERMITTED BY LAW.** In connection with Artist's Services, Artist may be in an environment where Artist may hear, see, or encounter speech or physical contact, or otherwise experience sensations, that Artist or others may consider offensive. Artist shall immediately notify Studio if for any reason Artist feels harassed (e.g., due to Artist's race, nationality, sex, age, disability, sexual orientation or marital status), threatened or otherwise uncomfortable in connection with Artist's Services, and Artist understands that Studio shall not, and shall not authorize anyone else to, penalize or retaliate against Artist for doing so. **Artist consents and agrees to, and assumes all risks of, the actions and omissions and being subject to the speech, sensations and conduct, described in this paragraph regardless of whether they may infringe Artist's rights or give rise to any Claim in the absence of Artist's express consent and agreement.**

(d) <u>Activities, Locations and Other Risks.</u> Artist understands that (i) the activities involved in or otherwise associated with the Series and Artist's Services (including any travel related thereto), which may include, without limitation, hazardous recreational activities, domestic and international travel, and the consumption of alcohol by Artist and others (collectively, "Activities"), (ii) the Series participants and other persons with whom Artist may interact, come into contact, or determine to engage in a relationship, with during the rendition of Artist's Services hereunder (including Studio employees and members of the public) (collectively, "Participants"), and (iii) the locations of and around such Activities, interactions and contacts (collectively, "Locations"), may be or become hazardous and dangerous, and may expose Artist to risks of death, serious and extreme physical, emotional and mental stress and injury, and property loss and damage, regardless of the degree of Artist's participation, interaction, contact or attendance. Artist understands and agrees that Studio bears no responsibility for determining, and neither Studio nor anyone else has made any representations or warranties of any kind regarding, (A) whether Artist is qualified, fit or able to participate in any Activities, interact or have contact with any Participants, or attend any Locations, or (B) the nature of any Participant's current or future actions, omissions or statements. **Artist hereby waives any right Artist might otherwise have to any warnings, instructions, warranties or precautionary measures regarding the Activities, Participants or Locations, or any other aspect of the Series or Services.** By participating in the Activities, interacting or having contact with the Participants, and attending the Locations, to any degree, Artist thereby certifies that Artist understands the physical, emotional and mental requirements and risks thereof, and Artist represents and warrants that Artist is able to do each of the foregoing (including performing all of the essential functions of the Activities). Artist shall immediately notify Studio: (x) if at any time Artist believes Artist is incapable, with or without a reasonable accommodation, of participating in any Activities (including performing all essential functions thereof), interacting or having contact with any Participants or attending any Locations, based on the physical, emotional or mental requirements thereof; and (y) of any physical, emotional, or mental conditions that might affect Artist or any Participants. **By participating in the Activities, interacting or having contact with the Participants, and attending the Locations, to any degree, Artist understands** and assumes all risks thereof, and Artist consents and agrees to all actions and omissions that may arise in connection with the foregoing, regardless of whether they may infringe Artist's rights or give rise to any Claim in the absence of Artist's express consent and agreement. Artist shall not at any time threaten, intimidate, injure, damage or use violence against any person or property. Studio shall have the right, but not the obligation, to enter any Location in order to monitor or preserve the safety of persons and property, and use force to restrain Artist if Artist's behavior or actions create circumstances which, in Studio's sole judgment, pose a threat to persons or property.

(e) <u>Equipment.</u> Any equipment, products or services provided to Artist in or in connection with Artist's employment hereunder (collectively, "Equipment") are provided on an "as is" basis and neither Studio nor anyone else has made any representations or warranties (express or implied) with respect thereto. Studio specifically disclaims all warranties (express or implied) with respect to any Equipment, including, without limitation, all warranties with respect to fitness for a particular purpose. **Artist hereby waives any right Artist might otherwise have to any warnings, instructions, warranties or precautionary measures regarding any Equipment. Artist consents and agrees to, and assumes all risks of, the actions and omissions described in this paragraph regardless of whether they may infringe Artist's rights or give rise to any Claim in the absence of Artist's express consent and agreement.**

(f) <u>Additional Risks.</u> The risks, hazards and dangers outlined herein are not an exhaustive list of the risks, hazards and dangers Artist may be exposed to as a result of Artist's participation in the Series and rendition of Services. **Artist assumes any and all risks, hazards and dangers associated with the foregoing, regardless of whether they are detailed in this Agreement, and the waivers, releases and indemnities that Artist has executed apply to all such risks, hazards and dangers.**

11. <u>RELEASE AND AGREEMENT NOT TO SUE.</u> **TO THE MAXIMUM EXTENT PERMITTED BY LAW, ON BEHALF OF ARTIST'S SELF AND ARTIST'S HEIRS, NEXT OF KIN, SPOUSES, GUARDIANS, EMPLOYEES, AGENTS, CONTRACTORS, REPRESENTATIVES, EXECUTORS, ADMINISTRATORS, SUCCESSORS, LICENSEES AND ASSIGNS (COLLECTIVELY, THE "RELEASING PARTIES"), ARTIST HEREBY IRREVOCABLY AND UNCONDITIONALLY RELEASES AND FOREVER DISCHARGES EACH OF THE RELEASED PARTIES (AS DEFINED BELOW) FROM ANY AND ALL CLAIMS, ACTIONS, COMPLAINTS, DAMAGES, DEMANDS, ALLEGATIONS, SUITS, LIABILITIES, LOSSES, LIENS, COSTS, EXPENSES, INJURIES AND CAUSES OF ACTION, OF ANY KIND WHATSOEVER, (COLLECTIVELY, "CLAIMS") (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND COSTS AND EXPERT WITNESS FEES) DIRECTLY OR INDIRECTLY CAUSED BY, ARISING OUT OF, RESULTING FROM, OR RELATING TO, IN ANY WAY, THE SERIES (INCLUDING, WITHOUT LIMITATION, ARTIST'S PARTICIPATION THEREIN AND THE DEVELOPMENT, PRODUCTION, DISTRIBUTION OR EXPLOITATION THEREOF), ARTIST'S SERVICES, THE ACTIVITIES AND LOCATIONS, THE WORK, OR THE EXERCISE OF ANY RIGHTS GRANTED HEREIN, ON ANY LEGAL OR EQUITABLE THEORY WHATSOEVER (INCLUDING, WITHOUT LIMITATION, CLAIMS IN VIOLATION OF THE NO OBLIGATION; "PAY OR PLAY" PARAGRAPH ABOVE OR THE WORKER'S COMPENSATION PARAGRAPH BELOW, NEGLIGENCE, RIGHTS OF PRIVACY AND PUBLICITY, DEFAMATION, FALSE LIGHT, INFLICTION OF EMOTIONAL DISTRESS, COPYRIGHT AND OTHER INTELLECTUAL PROPERTY INFRINGEMENT) (COLLECTIVELY, THE "RELEASED CLAIMS"), OTHER THAN CLAIMS WITH RESPECT TO ARTIST'S RIGHTS PURSUANT TO APPLICABLE WORKERS' COMPENSATION LAW (AS DEFINED IN THE WORKER'S COMPENSATION PARAGRAPH BELOW) AND CLAIMS REGARDING ANY FAILURE BY STUDIO TO PAY THE COMPENSATION SPECIFIED HEREIN. TO THE MAXIMUM EXTENT PERMITTED BY LAW, ARTIST SHALL NOT SUE, INSTITUTE ANY OTHER PROCEEDINGS, OR MAKE ANY CLAIM AGAINST ANY OF THE RELEASED PARTIES OR ANYONE ELSE FOR ANY CAUSE OF ACTION BASED ON ANY OF THE RELEASED CLAIMS.** As used herein, the term "Released Parties" shall mean and refer to Studio, Network, all entities and platforms of NBCUniversal Media, LLC, Comcast Corporation, any other licensees or assignees of the Series or the Work, any third-party production company engaged in connection with the Series, all Participants, all other persons and entities rendering services in connection with the Series or otherwise connected to the Series or Artist's Services, all parent, subsidiary, related and affiliated entities, licensees, successors, assigns, sponsors and advertisers of each of the foregoing, all of the respective directors, officers, employees, principals, executives, on-air talent, agents, contractors, partners, shareholders, representatives and members of each of the foregoing, and the respective heirs, next of kin, spouses, guardians, representatives, executors, administrators, successors, licensees and assigns of each of the foregoing.

12. RELEASE OF UNKNOWN CLAIMS. Artist understands that there is a possibility that, after the execution of this Agreement, the Releasing Parties may discover facts or incur or suffer Claims that were unknown to or unsuspected by the Releasing Parties at the time Artist executed this Agreement, and which, if known to or suspected by the Releasing Parties prior to such execution, may have materially affected Artist's decision to do so. Irrespective of the foregoing, on behalf of the Releasing Parties, Artist has assumed any risk of such unknown and unsuspected facts and Claims. NOTWITHSTANDING ANY APPLICABLE LAW OF ANY JURISDICTION LIMITING OR PREVENTING ARTIST FROM RELEASING UNKNOWN OR UNSUSPECTED CLAIMS, THE RELEASES CONTAINED HEREIN SHALL CONSTITUTE A FULL, FINAL, AND COMPLETE RELEASE AND DISCHARGE OF THE RELEASED CLAIMS THAT THE RELEASING PARTIES HAVE OR MAY HAVE, AT ANY TIME, AGAINST ANY OF THE RELEASED PARTIES, IRRESPECTIVE OF WHETHER THEY ARE KNOWN TO OR SUSPECTED BY THE RELEASING PARTIES. TO THE MAXIMUM EXTENT PERMITTED BY LAW, ON BEHALF OF THE RELEASING PARTIES, ARTIST WAIVES THE BENEFIT OF ALL SUCH APPLICABLE LAWS. ARTIST UNDERSTANDS THE FOREGOING WAIVER AND ITS SIGNIFICANCE AND CONSEQUENCES, INCLUDING, WITHOUT LIMITATION, ITS SIGNIFICANCE AND CONSEQUENCES FOR THE RELEASES ARTIST HAS MADE HEREIN.

13. INDEMNITY. To the maximum extent permitted by law, Artist shall indemnify and hold each of the Released Parties free and harmless from and against any and all third party (including, without limitation, any government body and Artist's employees, agents, or representatives) Claims (including, without limitation, outside attorneys' reasonable fees and costs [whether or not in connection with litigation] and expert witness fees) caused by, arising out of, resulting from, or relating to, Artist's Services or participation in the Series, including, without limitation: (a) Artist's statements, actions and omissions during or in connection with Artist's Services, whether or not authorized by any Released Party; (b) Artist's failure to follow the advice or instructions of Studio or anyone else connected with the Series; (c) Artist's breach of this Agreement or any other agreements with the Released Parties and/or related to the Series; (d) Artist's receipt, possession or use of any consideration received hereunder (including, without limitation, any failure by Artist to pay taxes with respect thereto); (e) the knowingly unlawful, grossly negligent, reckless or other willful misconduct of Artist or any of Artist's employees, agents, representatives or invitees in connection with the Series or rendition of Artist's Services; and (f) any materials supplied or licensed by Artist. Studio shall not be required to seek indemnification from Artist for a Claim by a third party while that Claim by a third party is pending, nor shall Artist be required to indemnify Studio based on an alleged, rather than an actual, breach of warranty or violation of the rights of third parties. Therefore, Artist acknowledges that any claim for indemnification by Studio against Artist need not be filed during the pendency of such third party Claim. Nothing in this paragraph precludes Studio from bringing a claim against Artist for an actual breach of this Agreement by Artist, in the absence of an adjudication of a third party Claim. As between Artist and Studio, Studio or Network shall control the defense of any Claim(s) brought against the Released Parties, however the assumption of the defense of any Claim by Studio shall not operate as a waiver, release or limitation of any rights, remedies or claims Studio may have or of Artist's indemnity obligations hereunder.

14. WORKER'S COMPENSATION. With respect to any injury, illness, disability or death that Artist may suffer during or as a consequence of Artist's employment hereunder (whether during or following such period of employment) (each an "Event"), which Event is compensable under the applicable workers' compensation statute and body of law pertaining thereto ("Workers' Compensation Law"):
(a) If the applicability of Workers' Compensation Law is dependent upon an election by Artist, Artist hereby elects to be bound by such Workers' Compensation Law;
(b) The rights and remedies of Artist and all other Releasing Parties who may have the right to claim compensation or damages for an Event shall be limited to those under Workers' Compensation Law and the Released Parties shall not have any other obligation to Artist by reason of an Event; and
(c) If Artist is being furnished by a loan-out company then, for the purposes of Workers' Compensation Law, Studio is Artist's "special employer" hereunder and the entity furnishing Artist's services pursuant to the Loan-Out Agreement to which this Agreement is attached is Artist's "general employer," as such terms are understood for purposes of Worker's Compensation Law.

15. EMERGENCY CARE. In case of an emergency, Artist authorizes: (a) Studio to arrange for or otherwise provide medical assistance to Artist as Studio may determine necessary; (b) any licensed physician, health care personnel or medical facility to provide any medical care (including, without limitation, surgery and use of anesthetics) and to hospitalize Artist, as such individuals or facilities determine necessary or advisable, pending receipt of a specific consent from Artist; and (c) any paramedics, emergency medical technicians, or other first responders to provide any medical care such individuals determine necessary. To the maximum extent permitted by law, Artist understands and agrees that Studio may make Recordings of any injury or health related matter occurring during Artist's Services and any treatment Artist may receive, which shall form part of the Work, which may be used and exploited as set forth herein.

16. MANDATORY MEDIATION AND ARBITRATION; GOVERNING LAW AND FORUM; REMEDIES.

(a) Governing Law. This Agreement shall be construed and enforced in accordance with the internal, substantive laws of the State of New York, applicable to contracts negotiated, executed, and fully performed within that State, regardless of where negotiation, execution and performance of this Agreement may actually occur and without regard to that state's conflict of laws provisions.

(b) MEDIATION AND ARBITRATION. WHERE A CONTROVERSY, DISPUTE OR CLAIM ARISES BETWEEN ARTIST, ON THE ONE HAND, AND ONE OR MORE OF THE RELEASED PARTIES, ON THE OTHER HAND, IN CONNECTION WITH ARTIST'S ENGAGEMENT HEREUNDER, ARTIST'S SERVICES OR PARTICIPATION IN THE SERIES (INCLUDING, WITHOUT LIMITATION, THOSE RELATING TO THIS AGREEMENT OR THE SCOPE OR APPLICABILITY OF THIS AGREEMENT TO MEDIATE AND ARBITRATE) (EACH A "DISPUTE") THAT CANNOT BE RESOLVED THROUGH DIRECT COMMUNICATIONS BETWEEN THE PARTIES TO SUCH DISPUTE, THEN SUBJECT TO SUBPARAGRAPH (c) BELOW, SUCH DISPUTE SHALL BE RESOLVED PURSUANT TO THE MEDIATION AND ARBITRATION PROCEDURES OF JAMS AND ADMINISTERED BY JAMS OR ITS SUCCESSOR ("JAMS") IN ACCORDANCE WITH THE COMPREHENSIVE RULES AND PROCEDURES, INCLUDING THE OPTIONAL APPEAL PROCEDURE, OF JAMS OR ANY SUBSEQUENT VERSIONS OF THE FOREGOING (COLLECTIVELY, "JAMS RULES"), INCLUDING, WITHOUT LIMITATION, THE RULES PROVIDING FOR LIMITED DISCOVERY AND OTHER EXCHANGE OF INFORMATION AND, TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE RULE PROVIDING THAT EACH PARTY SHALL PAY PRO RATA ITS SHARE OF JAMS FEES AND EXPENSES, AS EACH OF THE FOREGOING ARE MODIFIED BY THIS AGREEMENT. THE JAMS RULES ARE AVAILABLE AT WWW.JAMSADR.COM, AND A FURTHER COPY OF THE JAMS RULES SHALL BE PROVIDED TO ARTIST BY STUDIO UPON REQUEST. THE PARTIES TO ANY DISPUTE SHALL FIRST ENDEAVOR TO RESOLVE EACH DISPUTE THROUGH MEDIATION ADMINISTERED BY JAMS BEFORE COMMENCING ANY ARBITRATION. MEDIATION AND ARBITRATION SHALL BE CONDUCTED IN NEW YORK COUNTY, NEW YORK.

ANY MEDIATION PROCEEDINGS SHALL BE HELD BEFORE A SINGLE NEUTRAL MEDIATOR. ANY ARBITRATION PROCEEDINGS SHALL BE HELD BEFORE A SINGLE NEUTRAL ARBITRATOR. THE JAMS RULES FOR SELECTION OF MEDIATORS AND ARBITRATORS SHALL BE FOLLOWED, EXCEPT THAT THE MEDIATOR OR ARBITRATOR SHALL BE (i) AN EXPERIENCED MEDIATOR OR ARBITRATOR (AS APPLICABLE), WHO IS EXPERIENCED IN THE ENTERTAINMENT INDUSTRY AND/OR LABOR AND EMPLOYMENT AND LICENSED TO PRACTICE LAW IN NEW YORK, OR (ii) A RETIRED JUDGE. ANY APPELLATE PANEL SHALL CONSIST OF THREE (3) NEUTRAL MEMBERS WHICH MEET THE FOREGOING REQUIREMENTS.

THE BURDEN OF PROOF FOR ANY CLAIM SUBMITTED TO ARBITRATION SHALL BE AS IT WOULD BE IF SUCH CLAIM WERE LITIGATED IN A JUDICIAL PROCEEDING AND THE DECISION SHALL BE BASED ON THE INTERNAL SUBSTANTIVE LAWS OF THE STATE OF NEW YORK.

ANY MEDIATION AND/OR ARBITRATION SHALL BE CONFIDENTIAL (EXCEPT AS INFORMATION MAY BE REQUIRED IN ANY JUDICIAL PROCEEDING BROUGHT TO ENFORCE THESE ARBITRATION PROVISIONS OR ANY AWARD RENDERED HEREUNDER).

THE PARTIES TO ANY DISPUTE SHALL BE ENTITLED TO CONDUCT DISCOVERY PROCEEDINGS IN ANY ARBITRATION PROCEEDINGS IN ACCORDANCE WITH APPLICABLE PROVISIONS OF THE NEW YORK CIVIL PRACTICE LAW AND RULES,

§ 3101, EXCEPT AS MODIFIED BY THIS AGREEMENT. EACH SIDE MAY TAKE A MAXIMUM OF THREE (3) DEPOSITIONS AND NO OTHER DISCOVERY, EXCEPT DOCUMENT DISCOVERY, SHALL BE ALLOWED. NOTWITHSTANDING THE FOREGOING, UPON A SHOWING OF GOOD CAUSE THE ARBITRATOR SHALL HAVE THE DISCRETION TO GRANT LIMITED FURTHER DISCOVERY.

TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE DAMAGES RECOVERABLE BY THE PARTIES TO ANY DISPUTE SHALL BE LIMITED TO ACTUAL DAMAGES, AND SUCH PARTIES WAIVE THE RIGHT TO SEEK, AND SHALL IN NO EVENT BE LIABLE FOR, PUNITIVE OR EXEMPLARY DAMAGES. THE ARBITRATOR SHALL NOT HAVE THE AUTHORITY TO GRANT ANY REMEDIES THE PARTIES TO ANY DISPUTE HAVE WAIVED (INCLUDING, WITHOUT LIMITATION, PUNITIVE OR EXEMPLARY DAMAGES AS SET FORTH HEREIN).

UPON THE CONCLUSION OF ANY ARBITRATION PROCEEDINGS, THE ARBITRATOR SHALL RENDER FINDINGS OF FACT AND CONCLUSIONS OF LAW AND A WRITTEN OPINION SETTING FORTH THE BASIS AND REASONS FOR ANY DECISION REACHED AND SHALL DELIVER SUCH DOCUMENTS TO EACH PARTY TO THE DISPUTE ALONG WITH A SIGNED COPY OF THE AWARD IN ACCORDANCE WITH THE NEW YORK CIVIL PRACTICE LAW AND RULES, § 7507.

ANY ARBITRATION AWARD WITH RESPECT TO A DISPUTE SHALL BE FINAL AND BINDING UPON THE PARTIES TO SUCH DISPUTE. JUDGMENT UPON AN AWARD RENDERED BY AN ARBITRATOR MAY BE ENTERED IN ANY COURT HAVING JURISDICTION OVER THE RELEVANT PARTY TO THE APPLICABLE DISPUTE OR ITS ASSETS.

(c) Protection of Confidentiality and Exclusivity. Artist agrees that Artist's Services, and the rights and privileges granted to Studio and Network by Artist hereunder, are of a special, unique, unusual, extraordinary and intellectual character involving skill of the highest order, which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated by monetary damages in an action at law, and that a breach by Artist of the exclusivity provisions of this Agreement shall cause Studio and Network irreparable injury and damage. Further, Artist recognizes and acknowledges that given the unique nature of the Series and the commercial realities of the entertainment industry, which relies upon confidentiality, any breach of Artist's publicity or confidentiality obligations pursuant to this Agreement would cause Studio and Network irreparable injury and damage that cannot be reasonably or adequately compensated by monetary damages in an action at law. Artist therefore agrees that, notwithstanding anything contained herein, in the event of any actual or anticipated breach by Artist of Artist's exclusivity, publicity or confidentiality obligations pursuant to this Agreement, in addition to all other rights and remedies available to Studio and Network hereunder, Studio and Network shall be entitled to seek and obtain injunctive and other equitable relief from any court of competent jurisdiction with respect to such breach or infringement. The right to seek injunctive relief shall not be exclusive, and Studio and Network may pursue any other remedies that they may have against Artist for breach of this Agreement, including, without limitation, attorneys' fees and costs resulting to Studio and/or Network as a result thereof. Further, Artist agrees that given the nature of the entertainment industry, and the irreparable damage to Studio, Network and the licensees, successors and assigns of each of the foregoing that would result from delaying or preventing the exhibition of any program produced hereunder, Artist may not seek or obtain any injunctive relief that would prevent any such parties from exhibiting, marketing or otherwise exploiting any program produced hereunder, or otherwise granting any third party the right to do any of the foregoing.

(d) Non-Arbitrable Disputes. In the event any Dispute is held to be non-arbitrable, the parties agree first to try to resolve the Dispute through mediation as set forth in subparagraph (b) above, and if such mediation does not resolve the dispute, the parties elect to have the Dispute determined by a single referee in accordance with the procedures of the New York Civil Practice Law and Rules, § 4301 et. seq.

(e) Jurisdiction and Venue. The parties to a Dispute agree to submit to the in personam jurisdiction of the Supreme Court of the State of New York in New York County and the United States District Court for the Southern District of New York for purposes of: (i) enforcing the agreement to arbitrate set forth herein; (ii) confirming any arbitration award or entering judgment thereon; and (iii) any court proceeding under subparagraphs (c) or (d) above. The exclusive venue of any court proceedings under subparagraphs (c) or (d) above shall be the appropriate state and federal courts in the State of New York. The parties to any Dispute waive any and all objections that they may have as to jurisdiction or venue in any of the above-referenced courts. Artist agrees that service by Registered Mail within or outside the State of New York shall constitute effective personal service on Artist for jurisdictional and appearance purposes.

(f) Attorneys' Fees and Costs. To the extent permitted by law (i) each party to a Dispute shall be responsible for its own attorney's fees and costs, and (ii) except as set forth in subparagraph (c) above, the prevailing party shall not be entitled to any award of any such fees or costs from the other party.

(g) Severability. If any portion of the dispute resolution mechanism set forth in this paragraph is found to be invalid, illegal or unenforceable for any reason, that portion shall be severed from the rest and shall not affect this agreement to resolve all Disputes through mediation and arbitration.

17. NOTICE; COMPUTATION OF TIME PERIOD; MANNER OF DELIVERY. Where notice is required in writing hereunder, all such notices must be delivered by personal delivery, courier service with confirmation of receipt, postage-paid registered mail, Federal Express, UPS express mail, or fax, at the respective addresses given in this Agreement. Notice and payments shall be deemed given on the date sent. All notices from Studio to Artist must be given by, and all notices from Artist to Studio must be directed to, Studio's Business Affairs or Law Department. Whenever the last day on which a notice can be given falls on a weekend or holiday observed by Studio, such notice may be validly given on the next day (that is not on a weekend or holiday observed by Studio) following such weekend or holiday. Each party may notify the other party of a new address and/or contact for notices by giving the other party notice in writing in accordance with this paragraph.

18. NOT SUBJECT TO ANY GUILD AGREEMENTS. Artist acknowledges and agrees that: (a) any appearance by Artist in or in connection with the Series or Artist's Services shall be an appearance as Artist's self; (b) Artist's Services are not subject to any guild, union or other collective bargaining agreement; and (c) no consideration of any kind is or shall be owed or payable to Artist (including, any payments for use of the Work or any rights granted by Artist hereunder), except as otherwise expressly set forth in this Agreement. If any of Artist's Services become covered under any collective bargaining agreement to which Studio is or becomes a party ("Union Agreement"), to the extent the compensation payable to Artist hereunder is in excess of the minimum compensation due under such Union Agreement, Studio shall have the right to apply such excess against any and all payments that would otherwise be due at any time under such Union Agreement, to the maximum extent permitted by law and such Union Agreement.

19. SUSPENSION AND TERMINATION.
(a) Incapacity. If, notwithstanding a reasonable accommodation, Artist becomes prevented from complying with Artist's obligations hereunder by reason of any mental, physical or other illness, incapacity, disfigurement or impairment, a material alteration in Artist's present physical appearance or voice, or any cause rendering such non-compliance excusable at law, as determined by Studio in its sole discretion subject to applicable law (an "Incapacity"), Studio shall have the right, subject to applicable law, at Studio's election, to (i) suspend Artist's employment hereunder, at any time during the continuance of such Incapacity; and/or (ii) terminate Artist's employment hereunder, at any time after the continuance of such Incapacity for more than seven (7) consecutive days, or for an aggregate of ten (10) days or more, during any period in which Studio requires Artist's Services; however, Artist's employment shall be terminated immediately upon Artist's death. If Artist fails to qualify for cast insurance at customary rates, Studio shall have the right to suspend or terminate Artist's employment hereunder. To the maximum extent permitted by law, any occurrence which would otherwise be deemed an event of Incapacity shall instead be deemed an event of "Default" pursuant to subparagraph (b) below, if such occurrence is a result of Artist's use of alcohol or of any drug or controlled substance. If an event of Incapacity occurs or is alleged to have occurred, Studio may, at Studio's expense, require Artist to submit to medical examination(s) to be conducted by such physician(s) as may be designated by Studio.

(b) Default.
(i) If Artist (as determined by Studio in its sole discretion) (A) breaches any of Artist's representations, warranties, covenants or other obligations under this Agreement for any reason other than due to Incapacity or Force Majeure, (B) acts in an insubordinate or otherwise disruptive or unprofessional manner (e.g., refuses to comply with reasonable directions and instructions [provided that Artist may not refuse to comply with directions and instructions from a creative

standpoint], or engages in any activity that disrupts or threatens to disrupt production, publicity or exploitation of the Series) or violates criminal law, (C) engages in any activity or has previously engaged or been involved with any activity or incident that reflects negatively on Artist, the Series, Studio, Network, or the related entities, affiliates, licensees, assigns or sponsors of the foregoing, or (D) refuses to comply with any of Artist's obligations hereunder and/or fails to confirm by written notice within twenty-four (24) hours after Studio or Network requests such confirmation, that Artist shall fully comply with Artist's obligations hereunder (each of the foregoing a "Default"), then Studio shall have the right, subject to applicable law, to suspend Artist's employment hereunder. Without limiting any of Studio's other remedies hereunder or otherwise, in the event of a Default, Studio shall have the right to terminate Artist's employment hereunder, subject to applicable law.

(ii) If a Default hereunder is inadvertent (i.e., not intentional or repeated) and is by its nature reasonably capable of being cured (as determined by Studio in its sole discretion) within forty eight (48) hours (reducible to such shorter period as determined by Studio in its sole discretion and notified to Artist due to the nature of the applicable Default and/or exigent circumstances [e.g., a Default occurs during production of the Series]) without any additional expense to Studio, Artist shall have the right to attempt to timely cure such Default to Studio's satisfaction on a one-time only basis (i.e., Artist shall not have the right to cure other Defaults or repetitions of the same act or omission of Default).

(c) Force Majeure. If due to labor disputes, government regulations, failure of distribution facilities, war, calamity, failure of material personnel, or other conditions beyond Studio's control, Studio's production or other operations or Network's exhibition operations are materially impaired, as determined by Studio in its sole discretion (all collectively referred to as "Force Majeure"), subject to applicable law, Studio shall have the right, subject to applicable law, to suspend Artist's employment hereunder. If an event of Force Majeure prevents Studio from exercising such right, subject to applicable law, Artist's employment hereunder shall be deemed automatically suspended. If all productions for which Artist is engaged are cancelled due to an event of Force Majeure or an event of Force Majeure continues for a period of three (3) or more consecutive days, or an aggregate of five (5) or more days, during any period in which Studio has required or will require Artist's Services, Studio shall have the right to terminate Artist's employment hereunder, subject to applicable law.

(d) Effect of Suspension and Termination. Suspension of Artist's employment under this Agreement shall not affect Studio's and Artist's respective rights and obligations hereunder with respect to any Services that Artist has already performed. Any suspension of Artist's employment hereunder shall conclude when the cause thereof has ceased to exist and Studio has had a reasonable period of time to prepare for the resumption of Artist's Services (as determined by Studio in its sole discretion), or earlier at Studio's election, unless Studio terminates Artist's employment in accordance herewith. To the extent permitted by law, no compensation shall accrue or be payable to Artist hereunder during any period in which Artist's employment is suspended. To the extent permitted by law, during any suspension: (i) due to Incapacity or Default, Artist shall not render services for any other person or on Artist's own behalf; and (ii) due to Force Majeure, Artist may only render services for any other person or on Artist's own behalf to the extent permitted pursuant to the exclusivity provisions of the Main Agreement. Notwithstanding anything contained herein, upon the lifting of a suspension of Artist's employment hereunder, Artist shall resume rendering Services as, when and where required by Studio in accordance with the terms of this Agreement. If a period of any suspension hereunder includes a starting or option date previously designated by Studio or the date for exercise of any option or other right hereunder, Studio may cancel and/or postpone such date. Studio shall have the right to extend the term of Artist's employment hereunder, any Cycle or other time period (including the date for the exercise of any option or any other right hereunder) by a period of time equal to or less than the aggregate period(s) of suspension hereunder. To the maximum extent permitted by law, Studio shall have the right, at its election, to reduce the number of Episodes for which Studio is required to compensate Artist during a Cycle, if any, by one (1) Episode for each Episode (A) the production of which is canceled by Network, or (B) scheduled for production during any period of suspension of Artist's employment hereunder; however, the foregoing subparagraph (B) shall not apply if the suspension was due to an event of force majeure and the Episode(s) in question is (are) subsequently produced during the applicable Cycle. To the extent permitted by law, in the event of any termination of Artist's employment hereunder, Studio shall have no further obligations to Artist other than the obligation to pay Artist any fixed and accrued monetary compensation payable hereunder (if any) with respect to any completed program(s) for which Artist has rendered all required Services prior to such termination; however, no such compensation shall be payable if Artist's employment is terminated due to Artist's Default. Upon termination of Artist's employment hereunder, Artist shall promptly return to Studio all materials, information and equipment of any kind or nature provided to Artist in connection with Artist's employment ("Company Property").

20. ASSIGNMENT. Studio may assign, license and/or delegate, in whole or in part, this Agreement or any of its rights or responsibilities hereunder, and this Agreement and all of the rights granted to Studio hereunder shall inure to the benefit of Studio's successors, licensees, delegees and assigns. Artist may not assign license and/or delegate, in whole or in part, this Agreement or any of its rights or responsibilities hereunder, and any purported assignment, license or delegation in breach of the foregoing shall be null and void ab initio.

21. BACKGROUND CHECK. To the maximum extent permitted by law, Artist authorizes Studio and Network to investigate and access information about Artist in connection with Artist's employment hereunder. Artist shall sign any document(s) as required by any third party designated by Studio to perform any such investigations required by Studio or Network.

22. FURTHER DOCUMENTATION. Artist will, upon request, obtain, execute, acknowledge and/or deliver to Studio any further documentation or instrument that Studio or Network may determine necessary or desirable to (a) evidence, effectuate or protect any of the rights granted to Studio and/or Network hereunder, or (b) evidence or support any of the representations or warranties made by Artist (including, without limitation, Start Paperwork, documentation for the purposes of confirming the assignments granted by Artist herein, and a physician's certificate certifying Artist's fitness and ability to participate in the Activities). In connection with the foregoing, Artist hereby irrevocably appoints Studio as Artist's attorney-in-fact with full authority to execute, verify, acknowledge and deliver any such documentation or instruments which Artist fails or refuses to execute, verify, acknowledge or deliver. Such appointment shall be a power coupled with an interest, with Studio having full power of substitution and delegation.

23. MISCELLANEOUS.
(a) ARTIST ACKNOWLEDGES AND AGREES THAT, REGARDLESS OF ANY ASSIGNMENT OF THIS AGREEMENT, EACH OF THE RELEASED PARTIES SHALL BE THIRD PARTY BENEFICIARIES TO THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ARTIST'S AGREEMENT TO MANDATORY MEDIATION AND ARBITRATION.

(b) All rights, consents, releases, indemnities, agreements, waivers, assumptions of risk, warranties, representations, assignments, licenses and other covenants, made, given, granted or otherwise agreed by Artist hereunder are (i) given, made, granted or otherwise agreed by Artist freely, knowingly and, unless otherwise expressly set forth herein, on an unconditional basis, and (ii) to the maximum extent permitted by law, irrevocable.

(c) All rights of consent, approval, determination, designation and other rights accorded to Studio hereunder may be exercised in Studio's sole and absolute discretion.

(d) No waiver by either party of any breach of any covenant or provision of this Agreement shall be deemed to be a waiver of any preceding or succeeding breach of the same, or any other, covenant or provision.

(e) Any rights and remedies accorded under or arising by virtue of this Agreement, at law or in equity (i) may not be waived other than in writing, and (ii) shall be deemed to be cumulative, and the pursuit of one such right or remedy shall not be deemed or construed to be a waiver of, or otherwise preclude, any other such right or remedy rights and remedies.

(f) The suspension, termination or expiration of Artist's employment hereunder shall not: (i) affect Studio's ownership of the Work or of any rights granted to Studio therein (including the right to use and exploit the Work as set forth herein); (ii) relieve Artist of Artist's publicity, confidentiality, or indemnity obligations hereunder or, to the extent permitted by law, Artist's exclusivity obligations during the Exclusivity Period; (iii) affect the parties' agreement to resolve Disputes by the means set forth in the Mandatory Mediation and Arbitration; Governing Law and Forum; Remedies paragraph above; or (iv) otherwise affect any of the rights, consents, releases, covenants, agreements, waivers, assumptions of risk, warranties or representations, made, given, granted or otherwise agreed by Artist hereunder, with the exception of Artist's obligation to render Services.

(g) Should any provision of this Agreement be held to be void, invalid, inoperative or unenforceable by an adjudicator of competent jurisdiction, such provision shall be curtailed, limited or eliminated only to the minimum extent necessary to permit such provision to be held valid and enforceable, and all other

terms of this Agreement shall remain in full force and effect. Notwithstanding the foregoing, should the aggregate of all provisions of this Agreement that are held to be void, invalid, inoperative or unenforceable materially affect the benefits and obligations as a whole of the parties, this Agreement shall be voidable at Studio's discretion.

(h) All paragraph and subparagraph headings in this Agreement are for convenience purposes only, and do not in any way affect any terms of this Agreement.

(i) No provision of this Agreement shall be interpreted in favor of or against any party, by reason of the extent to which any party or its legal representative participate in its drafting.

(j) This Agreement may be executed in counterparts and may be executed by original, facsimile or electronic signature in a form acceptable to Studio, each of which shall be deemed an original.

**I UNDERSTAND THAT I HAVE AGREED TO MANDATORY MEDIATION AND ARBITRATION OF ALL CLAIMS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND CONSEQUENTLY I UNDERSTAND THAT I AM GIVING UP CERTAIN LEGAL RIGHTS UNDER THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, THE RIGHT TO FILE A LAWSUIT IN COURT WITH RESPECT TO ANY CLAIM ARISING IN CONNECTION WITH THIS AGREEMENT. I ACKNOWLEDGE AND AGREE THAT I HAVE HAD SUFFICIENT OPPORTUNITY TO RECEIVE AND REVIEW THE JAMS RULES AND TO CONSULT WITH LEGAL COUNSEL OF MY CHOICE IN CONNECTION WITH THIS AGREEMENT.**

ACCEPTED AND AGREED:

ARTIST: _[signature]_

Leah McSweeney

Dated: 10/04/2019

## APPENDIX 2

## BRAVO TALENT GUIDELINES

Please familiarize yourself with these expectations for Bravo talent:

### PROFESSIONALISM

- Be on time and available to fully perform all services. This includes showing up at your call times and staying and filming for as long as production requires.
- Do not publicly say excessively bad or critical things about Bravo, other Bravo talent, their family members or significant others, or the production company at any time including: (i) in press interviews or public appearances (whether live or recorded) or (ii) on social media.

**CONFIDENTIALITY** Do not talk publicly, confirm, "leak," provide material, or post about: (i) "behind-the-scenes" information or the production or edit process; (ii) taping that has not yet made it to air; or (iii) if a series or cast member (including yourself) is returning (until Bravo makes an official announcement).

### PUBLICITY

- Participate in press and promotional activities (including digital "after-shows") as reasonably requested by Bravo.
- Contact Bravo PR for approval for each public speaking, press, and in-person appearance opportunity, whether live or recorded. Examples include: (i) podcasts, social media (e.g., Facebook live, streaming talk shows, etc.), vlogs, websites, television, print, radio, and (ii) attendance at live events either to promote programming for any television or digital media network (e.g. red carpets, premiere parties, etc.) or that mention Bravo, the series, your role in the series, or any other Bravo talent (current or prior).
- Contact Bravo PR for approval before providing any person/company/brand, other than Bravo, with any photos, videos, or information of events that are included in the series or that Bravo would like to include in the series.

**ENDORSEMENT/SPONSORSHIP APPROVALS** Contact Bravo Business Affairs for approval prior to endorsing, sponsoring, or tagging any product, services, or media brand. Examples include: (i) social media posts promoting products or brands (including programming for any network) or (ii) commercials, spots, or, "presented by" or similarly tagged materials.

**EXCLUSIVITY WAIVERS**   Contact Bravo Business Affairs for a waiver for any opportunity not already expressly permitted in the exclusivity provision of your agreement.

**TIMELY REQUESTS** All approvals and/or waivers must be requested as soon as possible and no later than 48 hours in advance.

**BRAVO DISCRETION** While it is up to Bravo whether or not to grant approvals or waivers, and there will be factors of which you are not aware, the following may be considered: (i) whether the series is "in-season"; (ii) whether a potential opportunity involves a competitive network or involves any brand that is considered to be a national advertiser; and (iii) whether a potential opportunity includes other Bravo talent.

# FOREST PRODUCTIONS INC.
### 3800 BARHAM BLVD., SUITE 410
### Los Angeles, CA 90068

## LOCATION CONTRACT

Leah McSweeney ("Owner") is the owner of and/or controls all rights with respect to the property that is the subject of this contract (the "Property"). Owner hereby gives permission to Forest Productions Inc. and its employees, agents, contractors and suppliers ("Producer") to enter upon and use the Property located at: ▬▬▬▬▬▬▬▬▬▬ on ▬▬▬▬▬▬, (subject to change on account of weather conditions or change in production schedule) for the purpose of photographing, filming and recording (including, without limitation, sound recording) certain scenes for use in and in connection with the television program currently entitled "*The Real Housewives of New York City*" (the "Program") and for any additional uses as described below. Producer may use the Property until all scenes requiring the Property have been completed. Producer will have the right to use the Property for additional filming as may be necessary and payment will be prorated from the charges (if any) listed below.

Owner acknowledges and agrees that Owner will not be paid compensation for Producer's use of the Property under this contract nor for Producer's exercise of the rights granted by Owner under this contract. Owner further acknowledges and agrees that the consideration Owner will receive for Producer's use of the Property and/or Producer's exercise of its rights under this contract is the opportunity for publicity that the Property and/or Owner will receive if Producer decides to include photographs, film, or recordings made on the Property in any of its productions.

Producer may place all necessary facilities and equipment on the Property and agrees to remove them after completion of work and leave the Property in as good condition as when received, except for reasonable wear and tear from the uses permitted. Signs on the Property may, but need not, be removed or changed, but, if removed or changed, Producer will replace them. Producer may, if it elects, include any and all signs on the Property and any tradenames, trademarks, copyrights and logos of Owner or visible on the Property (collectively, the "Owner's Marks") in the photographs, film and recordings. Owner represents and warrants that the Property is maintained in compliance with all federal, state and local laws, rules, regulations, codes and ordinances and is free of latent defects or illegal conditions of which Owner is or should be aware except those of which Owner has notified Producer.

Producer agrees to use reasonable care to prevent damage to the Property and will indemnify and hold Owner harmless from any claims and demands arising out of or based upon personal injuries or property damage resulting from the negligence or willful misconduct of Producer, its officers, employees, agents or representatives while Producer is engaged in the aforementioned use of the Property.

If Owner claims that Producer is responsible for any such damage or injury, or both, Owner must notify Producer in writing within five (5) business days of the date that Producer vacates the Property, which writing shall include a detailed listing of all property damage and injuries for which Owner claims Producer is responsible. Owner shall cooperate fully with Producer in the investigation of such claims, and permit Producer's investigators to inspect the property claimed to be damaged.

Owner acknowledges and agrees that Producer has the right to photograph, film and record the Property, and to broadcast, exhibit and otherwise exploit the photographs, film and recordings of the Property and any and all furnishings, works of art and other objects located in or around the Property, as well as the Owner's Marks, in any and all manner and media whatsoever, whether now known or hereafter devised, throughout the universe in perpetuity. Without in any way limiting the foregoing, all rights of every kind in and to all photographs, film and recordings made on the Property (including, without limitation, all copyrights) shall be and remain vested in Producer, including, without limitation, the right to use and reuse all such photographs, film and recordings in and in connection with subsequent related and unrelated productions of any kind, as well as in and in connection with advertisements, promotions, publicity, clips, and other materials, etc. Neither Owner nor any tenant or any other party having an interest in the Property shall have any claim or action against Producer or any other party arising out of any use of the photographs, film and/or recordings. Owner's sole remedy for breach of this contract by Producer shall be an action for money damages. In no event will Owner be entitled to injunctive or other equitable relief, and in no event will Owner be entitled to terminate this contract. Producer has no obligation to include the Property in the Program or in any other production.

Owner represents and warrants that Owner has the right to enter into this contract and to grant Producer all rights provided by this contract. In the event that Owner is not the legal owner of the Property, Owner represents and warrants that Owner has secured from the legal owner the right and authority to enter into this contract and to grant Producer all rights provided hereunder. Owner agrees not to make any commercial or any other use of the fact that the Property appeared or may appear in the Program or in any of Producer's productions.

If any controversy or claim arising out of or relating to this contract, or the breach of any term hereof, cannot be settled through direct discussions, the parties agree to endeavor to first settle the controversy or claim by mediation conducted in New York County and administered by JAMS under its applicable rules, before commencing any proceedings permitted under this paragraph. If a dispute is not otherwise resolved through direct discussions or mediation, the controversy or claim, including the scope or applicability of this agreement to arbitrate, shall be resolved by final and binding confidential arbitration conducted in New York County, and administered by JAMS in accordance with the Streamlined Arbitration Rules and Procedures of JAMS or subsequent versions thereof, including the optional appeal procedure (the "JAMS Rules," available at www.jamsadr.com, including, without limitation, the rules providing for limited discovery and other exchange of information and, to the maximum extent permitted by law, the rule providing that each party shall pay *pro rata* its share of JAMS fees and expenses). The JAMS Rules for selection of mediators and arbitrators shall be followed, except that the mediator or arbitrator shall be (i) an experienced mediator or arbitrator (as applicable) licensed to practice law in New York or (ii) a retired judge. Notwithstanding the above requirements, if a party files suit in court or files an arbitration before first seeking to mediate, in direct violation of this paragraph, the other party does not have to request mediation to enforce the right to compel arbitration as required under this paragraph. Upon the conclusion of any arbitration proceedings, the arbitrator shall render findings of fact and conclusions of law and a written opinion setting forth the basis and reasons for any decision reached and shall deliver such documents to each party to the dispute. The arbitrator shall not have the authority to grant any remedies the parties to any dispute have waived herein.

Owner agrees that Producer may license, assign and otherwise transfer this contract and all rights granted by Owner to Producer under this contract to any person or entity.

Producer shall have the right to cancel this contract at any time prior to Producer's use of the Property. Upon Producer's cancellation of this contract, neither Producer nor Owner shall have any obligations whatsoever under this contract, and Owner shall immediately refund to Producer any and all sums previously paid by Producer (if any) pursuant to this contract. If any provisions of this contract are held to be void or unenforceable, all other provisions of this contract shall continue in full force and effect.

This is the entire contract. No other authorization is necessary to enable Producer to use the Property for the purpose contemplated. Nothing in this contract shall limit or restrict any rights otherwise enjoyed by Producer under law or contract.

ACCEPTED AND AGREED:

PRODUCER

By: _____

Date: 10/7/19

Show: "REAL HOUSEWIVES..."

OWNER

By: Leah McSweeney

Print Name/Title: Leah McSweeney

Address: ████

Telephone: ████

Date: 8/22/19